No. 25-5184                            September Term, 2024

1:25-cv-01030-PLF

**Filed On:** June 20, 2025

American Foreign Service Association,

      Appellee

    v.

Donald J. Trump, in his official capacity as
President of the United States, et al.,

      Appellants

     **BEFORE:**    Katsas, Rao, and Walker, Circuit Judges

### O R D E R

Upon consideration of the emergency motion for stay pending appeal and an immediate administrative stay, the opposition thereto, and the reply, it is

**ORDERED** that the motion for stay pending appeal be granted. The Government has shown that (1) it "is likely to succeed on the merits," (2) it "will be irreparably injured absent a stay," (3) a stay will not "substantially injure" other interested parties, and (4) a stay is in the "public interest." *See Nken v. Holder*, 556 U.S. 418, 434 (2009).

### I. Background

### A

The Foreign Service Act of 1980 governs, among other things, labor relations between the Executive Branch and the Foreign Service.[1] Like the Civil Service Reform

---

[1] The Foreign Service is a group of federal employees, including ambassadors and consular agents, who perform foreign-affairs functions abroad. *See* 22 U.S.C. §§ 3901, 3903. While most Foreign Service members work for the State Department, Subchapter X "applies . . . to the Department of State, the Broadcasting Board of Governors, the Agency for International Development, the Department of Agriculture, and the Department of Commerce." *Id.* § 4103(a); *see Reiner v. United States*, 686 F.2d 1017, 1018 (D.C. Cir. 1982) ("The Foreign Service consists of the federal employees, primarily in the State Department, who formulate and execute the foreign policies in the United States.").

Act of 1978, it grants federal employees collective-bargaining rights and prohibits unfair labor practices. 22 U.S.C. §§ 4104, 4115. Those provisions, found in Subchapter X, are enforced by the Foreign Service Labor Relations Board upon a complaint served by the General Counsel. *See id.* §§ 4106-08, 4116.

Subchapter X also contains an exception for national security. It authorizes the President to "exclude any [covered] subdivision" from the Act's requirements if he determines that (1) the subdivision "has as a primary function intelligence, counterintelligence, investigative, or national security work," and that (2) Subchapter X "cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." *Id.* § 4103(b).

B

On March 27, 2025, President Trump excluded from Subchapter X all subdivisions of the State Department and the United States Agency for International Development. *See* Exec. Order No. 14,251, §§ 1, 3, 90 Fed. Reg. 14553, 14553-55 (Apr. 3, 2025). In the Executive Order, the President determined that the listed subdivisions "have as a primary function intelligence, counterintelligence, investigative, or national security work" and that "Subchapter X . . . cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations." *Id.* § 1.

The American Foreign Service Association, a labor union that represents members of the Foreign Service, challenged the Executive Order. *American Foreign Service Association v. Trump*, No. 25-1030, 2025 WL 1387331, at *1, *3 (D.D.C. May 14, 2025). The Association claimed that the Executive Order was *ultra vires* and retaliation for First Amendment activity. *Id.* at *4.

On May 14, 2025, the district court held that the Executive Order was likely *ultra vires*. *Id.* at *13. It preliminarily enjoined Executive Branch officials from obeying the Executive Order. *See id.* at *1, *4. Nine days later, the Government moved for a stay pending appeal.

## II. Likelihood of Success on the Merits

The Foreign Service is the workforce through which the United States conducts its foreign affairs. And foreign affairs are critical to national security. So the Government is likely correct that the Executive Order is consistent with the Foreign Service Act's delegation of national-security determinations to the President. *See* 22 U.S.C. § 4103(b).

A plaintiff, like the Association, that brings an *ultra vires* claim against the President faces several, substantial obstacles. For one thing, *ultra vires* review — which is a suit in equity, not a statutory cause of action — is "strictly limited" when "other judicial-review statutes" are present, and it applies "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *NRC v. Texas*, Nos. 23-1300 & 23-1312, 2025 WL 1698781, slip op. at 14-15 (U.S. June 18, 2025) (cleaned up); *see also Nyunt v. Chairman, Broadcasting Board of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (an *ultra vires* challenge is "essentially a Hail Mary pass" that "rarely succeeds"). To obtain relief in this context, a plaintiff must show more than a "routine error in statutory interpretation or challenged findings of fact." *Federal Express Corp. v. U.S. Department of Commerce*, 39 F.4th 756, 763 (D.C. Cir. 2022) (cleaned up); *see also National Association of Postal Supervisors v. USPS*, 26 F.4th 960, 971, 975 (D.C. Cir. 2022) (*ultra vires* review looks at whether the agency contravened a "clear and specific statutory mandate" and whether its statutory construction is "utterly unreasonable" (cleaned up)). And, of course, the traditional factors for injunctive relief still apply. *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 110 (1902) (evaluating, in an *ultra vires* action challenging an order of the Postmaster General, whether the plaintiffs would suffer irreparable harm and whether they had an adequate remedy at law).

Another hurdle is that the President is not an agency. So it is unclear whether *ultra vires* review is available at all. Again, an *ultra vires* action is a suit in equity, *see Federal Express Corp.*, 39 F.4th at 763, and courts generally lack authority to enjoin the President, *see Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality op.) (federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties") (quoting *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867)); *id.* at 827 (Scalia, J., concurring in part and concurring in the judgment) (same); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him." (cleaned up)).

To be sure, the Supreme Court has assumed without deciding that some *ultra vires* claims may lie against presidential action. *See Dalton v. Specter*, 511 U.S. 462, 474 (1994). But it has held that "such review is not available when the statute in question commits the decision to the discretion of the President." *Id.*; *see also Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103, 106, 114 (1948) (certificates of public convenience and necessity that are "subject to the President's approval" under the Civil Aeronautics Act "embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate").

Here, the statute commits the relevant decision to the President's discretion. Section 4103(b) delegates broad authority to the President to exclude parts of the Foreign Service from Subchapter X in the interest of national security. Such determinations are consistent with the President's role as commander-in-chief. *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017) ("National-security policy is the prerogative of the Congress and President."). Simply put, national-security matters generally make poor candidates for judicial review, especially when those matters involve the President's unique responsibility to manage the country's foreign affairs. *Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."); *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319 (1936) ("The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations." (quoting 10 ANNALS OF CONG. 613 (1800))).

Even assuming this case is justiciable, our review must be exceedingly deferential. When a statutory delegation invokes the President's discretion in exercising core Article II responsibilities, there is little for a court to review. *Cf. Curtiss-Wright*, 299 U.S. at 320 (foreign-affairs legislation "must often accord to the President a degree of discretion and freedom from statutory restriction which would not be admissible were domestic affairs alone involved"); *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) ("When the President acts pursuant to an express or implied authorization of Congress, his authority is at its maximum.").

For example, in *Curtiss-Wright*, President Roosevelt's embargo on arms exports merely recited language from the authorizing joint resolution. 299 U.S. at 330-31. The Supreme Court upheld Roosevelt's proclamation, holding that "a finding which follows [the joint resolution's] language . . . cannot well be challenged as insufficient." *Id.* at 331. Here, the Executive Order recites § 4103(b)'s pertinent language.

More recently, in *Trump v. Hawaii*, 585 U.S. 667 (2018), the Supreme Court said it was "questionable" whether the President's national-security determinations under the Immigration and Nationality Act were subject to judicial review. *See id.* at 686 (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)). Nonetheless, it assumed that "some form of review [was] appropriate," and it upheld the President's determination in a single sentence that did not inspect the President's rationale. *Id.*

Following that path, we assume without deciding that a form of review is appropriate here and conclude that the Executive Order likely withstands the Association's "attacks on [its] sufficiency." *Id.* "The conduct of diplomatic negotiations, the everyday contact between our State Department officers and foreign nationals, the reports Foreign Service officers in the field submit to Washington, and the planning

activities they carry out all have a vital impact on maintenance of our national security." *Faruki v. Rogers*, 349 F. Supp. 723, 730 (D.D.C. 1972). After all, the Secretary of State is a member of the National Security Council. 50 U.S.C. § 3021(c)(1). And the Department's mission is to "protect and promote U.S. *security*, prosperity, and democratic values . . . ." *About*, State Dep't, www.state.gov/about/ (emphasis added).

A more "searching inquiry" than this would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Hawaii*, 585 U.S. at 686. The President's national-security findings are not agency actions subject to arbitrary-or-capricious review, and we decline to treat them as such.

### III. Remaining Stay Factors

The remaining factors support a stay.

The district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress. *See* 22 U.S.C. § 4103(b). That harm outweighs any non-monetary harm the Association may suffer during this appeal. To the extent the Association or its members will suffer irreparable harm directly traceable to the Executive Order, as opposed to separate agency actions, the balance of equities favors the Government. The competing interests — union representation versus national security — were already weighed by Congress when it passed the Foreign Service Act, including § 4103(b). Finally, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *National Treasury Employees Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 (D.C. Cir. May 16, 2025) (citing *Ziglar*, 582 U.S. at 142; *Winter v. NRDC*, 555 U.S. 7, 33 (2008)).

\* \* \*

For these reasons, the Government has met its burden for a stay pending appeal.[2]

**Per Curiam**

                                        **FOR THE COURT:**
                                        Clifton B. Cislak, Clerk

                        BY:    /s/
                                      Selena R. Gancasz
                                      Deputy Clerk

---

[2] Like the district court, we do not address the merits of the Association's First Amendment retaliation claim. *See American Foreign Service Association*, 2025 WL 1387331, at *13 n.8.