# [ORAL ARGUMENT NOT SCHEDULED]

## No. 25-5184

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT
───────────────────

### AMERICAN FOREIGN SERVICE ASSOCIATION,

Plaintiff-Appellee,

v.

### DONALD J. TRUMP et al.,

Defendants-Appellants.

───────────────────

On Appeal from the United States District Court
for the District of Columbia

───────────────────

## BRIEF FOR APPELLANTS
───────────────────

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.     Parties and Amici

Defendants-appellants are Donald J. Trump, Office of Personnel Management, U.S. Department of State, U.S. Agency for International Development, Marco Rubio, and Charles Ezell.  Plaintiff-appellee is American Foreign Service Association.  No other parties, intervenors, or amici curiae appeared before the district court or have entered appearances in this Court.

## B.     Rulings Under Review

Defendants seek review of the May 14, 2025, order and opinion of the district court (Friedman, J.) granting plaintiff a preliminary injunction.  *See* JA261-262; JA263-298.  The district court's opinion has not yet been assigned a citation in the Federal Supplement but is available on Westlaw at 2025 WL 1387331.

## C. Related Cases

This case has not previously been before the Court. The following cases involve an overlapping set of defendants and raise similar issues to this case:

- *National Treasury Employees Union v. Trump*, No. 25-5157 (D.C. Cir.)

- *National Treasury Employees Union v. Trump*, No. 1:25-cv-0935 (D.D.C.)

- *Federal Education Ass'n v. Trump*, No. 25-5303 (D.C. Cir.)

- *Federal Education Ass'n v. Trump*, No. 25-cv-01362 (D.D.C.).

- *American Federation of Government Employees v. Trump*, No. 25-4014 (9th Cir.)

- *American Federation of Government Employees v. Trump*, No. 25-cv-03070 (N.D. Cal.)

- *U.S. Department of Treasury v. National Treasury Employees Union Chapter 73*, No. 25-5656 (6th Cir.)

*/s/ Joshua M. Koppel*
Joshua M. Koppel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

GLOSSARY ..................................................................................xii

INTRODUCTION ............................................................................1

STATEMENT OF JURISDICTION ....................................................3

STATEMENT OF THE ISSUES ........................................................3

PERTINENT STATUTES .................................................................4

STATEMENT OF THE CASE ...........................................................4

    A.    Statutory And Regulatory Background ...................................4

    B.    Factual Background ..............................................................7

    C.    Prior Proceedings ..............................................................11

SUMMARY OF ARGUMENT .........................................................18

STANDARD OF REVIEW ..............................................................21

ARGUMENT ................................................................................21

I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS .............22

    A.    The Foreign Service Act Precludes District-Court Jurisdiction Over Plaintiff's Claims .....................................22

    B.    Plaintiff Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute .................................................................33

iii

C.    Plaintiff Is Not Likely To Succeed On The Merits Of Its *Ultra Vires* Claim ...................................................... 36

    1.    The executive order is facially consistent with statute ........................................................................ 37

    2.    Plaintiff failed to rebut the presumption of regularity ..................................................................... 39

    3.    The President's determinations reasonably apply the criteria of § 4103(b) ................................................ 49

II.    PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM ............................................. 57

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR ................................................... 61

CONCLUSION ........................................................................ 63

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                   **Page(s)**

*AFGE v. Loy*,
367 F.3d 932 (D.C. Cir. 2004) ............................................................. 26

*AFGE v. Reagan*,
870 F.2d 723 (D.C. Cir. 1989) ............................... 37, 38, 39, 42, 46, 53

*AFGE v. Secretary of the Air Force*,
716 F.3d 633 (D.C. Cir. 2013) ....................................................... 22, 23

*AFGE v. Trump,* No. 25-cv-03070,
2025 WL 1755442 (N.D. Cal. June 24, 2025) ..................................... 17

*AFGE v. Trump*, No. 25-4014,
2025 WL 2180674 (9th Cir. Aug. 1, 2025) .................. 17, 18, 44, 60, 62

*AFGE v. Trump*,
929 F.3d 748 (D.C. Cir. 2019) ......................... 23, 24, 26, 27, 28, 31, 59

*AFGE Local 446 v. Nicholson*,
475 F.3d 341 (D.C. Cir. 2007) ............................................................. 32

*AFSA v. Baker*,
895 F.2d 1460 (D.C. Cir. 1990) ......................................................... 23

*AFSA v. Trump*, No. 25-5184,
2025 WL 1742853 (D.C. Cir. June 20, 2025)
.......................................... 13, 14, 15, 33, 34, 39, 50, 62, 63

*Axon Enter., Inc. v. Federal Trade Comm'n*,
598 U.S. 175 (2023) ............................................................................. 24

*Boumediene v. Bush*,
553 U.S. 723 (2008) ............................................................................. 29

*BP P.L.C. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021) ............................................................................. 40

*Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*,
333 U.S. 103 (1948) ............................................................................. 34

*Clevinger v. Advocacy Holdings, Inc.*,
 134 F.4th 1230 (D.C. Cir. 2025) ................................................ 21, 60

*Cole v. Young*,
 351 U.S. 536 (1956) ............................................... 54, 55, 56

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne*,
 250 U.S. 163 (1919) ...................................................... 33, 34

*Dalton v. Specter*,
 511 U.S. 462 (1994) ................................................... 33, 35

*Department of the Navy Naval Aviation Depot Naval
 Air Station Alameda & Int'l Ass'n of Machinists &
 Aerospace Workers Lodge 739*,
 36 F.L.R.A. 509 (1990) ......................................................... 59

*Department of the Navy, Naval Telecomms. Ctr. &
 Navtelcom Unit Loc. No. 1*,
 6 F.L.R.A. 498, 500 (1981) ................................................ 31

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking &
 Salvage Co.*,
 414 F.3d 700 (7th Cir. 2005) ........................................ 57, 58

*Elgin v. Department of the Treasury*,
 567 U.S. 1 (2012) ................................................ 26, 27, 29

*Federal Educ. Ass'n v. Trump*,
 No. 25-1362, 2025 WL 2355747 (D.D.C. Aug. 14, 2025) ................... 16

*Federal Express Corp. v. U.S. Dep't of Com.*,
 39 F.4th 756 (D.C. Cir. 2022) ...................................... 36, 37

*Free Enter. Fund v. Public Co. Acct. Oversight Bd.*,
 561 U.S. 477 (2010) .......................................................... 22

*Gilligan v. Morgan*,
 413 U.S. 1 (1973) ............................................................ 54

*Haig v. Agee*,
 453 U.S. 280 (1981) .......................................................... 35

vi

*Henderson ex rel. NLRB v. Bluefield Hosp. Co.*,
    902 F.3d 432 (4th Cir. 2018) ............................................ 58

*Hercules Inc. v. EPA*,
    598 F.2d 91 (D.C. Cir. 1978) ............................................ 39

*Holder v. Humanitarian L. Project*
    561 U.S. 1 (2010) ............................................................. 42

*Independent Union of Pension Emps. for Democracy & Just.*
    *& Pension Benefit Guar. Corp.*,
    68 F.L.R.A. 999 (2015) .................................................... 28

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................... 61

*North Am. Butterfly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ................................... 36, 49

*NTEU v. Trump*, No. 25-5157:
    2025 WL 1441563 (D.C. Cir. May 16, 2025) .......... 16, 60, 62

*NTEU v. Trump*,
    780 F. Supp. 3d 237 (D.D.C. 2025) .......... 11, 12, 40, 42, 43, 45, 46, 47

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025) .........................................................36

*Owlfeather-Gorbey v. Avery*,
    119 F.4th 78 (D.C. Cir. 2024) .......................................... 39

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................. 23, 24, 29

*Trump v. Hawaii*,
    585 U.S. 667 (2018) ................................................... 42, 48

*Trump v. International Refugee Assistance Project*,
    582 U.S. 571 (2017) ......................................................... 61

*U.S. Army Corps of Eng'rs Memphis Dist. & National*
    *Fed'n of Fed. Emps. Loc. 259*,
    53 F.L.R.A. 79 (1997) ...................................................... 54

*U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966,*
57 F.L.R.A. 750 (2002) ............................................................ 25, 30

*U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10,*
No. 6:25-cv-00119, 2025 WL 2058374 (W.D. Tex. July 23, 2025) ..... 10

*U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970,*
71 F.L.R.A. 829 (2020) ....................................................... 60

*U.S. Dep't of Homeland Sec. U.S. Immigration &*
*Customs Enf't & AFGE Nat'l Immigration & Customs*
*Enf't Council 118,*
67 F.L.R.A. 501 (2014) ....................................................... 46

*U.S. Dep't of the Air Force Davis-Monthan Air Force Base*
*& AFGE Loc. 2924,*
62 F.L.R.A. 332 (2008) ....................................................... 28

*U.S. Dep't of the Treasury U.S. Mint & AFGE Mint*
*Council, C-157,*
35 F.L.R.A. 1095 (1990) ....................................................... 60

*U.S. Dep't of Treasury v. NTEU, Chapter 73,*
No. 2: 25-049, 2025 WL 1446376 (E.D. Ky. May 20, 2025) ............... 10

*U.S. Info. Agency v. Krc,*
989 F.2d 1211 (D.C. Cir. 1993) ......................................... 5

*United States v. Curtiss-Wright Exp. Corp.,*
299 U.S. 304 (1936) ............................................................ 39

*United States v. Ruiz,*
536 U.S. 622 (2002) ............................................................ 29

*Webster v. Doe,*
486 U.S. 592 (1988) ............................................................ 35, 39, 43

*Winter v. Natural Res. Def. Council, Inc.,*
555 U.S. 7 (2008) ............................................................ 21, 61

*Ziglar v. Abbasi,*
582 U.S. 120 (2017) ............................................................ 35, 36

**Statutes:**

5 U.S.C. §§ 7101-7135 ............................................................... 4

5 U.S.C. § 7101(a) ..................................................................... 40

5 U.S.C. § 7102(2) ...................................................................... 4

5 U.S.C. § 7103(b)(1) ............................................................... 1, 5

5 U.S.C. § 7106 ........................................................................... 4

5 U.S.C. § 7112(b)(6) ................................................................ 28

5 U.S.C. § 7114 ........................................................................... 4

5 U.S.C. § 7118 ........................................................................... 4

15 U.S.C. § 634b ....................................................................... 50

22 U.S.C. § 2551 .................................................................... 49-50

22 U.S.C. § 2651a(b)(2) ........................................................... 51

22 U.S.C. §§ 4101-4118 ............................................................ 5

22 U.S.C. § 4103(b) ......................................................... 1, 6, 49

22 U.S.C. § 4103(b)(1) ............................................................. 49

22 U.S.C. § 4103(b)(2) ....................................................... 40, 53

22 U.S.C. §§ 4106-4107 ............................................................ 5

22 U.S.C. § 4106 ....................................................................... 27

22 U.S.C. § 4107(a) .................................................... 11, 22, 27

22 U.S.C. § 4107(b) ................................................................. 27

22 U.S.C. § 4109(a) ................................................ 6, 22, 24, 25

22 U.S.C. § 4115 ......................................................................... 6

ix

22 U.S.C. § 4115(a) ................................................................ 24

22 U.S.C. § 4115(a)(8) .......................................................... 27

22 U.S.C. § 4116(a) ................................................................ 6

22 U.S.C. § 4116(g) ............................................................... 58

28 U.S.C. § 1292(a)(1) ........................................................... 3

28 U.S.C. § 1331 .............................................................. 3, 22

38 U.S.C. § 7422(b) ............................................................. 32

38 U.S.C. § 7422(d) ............................................................. 32

50 U.S.C. § 3021(c)(1) ......................................................... 50

**Regulatory Materials:**

Exec. Order No. 12,171,
    44 Fed. Reg. 66,565 (Nov. 20, 1979) ............................... 6, 7

Exec. Order No. 12,666,
    54 Fed. Reg. 1,921 (Jan. 17, 1989) ..................................... 7

Exec. Order No. 13,039,
    62 Fed. Reg. 12,529 (Mar. 14, 1997) .................................. 7

Exec. Order No. 13,252,
    67 Fed. Reg. 1,601 (Jan. 11, 2002) ..................................... 7

Exec. Order No. 13,480,
    73 Fed. Reg. 73,991 (Dec. 4, 2008) .................................... 7

Exec. Order No. 14,251,
    90 Fed. Reg. 14,553 (Apr. 3, 2025) ........................... 7, 8, 56

**Other Authorities:**

Joseph R. Biden Jr., *Memorandum on Renewing
  the National Security Council System* (Feb. 4, 2021),
  https://perma.cc/9EHR-JANN ............................................................ 52

Bureau of Diplomatic Sec., U.S. Dep't of State,
  *Our Mission and Vision*, https://perma.cc/2PSL-Z5TQ ...................... 51

Letter, *AFGE v. Trump*, No. 25-4014
  (9th Cir. Aug. 14, 2025), Dkt. 34.1 .................................................... 10

Memorandum from Charles Ezell, Acting Dir., OPM,
  to Heads and Acting Heads of Departments and
  Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F ............... 8, 9

Office of Inspector Gen., USAID, *OIG Oversight:
  USAID Overview*, https://perma.cc/DD9K-P9NP .......................... 51-52

Order, *NTEU v. Trump*, No. 25-5157 (D.C. Cir. July 16, 2025) ............ 16

The White House, *Fact Sheet: President Donald J.
  Trump Exempts Agencies with National Security
  Missions from Federal Collective Bargaining
  Requirements* (Mar. 27, 2025),
  https://perma.cc/Y7HR-4W3H .................................................. 44, 48-49

U.S. Dep't of State, *About the U.S. Department of State*,
  https://perma.cc/8GPX-63RG ............................................................. 51

U.S. Dep't of State, *Foreign Service*,
  https://perma.cc/47QK-RHNC ............................................................. 52

# GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| CSRA | Civil Service Reform Act |
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor–Management Relations Statute |
| FSLRB | Foreign Service Labor Relations Board |
| NTEU | National Treasury Employees Union |
| OPM | Office of Personnel Management |
| USAID | U.S. Agency for International Development |

## INTRODUCTION

When Congress granted members of the civil service and Foreign Service the right to unionize and bargain collectively, it recognized that those activities could, in certain circumstances, be inconsistent with the needs of national security. Accordingly, Congress vested the President with discretion to exclude certain agencies and agency subdivisions from the labor-relations statutes "if the President determines" that national security so requires. 5 U.S.C. § 7103(b)(1); 22 U.S.C. § 4103(b). Like his predecessors, President Trump exercised that authority by issuing an executive order determining that certain agencies and subdivisions should be excluded from the scope of the statutes.

Plaintiff American Foreign Service Association (AFSA), which represents employees in two of the excluded agencies, filed suit claiming that the executive order is inconsistent with the terms of the Foreign Service Act and violates the First Amendment. In this case, as in two others currently pending before this Court and a fourth pending before the Court of Appeals for the Ninth Circuit, the district court preliminarily enjoined the government from enforcing the executive order. In three of these cases, the court of appeals has stayed the

preliminary injunction, finding, for at least three different reasons, that the government is likely to prevail on the merits.[1]

This Court should, consistent with the reasoning of those stay decisions, reverse the district court and vacate the preliminary injunction. First, the district court was wrong to exercise jurisdiction over AFSA's claims, which should have been brought before the Foreign Service Labor Relations Board (FSLRB), with judicial review available directly in this Court. Second, the district court's merits analysis is wrong several times over. As a preliminary matter, AFSA cannot bring a non-statutory *ultra vires* claim to challenge the President's exercise of discretion conferred by statute. Furthermore, the district court failed to afford the considerable deference owed to the President in making a national-security determination under the Foreign Service Act. Instead, the district court improperly drew negative inferences at every turn, holding that AFSA had rebutted the presumption of regularity that this Court has recognized attaches to a President's exclusion order, based on a non-existent conflict with the statute. And the district court then proceeded to second-guess the President's national-security

_____

[1] The government's stay motion in the fourth case is pending.

2

determination, improperly replacing the President's judgment with the court's own.  Finally, the district court incorrectly weighed the equitable factors, ignoring that AFSA's injuries are both speculative and reparable and discounting the national-security interests that Congress left to the President to safeguard and that the executive order addresses.

In light of the district court's unwarranted usurpation of a national-security prerogative statutorily entrusted to the President, this Court should vacate the district court's preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiff invoked the jurisdiction of the district court under 28 U.S.C. § 1331.  JA10.  The district court granted plaintiff's motion for a preliminary injunction on May 14, 2025.  JA261-262.  Defendants filed a timely notice of appeal on May 21, 2025.  JA299.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court lacked Article III jurisdiction because plaintiff's claim must be channeled to the FSLRB, with judicial

review directly in this Court, in accordance with the Foreign Service Act.

2. Whether the district court erred in finding that plaintiff is likely to succeed on its claim that the executive order is *ultra vires*.

3. Whether the district court erred in finding that equitable factors support a preliminary injunction.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A. Statutory And Regulatory Background

Congress enacted the Federal Service Labor–Management Relations Statute (FSLMRS) as part of the Civil Service Reform Act of 1978 (CSRA) to govern labor relations between the Executive Branch and its employees. *See* 5 U.S.C. §§ 7101-7135. The FSLMRS grants federal employees the right to organize and bargain collectively, and it requires that unions and federal agencies negotiate in good faith over certain matters. *Id.* §§ 7102(2), 7106, 7114. The statute also establishes a dedicated mechanism for resolving labor disputes before the Federal Labor Relations Authority (FLRA). *See, e.g.*, *id.* § 7118. Recognizing that in certain circumstances union activity may not be

consistent with the needs of national security, however, the statute allows the President to exclude "any agency or subdivision thereof" from coverage under the statute if the President determines that the agency "has as a primary function intelligence, counterintelligence, investigative, or national security work" and that the provisions of the FSLMRS "cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations." *Id.* § 7103(b)(1).

The Foreign Service Act of 1980 was enacted as a "companion measure" to the CSRA, and it provides an analogous employment system for members of the Foreign Service. *U.S. Info. Agency v. Krc*, 989 F.2d 1211, 1217 (D.C. Cir. 1993) (quotation marks omitted). Subchapter X of the Foreign Service Act governs labor relations between members of the Foreign Service and their employing agencies. *See* 22 U.S.C. §§ 4101-4118. Congress established the Foreign Service Labor Relations Board within the FLRA to conduct union elections and resolve labor disputes involving members of the Foreign Service. *Id.* §§ 4106-4107. As relevant here, an employee or union may file a charge with the FSLRB alleging that an agency has engaged in an unfair labor

practice, which can include, *inter alia*, a failure to negotiate in good faith or comply with any provision of subchapter X. *See id.* §§ 4115, 4116(a). The FLRA's General Counsel "shall investigate" any such charge and may file a complaint against the agency before the FSLRB. *Id.* § 4116(a). With certain exceptions, the FSLRB's decisions are subject to review in this Court. *Id.* § 4109(a).

Like the FSLMRS, subchapter X of the Foreign Service Act provides that "[t]he President may by Executive order exclude any subdivision" of an agency employing members of the Foreign Service "from coverage" of the subchapter "if the President determines that":

> (1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

> (2) the provisions of th[e] subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

22 U.S.C. § 4103(b).

Shortly after the FSLMRS's enactment, President Carter issued an executive order excluding more than 45 agencies or subdivisions from coverage, precluding their employees from collective bargaining. Exec. Order No. 12,171, 44 Fed. Reg. 66,565 (Nov. 20, 1979). Those agencies included, *inter alia*, subdivisions of the Library of Congress,

Department of the Treasury and Internal Revenue Service, Department of Defense, Department of Energy, and Agency for International Development. *Id.* § 1-2, 44 Fed. Reg. at 66,565-66,566. Every President since, except President Biden, has issued similar executive orders expanding that list in response to changing circumstances and the evolving investigative and national-security responsibilities of federal agencies. *See, e.g.*, Exec. Order No. 13,480, 73 Fed. Reg. 73,991 (Dec. 4, 2008); Exec. Order No. 13,252, 67 Fed. Reg. 1,601 (Jan. 11, 2002); Exec. Order No. 13,039, 62 Fed. Reg. 12,529 (Mar. 14, 1997); Exec. Order No. 12,666, 54 Fed. Reg. 1,921 (Jan. 17, 1989).

## B. Factual Background

In March 2025, President Trump issued another such executive order, determining that certain agencies and subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the labor-relations provisions of the FSLMRS and Foreign Service Act "cannot be applied to th[o]se agencies and agency subdivisions in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, §§ 1-3, 90 Fed. Reg. 14,553, 14,553-14,555 (Apr. 3, 2025). As relevant here, the

executive order designates all subdivisions of the State Department and U.S. Agency for International Development (USAID) employing members of the Foreign Service. *Id.* § 3, 90 Fed. Reg. at 14,555.

The same day, the Office of Personnel Management (OPM) issued guidance to federal agencies. Memorandum from Charles Ezell, Acting Dir., OPM, to Heads and Acting Heads of Departments and Agencies (Mar. 27, 2025), https://perma.cc/QH4A-MQ9F (OPM Guidance). OPM explained that "covered agencies and subdivisions are no longer subject to … collective-bargaining requirements," and advised agencies to "consult with their General Counsels as to how to implement" the executive order. OPM Guidance 3.

The OPM guidance also identified several ways in which exclusion from the FSLMRS and subchapter X could improve agency functions. OPM explained that collective-bargaining agreements "often create procedural impediments to separating poor performers beyond those required by statute or regulation," and that covered agencies and subdivisions would now have a freer hand to "separate employees for unacceptable performance in appropriate cases." OPM Guidance 3-4. The guidance also emphasized that covered agencies would be able to

"eliminate waste, bloat, and insularity" by conducting reductions in force where appropriate, ordering employees to return to in-person work, and ensuring that agency resources are used for agency, rather than union, business. OPM Guidance 5-6.

Prior to the issuance of the executive order, plaintiff AFSA was certified as the exclusive representative of all members of the Foreign Service. JA11. Shortly after the executive order was issued, the State Department terminated its collective-bargaining agreement with AFSA. JA20-21. Several other designated agencies (with employees in the civil service) filed suits requesting declaratory judgments that, under Executive Order 14,251, they can legally repudiate such agreements. *See* Complaint, *U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10*, No. 6:25-cv-00119 (W.D. Tex. Mar. 27, 2025); Complaint, *U.S. Dep't of Treasury v. National Treasury Employees Union* (*NTEU*), *Chapter 73*, No. 2:25-cv-00049 (E.D. Ky. Mar. 28, 2025). The district courts in those cases concluded that although the government made "compelling arguments that the Executive Order is a lawful exercise of the President's authority delegated to him by Congress under [the FSLMRS] and the President's inherent authority under Article II," the

government lacks standing to seek a declaratory judgment. *U.S. Dep't of Def. v. American Fed'n of Gov't Emps. Dist. 10*, No. 6:25-cv-00119, 2025 WL 2058374, at *1 (W.D. Tex. July 23, 2025); *see also U.S. Dep't of Treasury v. NTEU, Chapter 73*, No. 2:25-cv-00049, 2025 WL 1446376, at *1 (E.D. Ky. May 20, 2025) (noting that "Treasury makes a good argument on the merits" but "does not have standing to bring the action"), *appeal docketed*, No. 25-5656 (6th Cir.).

On April 8, the Chief Human Capital Officers Council, an interagency forum led by the Director of OPM, shared with the designated agencies a Frequently Asked Questions document regarding implementation of the executive order. The document advised agencies not to "terminate any [collective-bargaining agreements]" or file FLRA petitions to "decertify bargaining units" "until the conclusion of litigation." Exhibit 1-B to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction, *NTEU v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 11, 2025), Dkt. 26-1.[2]

---

[2] The Council has more recently updated the Frequently Asked Questions document, advising agencies that they may terminate collective-bargaining agreements with unions other than the National Treasury Employees Union. *See* Letter, *AFGE v. Trump*, No. 25-4014 (9th Cir. Aug. 14, 2025), Dkt. 34.1.

### C. Prior Proceedings

**1.** AFSA filed this action against the President, OPM, the State Department, USAID, and the agencies' heads, alleging that the executive order is inconsistent with subchapter X of the Foreign Service Act, and that the order was issued in retaliation for the union's exercise of its First Amendment rights. JA21-26.

Plaintiff moved for a preliminary injunction, which the court granted on May 14, 2025. JA261-262. In granting the injunction, the court relied heavily on its earlier decision granting an injunction in *NTEU v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025), in which a union representing civil-service employees in several agencies had filed similar claims alleging that the same executive order violated the FSLMRS.

Although the Foreign Service Act makes the FSLRB responsible for "administer[ing] … the provisions" of subchapter X and resolving disputes arising under the subchapter, 22 U.S.C. § 4107(a), the district court determined that it has jurisdiction over AFSA's claims, JA271-276. The court reasoned that the statutory review scheme is not available here because the relevant agencies and subdivisions have

been excluded from subchapter X's coverage by the executive order. JA273-274.

On the merits, the court acknowledged that the executive order is entitled to a presumption of regularity, but it opined that AFSA had rebutted that presumption by identifying an ostensible conflict with the statute and indications of improper motive.  JA278-279, 281-283. Incorporating its prior analysis in *NTEU*, the court declared that the President acted either with "indifferen[ce] to" or "in contravention of" the requirements of the statute by finding that union activity could be dangerous in agencies with national-security responsibilities, that the scope of the order and an accompanying White House Fact Sheet reflected retaliatory motive toward certain unions, and that the order was motivated by policy goals unrelated to those reflected in the FSLMRS and Foreign Service Act.  JA281-283 (quotation marks omitted); *see NTEU*, 780 F. Supp. 3d at 254-257.  The court then held that the government had failed to show that the "primary function" of the State Department and USAID is "national security," JA285-286, and declared that the President had applied an overly broad

interpretation of "national security" when invoking § 4103(b), JA286-290.

The court also held that AFSA faced irreparable harm from loss of bargaining power and union dues. JA291-295. And it determined that an injunction would serve the public interest by safeguarding collective-bargaining rights. JA295-296.[3]

**2.** The government appealed and moved for a stay of the injunction. This Court granted that motion on June 20, 2025. *AFSA v. Trump* (*AFSA* Stay Order), No. 25-5184, 2025 WL 1742853 (D.C. Cir. June 20, 2025) (per curiam). The Court noted that AFSA "faces several, substantial obstacles" to prevailing on its *ultra vires* claims. *Id.* at *2. First, *ultra vires* review is available "only when an agency has taken action entirely in excess of its delegated powers and contrary to a *specific prohibition* in a statute." *Id.* (quotation marks omitted). Second, "it is unclear whether *ultra vires* review is available" against the President "at all," and even if it is, such review is certainly "not available when the statute in question commits the decision to the

---

[3] The district court's decision did not address AFSA's First Amendment claim, and that claim is not at issue in this appeal.

discretion of the President." *Id.* (quotation marks omitted). "Here, the statute commits the relevant decision to the President's discretion." *Id.* at *3. Third, even if the case is justiciable, a court's review "must be exceedingly deferential" where, as here, "a statutory delegation invokes the President's discretion in exercising core Article II responsibilities." *Id.*

In light of these background principles, the Court concluded "that the Executive Order likely withstands [AFSA's] attacks on its sufficiency." *AFSA* Stay Order, 2025 WL 1742853, at *3 (alteration and quotation marks omitted). The Court explained that "'[t]he conduct of diplomatic negotiations, the everyday contact between our State Department officers and foreign nationals, the reports Foreign Service officers in the field submit to Washington, and the planning activities they carry out all have a vital impact on maintenance of our national security,'" that "the Secretary of State is a member of the National Security Council," and that "the Department's mission is to 'protect and promote U.S. *security*, prosperity, and democratic values.'" *Id.* And the Court emphasized that "[a] more 'searching inquiry' than this would be

'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'" *Id.*

Turning to the equities, the court found that the district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress. *AFSA* Stay Order, 2025 WL 1742853, at *3. The Court concluded that this harm outweighs any non-monetary harm AFSA may suffer during the appeal, and observed that "[t]he competing interests— union representation versus national security—were already weighed by Congress when it passed the Foreign Service Act, including § 4103(b)." *Id.*

AFSA moved for reconsideration en banc, which this Court denied on July 30, 2025.

**3.** District courts have preliminarily enjoined the executive order at issue here in three other cases, as well. As already noted, in *NTEU*, the same district judge who issued the injunction in this case enjoined the government from implementing a separate section of the executive order against certain agencies that employ members of the civil service. This Court stayed that injunction. *NTEU v. Trump* (*NTEU* Stay

Order), No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) (per curiam). The Court reasoned that the government is likely to prevail on the merits of the appeal because NTEU "failed to establish irreparable harm." *Id.* at *1-2. The Court explained that the asserted harm to the union's bargaining power is speculative because it "would materialize only *after* an agency terminates a collective-bargaining agreement, and the Government directed agencies to *refrain* from terminating collective-bargaining agreements or decertifying bargaining units until after the litigation concludes." *Id.* at *1. Moreover, the Court found that NTEU's alleged financial injury is speculative because the union can collect dues directly from its members, and any loss that results from agencies declining to withhold dues from employees' paychecks can be remedied in a subsequent FLRA proceeding. *Id.* at *2. NTEU filed a motion for reconsideration en banc, which this Court denied. Order, *NTEU v. Trump*, No. 25-5157 (D.C. Cir. July 16, 2025) (en banc) (per curiam).

In *Federal Education Ass'n v. Trump*, No. 25-1362, 2025 WL 2355747 (D.D.C. Aug. 14, 2025), the same district court enjoined the government from enforcing the executive order against unions

representing certain Department of Defense employees.  The
government has appealed and moved for a stay.  *See Federal Educ.
Ass'n v. Trump*, No. 25-5303 (D.C. Cir.).

Finally, in *American Federation of Government Employees* (*AFGE*)
*v. Trump*, No. 25-cv-03070, 2025 WL 1755442 (N.D. Cal. June 24, 2025),
another district court enjoined the executive order at the behest of a
separate group of union plaintiffs.  This time, the district court did not
reach the unions' *ultra vires* claims and instead held that the unions
had raised a serious question whether the executive order is consistent
with the First Amendment.  *Id.* at *2.  The Ninth Circuit granted a stay
pending appeal.  *AFGE v. Trump* (*AFGE* Stay Order), No. 25-4014, __
F.4th __, 2025 WL 2180674 (9th Cir. Aug. 1, 2025) (per curiam).  The
court explained that the government had shown that it is likely to
succeed on the merits of the First Amendment retaliation claim because
the executive order "[o]n its face … does not express any retaliatory
animus" but instead "conveys the President's determination that the
excluded agencies have primary functions implicating national security
and cannot be subjected to the FSLMRS consistent with national
security."  *Id.* at *4.  The court rejected the unions' reliance on a fact

sheet issued by the White House, explaining that the fact sheet "conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions." *Id.* The Ninth Circuit also found that the equitable factors favor the government because the preliminary injunction impedes the government's ability to protect national security and any temporary harm to the plaintiff unions could be addressed at the conclusion of litigation. *Id.* at *5.

## SUMMARY OF ARGUMENT

**I.** Plaintiff is unlikely to succeed on the merits of its suit. First, Congress withdrew district-court jurisdiction over claims like plaintiff's through the Foreign Service Act, which establishes a comprehensive scheme for reviewing and remedying allegations that federal agencies have violated the labor-relations provisions of that Act. Under the statute, plaintiff is required to submit its claims to the FSLRB; only after receiving a final FSLRB order may plaintiff seek judicial review, directly in the court of appeals.

Second, plaintiff's *ultra vires* claim fails at the outset because the Supreme Court has made clear that *ultra vires* review of presidential action is not available when the statute in question commits the action to the discretion of the President. Section 4103(b) provides a grant of broad, unreviewable discretion to the President and forecloses the application of any meaningful judicial standard of review.

Third, even if AFSA could assert an *ultra vires* claim, it cannot establish that the President acted contrary to the statute. The President properly invoked his authority to exclude agencies from the labor-relations provisions of the Foreign Service Act, and this Court has held that such a decision is entitled to a presumption of regularity. The district court erred in holding that plaintiff had rebutted that presumption, and the evidence it cited only confirms that the executive order was issued after the President made the determination contemplated by statute. In any event, the President's exclusion determination cannot be found *ultra vires* because it is not obviously beyond the terms of the statute. The State Department and USAID plainly perform intelligence, investigative, or national-security work as a primary function, and the President reasonably determined that

applying the provisions of subchapter X to those agencies is inconsistent with national security.

**II.**  Plaintiff has not established that it would likely incur irreparable harm absent a preliminary injunction.  The district court relied on two supposed harms, but neither supports the extraordinary remedy of a preliminary injunction.  First, if AFSA ultimately prevails in this litigation, the FSLRB could impose a retroactive remedy to address any interim changes to working conditions that agencies may have made outside the bargaining process.  Second, AFSA's asserted monetary harm is not irreparable because the FSLRB can order the defendant agencies to reimburse AFSA if they are found to have unlawfully failed to withhold dues from employees' paychecks.  And the claimed financial harm is speculative, in any event, because AFSA can collect dues directly from its members.

**III.**  The balance of the equities and the public interest weigh in defendants' favor.  In the Foreign Service Act, Congress left it to the President to determine when the government's national-security functions are incompatible with the demands of collective bargaining. The district court's preliminary injunction intrudes on the President's

discharge of his duties under that statute, subjecting the government to collective-bargaining requirements that the President has concluded are inconsistent with various agencies' national-security functions.

## STANDARD OF REVIEW

The Court reviews the district court's weighing of the preliminary-injunction factors for an abuse of discretion, its factual findings for clear error, and its legal conclusions de novo. *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1233-1234 (D.C. Cir. 2025).

## ARGUMENT

To obtain a preliminary injunction, a movant "must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Each of these factors weighed against granting a preliminary injunction here.

## I. THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A. The Foreign Service Act Precludes District-Court Jurisdiction Over Plaintiff's Claims

**1.** Although Congress has generally granted district courts original jurisdiction over civil actions arising under the Constitution and laws of the United States, 28 U.S.C. § 1331, Congress has at times withdrawn such jurisdiction by establishing an alternative statutory scheme for administrative and judicial review of a dispute. "[W]hen Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems," those procedures are generally intended "to be exclusive." *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 489 (2010) (quotation marks omitted).

With the Foreign Service Act, as with the CSRA, "Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector," along with dedicated mechanisms for resolving federal labor disputes. *AFGE v. Secretary of the Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (quotation marks omitted). In particular, the Foreign Service Act channels adjudication of such disputes to the FSLRB, followed by direct review in this Court. *See* 22 U.S.C. §§ 4107(a), 4109(a). This Court has held that the Foreign

Service Act, like the analogous FSLMRS, "provides the exclusive

procedures by which federal employees and their bargaining

representatives may assert federal labor-management relations claims"

and unions "cannot circumvent this regime by instead bringing a suit in

district court." *AFGE*, 716 F.3d at 637-638 (addressing the FSLMRS);

*AFSA v. Baker*, 895 F.2d 1460, 1462 (D.C. Cir. 1990) (addressing the

Foreign Service Act).

The district court thus lacks jurisdiction to review plaintiff's

claims alleging that the government has acted contrary to the

provisions of subchapter X, unless those claims are not "of the type

Congress intended to be reviewed within [the] statutory structure."

*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212 (1994); *cf. AFGE v.*

*Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019) ("Congress intended the

[FSLMRS] scheme to be exclusive with respect to claims within its

scope."). In determining whether the claims presented here fit within

the statutory review scheme, the Court must consider whether "a

finding of preclusion could foreclose all meaningful judicial review,"

whether the claims are "wholly collateral" to the Foreign Service Act's

review provisions, and whether the claims are "outside the [FSLRB's]

expertise." *Thunder Basin Coal Co.*, 510 U.S. at 212-213 (quotation marks omitted); *see also AFGE*, 929 F.3d at 755. "The ultimate question is how best to understand what Congress has done—whether the statutory review scheme … reaches the claim in question." *Axon Enter., Inc. v. Federal Trade Comm'n*, 598 U.S. 175, 186 (2023).

Each of the three *Thunder Basin* factors weighs in favor of finding plaintiff's claims precluded. First, requiring AFSA to proceed through the statutory review scheme would not foreclose all meaningful judicial review. Specifically, AFSA can litigate its claims through the statutory scheme by alleging that the defendant agencies have committed unfair labor practices by "refus[ing] to consult or negotiate in good faith with a labor organization, as required [by]" the Foreign Service Act or by "fail[ing] or refus[ing] otherwise to comply with any provision" of subchapter X, 22 U.S.C. § 4115(a). The union could then obtain judicial review of an adverse FSLRB decision in this Court. *See id.* § 4109(a); *see also AFGE*, 929 F.3d at 757-758 (identifying ways a union could obtain judicial review of constitutional challenges to executive orders through the FSLMRS review scheme, including by filing unfair-labor-practice proceedings).

In addition, AFSA could challenge the executive order in cases already pending before the FSLRB. If the State Department or USAID moves to dismiss such a case because the executive order excludes the agency from the provisions of subchapter X, or if the FSLRB asks the parties to address its jurisdiction given the executive order, AFSA could raise its arguments that the FSLRB continues to have jurisdiction over those pending cases because the executive order is invalid. *See, e.g.*, *U.S. Att'y's Off. S. Dist. of Tex. & AFGE Loc. 3966*, 57 F.L.R.A. 750, 750 (2002) (noting the FLRA "requested and received submissions from the parties as to why [the] cases should not be dismissed for lack of jurisdiction in light of the Executive Order" excluding U.S. Attorneys' Offices from coverage of the FSLMRS). If the FSLRB disagrees with AFSA and dismisses such a case, that dismissal order would generally be subject to judicial review. *See* 22 U.S.C. § 4109(a).

Second, AFSA's claims are not wholly collateral to the Foreign Service Act's statutory review scheme. On the contrary, the complaint squarely raises a claim under subchapter X, alleging (among other things) that the executive order "was in violation of Section [4103](b)." JA23. The union's challenge in this case is thus "of the type that is

regularly adjudicated" through the Foreign Service Act's scheme: "disputes over whether th[at] Statute has been violated." *AFGE*, 929 F.3d at 760. And the remedies that AFSA seeks include, *inter alia*, a declaration that the executive order is unlawful and an order prohibiting the defendant agencies from implementing it. JA27. That is precisely the type of relief that a union could obtain through the statutory scheme. *Cf. AFGE*, 929 F.3d at 760 ("[T]he unions ask the district court for the same relief that they could ultimately obtain through the statutory scheme, namely rulings on whether the executive orders are lawful and directives prohibiting agencies from following the executive orders during bargaining disputes.").

Indeed, in analogous contexts regarding orders excluding federal workers from the FSLMRS and collective bargaining, this Court has held that the FLRA has "exclusive authority to render judgment on the question" whether that exclusion was valid. *AFGE v. Loy*, 367 F.3d 932, 935-936 (D.C. Cir. 2004). AFSA's challenge is thus not wholly collateral to the statutory scheme. *See Elgin v. Department of the Treasury*, 567 U.S. 1, 22 (2012) (holding that a constitutional claim was not wholly collateral to the CSRA scheme because the plaintiffs challenged

"precisely the type of personnel action regularly adjudicated by the [Merit Systems Protection Board] and the Federal Circuit within the CSRA scheme" and "request[ed] relief that the CSRA routinely affords").

Third, AFSA's claims are not beyond the expertise of the FSLRB. Plaintiff's statutory challenges "lie at the core" of the FSLRB's "'specialized expertise in the field of federal labor relations.'" *AFGE*, 929 F.3d at 760. Their claims require interpreting the Foreign Service Act—"the very law that the [FSLRB] is charged with administering and interpreting," *id.* at 760-761; *see* 22 U.S.C. § 4107(a), and Congress has directed the FSLRB to adjudicate disputes over whether an agency has failed or refused to comply with the statute, *see* 22 U.S.C. § 4115(a)(8). *See Elgin*, 567 U.S. at 23 (ruling that a claim was not outside the Merit Systems Protection Board's expertise where the challenged statute was one that the Board "regularly construes"). The FSLRB could also bring its expertise to bear on factual issues that may be presented in this case; after all, the FLRA—which shares a chairperson and staff with the FSLRB, and whose precedent the FSLRB applies, *see* 22 U.S.C. §§ 4106, 4107(b)—regularly resolves disputes over whether certain

employees are "engaged in intelligence, counterintelligence, investigative, or security work which directly affects national security," 5 U.S.C. § 7112(b)(6)—a standard with obvious overlap with the provision at issue in this case. *See, e.g.*, *U.S. Dep't of the Air Force Davis-Monthan Air Force Base & AFGE Loc. 2924*, 62 F.L.R.A. 332, 334-336 (2008) (considering whether employees were engaged in work that directly affects national security). The FLRA also adjudicates First Amendment-retaliation claims in the course of its ordinary work. *See Independent Union of Pension Emps. for Democracy & Just. & Pension Benefit Guar. Corp.*, 68 F.L.R.A. 999, 1014 (2015) (considering a claim that an agency had initiated arbitration in retaliation for a union's exercise of free-speech rights). The FSLRB thus has expertise that goes to the core issues in this case.

Even if the FSLRB declined to address all of AFSA's claims or lacked expertise on some issue raised by those claims, however, this Court could consider the claims on appeal from the FSLRB. *See AFGE*, 929 F.3d at 758. After all, "[i]t is not unusual for an appellate court reviewing the decision of an administrative agency to consider a constitutional challenge to a federal statute that the agency concluded

it lacked authority to decide." *Elgin*, 567 U.S. at 18 n.8; *see also AFGE*, 929 F.3d at 758 ("[I]t is of no dispositive significance whether the agency has the authority to rule on constitutional claims so long as the claims can eventually reach an Article III court fully competent to adjudicate them[.]" (quotation marks omitted)).  There is thus no reason why plaintiff's constitutional or statutory claims could not be "meaningfully addressed in the Court of Appeals." *Thunder Basin Coal Co.*, 510 U.S. at 215.

    **2.**  The district court concluded that it had jurisdiction because Executive Order 14,251 exempts the agencies at issue from subchapter X of the Foreign Service Act, making FSLRB review unavailable. JA273.  But this circular logic assumes the validity of the very order that AFSA contends is invalid; if AFSA is correct on the merits of its claim, then the defendant agencies were not properly excluded and the FSLRB has jurisdiction to resolve disputes between AFSA and those agencies.  Just as "a federal court always has jurisdiction to determine its own jurisdiction," *United States v. Ruiz*, 536 U.S. 622, 628 (2002), including to consider the scope and validity of a jurisdiction-stripping provision, *see generally Boumediene v. Bush*, 553 U.S. 723 (2008), the

FSLRB also has authority to consider whether the executive order was a valid exercise of the President's authority under § 4103(b) to exclude agencies from coverage of subchapter X. Considering the scope of the FSLRB's jurisdiction will of course give the FSLRB an opportunity to decide the question at the heart of plaintiff's claims—whether the challenged executive order is lawful—and however the FSLRB disposes of that question, the losing party may then obtain judicial review of that question in this Court.

The district court noted that the FLRA has disclaimed authority to hear claims brought in connection with agencies excluded from the FSLMRS, JA274, but that does not mean that the FLRA or FSLRB lacks authority to consider the *validity* of a presidential exclusion and thus whether the relevant agencies are in fact excluded from the scope of the statute. Indeed, in *U.S. Attorney's Office Southern District of Texas & AFGE Local 3966*, for example, the FLRA "requested and received submissions from the parties" as to whether it should dismiss a pending case in light of an exclusion order under § 7103(b)(1). 57 F.L.R.A. at 750. Although none of the parties in that case disputed the validity of the executive order, if one of them had, the FLRA could have

resolved that dispute in order to resolve the question of its jurisdiction. And in *Department of the Navy, Naval Telecommunications Center & Navtelcom Unit Local No. 1*, the FLRA had to (and agreed to) construe the scope of an exclusion order in order to determine its jurisdiction. 6 F.L.R.A. 498, 500 (1981). There is thus no reason to think that the FSLRB would refuse to consider the validity of an executive order where doing so is necessary to determining its jurisdiction.

In fact, the FLRA has issued an order to show cause why a pending case between NTEU and an excluded agency should not be dismissed for lack of jurisdiction, *see* Exhibit 17 to Plaintiff NTEU's Reply in Support of Its Motion for a Preliminary Injunction, *NTEU v. Trump*, No. 1:25-cv-00935 (D.D.C. Apr. 16, 2025), Dkt. 29-1, demonstrating that the FLRA may be willing to consider a union's contention that the executive order is ineffective. And in any event, even if the FSLRB dismissed a case without opining on the validity of the challenged exclusion order, such an order would nonetheless trigger plaintiff's ability to seek judicial review of that preserved question in this Court. *See AFGE*, 929 F.3d at 758-759 ("[W]e may review the

31

unions' broad statutory and constitutional claims on appeal from an FLRA proceeding even if the FLRA cannot.").

Finally, the district court's reliance on *AFGE Local 446 v. Nicholson*, 475 F.3d 341, 348 (D.C. Cir. 2007), is misplaced, as that decision only underscores that AFSA's claims should have been brought before the FSLRB. *See* JA276. In that case, the Secretary of Veterans Affairs' delegee had determined, pursuant to statutory authority, that a certain matter concerning employee compensation was not subject to collective bargaining. 475 F.3d at 346; *see* 38 U.S.C. § 7422(b), (d). This Court held that the FLRA did not have authority to review the Secretary's decision because the statute expressly provided that the decision "may not be reviewed by any other agency," which this Court interpreted to include the FLRA. *AFGE*, 475 F.3d at 347 (quoting 38 U.S.C. § 7422(d)). The authority providing for the President's exclusion order at issue here, in contrast, does not "expressly" provide that such an order is "outside the [FSLRB's] purview." *Id.* at 348. Accordingly, the FSLRB has jurisdiction to review challenges to that executive order, just as it has authority to review other disputes arising under the Foreign Service Act and not expressly removed from its jurisdiction.

**B.** **Plaintiff Cannot Assert An *Ultra Vires* Claim To Challenge The President's Exercise Of Discretion Granted By Statute**

Even if the district court has jurisdiction, AFSA is unlikely to succeed on the merits because it fails to state a claim upon which relief can be granted. Plaintiff seeks non-statutory, or *ultra vires*, review of an order issued by the President. The Supreme Court has assumed without deciding that some *ultra vires* claims that the President has violated a statutory mandate are judicially reviewable. *Dalton v. Specter*, 511 U.S. 462, 474 (1994). But "such review is not available when," as here, "the statute in question commits the decision to the discretion of the President." *Id.*; *see also AFSA* Stay Order, No. 25-5184, 2025 WL 1742853, at *2 (D.C. Cir. June 20, 2025) (per curiam).

In *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, the Court considered a challenge to the President's exercise of statutorily conferred authority, for the duration of World War I, "to supervise or to take possession and assume control of any telegraph, telephone, … or radio system" "whenever he shall deem it necessary for the national security or defense." 250 U.S. 163, 181-182 (1919). South Dakota claimed that the President exceeded his authority by taking

control of the telegraph and telephone systems, contending that "there was nothing in the conditions at the time the power was exercised which justified the calling into play of the authority" and "assail[ing] the motives which it is asserted induced the exercise of the power." *Id.* at 184. The Court held that it lacked authority to consider such a claim because where a challenge to the President's action "concerns not a want of power, but a mere excess or abuse of discretion in exerting a power given, it is clear that it involves considerations which are beyond the reach of judicial power." *Id.*; *see also Chicago & S. Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 114 (1948) (holding that certificates permitting foreign carriers to engage in overseas transportation "embody Presidential discretion as to political matters beyond the competence of the courts to adjudicate").

The Foreign Service Act provides a similar grant of broad, unreviewable discretion to the President to exercise certain powers when he has determined it is necessary for the national security to exclude certain agencies or subdivisions from coverage of subchapter X. *See AFSA* Stay Order, 2025 WL 1742853, at *3 (concluding that § 4103(b) "delegates broad authority to the President to exclude parts of

the Foreign Service from Subchapter X in the interest of national security" and "commits the relevant decision to the President's discretion"). The relevant provision "fairly exudes deference" to the President "and appears … to foreclose the application of any meaningful judicial standard of review." *Webster v. Doe*, 486 U.S. 592, 600 (1988). "How the President chooses to exercise the discretion Congress has granted him" in the Foreign Service Act is thus "not a matter for [a court's] review." *Dalton*, 511 U.S. at 476.

Judicial review of the President's discretionary determination in this area is particularly inappropriate because that determination—like the one at issue in *Dakota Central Telephone*—arises in the national-security context. "National-security policy is the prerogative of the Congress and President," and "[j]udicial inquiry into the national-security realm raises 'concerns for the separation of powers.'" *Ziglar v. Abbasi*, 582 U.S. 120, 142 (2017); *see also Haig v. Agee*, 453 U.S. 280, 292 (1981) ("Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention."). Courts are therefore "'reluctant to intrude upon'" an exercise of that national-security authority "unless 'Congress specifically has provided

otherwise,'" *Ziglar*, 582 U.S. at 143, and a non-statutory *ultra vires*

claim like AFSA asserts here necessarily lacks congressional

authorization. AFSA thus lacks a cause of action to challenge the

President's exercise of discretion vested in him by the Foreign Service

Act.

### C. Plaintiff Is Not Likely To Succeed On The Merits Of Its *Ultra Vires* Claim

Even if AFSA could assert an *ultra vires* claim, it cannot establish

that the President acted contrary to statute. AFSA faces a high bar to

establish its right to relief. *Ultra vires* review "is intended to be of

extremely limited scope." *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d

1244, 1262 (D.C. Cir. 2020) (quotation marks omitted). To prevail,

AFSA would have to show that the President acted "'in excess of [his]

delegated powers and contrary to a *specific prohibition*' in a statute."

*Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665, 681 (2025). An *ultra*

*vires* challenge "is essentially a Hail Mary pass," and "garden-variety

errors of law or fact are not enough" to establish such a claim. *Federal*

*Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 764-765 (D.C. Cir.

2022) (alteration and quotation marks omitted). Rather, "*ultra*

*vires* claimants must demonstrate that the agency has plainly and

openly crossed a congressionally drawn line in the sand." *Id.* at 765.

AFSA is unable to meet this standard in light of the discretionary

authority that § 4103(b) vests in the President.

### 1. The executive order is facially consistent with statute

This Court has held that a President's exclusion order under the

analogous authority provided by the FSLMRS need not be explained

and is entitled to a presumption of regularity. *AFGE v. Reagan*, 870

F.2d 723, 727-728 (D.C. Cir. 1989). In *AFGE v. Reagan*, this Court

considered a challenge to President Reagan's exercise of discretion to

exclude certain subdivisions of the U.S. Marshals Service from the

scope of the FSLMRS. *Id.* at 725. The union plaintiff in that case

contended that federal marshals are not engaged in the protection of

national security, and although the district court rejected that

argument, it held that the President did not lawfully exercise his power

because he did not include in the executive order his determination of

the conditions specified in the statute. *Id.* This Court reversed,

rejecting the argument that "courts are the instrumentalities for

ensuring that the [5 U.S.C. § 7103(b)(1)] authority is properly exercised"

and upholding the validity of the executive order. *Id.* at 726-728. The

Court explained that "Section 7103(b)(1) makes clear that the President may exclude an agency from the Act's coverage whenever he 'determines' that the conditions statutorily specified exist," and this section "does not expressly call upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order." *Id.* at 727. Rather, a bare determination by the President is sufficient to invoke that authority. In light of the presumption of regularity, the Court refused to entertain "an unwarranted assumption that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *Id.* at 728.

This Court in *AFGE* thus properly recognized the extent of the discretion statutorily vested in the President and, correspondingly, the limited role for judicial review. After all, "[s]hort of permitting cross-examination of the [President] concerning his views of the Nation's security" and whether granting employees in the relevant agencies coverage under the provisions of the FSLMRS is "inimical to those interests"—a procedure that would plainly be improper—there is "no basis on which a reviewing court could properly assess" a President's

exclusion decision. *Webster*, 486 U.S. at 600. The same analysis applies to review of the President's exercise of discretion under § 4103(b).

The executive order under review here "cited accurately the statutory source of authority therefor, and purported to amend [President Carter's] earlier order that indubitably was a proper exercise of that authority." *AFGE*, 870 F.2d at 728. The President's determination thus "satisfies every requirement" of § 4103(b), "and a finding which follows [the statute's] language, as this finding does, cannot well be challenged as insufficient." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 331 (1936); *see also AFSA* Stay Order, 2025 WL 1742853, at *3.

### 2. Plaintiff failed to rebut the presumption of regularity

If any further role for judicial review remains, it must be limited to circumstances where a plaintiff can overcome the presumption of regularity by making a "strong showing of bad faith or improper behavior." *Hercules Inc. v. EPA*, 598 F.2d 91, 123 (D.C. Cir. 1978); *see also Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024) (a party seeking to rebut the presumption of regularity must present "clear evidence" that public officers have not "properly discharged their

official duties" (quotation marks omitted)). No such showing was made here, and the district court mistakenly concluded that AFSA had overcome the presumption of regularity.

**a.** First, the district court believed that the scope of the executive order is inconsistent with Congress's finding that "labor organizations and collective bargaining in the civil service are in the public interest." *NTEU v. Trump*, 780 F. Supp. 3d 237, 254-255 (D.D.C. 2025) (quoting 5 U.S.C. § 7101(a)).[4] But the Foreign Service Act's "[e]xceptions and exemptions are no less part of Congress's work than its rules and standards—and all are worthy of a court's respect." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 239 (2021). By permitting the President to exclude subagencies from subchapter X's coverage where collective bargaining is inconsistent with "national security requirements and considerations," 22 U.S.C. § 4103(b)(2), Congress recognized that this is an "area[] fraught with competing social demands where … trade-offs are required." *BP*, 593 U.S. at 239. The

---

[4] The government cites the district court's decision in *NTEU* throughout this section because the court incorporated its discussion there by reference, finding that "[t]he analysis is identical here because this case implicates the exact same Executive Order." JA281-282.

district court erred in construing the executive order as a *violation* of the statute rather than as *respecting* the competing priorities that it balances.

Although Congress found that permitting collective bargaining in the civil service would generally be in the public interest, it also recognized that this would not always be the case, and it granted the President authority to exclude agency subdivisions from the scope of subchapter X in those circumstances. The executive order is entirely compatible with Congress's judgment that the President is best positioned to make determinations over time as to which subagencies should be exempted from subchapter X based on national-security concerns.

The district court placed undue emphasis on the breadth of the executive order, disregarding the fact that the President could reasonably determine that in the nearly half-century since the FSLMRS and Foreign Service Act were enacted, national-security considerations and the conduct of labor organizations have changed such that a larger share of the federal workforce can, and should, be excluded from the statute's coverage. Contrary to the district court's suggestion, *see*

*NTEU*, 780 F. Supp. 3d at 254-255, Congress nowhere stated that the President's determinations under § 7103(b)(1) or § 4103(b) can cover only a certain percentage of the federal workforce. In any event, allegations that the President has established an "overbroad" policy that does not "serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Trump v. Hawaii*, 585 U.S. 667, 707-708 (2018). The district court's disagreement with the President's line-drawing and its assumption that the order's breadth indicated unlawful motives turned the presumption of regularity on its head and was "unwarranted." *AFGE*, 870 F.2d at 728.

At any rate, it is not surprising that over time, in response to different national-security requirements and considerations, and applying different "informed judgment[s]," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010), different Presidents will make different determinations under § 4103(b). Some determinations may reflect a narrower view of subagencies' national-security functions and the impact of subchapter X on prevailing national-security requirements

and considerations.  Other determinations may reflect a different view and assessment.  But Congress provided no standards by which to judge a President's invocation of § 4103(b)(1), leaving it to the President to make those determinations.  *See Webster*, 486 U.S. at 600.  The district court's suggestion that the President must have acted contrary to statute because he took a capacious view of national-security interests is entirely misplaced.

**b.**  Second, the district court viewed statements in a White House fact sheet as indicating that the President had considered improper factors.  *See NTEU*, 780 F. Supp. 3d at 255-256.  But even if that fact sheet represented the motivations of the President in issuing the executive order, it does not reflect any motivations inconsistent with the statute.  Rather, the fact sheet merely explains how unions' activities have impaired the functioning of agencies in a manner that could undermine national security—a circumstance that is plainly relevant to the President's determination under § 4103(b).  The fact sheet notes, for example, that the FSLMRS can "enable[] hostile Federal unions to obstruct agency management" by preventing agencies from removing employees for poor performance or misconduct and impede agencies

43

from taking other operational measures including, for example, "modify[ing] cybersecurity policies."  The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H (*Fact Sheet*).  Such considerations are entirely in accord with an executive order issued to protect President Trump's "ability to manage agencies with vital national security missions" and "to ensure that agencies vital to national security can execute their missions without delay and protect the American people."  *Id.*; *see AFGE* Stay Order, No. 25-4014, __ F.4th __, 2025 WL 2180674, at *4 (9th Cir. Aug. 1, 2025) (per curiam) ("The Fact Sheet … conveys that [Executive Order] 14,251 advances national security by curtailing union activity that undermines the agile functioning of government offices with national security-related missions," and thus demonstrates "an overarching objective of protecting national security through its assessment that collective bargaining impedes the functioning of agencies with national security-related responsibilities.").

The district court drew a false distinction between whether "'the provisions' of the FSLMRS themselves" cannot be applied in a manner consistent with national security and whether "the unions' *use of* these provisions" would be inconsistent with national security. *NTEU*, 780 F. Supp. 3d at 256. Applying the provisions of the FSLMRS and subchapter X to certain agencies and subagencies would be inconsistent with national-security requirements precisely *because* unions can use those provisions in a manner that "jeopardizes [the President's] ability to manage agencies with vital national security missions," which necessarily includes, *inter alia*, ensuring performance accountability. *Fact Sheet*. Union activity that makes it difficult for agencies engaged in national-security work to terminate poor performers not only obstructs President Trump's "policy directives and 'agenda'" (which includes improving the functioning of these agencies), *NTEU*, 780 F. Supp. 3d at 256, but also impairs the agencies' ability to safeguard national security, and it is thus a legitimate consideration under § 4103(b). As another example, the fact sheet describes how a union obtained an FLRA decision holding that U.S. Immigration and Customs Enforcement had to bargain before addressing cybersecurity threats by

45

blocking access to web-based email services on its network.  *See U.S. Dep't of Homeland Sec. U.S. Immigration & Customs Enf't & AFGE Nat'l Immigration & Customs Enf't Council 118*, 67 F.L.R.A. 501 (2014). Rather than suggesting a "retaliatory motive," JA283, the fact sheet reasonably describes how collective bargaining has been used to undermine national-security requirements.

Instead of acknowledging the relevance of union activity to the § 4103(b) determination and presuming that the fact sheet indicated legitimate considerations regarding past union practices, the district court drew the most negative possible inference and attributed unconstitutional motives to the President:  The court suggested that the President issued the executive order to "punish" certain unions because of their opposition to his agenda.  *NTEU*, 780 F. Supp. 3d at 256.  In doing so, the district court disregarded both the deference owed to the President's national-security assessments and its duty not to assume "that the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them."  *AFGE*, 870 F.2d at 728.

**c.** Third, the district court erred in declaring that the OPM guidance demonstrates that the executive order was motivated by unrelated policy goals. *See NTEU*, 780 F. Supp. 3d at 256-257. The guidance notes the policy of this Administration "to eliminate waste, bloat, and insularity" within agencies, OPM Guidance 5, and as applied to agencies that have as a primary function intelligence, investigative, or national-security work, these policies are directly relevant to the policy goals of § 4103(b). Congress may have thought inefficiencies are tolerable in certain circumstances as the price for allowing federal employees to organize, but Congress made clear that labor interests cannot be allowed to undermine national security. In agencies like the State Department, for example, removing "procedural impediments to separating poor performers" is a national-security imperative, OPM Guidance 3. So is the ability to optimize the efficiency of an agency through restructuring, even when that involves layoffs. *Contra NTEU*, 780 F. Supp. 3d at 257.

The Foreign Service Act does not permit courts to second-guess the President's decisions about how agencies must be operated so that employees can best perform their national-security work. Rather, the

statute expressly leaves that judgment to the President.  Judicially second-guessing the President's national-security determinations would be "inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere." *Hawaii*, 585 U.S. at 686.  Furthermore, "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" *Id.* at 704.  The district court erred in rejecting the presumption of regularity based on its disagreement with a determination that Congress appropriately left to the President.

**d.**  In addition to the reasons identified in *NTEU*, the district court here also opined that AFSA had overcome the presumption of regularity because the executive order does not strip collective-bargaining rights from U.S. Customs and Border Protection employees, and because the Secretary of Veterans Affairs had exercised his authority to restore collective-bargaining rights to certain unions who had filed no or few grievances against the Department of Veterans Affairs.  JA282-283.  But as the White House explained, where unions are engaged in such "constructive partnerships" with agencies, *Fact*

*Sheet*, the President was entitled to conclude that collective-bargaining provisions can be applied "in a manner consistent with national security requirements and considerations," 22 U.S.C. § 4103(b), and exclusion is thus unwarranted. The President's exclusion order is not undermined by any tailoring-related complaints; rather such complaints demonstrate that the President applied the statutory factors when making his determination.

### 3. The President's determinations reasonably apply the criteria of § 4103(b)

Even if the district court could properly look behind the President's determination, the government would still prevail because that determination is reasonable and not "'obviously beyond the terms of the statute,'" *North Am. Butterfly Ass'n*, 977 F.3d at 1263.

**a.** The President reasonably determined that subdivisions of the Department of State and USAID have intelligence, investigative, or national-security work as "a primary function," 22 U.S.C. § 4103(b)(1). An agency subdivision can have multiple primary functions, as Congress recognized through its use of the article "a." And although Congress does not always enumerate an agency or agency subdivisions' primary functions, where it has, it frequently lists several. *See, e.g.*, 22

49

U.S.C. § 2551 (providing that the Secretary of State "shall have the authority … to carry out" four "primary functions" in the area of arms control alone); 15 U.S.C. § 634b (listing 12 "primary functions"). Thus, an agency subdivision would fit within the terms of § 4103(b)(1) even if it does not only (or mostly) perform intelligence, investigative, or national-security work, so long as such work is "a" primary function of the subdivision.

It cannot be seriously disputed that the Department of State performs national-security work as a primary function. As this Court explained, "[t]he conduct of diplomatic negotiations, the everyday contact between our State Department officers and foreign nationals, the reports Foreign Service officers in the field submit to Washington, and the planning activities they carry out all have a vital impact on maintenance of our national security." *AFSA* Stay Order, 2025 WL 1742853, at *3 (quotation marks omitted). The Secretary of State is a member of the National Security Council. 50 U.S.C. § 3021(c)(1). And the Department's declared mission is "[t]o protect and promote U.S. *security*, prosperity, and democratic values." U.S. Dep't of State, *About*

*the U.S. Department of State*, https://perma.cc/8GPX-63RG (emphasis added).

The subdivisions of the State Department carry out that national-security work as a primary function. Congress has assigned to the Under Secretary for Arms Control and International Security, for example, "matters related to international security policy, arms control, and nonproliferation," and permitted the Under Secretary to attend National Security Council meetings. 22 U.S.C. § 2651a(b)(2). And the Bureau of Diplomatic Security "lead[s] worldwide security and law enforcement efforts to advance U.S. foreign policy and safeguard national security interests." Bureau of Diplomatic Sec., U.S. Dep't of State, *Our Mission and Vision*, https://perma.cc/2PSL-Z5TQ. It is beyond dispute that these subdivisions perform national-security work as a primary function.

Similarly, USAID "is the principal U.S. agency responsible for extending development assistance to countries around the world," and its programs "aim to support economic growth, combat the spread of disease, promote democratic reform, and address food insecurity." Office of Inspector Gen., USAID, *OIG Oversight: USAID Overview*,

https://perma.cc/DD9K-P9NP.  USAID frequently operates in fragile

states, conflict zones, and areas where the United States has strategic

intelligence interests, including supporting counterterrorism efforts and

democratic movements.  USAID subdivisions partner closely with the

Department of Defense, the State Department, and other agencies

protecting U.S. interests abroad.  And the USAID Administrator has at

times been a member of the National Security Council.  *See* Joseph R.

Biden Jr., *Memorandum on Renewing the National Security Council*

*System* (Feb. 4, 2021), https://perma.cc/9EHR-JANN.

"Foreign Service personnel practice diplomacy to advance

America's interests, solve global challenges, build alliances, counter

adversaries, promote peace, and find new opportunities for our nation."

U.S. Dep't of State, *Foreign Service*, https://perma.cc/47QK-RHNC.

Their role, and that of their employing subdivisions, is inextricably

intertwined with a national-security function.

The district court did not dispute that the relevant agency

subdivisions perform national-security work, but it faulted the

government for allegedly "omit[ing] the critical step of explaining why"

that work is "the 'primary function'" of the subdivisions.  JA286.  This

reasoning improperly usurps the President's discretion and turns the relevant legal standard on its head. The notion that the government bears the burden of explaining the designation of any agency or subdivision is flatly inconsistent with the Court's holding in *AFGE v. Reagan* that the President need not "insert written findings into an exempting order." 870 F.2d at 727. If the President need not explain his determination in the executive order itself, neither should a court require such explanations in subsequent litigation.

**b.** The President also permissibly determined that the provisions of subchapter X cannot be applied to subdivisions of the State Department and USAID "consistent with national security requirements and considerations." 22 U.S.C. § 4103(b)(2). The dictates of national security may, at any time, require changes in working conditions or employee status to be accomplished without hesitation, prior notice, or an opportunity to bargain. The collective-bargaining agreements negotiated under subchapter X, in contrast, are by nature designed to reduce the control of the agency over its personnel and operations.

For example, the State Department and USAID must postpone operational changes that substantively affect working conditions until they have offered the relevant union an opportunity to bargain. *See* JA57-58; JA172-173. And the FLRA routinely pauses agency attempts to implement changes before a midterm bargaining process has concluded, a process that often imposes delays of months or years. *See, e.g.*, *U.S. Army Corps of Eng'rs Memphis Dist. & National Fed'n of Fed. Emps. Loc. 259*, 53 F.L.R.A. 79, 86-87 (1997).

Providing for the national security involves "complex, subtle, and professional decisions as to the composition, training, equipping, and control" of the workforce performing investigations, intelligence, and national-security tasks. *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973). The President reasonably concluded that collective-bargaining agreements that impede or prevent agencies from separating underperforming employees, dictate the place or conditions of work, or impair the Executive Branch's ability to react to rapid developments with due haste are inconsistent with national-security considerations.

**c.** Relying on *Cole v. Young*, 351 U.S. 536 (1956), the district court opined that the term "national security" includes "only those activities

… that are directly concerned with the protection of the Nation from internal subversion or foreign aggression." JA287 (alteration in original) (quoting *Cole*, 351 U.S. at 544). But nothing in Executive Order 14,251 is inconsistent with that definition. The State Department's management of international alliances and foreign relations, including in conflict zones, is critical to protecting the Nation from foreign aggression. *Cf. Cole*, 351 U.S. at 544-545 (noting that agencies "directly concerned with the national defense" include those that "are concerned with … international relations"). Indeed, in *Cole* itself the Supreme Court was willing to "assume" that the President had validly extended a statute permitting the summary dismissal of employees to the Department of Health, Education, and Welfare on the basis that doing so was in the best interests of national security. *Id.* at 542. That conclusion applies *a fortiori* to subdivisions of the Department of State.

In any event, *Cole*'s holding is clearly inapplicable here. *Cole* held that an employee had been improperly subjected to summary-termination procedures that the statute permitted only in circumstances where "necessary or advisable in the interest of the

national security" because the agency had acted pursuant to an executive order that allowed the discharge of "any employee of doubtful loyalty, *irrespective* of the character of his job and its relationship to the 'national security.'" 351 U.S. at 541, 552-553, 556-557 (emphasis added). The Court found that the executive order in that case permitted summary termination in circumstances not authorized by statute because it allowed agencies to dispense with the national-security determination contemplated by statute. Here, however, the President expressly determined that, with regard to each of the subdivisions listed in the executive order, the provisions of subchapter X "cannot be applied … in a manner consistent with national security requirements and considerations." Exec. Order No. 14,251, § 1, 90 Fed. Reg. at 14,553. *Cole* provides no basis to second-guess that determination.

Accordingly, the district court's decision to second-guess the President's determination of whether the provisions of subchapter X can be applied to certain agencies consistent with the requirements of national security was entirely improper. Such an approach is inconsistent with the statute's grant of discretion to the President, the

presumption of regularity recognized in *AFGE v. Reagan*, and the standard for establishing a right to relief on a non-statutory *ultra vires* claim.

## II. PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM

AFSA also failed to establish irreparable harm, which is by itself a sufficient basis for vacating the preliminary injunction. The district court identified two supposed harms to AFSA, but neither supports the injunction.

**A.** First, the district court thought that AFSA would lose bargaining power absent an injunction. JA291-294. But it is speculative to think that employees—whose membership is purely voluntary regardless of the executive order—will leave the union while this litigation is ongoing, and just as speculative to think that the loss of some number of members would materially weaken AFSA's bargaining position. Other courts have similarly held that a union's concern "that its members will lose confidence in the union" absent immediate relief "is too speculative to justify a preliminary injunction." *East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005). A union "is free to explain the difficulties

of litigation to its members if they ask why more is not being done sooner," and "if some members' confidence is shaken, the chance that vindication of the union at trial would not restore that confidence is too speculative to justify a preliminary injunction." *Id.*; *see also, e.g.*, *Henderson ex rel. NLRB v. Bluefield Hosp. Co.*, 902 F.3d 432, 440 (4th Cir. 2018) (rejecting the "theory that interim relief is necessary to prevent the Union from losing employee support"). If AFSA ultimately prevails in this litigation and its status as an exclusive bargaining representative is reaffirmed, AFSA has identified no reason that employees who may have left the union would not rejoin. AFSA thus cannot demonstrate that any ostensible harm would be lasting or irreparable.

Nor would plaintiff suffer irreparable harm from the State Department or USAID's refusal to negotiate over changes to employment conditions during the pendency of litigation. If AFSA prevails and the executive order is invalidated, the FSLRB could direct the agencies not to implement the executive order and impose a retroactive remedy—including with regard to any reductions in force. *See* 22 U.S.C. § 4116(g) (authorizing the FSLRB to issue an order that

gives a collective-bargaining agreement "retroactive effect" and to take "such other action as will carry out the purpose" of subchapter X); *Department of the Navy Naval Aviation Depot Naval Air Station Alameda & Int'l Ass'n of Machinists & Aerospace Workers Lodge 739*, 36 F.L.R.A. 509, 511 (1990) ("Where an agency violates the [FSLMRS] by changing a negotiable condition of employment without fulfilling its obligation to bargain on that change, the Statute requires the imposition of a status quo ante remedy, in the absence of special circumstances."). AFSA's remedy for agency non-compliance with a collective-bargaining agreement is through grievance procedures and the Foreign Service Grievance Board, or unfair-labor-practice complaints and the FSLRB, not by seeking a preliminary injunction in district court. *See AFGE*, 929 F.3d at 757-758 (union had administrative options to challenge executive orders before the FLRA, and the FLRA could grant effective relief by directing agencies not to implement various provisions of executive orders).

**B.** The district court also erred in finding that plaintiff would suffer monetary harm absent an injunction because the defendant agencies have stopped withholding union dues from employees'

paychecks.  *See* JA294-295.  Such "financial injuries are rarely irreparable because they are presumptively remediable through monetary damages."  *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1234 (D.C. Cir. 2025).  And as this Court explained in *NTEU*, AFSA "can seek to recover missing dues in subsequent [FSLRB] proceedings if the Union ultimately prevails in this litigation."  *NTEU* Stay Order, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (per curiam); *see U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970*, 71 F.L.R.A. 829, 830 (2020) (ordering reimbursement of dues that an agency unlawfully failed to withhold); *U.S. Dep't of the Treasury U.S. Mint & AFGE Mint Council, C-157*, 35 F.L.R.A. 1095, 1100-1102 (1990) (same).

In any event, it is speculative that AFSA will suffer significant financial injury in the interim.  Although agencies are no longer withholding dues from the paychecks of employees who are covered by the executive order, AFSA can collect dues directly from such members.  *NTEU* Stay Order, 2025 WL 1441563, at *2.  "[T]hat is, after all, how most other voluntary membership organizations collect dues."  *Id.*; *see also AFGE* Stay Order, 2025 WL 2180674, at *5 ("[P]aused

administration of dues collection can be addressed by voluntary dues payment in the interim and by monetary damages at the end of litigation[.]").  And, in fact, AFSA already has a means of allowing members to pay their dues directly online.  *See* JA235.

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, the last two preliminary-injunction factors—which merge because the government is the party opposing an injunction, *see Nken v. Holder*, 556 U.S. 418, 435 (2009)—strongly favor defendants.  The clear congressional purpose of § 4103(b) is to allow the President to guarantee the effective operation of the State Department and USAID relevant to national security without the constraints of collective bargaining.  "The interest in preserving national security is an urgent objective of the highest order."  *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam) (quotation marks omitted).  To interfere with the President's assessment of the government's investigative, intelligence, and national-security functions "would appreciably injure [the Nation's] interests."  *Id.* at 582; *see also Winter*, 555 U.S. at 31 (holding that it would be "cold comfort" to allow the Navy to request relief from a preliminary injunction on an

emergency basis if the injunction "actually results in an inability to train and certify sufficient naval forces to provide for the national defense" (alteration and quotation marks omitted)).

As this Court previously concluded, "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA* Stay Order, 2025 WL 1742853, at *3. The injunction "ties the government's hands" in determining whether and how to implement the executive order, and "[t]hat transfer of control, from the Executive to the Judiciary," is particularly "problematic … in the national security context, an area in which the President generally enjoys unique responsibility." *NTEU* Stay Order, 2025 WL 1441563, at *2 (quotation marks omitted). In contrast, "preserving the President's autonomy under a statute that expressly recognizes his national-security expertise is within the public interest." *Id.* at *3; *see also AFGE* Stay Order, 2025 WL 2180674, at *5.

Congress already weighed the competing interests—union representation versus national security—when it passed the Foreign Service Act. *See AFSA* Stay Order, 2025 WL 1742853, at *3. To the

extent AFSA will suffer any irreparable harm directly traceable to the executive order, the balance of equities favors the government. *See id.*

## CONCLUSION

For the foregoing reasons, the district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MELISSA N. PATTERSON

*/s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
*Attorneys, Appellate Staff*
*Civil Division, Room 7212*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4820*
*joshua.m.koppel@usdoj.gov*

September 2025

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,637 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joshua M. Koppel*
Joshua M. Koppel

# ADDENDUM

# TABLE OF CONTENTS

22 U.S.C. § 4103.................................................................A1

22 U.S.C. § 4106.................................................................A2

22 U.S.C. § 4107.................................................................A4

22 U.S.C. § 4109.................................................................A6

22 U.S.C. § 4115.................................................................A7

22 U.S.C. § 4116.................................................................A8

**22 U.S.C. § 4103**

## § 4103. Application

(a) Departments and agencies affected

This subchapter applies only with respect to the Department of State, the Broadcasting Board of Governors, the Agency for International Development, the Department of Agriculture, and the Department of Commerce.

(b) Exclusion of subdivisions

The President may by Executive order exclude any subdivision of the Department from coverage under this subchapter if the President determines that--

(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

(c) Suspension of provisions

The President may by Executive order suspend any provision of this subchapter with respect to any post, bureau, office, or activity of the Department, if the President determines in writing that the suspension is necessary in the interest of national security because of an emergency.

**22 U.S.C. § 4106**

## § 4106. Foreign Service Labor Relations Board

(a) Establishment; composition

There is established within the Federal Labor Relations Authority the Foreign Service Labor Relations Board. The Board shall be composed of 3 members, 1 of whom shall be the Chairman of the Authority, who shall be the Chairperson of the Board. The remaining 2 members shall be appointed by the Chairperson of the Board from nominees approved in writing by the agencies to which this subchapter applies, and the exclusive representative (if any) of employees in each such agency. In the event of inability to obtain agreement on a nominee, the Chairperson shall appoint the remaining 2 members from among individuals the Chairperson considers knowledgeable in labor-management relations and the conduct of foreign affairs.

(b) Chairperson serving concurrently as Chairman of Authority; length of terms; designation of alternate Chairperson

The Chairperson shall serve on the Board while serving as Chairman of the Authority. Of the 2 original members of the Board other than the Chairperson, one shall be appointed for a 2-year term and one shall be appointed for a 3-year term. Thereafter, each member of the Board other than the Chairperson shall be appointed for a term of 3 years, except that an individual appointed to fill a vacancy occurring before the end of a term shall be appointed for the unexpired term of the member replaced. The Chairperson may at any time designate an alternate Chairperson from among the members of the Authority.

(c) Vacancies

A vacancy on the Board shall not impair the right of the remaining members to exercise the full powers of the Board.

(d) Holding other Government offices or positions; compensation

The members of the Board, other than the Chairperson, may not hold another office or position in the Government except as authorized by law, and shall receive compensation at the daily equivalent of the rate payable for level V of the Executive Schedule under section 5316 of Title 5 for each day they are performing their duties (including traveltime).

(e) Removal of members

The Chairperson may remove any other Board member, upon written notice, for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at a hearing, except where the right to a hearing is waived in writing.

**22 U.S.C. § 4107**

**§ 4107. Functions of Foreign Service Labor Relations Board**

(a) General provisions

The Board shall--

(1) supervise or conduct elections and determine whether a labor organization has been selected as the exclusive representative by a majority of employees who cast valid ballots and otherwise administer the provisions of this subchapter relating to the according of exclusive recognition to a labor organization;

(2) resolve complaints of alleged unfair labor practices;

(3) resolve issues relating to the obligation to bargain in good faith;

(4) resolve disputes concerning the effect, the interpretation, or a claim of breach of a collective bargaining agreement, in accordance with section 4114 of this title; and

(5) take any action considered necessary to administer effectively the provisions of this subchapter.

(b) Consistency or precedence of decisions under other provisions of law

Decisions of the Board under this subchapter shall be consistent with decisions rendered by the Authority under chapter 71 of Title 5, other than in cases in which the Board finds that special circumstances require otherwise. Decisions of the Board under this subchapter shall not be construed as precedent by the Authority, or any court or other authority, for any decision under chapter 71 of Title 5.

(c) Implementation

In order to carry out its functions under this subchapter--

(1) the Board shall by regulation adopt procedures to apply in the administration of this subchapter; and

(2) the Board may--

(A) adopt other regulations concerning its functions under this subchapter;

(B) conduct appropriate inquiries wherever persons subject to this subchapter are located;

(C) hold hearings;

(D) administer oaths, take the testimony or deposition of any individual under oath, and issue subpenas;

(E) require the Department or a labor organization to cease and desist from violations of this subchapter and require it to take any remedial action the Board considers appropriate to carry out this subchapter; and

(F) consistent with the provisions of this subchapter, exercise the functions the Authority has under chapter 71 of Title 5 to the same extent and in the same manner as is the case with respect to persons subject to chapter 71 of such title.

## 22 U.S.C. § 4109

## § 4109. Judicial review and enforcement

(a) Persons entitled to maintain action; time of filing; venue

Except as provided in section 4114(d) of this title, any person aggrieved by a final order of the Board may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of such order in the United States Court of Appeals for the District of Columbia.

(b) Enforcement of order; temporary relief or restraining order

The Board may petition the United States Court of Appeals for the District of Columbia for the enforcement of any order of the Board under this subchapter and for any appropriate temporary relief or restraining order.

(c) Applicability of other provisions of law

Subsection (c) of section 7123 of Title 5 shall apply to judicial review and enforcement of actions by the Board in the same manner that it applies to judicial review and enforcement of actions of the Authority under chapter 71 of Title 5.

(d) Unfair labor practices

The Board may, upon issuance of a complaint as provided in section 4116 of this title charging that any person has engaged in or is engaging in an unfair labor practice, petition the United States District Court for the District of Columbia, for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the Department to carry out its essential functions or if the Board fails to establish probable cause that an unfair labor practice is being committed.

**22 U.S.C. § 4115**

**§ 4115. Unfair labor practices**

(a) Department of State

It shall be an unfair labor practice for the Department--

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this subchapter;

(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

(3) to sponsor, control, or otherwise assist any labor organization, other than to furnish upon request customary and routine services and facilities on an impartial basis to labor organizations having equivalent status;

(4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint or petition, or has given any information, affidavit, or testimony under this subchapter;

(5) to refuse to consult or negotiate in good faith with a labor organization, as required under this subchapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions, as required under this subchapter;

(7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of Title 5) which is in conflict with an applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

(8) to fail or refuse otherwise to comply with any provision of this subchapter.

\* \* \*

## 22 U.S.C. § 4116

## § 4116. Prevention of unfair labor practices

(a) Investigation by General Counsel; issuance of complaint; statement of reasons

If the Department or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the Department or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.

(b) Notice in complaint

Any complaint under subsection (a) shall contain a notice--

   (1) of the charge;

   (2) that a hearing will be held before the Board (or any member thereof or before an individual employed by the Board and designated for such purpose); and

   (3) of the time and place fixed for the hearing.

(c) Answer; personal appearance

The labor organization or Department involved shall have the right to file an answer to the original and any amended complaint and to appear in person or otherwise and give testimony at the time and place fixed in the complaint for the hearing.

(d) Time of filing of charges

   (1) Except as provided in paragraph (2), no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Board.

   (2) If the General Counsel determines that the person filing any charge was prevented from filing the charge during the 6-month period referred to in paragraph (1) by reason of--

(A) any failure of the Department or labor organization against which the charge is made to perform a duty owed to the person, or

(B) any concealment which prevented discovery of the alleged unfair labor practice during the 6-month period,

the General Counsel may issue a complaint based on the charge if the charge was filed during the 6-month period beginning on the day of the discovery by the person of the alleged unfair labor practice.

(e) Regulations providing for resolution through informal methods

The General Counsel may prescribe regulations providing for informal methods by which the alleged unfair labor practice may be resolved prior to the issuance of a complaint.

(f) Hearing

The Board (or any member thereof or any individual employed by the Board and designated for such purpose) shall conduct a hearing on the complaint not earlier than 5 days after the date on which the complaint is served. In the discretion of the individual or individuals conducting the hearing, any person involved may be allowed to intervene in the hearing and to present testimony. Any such hearing shall, to the extent practicable, be conducted in accordance with the provisions of subchapter II of chapter 5 of Title 5, except that the parties shall not be bound by rules of evidence, whether statutory, common law, or adopted by a court. A transcript shall be kept of the hearing. After such a hearing the Board, in its discretion, may upon notice receive further evidence or hear argument.

(g) Findings of fact relative to issuance of orders; backpay

If the Board (or any member thereof or any individual employed by the Board and designated for such purpose) determines after any hearing on a complaint under subsection (f) that the preponderance of the evidence received demonstrates that the Department or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the Department or labor organization an order--

(1) to cease and desist from any such unfair labor practice in which the Department or labor organization is engaged;

(2) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Board and requiring that the agreement, as amended, be given retroactive effect;

(3) requiring reinstatement of an employee with backpay in accordance with section 5596 of Title 5; or

(4) including any combination of the actions described in paragraphs (1) through (3) or such other action as will carry out the purpose of this subchapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the Department (as provided in section 5596 of Title 5) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

(h) Findings of fact requiring dismissal of complaint

If the individual or individuals conducting the hearing determine that the preponderance of the evidence received fails to demonstrate that the Department or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, the individual or individuals shall state in writing their findings of fact and shall issue an order dismissing the complaint.