# [ORAL ARGUMENT NOT SCHEDULED]

## No. 25-5184

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――

AMERICAN FOREIGN SERVICE ASSOCIATION,

Plaintiff-Appellee,

v.

DONALD J. TRUMP et al.,

Defendants-Appellants.

―――――――――――

On Appeal from the United States District Court
for the District of Columbia

―――――――――――

## JOINT APPENDIX

―――――――――――

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*

  *Counsel for Defendants-Appellants*

# INDEX

| Description | Dkt. No. | Page |
|---|---|---|
| District Court Docket Sheet | | JA1 |
| Complaint | 1 | JA9 |
| Exhibits to Plaintiff's Motion for Preliminary Injunction | | |
| Declaration of Thomas Yazdgerdi | 10-2 | JA29 |
| Declaration of Tina Wong | 10-3 | JA84 |
| Declaration of Randall Chester | 10-4 | JA149 |
| Declaration of Asgeir Sigfusson | 10-5 | JA194 |
| Declaration of Neera A. Parikh | 10-6 | JA200 |
| Declaration of Sharon L. Papp | 10-7 | JA207 |
| Exhibits to Reply in Support of Motion for Preliminary Injunction | 25 | JA220 |
| Defendants' Notice of Exhibits | 28 | JA229 |
| Supplemental Declaration of Thomas Yazdgerdi | 31 | JA241 |
| Order Granting Preliminary Injunction | 36 | JA261 |
| Opinion on Preliminary Injunction | 37 | JA263 |
| Notice of Appeal | 40 | JA299 |

APPEAL,TYPE-D

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:25-cv-01030-PLF

AMERICAN FOREIGN SERVICE ASSOCIATION v. TRUMP et al
Assigned to: Judge Paul L. Friedman
Related Cases: 1:25-cv-00935-PLF
              1:25-cv-02445-PLF
              1:25-cv-02657-PLF
              1:25-cv-02947-PLF
              1:25-cv-01362-PLF
Case in other court: USCA, 25-05184
Cause: 05:704 Labor Litigation

Date Filed: 04/07/2025
Jury Demand: None
Nature of Suit: 790 Labor: Other
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**AMERICAN FOREIGN SERVICE ASSOCIATION**

represented by **Richard J Hirn**
5335 Wisconsin Avenue, NW
Suite 440
Washington, DC 20015
(202) 274-1812
Fax: (202) 686-2877
Email: richard@hirnlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Keith R. Bolek**
O'DONOGHUE & O'DONOGHUE LLP
5301 Wisconsin Avenue, NW
Suite 800
Washington, DC 20015
Email: kbolek@odonoghuelaw.com
*ATTORNEY TO BE NOTICED*

**Raeka Safai**
AMERICAN FOREIGN SERVICE ASSOCIATION
2101 E St NW
Washington, DC 20037
202-647-8160
Email: safai@afsa.org
*ATTORNEY TO BE NOTICED*

**Sharon L. Papp**
AMERICAN FOREIGN SERVICE ASSOCIATION
2101 E Street, NW
Washington, DC 20037
703-598-4344

Email: papp@afsa.org
*ATTORNEY TO BE NOTICED*

**April H. Pullium**
O'DONOGHUE & O'DONOGHUE LLP
5301 Wisconsin Ave. NW
Suite 800
Washington, DC 20015
202-362-0041
Fax: 202-362-2640
Email: apullium@odonoghuelaw.com
*ATTORNEY TO BE NOTICED*

V.

<u>**Defendant**</u>

**DONALD J. TRUMP**
*in his official capacity as President of the
United States*

represented by **Jeremy S. Simon**
DOJ-USAO
Patrick Henry Building
601 D. Street, N.W.
Washington, DC 20530
(202) 252-2528
Email: jeremy.simon@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**OFFICE OF PERSONNEL
MANAGEMENT**

represented by **Jeremy S. Simon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. DEPARTMENT OF STATE**

represented by **Jeremy S. Simon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**U.S. AGENCY FOR INTERNATIONAL
DEVELOPMENT**

represented by **Jeremy S. Simon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**MARCO A. RUBIO**
*in his official capacity as Secretary of State
and Acting Administrator, United States
Agency for International Development*

represented by **Jeremy S. Simon**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

<u>**Defendant**</u>

**CHARLES EZELL**
*in his official capacity as Acting Director,*

represented by **Jeremy S. Simon**
(See above for address)

*Office of Personnel Management*                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/07/2025 | 1 | COMPLAINT *for Declaratory and Injunctive Relief* against All Defendants ( Filing fee $ 405 receipt number ADCDC-11594850) filed by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Civil Cover Sheet, # 2 Summons to Donald J. Trump, # 3 Summons to Office of Personnel Management, # 4 Summons to U.S. Department of State, # 5 Summons to U.S. Agency for International Development, # 6 Summons to Marco Rubio, # 7 Summons to Charles Ezell)(Pullium, April) (Attachment 1 replaced to remove fillable form on 4/7/2025) (zjd). (Entered: 04/07/2025) |
| 04/07/2025 | 2 | NOTICE OF RELATED CASE by AMERICAN FOREIGN SERVICE ASSOCIATION. Case related to Case No. 1:25-cv-935 (D.D.C); 3:25-cv-03070 (N.D. Cal.). (Pullium, April) (Main Document 2 replaced to remove fillable form on 4/7/2025) (zjd). (Entered: 04/07/2025) |
| 04/07/2025 | 3 | NOTICE of Appearance by Keith R. Bolek on behalf of AMERICAN FOREIGN SERVICE ASSOCIATION (Bolek, Keith) (Entered: 04/07/2025) |
| 04/07/2025 | 4 | NOTICE of Appearance by April H. Pullium on behalf of AMERICAN FOREIGN SERVICE ASSOCIATION (Pullium, April) (Entered: 04/07/2025) |
| 04/07/2025 | 5 | NOTICE of Appearance by Richard J Hirn on behalf of AMERICAN FOREIGN SERVICE ASSOCIATION (Hirn, Richard) (Entered: 04/07/2025) |
| 04/07/2025 | 6 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by AMERICAN FOREIGN SERVICE ASSOCIATION (Pullium, April) (Entered: 04/07/2025) |
| 04/07/2025 | | Case Assigned to Judge Paul L. Friedman. (zjd) (Entered: 04/07/2025) |
| 04/07/2025 | 7 | SUMMONS (6) Issued Electronically as to CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, and U.S. DEPARTMENT OF STATE. (Attachment: # 1 Notice and Consent) (zjd) (Entered: 04/07/2025) |
| 04/08/2025 | 8 | REQUEST FOR SUMMONS TO ISSUE filed by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Summons to U.S. Attorney's Office, # 2 Summons to U.S. Attorney General)(Pullium, April) (Entered: 04/08/2025) |
| 04/08/2025 | 9 | SUMMONS (2) Issued Electronically as to U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(zjm) (Entered: 04/08/2025) |
| 04/14/2025 | 10 | MOTION for Preliminary Injunction by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Memorandum in Support of Motion for Preliminary Injunction, # 2 Declaration of Thomas Yazdgerdi, # 3 Declaration of Tina Wong, # 4 Declaration of Randall Chester, # 5 Declaration of Asgeir Sigfusson, # 6 Declaration of Neera Parikh, # 7 Declaration of Sharon Papp, # 8 Text of Proposed Order)(Pullium, April) (Entered: 04/14/2025) |
| 04/14/2025 | 11 | NOTICE *of Certificate Pursuant to Local Civil Rule 65.1* by AMERICAN FOREIGN SERVICE ASSOCIATION (Pullium, April) (Entered: 04/14/2025) |
| 04/14/2025 | 13 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 4/14/2025. |

| | | |
|---|---|---|
| | | Answer due for ALL FEDERAL DEFENDANTS by 6/13/2025. (See Docket Entry 11 to view document)(zjm) (Entered: 04/15/2025) |
| 04/15/2025 | 12 | ORDER scheduling oral argument on 10 Plaintiff's Motion for a Preliminary Injunction for May 5, 2025 at 2:00 p.m. and directing parties to meet and confer and file a joint status report. See Order for details. Signed by Judge Paul L. Friedman on April 15, 2025. (lcjd) (Entered: 04/15/2025) |
| 04/15/2025 | | Set/Reset Hearings: Preliminary Injunction Hearing set for 5/5/2025 at 2:00 PM in Courtroom 29A- In Person before Judge Paul L. Friedman. (tj) (Entered: 04/15/2025) |
| 04/16/2025 | 14 | NOTICE of Appearance by Jeremy S. Simon on behalf of All Defendants (Simon, Jeremy) (Entered: 04/16/2025) |
| 04/16/2025 | 15 | Joint STATUS REPORT by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Simon, Jeremy) (Entered: 04/16/2025) |
| 04/16/2025 | | MINUTE ORDER: In light of the parties' 15 Joint Status Report, the defendants shall file their opposition to plaintiff's motion for a preliminary injunction [Dkt. No. 10] on or before April 25, 2025. The plaintiff shall file its reply on or before May 1, 2025. Signed by Judge Paul L. Friedman on April 16, 2025. (lcjd) (Entered: 04/16/2025) |
| 04/18/2025 | 16 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. CHARLES EZELL served on 4/14/2025 (Pullium, April) (Entered: 04/18/2025) |
| 04/18/2025 | 17 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. OFFICE OF PERSONNEL MANAGEMENT served on 4/14/2025 (Pullium, April) (Entered: 04/18/2025) |
| 04/18/2025 | 18 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. DEPARTMENT OF STATE served on 4/14/2025 (Pullium, April) (Entered: 04/18/2025) |
| 04/18/2025 | 19 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT served on 4/14/2025 (Pullium, April) (Entered: 04/18/2025) |
| 04/18/2025 | 20 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MARCO RUBIO served on 4/15/2025 (Pullium, April) (Entered: 04/18/2025) |
| 04/22/2025 | 21 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. DONALD J. TRUMP served on 4/21/2025 (Pullium, April) (Entered: 04/22/2025) |
| 04/22/2025 | 22 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 4/15/2025. (Pullium, April) (Entered: 04/22/2025) |
| 04/25/2025 | 23 | Memorandum in opposition to re 10 MOTION for Preliminary Injunction filed by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Attachments: # 1 Proposed Order)(Simon, Jeremy) (Entered: 04/25/2025) |
| 04/30/2025 | 24 | MOTION for Leave to File *Supplemental Declaration of Thomas Yazdgerdi* by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Declaration of Thomas Yazdgerdi, # 2 Text of Proposed Order)(Pullium, April) (Entered: 04/30/2025) |
| 04/30/2025 | 25 | REPLY to opposition to motion re 10 Motion for Preliminary Injunction, filed by AMERICAN FOREIGN SERVICE ASSOCIATION. (Pullium, April) (Entered: |

04/30/2025)

| 05/01/2025 | | MINUTE ORDER: The Court will connect the public-access telephone line for the motion hearing now scheduled for May 5, 2025 at 2:00 p.m. Any member of the public or media may access the public-access line by dialing (833) 990-9400, and using meeting ID 492497252. As a reminder, any use of the public-access telephone line requires adherence to the general prohibition against recording, livestreaming, and rebroadcasting of court proceedings (including those held by videoconference). Violation of these prohibitions may result in sanctions, including removal of court-issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or other sanctions deemed necessary by the Court. Signed by Judge Paul L. Friedman on May 1, 2025. (lcjd) (Entered: 05/01/2025) |
|---|---|---|
| 05/02/2025 | 26 | ENTERED IN ERROR.....Joint STATUS REPORT by AMERICAN FOREIGN SERVICE ASSOCIATION. (Pullium, April) Modified on 5/2/2025 (zjm). (Entered: 05/02/2025) |
| 05/02/2025 | | NOTICE OF ERROR regarding 26 Status Report. The following error(s) need correction: Invalid attorney signature- signature on document must match PACER login. Please refile. (zjm) (Entered: 05/02/2025) |
| 05/02/2025 | 27 | Joint STATUS REPORT by AMERICAN FOREIGN SERVICE ASSOCIATION. (Pullium, April) (Entered: 05/02/2025) |
| 05/05/2025 | 28 | NOTICE *(Defendants' Notice of Exhibits)* by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE (Simon, Jeremy) (Entered: 05/05/2025) |
| 05/05/2025 | | MINUTE ORDER: Upon consideration of plaintiff's 24 Motion for Leave to File Supplemental Declaration of Thomas Yazdgerdi, the motion is GRANTED. Signed by Judge Paul L. Friedman on May 5, 2025. (lcjd) (Entered: 05/05/2025) |
| 05/05/2025 | | Minute Entry for proceedings held before Judge Paul L. Friedman: Motion Hearing held on 5/5/2025 re 10 MOTION for Preliminary Injunction filed by AMERICAN FOREIGN SERVICE ASSOCIATION. Oral argument heard, and the court takes the motion under advisement. Plaintiff's to submit a revised proposed order for the court's review by 5/6/25. Government's to respond by 5/7/25 if there are any objections. (Court Reporter: Janice Dickman) (tj) (Entered: 05/06/2025) |
| 05/05/2025 | 31 | DECLARATION by AMERICAN FOREIGN SERVICE ASSOCIATION re 10 MOTION for Preliminary Injunction . (zjm) (Entered: 05/09/2025) |
| 05/06/2025 | 29 | NOTICE of Proposed Order *(Revised)* by AMERICAN FOREIGN SERVICE ASSOCIATION re 10 MOTION for Preliminary Injunction (Pullium, April) (Entered: 05/06/2025) |
| 05/07/2025 | 30 | RESPONSE re 29 Notice of Proposed Order *(Defendants' Response to Proposed Order)* filed by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Attachments: # 1 Revised Proposed Order (redline), # 2 Revised Proposed Order (redline accepted))(Simon, Jeremy) (Entered: 05/07/2025) |
| 05/09/2025 | | MINUTE ORDER: In light of the issues raised in Defendants' 30 Response to Proposed Order, plaintiff may file a response to defendants' filing 30 on or before May 12, 2025. Signed by Judge Paul L. Friedman on May 9, 2025. (lcjd) (Entered: 05/09/2025) |

| | | |
|---|---|---|
| 05/12/2025 | 32 | RESPONSE *to Defendants' Response to Proposed Order* filed by AMERICAN FOREIGN SERVICE ASSOCIATION. (Pullium, April) (Entered: 05/12/2025) |
| 05/12/2025 | 33 | NOTICE of Appearance by Raeka Safai on behalf of AMERICAN FOREIGN SERVICE ASSOCIATION. (Safai, Raeka) Modified on 5/13/2025 to correct event (zjm). (Entered: 05/12/2025) |
| 05/12/2025 | 34 | TRANSCRIPT OF PROCEEDINGS before Judge Paul L. Friedman held on May 5, 2025; Page Numbers: 1-56. Date of Issuance: May 12, 2025. Court Reporter: Janice Dickman, Telephone number: 202-354-3267, Transcripts may be ordered by submitting the Transcript Order Form <br><br> For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter referenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi-page, condensed, CD or ASCII) may be purchased from the court reporter. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty-one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov. <br><br> Redaction Request due 6/2/2025. Redacted Transcript Deadline set for 6/12/2025. Release of Transcript Restriction set for 8/10/2025.(Dickman, Janice) (Entered: 05/12/2025) |
| 05/13/2025 | 35 | NOTICE of Appearance by Sharon L. Papp on behalf of AMERICAN FOREIGN SERVICE ASSOCIATION (Papp, Sharon) Modified on 5/13/2025 to correct event (zjm). (Entered: 05/13/2025) |
| 05/14/2025 | 36 | ORDER granting Plaintiff's 10 Motion for a Preliminary Injunction. The parties are directed to file a joint status report on or before May 20, 2025. See Order for details. Signed by Judge Paul L. Friedman on May 14, 2025. (lcjd) (Entered: 05/14/2025) |
| 05/14/2025 | 37 | OPINION granting Plaintiff's 10 Motion for a Preliminary Injunction. See Opinion for details. Signed by Judge Paul L. Friedman on May 14, 2025. (lcjd) (Entered: 05/14/2025) |
| 05/15/2025 | | Set/Reset Deadlines: Status Report due by 5/20/2025 (tj) (Entered: 05/15/2025) |
| 05/20/2025 | 38 | Joint STATUS REPORT by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Simon, Jeremy) (Entered: 05/20/2025) |
| 05/20/2025 | | MINUTE ORDER: In light of the parties' 38 Joint Status Report, the parties are directed to file another joint status report on or before June 9, 2025. Signed by Judge Paul L. Friedman on May 20, 2025. (lcjd) (Entered: 05/20/2025) |
| 05/21/2025 | 39 | NOTICE *of Bond Posted* by AMERICAN FOREIGN SERVICE ASSOCIATION (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Pullium, April) (Entered: 05/21/2025) |
| 05/21/2025 | 40 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 36 Order on Motion for Preliminary Injunction, 37 Memorandum & Opinion by MARCO RUBIO, U.S. DEPARTMENT OF STATE, OFFICE OF PERSONNEL MANAGEMENT, CHARLES EZELL, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL |

| | | |
|---|---|---|
| | | DEVELOPMENT. Fee Status: No Fee Paid. Parties have been notified. (Simon, Jeremy) (Entered: 05/21/2025) |
| 05/21/2025 | 41 | Transmission of the Notice of Appeal, Order Appealed (Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals docketing fee was not paid because the appeal was filed by the government re 40 Notice of Appeal to DC Circuit Court,. (zjm) (Entered: 05/21/2025) |
| 05/22/2025 | | USCA Case Number 25-5184 for 40 Notice of Appeal to DC Circuit Court, filed by U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, OFFICE OF PERSONNEL MANAGEMENT, DONALD J. TRUMP, CHARLES EZELL, U.S. DEPARTMENT OF STATE, MARCO RUBIO. (zdp) (Entered: 05/22/2025) |
| 05/22/2025 | 42 | MOTION to Stay *Pending Appeal* by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Attachments: # 1 Proposed Order)(Simon, Jeremy) (Entered: 05/22/2025) |
| 05/23/2025 | | ORDER REFERRING MOTION: 42 MOTION to Stay *Pending Appeal* to Judge Moss. Signed by Judge Paul L. Friedman on May 23, 2025. (lcjd) (Entered: 05/23/2025) |
| 05/23/2025 | | MINUTE ORDER: In light of Defendants' motion to stay pending appeal, Dkt. 42 , it is hereby ORDERED that Plaintiff shall file a response on or before May 27, 2025, and Defendants may file a reply on or before May 29, 2025. Signed by Judge Randolph D. Moss on 5/23/2025. (lcrdm3) (Entered: 05/23/2025) |
| 05/27/2025 | 43 | Memorandum in opposition to re 42 MOTION to Stay *Pending Appeal* filed by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Text of Proposed Order)(Pullium, April) (Entered: 05/27/2025) |
| 05/28/2025 | | Set/Reset Deadlines: Status Report due by 6/9/2025 (tj) (Entered: 05/28/2025) |
| 05/29/2025 | 44 | REPLY to opposition to motion re 42 Motion to Stay filed by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Simon, Jeremy) (Entered: 05/29/2025) |
| 05/30/2025 | | MINUTE ORDER: In light of the circumstances surrounding Defendants' motion to stay pending appeal, Dkt. 42 , the Court will defer ruling on Defendants' motion. Under Federal Rule of Appellate Procedure 8(a), a party must "ordinarily" move first in the district court for a stay pending appeal before moving in the Court of Appeals for such relief. A party is relieved of this obligation if moving first in the district court would be "impracticable." Fed. R. App. P. 8(a)(2). The purpose of this rule (and its exceptions) is to conserve the courts' and the parties' resources, while ensuring that a party subject to an adverse judgment may timely seek relief to avoid an irreparable injury. Here, the Court concludes that deferral is appropriate for several reasons. First, although Defendants aver that they are suffering an irreparable injury from Judge Friedman's preliminary injunction order, Dkt. 37 , that contention is at least somewhat belied by their weeklong delay in moving for a stay. Second, Judge Friedman is currently unavailable, but he will become available again in the coming weeks, and so there is no compelling need for this Court to intervene and reconsider his decision in the interim. Finally, and most importantly, Defendants moved for a stay in the Court of Appeals, and that court ordered the parties to brief Defendants' motion on an expedited basis. Because the Court of Appeals appears poised to decide Defendants' motion, and because the Court of Appeals is the more appropriate forum for arguing Defendants are likely to prevail in the efforts to overturn the decision of another judge who sits on this same Court, the Court concludes that deferral is the most appropriate course. In the unlikely event that the D.C. Circuit does not decide whether to grant a stay before Judge |

| | | |
|---|---|---|
| | | Friedman returns to the office, he will be far better situated than the undersigned to evaluate the merits of Defendants' motion to stay his order. Signed by Judge Randolph D. Moss on 5/30/2025. (lcrdm3) (Entered: 05/30/2025) |
| 06/09/2025 | 45 | Joint STATUS REPORT *and Defendants' Consent Motion for Extension of Time to Respond to Complaint* by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (Attachments: # 1 Proposed Order)(Simon, Jeremy) (Entered: 06/09/2025) |
| 06/09/2025 | 46 | MOTION for Extension of Time to by CHARLES EZELL, OFFICE OF PERSONNEL MANAGEMENT, MARCO RUBIO, DONALD J. TRUMP, U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, U.S. DEPARTMENT OF STATE. (See Docket Entry 45 to view document) (zjm) Modified on 6/11/2025 (zjm). (Entered: 06/11/2025) |
| 06/10/2025 | | MINUTE ORDER: In light of the parties' 45 Joint Status Report, the deadlines for the parties' dispositive motions are as follows: plaintiff's motion for summary judgment shall be filed on or before August 4, 2025; defendants' opposition and motion to dismiss or for summary judgment shall be filed on or before September 19, 2025; plaintiff's opposition and reply shall be filed on or before October 15, 2025; and defendants' reply shall be filed on or before November 13, 2025. Furthermore, defendants' motion for an extension of time to respond to the complaint, included in the 45 Joint Status Report, is GRANTED. Defendants shall respond to the complaint on or before September 19, 2025. Signed by Judge Paul L. Friedman on June 10, 2025. (lcjd) (Entered: 06/10/2025) |
| 06/17/2025 | 47 | MEMORANDUM OPINION AND ORDER denying Defendants' 42 Motion to Stay Pending Appeal. See Memorandum Opinion and Order for details. Signed by Judge Paul L. Friedman on June 17, 2025. (lcjd) (Entered: 06/17/2025) |
| 06/17/2025 | | Set/Reset Deadlines: Answer due by 9/19/2025, Dispositive Motions due by 9/19/2025. Response to Dispositive Motions due by 10/15/2025. Reply to Dispositive Motions due by 11/13/2025. Responses due by 9/19/2025 Replies due by 10/15/2025. Summary Judgment motions due by 8/4/2025. (tj) (Entered: 06/17/2025) |
| 08/04/2025 | 48 | MOTION for Summary Judgment by AMERICAN FOREIGN SERVICE ASSOCIATION. (Attachments: # 1 Memorandum in Support of Plaintiff's Motion for Summary Judgment, # 2 Statement of Facts, # 3 Declaration of John Naland, # 4 Declaration of Elizabeth ("Nikki") Gamer, # 5 Declaration (Third) of Thomas Yazdgerdi, # 6 Declaration (Second) of Neera Parikh, # 7 Declaration of Christine Miele, # 8 Declaration of Rohit Nepal, # 9 Declaration of John Dinkelman, # 10 Declaration (Second) of Asgeir Sigfusson, # 11 Declaration of Colleen Fallon-Lenaghan, # 12 Text of Proposed Order)(Pullium, April) (Entered: 08/04/2025) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, 2101 E Street, NW Washington, D.C. 20037, | : : : : | |
| *Plaintiff*, | : : : | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| v. | : : | |
| DONALD J. TRUMP, in his official capacity as President of the United States 1600 Pennsylvania Avenue, NW Washington, DC 20500, | : : : : : | Case No. 1:25-cv-1030 |
| OFFICE OF PERSONNEL MANAGEMENT, 1900 E Street, NW Washington, D.C.  20415, | : : : : | |
| U.S. DEPARTMENT OF STATE, 2201 C Street, NW Washington, D.C. 20520 | : : : : | |
| U.S. AGENCY FOR INTERNATIONAL DEVELOPMENT, 2201 C Street, NW Washington, D.C. 20520 | : : : : : | |
| MARCO RUBIO, in his official capacity as Secretary of State and Acting Administrator, United States Agency for International Development 2201 C Street NW Washington, D.C. 20520 | : : : : : : : : | |
| CHARLES EZELL, in his official capacity as Acting Director, Office of Personnel Management, 1900 E Street, NW Washington, D.C.  20415, | : : : : : : : | |
| *Defendants.* | : : | |

JA9

## Introduction

1.      In 1971, President Nixon issued an Executive Order granting collective bargaining rights to members of the Foreign Service because "the effective participation by the men and women of the Foreign Service in the formation of personnel policies and procedures affecting the conditions of their employment is essential to the efficient administration of the Foreign Service." In 1980 Congress enacted the Foreign Service Labor-Management Relations Statute to guarantee those rights in law. Through ten presidencies, our Secretaries of State have recognized and bargained with the American Foreign Service Association ("AFSA"). This bargaining has occurred during the Viet Nam War, the Cold War and the fall of the Soviet Union, 9/11 and the War on Terror, as well as during the war in Afghanistan, the longest war the United States has ever fought. Even though America is at peace, President Trump has now issued an executive order illegally terminating the Foreign Service's statutory collective bargaining rights, ostensibly because, somehow, they are no longer "consistent with national security requirements and considerations." This lawsuit seeks to set aside and enjoin this *ultra vires* action because the scope of the termination of collective bargaining rights is not authorized by the Foreign Service Labor-Management Relations Statute, and because the President terminated AFSA's collective bargaining rights not for national security reasons, but in retaliation for AFSA's opposition to the President's other attacks on the Foreign Service.

## Jurisdiction, Venue and Parties

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because the action arises under federal law, including the United States Constitution.

3.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e) because the Plaintiff's headquarters is located in the District of Columbia and therefore resides here, because the

JA10

Defendants reside here, and because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in Washington, D.C. because the Executive Order was issued here.

4.      Plaintiff AFSA was founded in 1924 as a professional association and advocate for the Members of the United States Foreign Service. AFSA has been certified by the Foreign Service Labor Relations Board as the exclusive representative of approximately 18,000 active duty members of the Foreign Service employed by the Department of State and the U.S. Agency for International Development ("USAID"), as well as the Foreign Commercial Service ("FCS") in the Department of Commerce, Foreign Agricultural Service ("AFS"), Animal and Plant Health Inspection Service ("APHIS") in the Department of Agriculture, and U.S. Agency for Global Media ("USAGM").

5.      The Defendant Donald J. Trump is the President of the United States and is being sued in his official capacity. In that capacity, he issued the Executive Order.

6.      The Office of Personnel Management ("OPM") is a federal agency headquartered in Washington, D.C.

7.      The U.S. Department of State ("State") is a federal agency headquartered in Washington, D.C. The President's Executive Order purports to exclude State from the Foreign Service Act's labor-management provisions pursuant to 22 U.S.C. § 4103(b).

8.      The U.S. Agency for International Development ("USAID") is a federal agency headquartered in Washington, D.C. The President's Executive Order purports to exclude USAID from the Foreign Service Act's labor-management provisions pursuant to 22 U.S.C. § 4103(b).

9.      The Defendant Marco Rubio is the Secretary of State as well as the Acting Director of USAID. He is sued in his official capacities.

10.     The Defendant Charles Ezell is the Acting Director of the U.S. Office of Personnel Management. He is sued in his official capacity. In that capacity, Defendant Ezell issued a

3

JA11

memorandum to heads and acting heads of departments and agencies entitled "Guidance of Executive Order Exclusions from Federal Labor-Management Programs."

## Factual Allegations

11.    In 1978, Congress enacted Chapter 71 of the Civil Service Reform Act, also known as the Federal Service Labor-Management Relations Statute (hereinafter "Chapter 71"), granting collective bargaining rights to most of the Federal civil service. But, because Congress found that "the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Service," in 1980 it enacted the Foreign Service Labor-Management Relations Statute ("FSLMRS"), 22 U.S.C. §§ 4101-4140, which is Chapter 10 of Title I of the Foreign Service Act of 1980.

12.    The FSLMRS defines "employee," in relevant part, as "a member of the [Foreign] Service who is a citizen of the United States, wherever serving, other than a management official, a confidential employee, a consular agent, a member of the Service who is a United Citizen (other than a family member employed under section 3951 of this title, or any individual who participates in a strike in violation of section 7311 of title 5…." 22 U.S.C. § 4102(8)(A). "Employees" are commonly referred to as Foreign Service members.

13.    The FSLMRS covers only Foreign Service members who are employed by the Department of State, the Broadcasting Board of Governors (now known as U.S. Agency for Global Media), USAID, and the Departments of Commerce and Agriculture, 22 U.S.C. § 4103.

14.    Like Chapter 71, which governs much of the Executive Branch, the FSLMRS guarantees the rights of Foreign Service members to form, join, assist and serve as representatives of

4

JA12

a labor organization, and to engage in collective bargaining with respect to conditions of employment through a representative of their own choosing. 22 U.S.C. § 4104.

15.    The FSLMRS provides that Foreign Service members of a covered Department or Agency shall constitute a single and separate worldwide bargaining unit, which excludes (a) "employees engaged in personnel work in other than a purely clerical capacity"; and (b) "employees engaged in criminal or national security investigations or who audit the work of individuals to ensure that their functions are discharged honestly and with integrity." 22 U.S.C. § 4112(1) & (2).

16.    The FSLMRS provides that a labor organization who is the exclusive bargaining representative of a worldwide bargaining unit, such as AFSA, shall be the representative of all Foreign Service members in that unit, without regard to whether the Foreign Service members are members of that union. 22 U.S.C. § 4113(a).

17.    Foreign Service members who voluntarily choose to join AFSA pay membership dues; if a bargaining unit employee so chooses and provides a written authorization to do so, agencies are required to deduct membership dues from an employees' pay and transmit those dues to the labor organization. 22 U.S.C. § 4118(a).

18.    The FSLMRS requires the labor organization, *e.g.*, AFSA, and the Department or Agency, *e.g.*, State or USAID, to meet and negotiate in good faith for purposes of arriving at a collective bargaining agreement, as well as to discuss and negotiate on any condition of employment. 22 U.S.C. §§ 4113(c), 4113(e)(1), 4113(e)(2), 4113(e)(3). The statute further requires the parties to execute a written document embodying any agreement resulting from their collective bargaining. 22 U.S.C. § 4113(6).

19.    This statute establishes the three-member Foreign Service Labor Relations Board ("Board") which is chaired by the Chair of the Federal Labor Relations Authority. 22 U.S.C. § 4106.

The Board supervises elections to determine which labor organization shall represent  Foreign Service members in each of the agencies covered by this statute and resolves unfair labor practice complaints and bargaining disputes. 22 U.S.C. § 4107.

20.     This statute identifies unfair labor practices virtually identical to those in the Federal Service Labor Management Relations Statute, which are investigated and prosecuted by the General Counsel of the Federal Labor Relations Authority. 22 U.S.C. §§ 4108, 4115, 4116.

21.     This statute defines the parties' obligations to bargain in good faith and establishes the Foreign Service Impasse Disputes Panel to resolve impasses that arise in bargaining. 22 U.S.C. §§ 4110, 4113(e). Importantly, this statute identifies an extensive listing of "management's rights," such as the right to determine the mission, budget, organization, and internal security practices of the agency, as well as the right to assign work, to make or not make promotions, to determine the number of employees and to conduct reductions in force and to take whatever actions may be necessary to carry out the mission of the Department during emergencies - all of which are off limits to bargaining, subject to exceptions for negotiating "procedures which management officials of the Department will observe in exercising" these functions or "appropriate arrangements for employees adversely affected by the exercise of" these functions. 22 U.S.C. § 4105.

22.     Unresolved grievances over contract violations, known in this statute as "Implementation Disputes," are adjudicated by a Foreign Service Grievance Board, whose decisions can be appealed to the Foreign Service Labor Relations Board.

23.     In 1973, AFSA was certified under Executive Order 11636 as the exclusive representative for Foreign Service members employed worldwide by the Department of State and, following a separate election by Foreign Service members at USAID, as their exclusive representative. AFSA has since negotiated "Framework Agreements" with the Department of State

6

JA14

and USAID governing their relationship under the authority of the Foreign Service Labor Management Relations Statute. These agreements include provisions that permit elected members of the Foreign Service to be "detailed" to AFSA. The elected AFSA President and Vice Presidents, on 100% official time, represent their fellow Foreign Service members in negotiations with their respective agency and in other representational activities. For the "efficient servicing of employees with the bargaining unit," the State Department and USAID agreements provide that AFSA will be given office space within the State Department and USAID headquarters, as well as access to the Department's registered mail, electronic mail and telecommunications systems for representational activities. Both agreements (as does the Foreign Service Labor Relations Statute itself) obligate the State Department and USAID to withhold AFSA dues from the bi-weekly paychecks of those members of the Foreign Service who voluntarily elect to pay dues in this manner.

24.    In the four decades since the Foreign Service Labor Management Relations Statute was enacted and these agreements were negotiated, there has been just eight "Implementation Disputes" brought to the Foreign Service Labor Relations Board by AFSA. https://www.flra.gov/foreign-service-labor-relations-board-decisions (last visited April 4, 2025). As a testament to the constructive relationship between AFSA and the Department of State, in 2006, the Society of Federal Labor and Employee Relations Professionals awarded them its Labor-Management Cooperation Award, which is presented annually to the Federal agency and labor organization that exemplifies the goal of cooperative labor-management relations.

25.    Immediately after his inauguration, the Defendant Trump began a wholesale attack on Foreign Service members and their work, which was vigorously, vocally and successfully opposed by AFSA.

26.     On January 20, 2025 Defendant Trump issued an Executive Order titled "Reevaluating and Realigning United States Foreign Aid," directing an immediate "90-day pause in United States foreign development assistance for assessment of programmatic efficiencies and consistency with United States foreign policy." Defendant Rubio then directed the immediate issuance of stop-work orders on USAID foreign assistance awards. On January 26, 2025, at least fifty-six senior career agency staff, many of whom are Foreign Service members, were put on administrative leave.  On February 3, USAID's headquarters were shut down. AFSA issued a press release "strongly object[ing] to the administration's decision to dismantle the United States Agency for International Development (USAID). This will undermine U.S. national security, may subvert Congressional authority, and demonstrates a lack of respect for the dedication of the development professionals who serve America's interests abroad."

27.     The next day, Defendants Trump and Rubio ordered a shutdown of all overseas USAID missions and ordered thousands of USAID employees, including almost 1,400 Foreign Service members represented by AFSA, to be recalled. All Foreign Service members represented by AFSA and employed by USAID were placed on administrative leave effective February 7. On February 5, AFSA issued another press release calling the recall of the Foreign Service a "reckless move" that "weakens America's presence abroad" and "undermines national security amid rising global instability."

28.     AFSA then filed suit in this Court along with another union that represents USAID employees alleging *inter alia*, that Defendant Trump's and Defendant Rubio's actions in dissolving USAID violated the separation of powers. *Amer. Foreign Serv. Assn. et al v. Trump*., No. 1:25-cv-352 (CJN). On February 7, Judge Nichols issued a temporary restraining order against the administrative leave and recall.

JA16

29.    On February 12, Defendant Trump issued Executive Order 14,211, "One Voice for America's Foreign Relations," directing Defendant Rubio to revamp the recruiting, performance, evaluation and retention standards for the Foreign Service to ensure their fealty to the President. According to the *New York Times*, "[t]his Executive Order challenges the basic and longstanding principles of the Foreign Service: that career diplomats should be hired based on their qualifications and expertise, not their political views, and that dissent should be welcomed and not punished."  The *Times* quoted AFSA as saying that it would "always defend the integrity and nonpolitical nature of the Foreign Service so that our members can continue to serve the American people."

30.    On February 22, AFSA issued another press release criticizing the Defendant Ezell's requirement that Foreign Service members and other civil servants be required to provide a weekly report to OPM of their accomplishments during the previous week in the form of "five bullets." "To disparage public servants by making them prove their value through this OPM email exercise does a disservice to them and to the country they love and work tirelessly to represent," the release stated. "We will not stand by while their careers are threatened. AFSA will vigorously oppose any unlawful effort to terminate or diminish the work and sacrifice of Foreign Service members," it concluded.

31.    On March 11, AFSA issued another press release stating that it "is alarmed by reports that USAID has directed the destruction of classified and sensitive documents that may be relevant to ongoing litigation regarding the termination of USAID employees and the cessation of USAID grants."

32.    On March 19, AFSA issued another press release criticizing the removal of Diversity, Equity, Inclusion, and Accessibility as factors in performance evaluation and promotion in the Foreign Service. The release noted that the use of these factors had been negotiated in good faith

between AFSA and the Department of State, and that "any changes to the tenure and promotion system must be subject to collective bargaining, as required by law."

33.    On March 21, AFSA and others filed suit against the Administration in U.S. District Court in the Southern District of New York to enjoin the disbandment of the U.S. Agency for Global Media ("USAGM"), which employs 16 Foreign Service members represented by AFSA. On March 28, U.S. District Judge Oetken issued a temporary restraining order prohibiting "any further attempt to terminate, reduce-in-force, place on leave, or furlough any USAGM employee."

34.    The Foreign Service Labor Management Relations Statute contains a provision that has never before been used by any of the seven Presidents who served since the statute was enacted (including the first term served by Defendant Trump). It provides:

> **(b)    Exclusion of subdivisions.** The President may by Executive order exclude any subdivision of the Department from coverage under this subchapter if the President determines that—
>
> **(1)**    the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
>
> **(2)**    the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

22 U.S.C. § 4103(b). Comparable, although not identical, language appears in Chapter 71 which allows the President to exclude not just "subdivisions" of agencies from collective bargaining under the statute, but entire agencies themselves. 5 U.S.C. § 7103(b).

35.    On March 27, 2025, Defendant Trump issued Executive Order No. 14,251, *Exclusions from Federal Labor-Management Programs*, 90 Fed. Reg. 14553 (Mar. 27, 2025), which invoked § 4103(b) and terminated the collective bargaining rights of all the Foreign Service members employed by the Department of State and USAID. Although § 4103(b) permits the President to exclude certain

10

JA18

"subdivisions" of the Department of State and USAID from collective bargaining rights when he makes a *bona fide*, good faith determination that the Foreign Service Labor Management Relations Statute "cannot be applied to that subdivision in a manner consistent with national security requirements and considerations," the President subverted the plain language and intent of the statute by listing and excluding each and every subdivision in the Department of State and USAID that employs Foreign Service members.

36.    President Trump's Executive Order strips collecting bargaining rights not only from Foreign Service members at the Department of State and USAID, but also from three-quarters of the federal employees who are currently represented by federal sector unions, demonstrating that it was not a targeted assessment based on national security concerns. *See* Hassan Ali Kanu, *Trump Moves to Strip Unionization Rights from Most Federal Workers*, Politico.com, available at https://www.politico.com/news/2025/03/28/union-rights-federal-workers-donald-trump-00257010(Mar. 28, 2025).

37.    The White House issued a "fact sheet" simultaneously with the Executive Order in which it candidly admitted that the President's Executive Order was issued to curtail the power of and to punish those particular labor organizations who, like AFSA, have ostensibly "obstructed" the President's efforts to illegally dismantle the Federal government and to illegally dismiss large segments of the Federal workforce these labor organizations represent:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.
> Certain Federal unions have declared war on President Trump's agenda.
>
> The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
>
> For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.

Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

*Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements,* https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ (last visited April 1, 2025).

38.     Also on March 28, the Defendant Ezell issued a Memorandum to Heads and Acting Heads of Departments and Agencies instructing them to discontinue participation in ongoing and future grievance procedures, to disregard extant collective bargaining agreements, to prohibit union representatives from using "official time" authorized by statute and collective bargaining agreements for representational purposes, to terminate the unions' use of agency resources such as office space, and, in order to starve the unions of resources, to terminate employees' dues allotments that are also authorized by statute and collective bargaining agreements. *Guidance on Executive Order Exclusions from Federal Labor-Management Programs,* https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf (last visited April 1, 2025).

39.     Pursuant to the Defendant Ezell's Guidance, on March 31 the Chief Labor Management Negotiator at the Department of State sent AFSA officers the following email shutting down AFSA's operations with immediate effect, including termination of dues allotments, official time, and an order to vacate the union's offices at the Department of State:

On Thursday, March 27, 2025, the President issued an Executive Order (EO), entitled "Exclusions from Federal Labor-Management Relations Programs." In compliance with the EO, effective immediately, the Department hereby terminates the Framework Agreement with AFSA and will no longer recognize AFSA as an exclusively recognized labor organization.

The Department will cease all further payroll dues allotments immediately. Additionally, all recurring meetings between AFSA and the Department are cancelled. Official time for the AFSA President, AFSA State VP, and the additional AFSA representative on 100% official time under the terms of Article 5, Section 3(b) of the Framework Agreement will end at close of business today. We encourage these employees to be in contact with their CDO to pursue appropriate follow-on assignments.

AFSA elections may not proceed using agency space or government equipment (i.e., .gov messaging). AFSA must also remove all material from and vacate AFSA's Department-provided office suite in HST by COB April 4. AFSA's access to the suite will end no later than Friday, April 4.

## Claims for Relief

### First Cause of Action

### *Ultra Vires (Violation of Foreign Service Labor-Management Relations Statute/ Separation of Powers)*

40.    AFSA reasserts and realleges the allegations contained in paragraphs 1 through 39 as if fully set forth here.

41.    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*. Courts have jurisdiction to grant relief when the President and his subordinate officials act beyond the scope of their authority and violate the law to the injury of an individual or organization.

42.    The Foreign Service Labor-Management Relations Statute ("FSLMRS") provides that subdivisions of covered Departments and Agencies may be excluded from coverage if "(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national

security work, and (2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b)

43.    Although a president has the authority under 22 U.S.C. § 4103(b) to exempt a subdivision of the Department of State or USAID from coverage of the FSLMRS if he or she makes a *bona fide*, good faith determination that the Statute "cannot be applied to that subdivision in a manner consistent with national security requirements and considerations," he lacks the authority to exempt the entirety of the Department of State and USAID from coverage of the Statute because it would be tantamount to repealing the entire statute, which may only be done by Congress.

44.    The fact that, since 1973, Foreign Service members have worked at Departments and Agencies set forth in the March 27, 2025 Executive Order, have served their country while exercising their rights to organize and bargain collectively belies the claim that the provisions of the FSLMRS cannot be applied to those Departments and Agencies "in a manner consistent with national security requirements and considerations."

45.    The White House's Fact Sheet that accompanied the Executive Order further rebuts any claim that the Executive Order was based upon any *bona fide*, good faith determination necessarily to eliminate statutory rights under 22 U.S.C. § 4103(b) about each included Department and Agency: this Order was driven not by the function of the Department or Agency but by the fact that Foreign Service members have chosen AFSA as their elected representative. The White House admitted President Trump eliminated the Foreign Service members' statutory rights to strike a blow at "hostile Federal unions," like AFSA, that it believes are "enable[d]" by the FSLMRS.

46.    Rather than consider whether the FSLMRS could be applied consistent with national security requirements, President Trump used the pretext of national security to deprive Foreign

Service members of their statutory rights under that statute in order to attack the Foreign Service members' exclusive bargaining representative, AFSA, because it would not "work with him."

47.    The Defendant Trump's March 27, 2025 Executive Order titled *Exclusions from Federal Labor-Management Programs,* in which he exempted the entirety of the Department of State and USAID from the coverage of the Foreign Service Labor Management Relations Statute, was in violation of Section 4013(b) and *ultra vires*.

48.    The Defendant Ezell's March 27, 2025 *Guidance on Executive Order Exclusions from Federal Labor-Management Programs,* to the extent that it applied to Foreign Service members to whom Congress granted collective bargaining rights, was also *ultra vires* because it relied on and enforced an illegally issued and invalid Executive Order.

49.    The Defendant Rubio's March 31, 2025 order to AFSA, issued through his subordinate, terminating AFSA's collective bargaining agreement, official time, access to office space and dues allotment, was also *ultra vires* because it relied on and enforced an illegally issued and invalid Executive Order and on illegally issued and invalid *Guidance* from Defendant Ezell.

**Second Cause of Action**

***Ultra Vires (Violation of Foreign Service Labor-Management Relations Statute)***

50.    AFSA reasserts and realleges the allegations contained in paragraphs 1 through 49 as if fully set forth here.

51.    Plaintiff has a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*. Courts have jurisdiction to grant relief when the President and his subordinate officials act beyond the scope of their authority and violate the law to the injury of an individual or organization.

52.    The President may exclude any subdivision of the Department from coverage of the Foreign Service Labor Management Relations Statute *only* if he determines that the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, *and* the provisions of the Statute cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

53.    The exclusion of the entirety of the Department of State and USAID from coverage of the Statute was not based on any actual or *bona fide* determination that the Foreign Service members in each and every subdivision in both the State Department and USAID were engaged in intelligence, counterintelligence, investigative, or national security work, *and* that allowing them to collectively bargain as they have done during ten presidencies for over half a century has now become inconsistent with national security. Simply stated, nothing has changed that now warrants the exclusion or anything upon which a determination can be based. The fact sheet that the White House issued reveals other motives for terminating AFSA's and other labor organizations' collective bargaining rights, as does the sweeping scope of the Order as well as the selective exclusions from the Order of a handful a favored unions (such as the police unions and Border Patrol agents) who are viewed as supporters of the President's agenda.

54.    Thus, the Defendant Trump was indifferent to the purposes of the Foreign Service Labor Management Relations Statute and has acted deliberately in contravention of them. Therefore, the Defendant Trump's March 27, 2025 Executive Order titled *Exclusions from Federal Labor-Management Programs,* in which he exempted the entirety of the Department of State and USAID from the coverage of the Foreign Service Labor Management Relations Statute, was *ultra vires*.

55.    The Defendant Ezell's March 27, 2025 *Guidance on Executive Order Exclusions from Federal Labor-Management Programs,* to the extent that it applied to Foreign Service members to

JA24

whom Congress granted collective bargaining rights, was also *ultra vires* because it relied on and enforced an illegally issued and invalid Executive Order.

56.    The Defendant Rubio's March 31, 2025 order to AFSA, issued through his subordinate, terminating AFSA's collective bargaining agreement, official time, access to office space and dues allotment, was also *ultra vires* because it relied on and enforced an illegally issued and invalid Executive Order and on illegally issued and invalid *Guidance* from Defendant Ezell.

**Third Cause of Action**

*Violation of AFSA's First Amendment Rights*

57.    AFSA reasserts and realleges the allegations contained in paragraphs 1 through 56 as if fully set forth here.

58.    "[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).

59.    AFSA's litigation against Defendant Trump's actions is protected speech and petitioning activity. *See, e.g.*, *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 542-525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 741 (1983); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 542-49 (2000) ("advocacy by [an] attorney to the courts" is "speech and expression" that enjoys First Amendment protection); *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (holding that "filing a complaint in court is a form of petitioning activity" that the First Amendment protects).

60.    AFSA's public criticisms of the Defendant Trump's attacks on the integrity and professionalism of the Foreign Service, and its public opposition to his attempts to reshape it into a

personally loyal "workforce of patriots" (as he has characterized his aims) also constitutes activity protected by the First Amendment.

61.    The Executive Order retaliates against AFSA for that protected First Amendment activity. Indeed, the White House's Fact Sheet on the Executive Order proclaims the Order's retaliatory motive. To justify the Executive Order, the Fact Sheet explains that "[c]ertain Federal unions have declared war on President Trump's agenda."

62.    The Executive Order also constitutes "viewpoint discrimination" because it excludes those labor organizations which have been supportive of the Defendant Trump. As the Fact Sheet frankly explains, "President Trump supports constructive partnerships with unions who work with him" but that "he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions."

63.    Defendants have also acted to illegally curtail and infringe AFSA's First Amendment rights by carrying out the Executive Order and terminating AFSA's collective bargaining rights and terminating its collective bargaining agreements and the privileges and benefits AFSA enjoys under the Statute and which it has negotiated in its collective bargaining agreements.

64.    The Executive Order thus "constitutes a sufficiently adverse action" against AFSA "to give rise to an actionable First Amendment claim." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The Order, in other words, "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Connelly v. Cnty. of Rockland*, 61 F.4th 322, 325 (2d Cir. 2023).

## Prayer for Relief

WHEREFORE, the Plaintiff AFSA requests judgment against the Defendants:

A.     Declaring that Sections 1(b) and 3 of the March 27, 2025 Executive Order are unlawful and null and void.

B.     Declaring that the Defendant Ezell's March 27, 2025, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, is unlawful as applied to AFSA.

C.     Enjoining Defendant Rubio and all his agents and subordinates from implementing Sections 1(b) and 3 of the March 27, 2025 Executive Order.

D.     Enjoining Defendant Rubio and all agents and subordinates from implementing the Defendant Ezell's March 27, 2025, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs* with respect to AFSA.

E.     Enjoin Defendants State, USAID, and Rubio from continuing to fail to recognize AFSA as the exclusive representative of the members of the Foreign Service employed by State and USAID and order their agents and subordinates to restore AFSA's collective bargaining agreements with State and USAID and to honor the agreements' provisions and any of the Statute's provisions concerning dues allotments, official time, use of and access to agency resources including office space.

F.     Awarding Plaintiff reasonable attorney fees and costs incurred.

G.     Ordering such further relief as the Court may deem just and appropriate.

Dated: April 7, 2025           Respectfully submitted,

By:    */s/ Richard J. Hirn*
        Richard J. Hirn
        D.C. Bar No. 291849
        richard@hirnlaw.com
        5335 Wisconsin Ave., NW, Suite 440
        Washington, D.C. 20015
        (202) 274-1812

By:      */s/ Keith R. Bolek*
       Keith R. Bolek
       Bar No. 463129
       kbolek@odonoghuelaw.com

       April H. Pullium
       Bar No. 198026
       apullium@odonoghuelaw.com

       O'Donoghue & O'Donoghue LLP
       5301 Wisconsin Avenue, Suite 800
       Washington, D.C. 20015
       (202) 362-0041

By:      */s/ Sharon L. Papp*
       Sharon L. Papp*
       General Counsel
       D.C. Bar No. 107992
       papp@afsa.org

       Raeka Safai*
       Deputy General Counsel
       D.C. Bar No. 977301
       safai@afsa.org

       American Foreign Service Association
       2101 E Street, NW
       Washington, DC 20037
       (202) 338-4045

       *D.D.C. Application Pending

       *Counsel for Plaintiff American Foreign Service Association*

## IN TH E UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, et al., | ) ) ) | |
| *Plaintiff,* | ) ) | Civil Action No. 1:25-cv-1030 -PLF |
| v. | ) ) ) | |
| DONALD J. TRUMP, et al., | ) ) | |
| *Defendants.* | ) ) | |

## DECLARATION OF THOMAS YAZDGERDI

I, Thomas Yazdgerdi, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am a member of the Senior Foreign Service at the Department of State. I joined the Foreign Service in October 1991 and have served abroad, mostly in southeastern Europe, including Albania, Greece, and Kosovo. I also served tours as a deputy political counselor at the U.S. Embassy in Baghdad; the consul general at the U.S. Consulate in Kirkuk, Iraq; and political counselor at the US Embassy in Kabul, Afghanistan. Members of the Foreign Service at the Department of State are professional, nonpartisan diplomats who perform a wide range of activities, including assisting individual U.S. citizens abroad; negotiating with representatives of foreign governments; processing visa applications; promoting U.S. business and economic interests globally; representing U.S. art and culture; communicating U.S. policy goals to international media; and many others. Foreign Service generalist members are assigned to one of five "cones" – management, consular, economic,

political, or public diplomacy – and their tasks vary widely even within each cone. The
same holds true with Foreign Service specialist members, whose areas of specialty include
facilities management, medical, information technology, office management, construction
engineering, security, and many others.

2.      From July 2019 to July 2023, I served as the full-time Vice President of the
American Foreign Service Association (AFSA), the exclusive representative for the State
Department. In that capacity, I was the primary AFSA elected official who engaged in
collective bargaining on behalf of Foreign Service employees with the Department of State.
I was elected to the position of President of AFSA for a two-year term beginning on July
15, 2023. When I was Vice President and from the time I became President until March
31, 2025, I worked full-time performing union representational duties while on "official
time." My union duties routinely required at least 40 hours of work per week, which I could
not have performed if I had been working full-time in a Foreign Service assignment.

3.      AFSA represents 17,618 active-duty members of the Foreign Service at the
Department of State, the United States Agency for International Development (USAID),
the Foreign Commercial Service (FCS), the Foreign Agriculture Service (FAS), the United
States Agency for Global Media (USAGM), and the Animal and Plant Health Inspectors
Service (APHIS). 14,593 of the active-duty Foreign Service members are dues paying
members of AFSA. Of this number, 13,478 pay dues by payroll deductions.

4.      AFSA was founded in 1924 as an unincorporated professional association
to further the professional development of members of the Foreign Service. AFSA was
incorporated in the District of Columbia in 1951. On January 22, 1973, AFSA was certified
as the exclusive representative of all Foreign Service employees of the Department of State.

AFSA was subsequently certified as the exclusive representative at USAID, FCS, FAS, USAGM, and finally, APHIS.

5.      The bargaining units at each of the six agencies listed above is a single, world-wide bargaining unit, and includes all Foreign Service employees except for confidential employees, management officials, employees engaged in personnel work other than in a purely personal capacity, employees engaged in criminal or national security investigations and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

6.      On July 15, 2019, AFSA and the State Department entered into a new, updated Framework Agreement, which is the collective bargaining agreement that covers the Foreign Service employees who work for that department. A true and correct copy of that agreement is provided as Exhibit 1 to this Declaration. The Framework Agreement covers issues relating to AFSA's and the Department's labor management relations, including 100 percent official time for the AFSA President and State Vice President, AFSA's use of office space in the Harry S. Truman building at no charge to AFSA, use of the Department's electronic mail systems to communicate with members, the union's right to information, union dues allotments, and the requirement that the Department provide AFSA with notice and the opportunity to bargain regarding changes to conditions of employment. The Framework Agreement was extended, without change, in January 2025, for three years. A true and correct copy of the January 2025 agreement to extend the Framework Agreement is attached as Exhibit 2 to this Declaration.

7.      AFSA is both the principal advocate for the long-term institutional well-being of the professional career Foreign Service and is responsible for safeguarding the

interests of AFSA members who serve overseas for the majority of their careers. AFSA advocates for federal and state legislation on behalf of Foreign Service members. Because over 80 percent of Foreign Service members are dues paying members of AFSA, Congressional staff members seek AFSA's opinion on planned or pending legislation, in recognition of AFSA's role as the exclusive representative and "the Voice of the Foreign Service." As AFSA's President, I routinely advocate for legislation on behalf of our members, especially on Capitol Hill.

8.      AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global leadership. AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests and values.

9.      As the exclusive representative for Foreign Service employees at the six foreign affairs agencies, AFSA negotiates or consults with the foreign affairs agencies on a wide range of personnel issues including: assignment procedures, tenure and promotion board procedures, agency-level grievance and discipline procedures, time-in-class and time-in-service rules, procedures for awarding Meritorious Service Awards, and procedures relating to when investigatory interviews of employees can be recorded, among many other issues. AFSA provides legal and other assistance to individual members facing allegations of misconduct by representing them in investigatory interviews conducted by the Offices of Inspector General, Offices of Civil Rights, and the Offices of Security, and with disciplinary proposals, security clearance issues, grievances, medical clearance issues, and a myriad of issues relating to their unique conditions of employment.  A true and

correct copy of an agreement that AFSA negotiated regarding procedures for recording of

investigatory interviews is attached as Exhibit 3 to this declaration.

10.    The March 27, 2025, Executive Order "Exclusions from Federal Labor-

Management Relations Programs" (Executive Order) already has had an immediate impact

on AFSA's ability to safeguard the interests and rights of Foreign Service members at the

State Department, USAID, FCS, and APHIS. On March 31, 2025, the State Department's

Chief Labor Management Negotiator sent me an email that stated:

> On Thursday, March 27, 2025, the President issued an Executive Order (EO),
> entitled "Exclusions from Federal Labor-Management Relations Programs." In
> compliance with the EO, effective immediately, the Department hereby terminates
> the Framework Agreement with AFSA and will no longer recognize AFSA as an
> exclusively recognized labor organization.

> The Department will cease all further payroll dues allotments
> immediately. Additionally, all recurring meetings between AFSA and the
> Department are cancelled. Official time for the AFSA President, AFSA State VP,
> and the additional AFSA representative on 100% official time under the terms of
> Article 5, Section 3(b) of the Framework Agreement will end at close of business
> today. We encourage these employees to be in contact with their CDO [Career
> Development Officers] to pursue appropriate follow-on assignments.

> AFSA elections may not proceed using agency space or government equipment
> (i.e., .gov messaging). AFSA must also remove all material from and vacate
> AFSA's Department-provided office suite in HST by COB April 4. AFSA's access
> to the suite will end no later than Friday, April 4.

A true and correct copy of the e-mail is provided as Exhibit 4 to this Declaration.

11.    I officially learned at 4:38 pm on Monday, March 31, that the State

Department would stop paying my salary as the AFSA President, as early as April 1, if I

chose to stay in my current position as the AFSA President. Because I was elected to serve

our members until July 15, the end date of the current AFSA Governing Board, and this

was reflected in my current Foreign Service assignment, I immediately reached out to the

Global Talent Management (GTM) Bureau to determine my options. I was told the next

administrative action to take place would be a change in assignment to "GTM over complement." This is the designation given when an individual has no assignment. As a result of the EO and the Department's immediate decision to stop paying those AFSA elected officials on 100% official time, I am forced to make significant decisions regarding my career for the well-being of my family. I am currently running for re-election as AFSA president. It is too late in the assignment process to find a suitable domestic assignment, and I am unable to serve overseas for family reasons. In addition, given the current administration's attacks on organized labor and the fact that I have been on the AFSA Governing Board since 2019, first as State Department VP and now as AFSA President, it would be unlikely for me to serve within the Department in an assignment that is commensurate with my experience as a Senior Foreign Service officer. As a result, I have made the difficult decision to retire two years earlier than expected to ensure an income stream for my family, through my annuity, which is approximately 50% of my current salary.

12.     If I am re-elected as AFSA President, absent an injunction or ruling in AFSA's favor, AFSA will need to pay the salary for the position. For over 50 years AFSA has counted on this full-time position as being paid by the Department. This change imposes a significant burden on AFSA at a time when we stand to lose a significant percentage of our dues paying members.

13.     Stripping AFSA of its right to serve as the exclusive representative takes away an essential check to prevent politicization of the Foreign Service. The Foreign Service personnel system was modeled after the Navy and is an "up or out" personnel system, meaning that employees who are not promoted or tenured within a certain amount

of time will be forced to separate from employment. Promotions are determined by selection boards consisting of career members of the Foreign Service and members of the public. *See* 22 U.S.C. §§ 4002 & 4003. AFSA has collective bargaining agreements in place to ensure that Foreign Service promotions are based strictly on the rankings of selection boards, as required in 22 U.S.C. § 4002(a). Our "safeguard" agreements, as they are called, provide a check on any attempt by management to change predetermined promotion numbers to capture favored employees who were not ranked high enough for promotion and to prevent leadership from skipping over disfavored employees who were recommended for promotion. A true and correct copy of a safeguard agreement between AFSA and the Department of State, which was entered on December 6, 1973, is attached as Exhibit 5 to this Declaration. This agreement has been maintained in the regular course of business in AFSA's files, where AFSA routinely stores copies of final collectively bargained agreements. To the best of my knowledge, there have not been any modifications to this agreement.

14.     Foreign Service employees spend two-thirds of their careers working overseas in the 200 plus embassies and consulates around the world. Many of these posts are extremely dangerous (such as Somalia, Syria, Ukraine, and Lebanon) while others, due to environmental factors, pose serious health risks to Foreign Service employees and their families (such as Bangkok, Beijing, and New Delhi).

15.     Overseas assignments typically involve three-year tours of duty; some assignments require language training before the assignment begins. While management retains the right to make assignments, AFSA has agreements in place governing the assignment processes, which allow Foreign Service members to submit bids on positions

that best suit their professional and family needs, while allowing management to select their assignment from those bids. The bidding system balances the needs of Foreign Service members and their families and the right of management to make assignment selections. AFSA also has agreements in place for employees to appeal their assignment to the Director General of the Foreign Service (or counterpart at the other foreign affairs agencies).

16.    Stripping AFSA of its right to negotiate conditions of employment, procedures, and appropriate arrangements for our members at State and USAID will harm members by allowing management to unilaterally discard safeguards that have balanced the rights of employees and management for over 50 years. I am especially concerned because the Department has just appointed an untenured employee to serve as the acting Director General (*i.e.*, the director of human resources). On April 4, I received a farewell notice from Catherine Rodriguez, senior bureau official (SBO) in the State Department's Global Talent Management bureau. She said that she would be succeeded by Lew Olowski as SBO. I am deeply concerned by the appointment of Mr. Olowski, who is an entry level officer (FS-04) and was untenured at the time of his appointment, and who will now take on the role of acting director general of the U.S. Foreign Service. This is one of the State Department's most senior leadership positions—traditionally filled by career members of the Senior Foreign Service with decades of Foreign Service experience and proven ability to do this demanding job. Having an inexperienced, untenured individual take on this role will negatively impact our members and the Foreign Service. It is akin to making a junior military officer the head of the Pentagon's personnel office. AFSA will have no ability to

push back against what we believe will be drastic and harmful changes to our members'
conditions of employment.

17.      The immediate cessation of automatic dues deductions means that AFSA
will potentially lose between $360,000 and $389,000 a month in revenue. Member dues
pay for approximately eighty-six percent of AFSA operations.

18. The day after the Executive Order was issued, members wrote to AFSA to
cancel their automatic dues allotment, expressing their concern that it is "now illegal" for
them to be a member of the union and continue to pay dues to AFSA. If we are not able to
collect dues for a prolonged period, it is likely we will have to lay off some of our
professional staff. Many of our staff have been with AFSA for over 20 years and have a
wealth of legal and other experience and knowledge representing Foreign Service members
in what is a very specialized, niche area of law.

19.      AFSA provides legal and other assistance to members at no additional cost,
outside of their monthly membership dues. If AFSA has to reduce its staff, Foreign Service
members who need assistance with investigations, grievances, discipline cases, and
security issues, will have to retain private counsel, which will be very costly as experienced
lawyers in the Washington DC area charge upward of between $400 and $600 an hour.
Most Foreign Service members, especially more junior members, will not be able to afford
private legal representation. Even if members could afford outside legal representation, the
Department of State has repudiated its Framework Agreement with AFSA and canceled all
pending meetings with AFSA, suggesting that the agency does not intend to honor
employees' collectively bargained rights to assistance with investigations and disciplinary
cases, or rights to file grievances with the agencies.

20.    In addition, AFSA's Framework Agreements provide AFSA's attorneys

and grievance staff access to the agencies' computer networks and office space for the

AFSA Vice Presidents at State and USAID at no cost to the union. In addition, ten members

of AFSA's legal and grievance staff, whose salaries are paid from union dues, have offices

in the State Department. On March 31, 2025, the Chief Labor Management Negotiator for

the Department of State notified me that AFSA must vacate AFSA's Department provided

office suite by close of business on April 4. Many of AFSA's attorneys and professional

staff have worked for AFSA for more than 20 or 30 years. They have documents pertaining

to AFSA members' individual grievance and discipline cases, in addition to historical

union documents, on their government computers. AFSA anticipates that the Department

of State is going to disable their .gov email accounts with little to no warning and that

important documents stored on the .gov system will be forever lost.

21.    AFSA's collective bargaining agreements also provide 100% official time

for the AFSA President, the Vice Presidents for State, USAID, Agriculture, and

Commerce, and one of the State Representatives to perform full-time union work, and

reasonable official time for the APHIS representative.

22.    The timing of the Executive Order creates additional hardships for AFSA

and for members of the Foreign Service. AFSA is in the middle of elections for the

governing board, which includes the 100% official time positions of President, State,

USAID and FCS Vice Presidents. Some employees running for positions on the 2025-2027

AFSA governing board have foregone bidding on Foreign Service assignments. These

employees will be prejudiced in finding assignments this late in the assignment cycle,

which could in turn impact future promotion opportunities. Without the ability to use

official time for union work, the individuals who are elected may choose not to serve in these previously full-time AFSA positions.

     23.    The timing of this executive order, in context with a memorandum from the Office of Personnel and Management (OPM), is particularly prejudicial to our members. In OPM's memorandum, government agencies were directed to present plans for reductions in force (RIF) by March 13, 2025, with implementation of those plans by September 30. By removing union representation of employees, removing the need to negotiate procedures and appropriate arrangements for employees who will be adversely impacted by RIFs, and invalidating collective bargaining agreements shortly before planned employee terminations, the administration is maximizing its chance to violate or reduce procedural protections for employees.

     24.    USAID employees, members of AFSA, did in fact receive notices of termination on March 28, 2025, the day after the issuance of the Executive Order. As USAID employees edge closer to the first RIF date, July 2, 2025, they require clarity on the processes whereby they will be eligible to apply for positions involved with U.S. assistance programs in the new State Department structure as well as information on where they should plan to live, including schooling for their children and employment for their spouses. This is especially true for the nearly 1,400 Foreign Service employees who are being forced to return from overseas, but domestic Foreign Service employees also face similar uncertainties regarding where they will live and work.

     25.    On February 7, 2025, I appeared in my capacity as AFSA President for an interview on *The Lead with Jake Tapper*, a CNN production, where I discussed President Trump's dismantling of USAID and AFSA's lawsuit to challenge President Trump's

actions. A video of the interview I provided is available online at: https://www.cnn.com/2025/02/07/world/video/the-lead-thomas-yazdgerdi-usaid-employees-abroad-union-president-trump-jake-tapper.

26.    This Executive Order represents the single greatest threat to the Foreign Service and to our union in AFSA's 100-year history. It opens the door to politicization, erodes due process, and strikes at the heart of the nonpartisan, merit-based system that has long safeguarded the integrity of America's diplomatic and development corps. It removes the mechanisms that ensure fairness, transparency, and accountability, and fundamentally weakens the rights of employees to have a voice in the policies that govern their professional lives.

27.    The injuries suffered by AFSA and its members are ongoing or imminent and will persist unless this Court intervenes.

Executed on April 14, 2025

Thomas Yazdgerdi

# EXHIBIT
# 1

# Framework Agreement
## *between*
# U.S. Department of State
# and American Foreign Service Association





**July 15, 2019**

# TABLE OF CONTENTS

PREAMBLE…………………………………………………………………..2

**ARTICLE 1**
PARTIES TO THE AGREEMENT AND RECOGNITION OF THE
BARGAINING UNIT……………………………..………………………….3

**ARTICLE 2**
DEFINITIONS……………………………………………………………….4

**ARTICLE 3**
DURATION AND RENEWAL OF AGREEMENT……………………................6

**ARTICLE 4**
EMPLOYEE RIGHTS AND RESPONSIBILITIES…………………………….7

**ARTICLE 5**
UNION RIGHTS AND RESPONSIBILITIES…………………………………9

**ARTICLE 6**
MANAGEMENT RIGHTS AND RESPONSIBILITIES…………………………...12

**ARTICLE 7**
NEGOTIATIONS……………………………………………………………14

**ARTICLE 8**
USE OF OFFICIAL FACILITIES AND SERVICES……………………….…..18

**ARTICLE 9**
USE OF TELECOMMUNICATIONS SYSTEM………………………....……21

**ARTICLE 10**
DUES WITHOLDING………………………………………………………23

JA43

## PREAMBLE

Pursuant to the policy set forth by Chapter 10 of the Foreign Service Act of 1980 (FS Act) governing Labor-Management Relations, the following articles of this Framework Agreement ("Agreement"), together with any and all supplemental agreements and amendments which may be subsequently agreed to, constitute the total Agreement between the Foreign Service of the Department of State, (hereinafter called the "Department" or "Employer"), and the American Foreign Service Association (hereinafter called the "Union" or "AFSA"). The Department and the Union are collectively referred to as the "Parties."

The Parties agree that the statutory protection of the right of employees to organize, bargain collectively, and participate through the Union safeguards the public interest, contributes to the effective conduct of business, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment. The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service. This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship.

With the foregoing in mind, the Parties subscribe to the following statements of the respective rights and obligations of the Department and the Union:

## ARTICLE 1

## PARTIES TO THE AGREEMENT
## AND RECOGNITION OF THE BARGAINING UNIT

### Section 1.  Recognition

On January 22, 1973 AFSA was certified as the exclusive representative of all
Foreign Service employees of the Department of State, as reaffirmed by Chapter
10 of the FS Act.  The bargaining unit constitutes a single world-wide bargaining
unit, excluding confidential employees described in Section 1002(6) of the FS
Act,[1] management officials as described in Section 1002(12) of the FS Act,[2]
employees engaged in personnel work in other than a purely clerical capacity,
employees engaged in criminal or national security investigations and employees
who audit the work of individuals to ensure that their functions are discharged with
honesty and integrity.

The Parties agree that for purposes of domestic positions, there is a presumption
that management officials include Executive Directors and their Deputies within
each Bureau and DAS or equivalent positions and above.  This Agreement does
not preclude AFSA or a management employee from challenging that presumption
in the appropriate forum, i.e. before the Foreign Service Labor Relations Board.

---

[1]    22 USC §4102(6).

[2]    22 USC §4102(12).

## ARTICLE 2

## DEFINITIONS

For the purposes of this Agreement, the terms listed below are defined as follows:

**BOARD**: The Foreign Service Labor Relations Board (FSLRB).

**CONFIDENTIAL EMPLOYEE**: An employee who acts in a confidential capacity with respect to an individual who formulates or effectuates management policies in the field of labor-management relations.

**CONDITIONS OF EMPLOYMENT**: Personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions, but does not include policies, practices, and matters —

a) relating to political activities prohibited abroad or prohibited under subchapter III of chapter 73 of title 5, U.S. Code;

b) relating to the designation or classification of any position under section 501;

c) to the extent such matters are specifically provided for by Federal statute; or,

d) relating to Government-wide or multiagency responsibility of the Secretary affecting the rights, benefits, or obligations of individuals employed in agencies other than those which are authorized to utilize the Foreign Service personnel system.

**DAYS**: Unless otherwise indicated, use of the word "days" refers to business days. In computing any period of time prescribed in this Agreement, the day of the act from which the designated period of time begins to run shall not be included. For example, if a party receives a proposal on April 1st, the 15 business day response period would begin on April 2nd.

**EMPLOYEE**: A member of the Foreign Service who is a citizen of the United States, wherever serving.[3]

---

[3]   FS Act §1002(8), 22 USC §4102(8).

**FRAMEWORK AGREEMENT**: The articles of this Agreement, together with any and all supplemental agreements and amendments which may be subsequently agreed to.

**MANAGEMENT OFFICIAL**: An individual who—

a) is a chief of mission or principal officer;

b) is serving in a position appointed by the President, by and with the advice and consent of the Senate, or by the President alone;

c) occupies a position which in the sole judgment of the Secretary is of comparable importance to the offices mentioned in subparagraph (a) or (b);

d) is serving as a deputy to any individual described by subparagraph (a), (b), or (c);

e) is assigned to carry out functions of the Inspector General of the Department of State and the Foreign Service under section 209 of the FS Act; or,

f) is engaged in the administration of this subchapter or in the formulation of the personnel policies and programs of the Department.

JA47

## ARTICLE 3

## DURATION AND RENEWAL OF AGREEMENT

### Section 1.  Effective Date and Term

The effective date of this Agreement shall be the date the agreement is signed by both Parties, subject to the approval of the Secretary of State, or designated agency head, or the 31st calendar day after the date signed by the Parties, whichever comes sooner.

Subject to Section 2, this Agreement shall remain in effect for three years from the effective date.  Thereafter, the Agreement shall be renewed for additional one-year periods dating from the anniversary date, unless between 105 and 60 calendar days prior to such anniversary date either party gives written notice to the other of its desire to amend, supplement, or renegotiate the Agreement.  The other party must acknowledge the notice promptly upon receipt.  The current Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

### Section 2.  Amendments and Supplements

This Agreement may be amended and/or supplemented as follows:

a) The Parties will amend and supplement this Agreement if required to reflect changes mandated by law, Executive Order, or Government-wide regulations;

b) Changes not mandated by law or Government-wide regulations may be proposed by either party at any time, but will only be negotiated if both Parties mutually agree to bargain over the proposals.

Page **6** of 25

JA48

# ARTICLE 4

## EMPLOYEE RIGHTS AND RESPONSIBILITIES

### Section 1.  Union Membership

a) An employee has the right to form, join, or assist a labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal.  No employee shall be required as a condition of employment, assignment, promotion or retention, to join or refrain from joining any labor organization.  Each employee shall be protected in the exercise of such right.  Except as otherwise provided by the FS Act, such right includes the right –

> 1.  To act for a labor organization in the capacity of a representative and, in that capacity, to present the views of the labor organization to the Secretary and other officials of the Government including Congress, or other appropriate authorities; and,

> 2.  To engage in collective bargaining with respect to conditions of employment through representatives chosen by the employees as provided by law.

b) No interference, restraint, coercion, discrimination, or reprisal will be practiced by the Employer against an employee for exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement; nor shall the Employer discourage or encourage employee membership in a labor organization.  Neither shall an employee be disciplined or otherwise discriminated against by the Employer because she/he participated in a grievance, appeal, unfair labor practice complaint or any other proceeding brought under the provisions of law.

c) Nothing in this Agreement shall require an employee to become or to remain a member of a labor organization.

d) This Agreement does not prevent any employee in the unit from bringing, on his/her own initiative, a grievance, complaint or any matter of personal concern to the attention of the appropriate officials without fear of penalty or reprisal.

## Section 2.  Representation Rights – Formal Discussions

a) An exclusive representative shall be given the opportunity to be present at:

> 1) Any formal discussion between one or more representatives of the Employer and one or more employees or their representatives concerning any grievance or any personnel policy, practice or other general condition of employment; and,

> 2) Any examination of the employee by a representative of the Employer in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action against the employee and the employee requests such representation.

b) The Department shall annually inform the AFSA bargaining unit employees of their Weingarten rights.  The Department Notice shall remind FS employees that AFSA is their exclusive representative.

## ARTICLE 5

## UNION RIGHTS AND RESPONSIBILITIES

### Section 1.  Recognition and Representation[4]

The Employer recognizes the Union's right to act for and negotiate agreements covering all employees in the unit.  The Union will represent all employees in the unit in those matters where it is acting as the exclusive representative without discrimination, and without regard to Union membership.

### Section 2.  Officers and Representation

The Department agrees to respect the rights of the Union and will recognize duly elected officers and other representatives of AFSA.  AFSA will provide the Department with a complete list of officers and representatives on a timely basis after each election of general officers and when new officers are appointed within the Union.

### Section 3.  Official Time[5]

a) The AFSA President and State Vice President shall be granted 100% official time to perform representational activities.  Official time is not authorized for internal Union business.

b) During the term of this Agreement, AFSA may submit a proposal for negotiation to the Department's Chief Labor Management Negotiator requesting up to 100% official time for an additional representative for a definitive period of time. The proposal should include a detailed description of the activities the representative will engage in and how he/she will engage with management.  The Department will negotiate the proposal in good faith.

c) While AFSA seldom uses employees other than those described above to represent employees during negotiations, there may be times when this occurs. When this occurs, the Parties agree that employees representing AFSA in the negotiations of a collective bargaining agreement or in union representational

---

[4]      FS Act §1013, 22 USC §4113.

[5]      FS Act §1018(d), 22 USC §4118(d).

JA51

activities shall be authorized a reasonable amount of official time when the employee would otherwise be in a duty status. The Department will so notify the supervisors of employees involved.

d) The Employer agrees to allow AFSA State Department representatives on 100% official time:

1. To be reviewed by a Selection Board for each year served; and,

2. To extend their time-in-class by time served in that capacity, but not to exceed two years in any position.

e) AFSA representatives on 100% official time shall be permitted to submit evaluative material (in the form of a self-evaluation memoranda) for inclusion in their official performance folders. These representatives may also obtain and submit a separate memorandum, for his/her OPF, from a Department employee that is at the same grade or higher than the representative.

## Section 4. Post Representatives

The Department agrees to recognize AFSA's designation of Department employees as AFSA representatives at post. Upon timely written notice of an individual's designation from AFSA to the Department's Chief Labor Management Negotiator, he/she or designee will certify the designation and promptly notify post management of the designation and authorization to deal with the named individual. All dealings at post will be in compliance with applicable FAM/FAH sections.

## Section 5. Changes in Bargaining Unit Status

When the Labor Management Office (HR/PC/LM), and/or Employer decides to change the Bargaining Unit Status (BUS) code of a position, the Union will be notified of the change prior to implementation.

## Section 6. Listings of FS Personnel

The Department will provide the Union a list of FS personnel. This listing will be alphabetical with grade and include the post of assignment. The Department agrees to provide a full listing as of September 30 of the year that this Agreement goes into force, and then on a triannual basis, i.e. three times a year.

**Section 7.  Union Right to Information**

In accordance with the provisions of Section 1013(e)(4) of Chapter 10 of the FS Act, the Department agrees to provide the Union, upon request and to the extent not prohibited by law, data:

> a)  which is normally maintained by the Department in the regular course of business;
>
> b)  which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of collective bargaining; and,
>
> c)  which does not constitute guidance, advice, counsel or training provided for management officials or confidential employees, related to collective bargaining.

This data will be transmitted to the Union in a reasonable period of time, normally within seven (7) days of the request.

## ARTICLE 6

## MANAGEMENT RIGHTS AND RESPONSIBILITIES

### Section 1. Management Rights[6]

Nothing in this section shall affect the authority of any management official, in accordance with applicable law to:

a) determine the mission, budget, organization, and internal security practices of the Department, and the number of individuals in the Foreign Service or in the Department;

b) hire, assign, direct, lay off, and retain individuals in the Foreign Service or in the Department, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member in accordance with regulations prescribed under the FS Act;

c) conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force conducted under Section 611 of the FS Act.[7]

d) assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Department shall be conducted;

e) fill positions from any appropriate source;

f) determine the need for uniform personnel policies and procedures between or among the Foreign Affairs agencies; and,

g) take whatever action may be necessary to carry out the mission of the Department during emergencies.

---

[6]    FS Act §1005, 22 USC §4105.

[7]    FS Act §611, 22 USC §4010a.

**Section 2.  Permissive and Mandatory Bargaining Authority**

Nothing in this section shall preclude the Employer and the Union from negotiating:

a)  at the election of the Employer, on the numbers, types and classes of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

b)  procedures which management officials will observe in exercising any function under this section; or

c)  appropriate arrangements for employees affected by the exercise of any function under this section by such management officials.

## ARTICLE 7

## NEGOTIATIONS

### Section 1. General

The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest.

### Section 2. Collective Bargaining

a)  The Parties recognize the right of either party to initiate bargaining where appropriate.  Although this Agreement covers many subjects, many other relevant rules, policies, and regulations are already codified within the Foreign Affairs Manual (FAM), Foreign Affairs Handbook (FAH), Annual Precepts, Standard Operating Procedures (SOPs), and other internal Department policy statements. To the extent that such documents were bargained between the Employer and Union, they are considered collective bargaining agreements and may contain sunset provisions or expiration dates (i.e. term limits) as mutually agreed to by the parties.

b)  Where no term limits exist, such documents will remain in force until changes have been negotiated between and agreed to by the Parties.  AFSA may propose changes, at any time, to these documents that lack an existing term limit.  Proposed changes will be considered seriously by the Department and responded to with either agreement to the proposed changes, request to negotiate the proposed changes, or rejection of the proposed changes for specific reasons.  When the Parties agree to engage in negotiation over requested changes, these existing agreements will remain in force until agreement between the parties is reached or until the full spectrum of negotiations allowed under the statute is completed. Ground rules establishing specific timeframes for negotiations may be requested by either party.

c)  Future changes to modify, terminate or amend existing agreements (e.g. FAM, FAH, SOPs) will require the full breadth of negotiation as contemplated under Section 3.  The parties hereby agree that all future agreements of this nature will have designated term limits unless mutually agreed to by the parties that a term limit on the agreement is not necessary.  Where a term limit exists, it will specifically indicate the length of the agreement, whether the parties will allow an agreement to rollover if not reopened in a timely manner, and as needed, the

window of opportunity to reopen an agreement by either party when its term is completed. Nothing prevents the parties from reopening an agreement at any time by mutual agreement.

**Section 3. Notice to the Union**

a) The Parties agree that the Union shall be given notice and the opportunity to negotiate with respect to changes in the conditions of employment of bargaining unit employees, to the extent consistent with Section 1005 of the FS Act,[8] and to the extent such changes in conditions of employment are greater than de minimis.

b) Notification may include a final date for the Union to request negotiations with respect to the proposed change. In no case shall such final date be less than ten (10) days from receipt of the notification of the proposed change. When notification does not include a final date for the Union to request negotiations, and the Union wishes to negotiate, the Union shall make a request to negotiate within thirty (30) calendar days from the date of receipt of the notification.

c) If the Union wishes to submit a request for clarification of the proposal, it must do so within seven (7) days. Management will respond within seven (7) days. The Union will then have seven (7) days from the receipt of the clarification to request negotiations. If the Union does not submit a timely request to negotiate or for further clarification, it shall be deemed to constitute acceptance of the change by the Union.

d) The Union will be required to submit its proposals within ten (10) days of requesting negotiations. Upon request, the Union will receive an extension of ten (10) additional days to submit proposals. Failure to submit timely proposals will allow the Department to implement the change.

e) The Department is precluded, upon the Union's request to negotiate and receipt of timely proposals, from implementing its proposed action until the Parties reach agreement or, if the Parties do not agree as to the obligation to negotiate, until the Board resolves the issue of whether the obligation to negotiate exists, unless required to carry out the mission of the Department in an emergency.

f) When good faith negotiations do not result in agreement, the Parties will first seek mediation to try and resolve the matter. If the Parties reach an impasse at

---

[8]    22 U.S.C. § 4105.

mediation, either Party may request the Foreign Service Impasse Disputes Panel (FSIDP) consider the impasse. While the impasse is before the FSIDP or a mediator, neither party will implement the proposed change except to the extent mutually agreed to or if an emergency requires the Department to take immediate action.

g) The Department will endeavor to provide the Union with documents that track all proposed changes and/or amendments to existing regulations, SOPs, and documents, clearly delineating the changes and/or amendments the Department proposes.

**Section 4. Union Proposals**

a) If the Union is the party reopening an agreement with a term limit, it will be responsible for providing notification to the Department of its proposed changes. The Union shall transmit to the Department any proposed changes within ten (10) days from requesting to reopen an agreement. The Department shall respond to the Union's proposed changes within fifteen (15) days from receipt of the proposed changes by agreeing to the proposed changes or requesting to negotiate over the proposed changes. If the Department requests clarification of any proposed changes during the fifteen (15) day period from receipt of the change, the Union shall address the request for clarification within seven (7) days. The Department will then have seven (7) days, from the receipt of the clarification to respond to the Union's proposed changes.

b) Where the Union wishes to propose changes to an agreement that does not contain a term limit, the Union may at any time transmit to the Department any proposed changes in personnel policies, practices, or matters, whether established by regulation or otherwise affecting working conditions of employees. The Department shall respond to the Union proposal(s) within fifteen (15) days from receipt of the proposal(s). If the Department requests clarification of any proposed changes during the fifteen (15) day period from receipt of the proposed change, the Union shall address the request for clarification within seven (7) days. The Department will then have seven (7) days, from the receipt of the clarification to respond to the Union proposal(s).

c) For matters addressed in Section 2(b) and Section 4(b), (i.e. proposed changes to agreements that do not contain a term limit), in those cases where the Department has responded rejecting the proposed changes under the "covered by" doctrine, AFSA will have three (3) opportunities within two (2) years from the effective date

of this Agreement to request negotiations regardless of a "covered by" argument and the Department must honor that request to negotiate. AFSA will have two additional opportunities within three years of the effective date of this Agreement to request negotiations as described above (i.e. regardless of the Department's "covered by" argument). Thereinafter, during each year that this Agreement rolls over, AFSA will have one opportunity per year to request negotiations regardless of a "covered by" argument and the Department must honor that request to negotiate.

## Section 5.  Extension

Nothing herein shall preclude the parties by mutual consent from extending any time limits imposed under this Article.

## Section 6.  Resolution of Implementation Dispute

Any dispute between the Department and the Union concerning the effect, interpretation or a claim of breach of a collective bargaining agreement shall be resolved pursuant to 22 U.S.C. § 4114 or as an Unfair Labor Practice.

# ARTICLE 8

## USE OF OFFICIAL FACILITIES AND SERVICES

### Section 1. Purpose

Unless otherwise specified, the services and facilities described in this article shall be provided by the Department to the Union free of charge.

### Section 2. Space and Furniture

For the convenience and efficient servicing of employees within the bargaining unit, the Department agrees to provide adequate office space, containing individual offices and office furniture, to include a safe to hold classified material for the use of the Union. Such space shall be limited to space available within the Harry S. Truman Building (HST). The Department shall provide general services for any facility related issues under their authority to include office equipment provided by the Department. The Department, with advance notice, also agrees to provide the Union with access to a cleared space, within HST, containing a computer and telephone for classified discussions and drafting on an as needed basis.

Additionally, the Department agrees to make reasonable efforts to provide conference rooms and/or auditoriums within HST to enable the Union to conduct general membership and other such meetings. Requests for use of such space must be initiated by the Union in writing, at least three days' prior to the requested date. The Union understands that the Department may need to preempt the space, with little notice, for its own use. The Department will make every effort to provide alternative arrangements when possible.

### Section 3. Telephones

The Union may use Department telephones for all international and local calls in conducting its representational business.

### Section 4. Submission to State Magazine

Articles that AFSA wishes to submit to be considered for publication will be submitted simultaneously to HR/PC/LM and the Editor of State Magazine.

## Section 5.  Bulletin Boards and Television

a) Upon request, AFSA may have access to Department Bulletin Boards not to exceed four (4) total.  Currently, AFSA has access to a bulletin board in HST near the main cafeteria and at FSI.  AFSA may continue use of those two (2) bulletin boards if they desire to do so, with the understanding that use of those Bulletin Boards will count as two (2) of the four (4) total Department Bulletin Boards to which AFSA may have access.  If those bulletin boards are removed in any building renovation, AFSA may seek the use of alternative bulletin boards.

b) The Department will also grant AFSA space, outside of the Main Cafeteria, HST to display a television.

c) Bulletin board material must be properly identified as belonging to AFSA and relate to employees, their employment by the Department or AFSA's role as the exclusive representative.  AFSA assumes all responsibility incident to the preparation, reproduction, distribution, posting, and maintenance of material on bulletin boards.  Postings will be devoid of libelous, scandalous or scurrilous material.

d) When AFSA desires to post materials at Departmental display areas other than those listed in Section 5(a), AFSA will submit such material to the Department in accordance with applicable procedures.

e) The Department agrees to permit AFSA representatives at overseas posts to display AFSA material in an area where other organizational material is located, e.g., on the CLO Notice Board or in a similarly visible location.  Specific notices of AFSA events can be displayed in general use spaces, such as on a cafeteria notice board or other general use bulletin board.

## Section 6.  Correspondence to Members

The use of the Department's facilities for registered mail is made necessary by AFSA's need to transmit documents between its Washington headquarters and its membership worldwide.

AFSA may use the Department's overseas pouch facilities on a reasonable basis for the distribution of general printed matter and individually addressed correspondence arising from AFSA's role as the exclusive representative.

**Section 7.  Electronic Mail Systems**

a) The Department shall provide AFSA e-mail access for representational purposes, such as communicating directly with employees on announcements of meetings, obtaining employee input on issue between Management and AFSA, and to assist employees with grievances, investigations, disciplinary and other similar employment related matters.

b) With the exception of three blast emails during AFSA's election season, the e-mail system shall not be used for internal union business, such as election and membership efforts.

c) Other than administrative proceedings, e.g. grievances, EEO, security clearance cases, the Union will not seek information or request meetings directly with management officials without the prior knowledge and approval of the Department's Chief Labor Management Negotiator or his/her designee.  Unless otherwise mutually agreed to, HR/PC/LM will be copied on any such emails.

d) Any Department issued fobs, iPads, BlackBerrys or related communication devices requested and issued to the elected AFSA President, State Vice President, and/or staff member, will be paid for by AFSA.

e) AFSA will abide by the provisions of 5 FAM 750 when using the Department's intranet and unclassified email system.

# ARTICLE 9

## USE OF TELECOMMUNICATIONS SYSTEM

Unless otherwise stated, AFSA's access to the Department's Cable/ALDAC and other telecommunications systems shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act.

### Section 1. Standard Procedures

a) AFSA will observe Department guidelines for the various types of correspondence it sends (i.e., telegrams, memorandums, letters, diplomatic notes, Department Notices, electronic messages, and invitations).

b) Cables and Department Notices (DN) will be written in the appropriate style and clearly identified to indicate that transmission is from AFSA through the Department.

c) Cables shall be unclassified except in extraordinary circumstances and by agreement of both parties. Cables shall be sent routine unless there is mutual agreement for a higher priority.

d) Cables and DNs will be presented to the Department's Chief Labor Management Negotiator or designee for clearance. A cable or DN must be cleared provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous or scandalous material. The clearer may disseminate the Cable or DN for wider input from management officials but is the sole clearer of the document. Redrafting of the cable is not the prerogative of the clearing official.

e) Cables and DNs shall normally be transmitted within two days of presentation by the Union to the Department's Chief Labor Management Negotiator or designee.

### Section 2. Overseas Procedures

Any communication presented by the AFSA representative for transmission to staff will be presented to the designated management official at post or regional management officer to be cleared for transmission. Communication must be cleared provided it is in compliance with the provisions of this Article and is

devoid of libelous, scurrilous or scandalous material.  Redrafting of the communication is not the prerogative of the clearing official.

## Section 3.  AFSA Elections and Awards

AFSA may use the cable system on a reasonable basis for distribution of material related to AFSA Awards, AFSA's Call for Nominations, and to announce the results of Governing Board elections.

JA64

## ARTICLE 10

## DUES WITHHOLDING

### Section 1.  General

Payroll deductions for the payment of Union dues may be made from the pay of bargaining unit employees and non-bargaining unit employees, if authorized by the employee.

### Section 2.  Supply of Forms

The Union will be responsible for the distribution of Standard Form 1187 for use by an eligible member of the Union who wishes to authorize the deduction of his/her dues.

### Section 3.  Changes in Dues Structure

The AFSA President or authorized AFSA official (e.g. Chief Operating Officer or equivalent, or AFSA Member Services) shall notify the Department's Chief Labor Management Negotiator or designee when the dues structure changes. HR/PC/LM will immediately notify the Department's Payroll Office of the change.  AFSA agrees that changes to dues structure can only occur once every calendar year.

### Section 4.  Bi-weekly deductions

Authorized deductions will be made each bi-weekly pay period from the pay of an employee who has authorized such allotment.  No deduction will be made in any period for which the employee's net earnings after other deductions are insufficient to cover the full amount of the allotment for dues.

The Union will not be charged or assessed a fee for services rendered, by the Department, in connection with these deductions.

### Section 5.  Bi-weekly listings

The Department will transmit to AFSA bi-weekly the total dues withheld each pay period along with a list of employees, the amount deducted for each employee, the total amount of the dues withheld for the year, and the amount of the check.  The

Department also agrees to provide a bi-weekly listing of discontinuance of the dues deduction.

## Section 6. Annuity deductions

Annuity deductions for the payment of AFSA dues will be made from the annuity of retired Foreign Service members if authorized by the annuitant by completing Standard Form 1187A. The Department will apprise retiring Employees of this option as part of the Department's ongoing retirement education and counseling efforts.

## Section 7. Discontinuance of Dues

An employee may seek to cease payroll dues deduction by contacting the Members Services Division within AFSA and processing the necessary paperwork. AFSA shall inform the Department to cease payroll dues deduction and send the necessary paperwork. AFSA may also request that the Department automatically cease dues deduction of any member AFSA no longer considers to be in good standing. Should AFSA no longer remain the exclusive representative of the Foreign Service bargaining unit, all related dues deduction shall cease on the effective date of that loss of recognition.

## SIGNATURES

The American Foreign Service Association and the Department of State hereby
agree to this negotiated Framework Agreement on the 15th of July , 2019.

**FOR THE DEPARTMENT OF STATE**            **FOR AFSA**

Steve Polson                               Ken Kero-Mentz
Chief Labor Management Negotiator          State Vice President

Chris Klemm                                Sharon Papp, Esq.
Deputy Labor Management Negotiator         General Counsel

Patty McCabe                               Raeka Safai, Esq.
Labor Relations Specialist                 Deputy General Counsel

                                           James Yorke
**APPROVAL**                               Senior Labor Management
                                           Representative

Brian Bulatao
Under Secretary for Management

    8/12/2019
Date



# EXHIBIT
# 2

# MEMORANDUM OF AGREEMENT

## AMERICAN FOREIGN SERVICE ASSOCIATION

## AND

## U.S. DEPARTMENT OF STATE

The American Foreign Service Association (AFSA) and the U.S. Department of State, collectively referred to as the Parties, recognize and affirm that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service. A Framework Agreement between the Parties has existed since at least 1987. The Parties entered into a new Framework Agreement on July 15, 2019. The Parties engaged in good faith negotiations regarding an extension of the Framework Agreement between October 8, 2024, and December 27, 2024.

The Parties affirm their commitment to build a positive and cooperative bilateral relationship and agree as follows:

> The Parties' July 15, 2019, Framework Agreement shall remain in effect for three (3) years from the effective date of this Memorandum of Agreement (MOA). Thereafter, the Framework Agreement shall be renewed for additional one-year periods dating from the anniversary date of this MOA, unless between 105 and 60 calendar days prior to the anniversary date of this MOA either party gives written notice to the other of its desire to amend, supplement, or renegotiate the Framework Agreement.

> The July 15, 2019, Framework Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

The effective date of this MOA shall be the date it is signed by both Parties.

**DEPARTMENT OF STATE**                    **AFSA**

*Richard R. Verma*  1/3/2025            *[signature]*  1/8/25

Richard Verma                              Thomas Yazdgerdi
Deputy Secretary of State                  AFSA President

# EXHIBIT 3

## MEMORANDUM OF AGREEMENT (MOA)

The parties to this MOA are the American Foreign Service Association (AFSA), the American Federation of Government Employees (AFGE), Local 1534, and the Department of State (Agency). The parties have had the opportunity to exchange proposals and discuss matters related to the Agency's right to audio/visual record all voluntary and compelled subject interviews conducted by the Bureau of Diplomatic Security's Office of Special Investigations (DS/DO/OSI) domestically and have agreed to the following provisions as it relates to those investigative interviews and said recordings:

1. DS/DO/OSI (previously known as DS/ICI/SID) is authorized to conduct overt domestic audio and visual recording of all voluntary and compelled subject interviews.

2. In addition to this audio and visual recording, DS/DO/OSI will record the interview via audio only on a separate device. This will serve as a redundant capability, in the unlikely event that the primary recording system fails.

3. For compelled interviews, DS will provide an employee at least 24 hours' advance notice of any interview unless such notification could jeopardize the investigation. If asked by the employee or by the Union representative on behalf of the employee, DS will advise whether the employee is the subject of the investigation unless such notification could jeopardize the investigation.

4. Interview recordings will begin prior to the subject's entrance into the interview room. At the outset of the interview, an investigator will inform the individual verbally that the interview is being recorded, that the recording will continue until the conclusion of the interview (even if the investigators or employee temporarily leave the room), and, the possible uses of the recording (e.g. in a criminal action, administrative action and/or security clearance revocation action). In addition, DS may post signage saying "Recording in Progress" either in or immediately outside the interview room.

5. Also at the outset of the interview, the investigators will remind the individual that it is an unclassified discussion. If there is a need to address any classified information, it will be done at the end of the interview - after the recorder is turned off.

6. DS will strive to ensure that all recordings have sufficient volume.

7. Investigators will provide the subject of the investigation with appropriate warnings at the beginning of the interview. When that person is a U.S. Government employee the investigator will administer a DS-7619 (warning form required for voluntary interviews) or a DS-7618 (warning form for a compelled interview). The employee may have representation in such an interview if he or she so elects.

8. Upon request from the employee or representative of the employee, the person being interviewed and his/her representative may adjourn to a private setting established by DS/OSI for a reasonable period of time mutually agreed to by the parties involved. The use of a private room will depend upon the nature and/or needed length of the conversation.

9. Upon the conclusion of the interview, investigators will preserve the recording via Department approved electronic media. The original copy of the interview recording(s) will remain in the OSI case file. The recording(s) will become an attachment to the Report of Investigation (ROI).

10. If the Union did not represent the employee during prior investigative interview(s), but the Union is representing the employee during a subsequent investigative interview in the same case, a Union representative will be allowed an opportunity to review the previous recording(s), prior to DS conducting the subsequent interview, in an appropriate setting if requested unless such review could create a conflict of interest. DS will make the recording(s) available to the Union representative within two (2) business days after the representative's request. In the event DS finds that a review of the recording(s) from the prior interview(s) would create a conflict of interest, DS will provide the Union representative with the basis for its position and provide the representative with the opportunity to mitigate the concerns within five (5) business days from when the Union representative is notified, by DS, of the basis for the conflict of interest. If the conflict of interest is mitigated, DS will make the recording(s) available to the representative within two (2) business days after the conflict of interest is mitigated. The Union representative may take non-verbatim notes, and DS reserves the right to have a DS agent present to witness said review of the recording.

11. If DS offers the employee an opportunity to resign in lieu of prosecution, DS will afford the employee's Union representative an opportunity, upon request, to listen/view the recording(s) unless such a review could create a conflict of interest or if the Department of Justice does not approve of such a review. DS will make the recording(s) available to the Union representative no more than two (2) business days after the Union representative's request. In the event DS finds that a review of the recording(s) from the prior interview(s) would create a conflict of interest, DS will provide the Union representative with the basis for its position and provide the Union representative with the opportunity to mitigate the concerns as soon as possible but no later than two (2) business days from when the Union representative is notified, by DS, of the basis for the conflict of interest. If the conflict of interest is mitigated, DS will make the recording(s) available to the Union representative within two (2) business days after the conflict of interest is mitigated. The review will not be allowed if the Department of Justice specifically rejects such a review.

2

12. When the ROI provided to HR/ER/CSD for appropriate action or to DS/PSS for security clearance review makes any reference to the recording or directly quotes from the recording, the ROI will indicate where in the recording that reference or quote occurs. DS is not obligated to transcribe the entire recording. However, DS may transcribe portions of the recording for inclusion in the ROI and will, in those instances, note the relevant location within the recording and include the transcript of those portions as attachments that are made available to the employee as appropriate.

13. The parties will send a joint message announcing the implementation of this policy to include a summary of the procedural protections negotiated into this agreement stating that this policy will go into effect ten (10) business days after the date of that joint notice.

14. Should the Department propose an expansion of this policy; the Department will notify the Unions of this proposal and bargain as appropriate.

15. As it pertains to employees represented by AFSA on Foreign Service appointments including those employed by other Foreign Affairs agencies, this agreement applies to both positions within the bargaining unit and those out of the bargaining unit.

FOR THE AGENCY

Steven J. Polson
Chief Labor Management Negotiator

FOR THE UNION

Angle Bryan
AFSA State Vice President
1 JUNE 2016

Anthony Bishop
AFGE State Vice President

3

## IMPLEMENTATION OF OVERT DOMESTIC AUDIOVISUAL
## RECORDINGS OF INVESTIGATIVE INTERVIEWS

On November 25, 2013, then Deputy Secretary Burns approved a policy that authorized the Bureau of Diplomatic Security's Office of Special Investigations (DS/DO/OSI) to conduct overt domestic audiovisual recording of subject interviews in both compelled and voluntary settings in routine criminal and administrative investigations. After careful consideration of Union concerns, Deputy Secretary Higginbottom upheld the Burns' approval and the parties moved forward to bargain impact and implementation of said policy. This policy does not apply to bargaining unit employees of Passport Services represented by the National Federation of Federal Employees (NFFE) Local 1998.

The Department, the American Federation of Government Employees (AFGE) Local 1534, and the American Foreign Service Association (AFSA) concluded bargaining and agree on the following procedural protections:

- Employees are entitled to representation at said interviews at their election. For compelled interviews, DS will provide at least 24 hours notice of any interview unless such notification could jeopardize the investigation.
- Employees will be advised when a recording begins and when it ends.
- Subjects of interviews will be given appropriate warnings and assurances prior to the commencement of the interview.
- Employees and/or their representative will be entitled to a copy of the recording at the appropriate opportunity should formal action (disciplinary action or revocation of the employee's security clearance) be pursued.
- An employee's Union representative will be given the opportunity to listen/view the recording in an appropriate setting if the Union is now representing an employee prior to a second interview unless such review could create a conflict of interest.
- If the Department proposes an expansion of the policy, it must notify the Unions and bargain as appropriate.

- This policy shall go into effect 10 business days from the issuance of this notice. Prior to the effective date of the policy, DS/DO/OSI is required to obtain written consent from an employee in order to audio/video record the interview.

Should anyone have questions or concerns about this policy, they should contact the DS Office of Special Investigations via email at DS-OSIDutyAgent@state.gov or their respective Union.

# EXHIBIT
# 4

| | |
|---|---|
| **From:** | Polson, Steven J |
| **To:** | Thomas Yazdgerdi |
| **Cc:** | floyd@afsa.org; Tina Wong; Bradley, Patrick G; Phillips, Bradley Aaron; Klemm, Christopher G |
| **Subject:** | [EXTERNAL]Recent EO on Unions |
| **Date:** | Monday, March 31, 2025 4:38:53 PM |

On Thursday, March 27, 2025, the President issued an Executive Order (EO), entitled "Exclusions from Federal Labor-Management Relations Programs." In compliance with the EO, effective immediately, the Department hereby terminates the Framework Agreement with AFSA and will no longer recognize AFSA as an exclusively recognized labor organization.

The Department will cease all further payroll dues allotments immediately. Additionally, all recurring meetings between AFSA and the Department are cancelled. Official time for the AFSA President, AFSA State VP, and the additional AFSA representative on 100% official time under the terms of Article 5, Section 3(b) of the Framework Agreement will end at close of business today. We encourage these employees to be in contact with their CDO to pursue appropriate follow-on assignments.

AFSA elections may not proceed using agency space or government equipment (i.e., .gov messaging). AFSA must also remove all material from and vacate AFSA's Department-provided office suite in HST by COB April 4. AFSA's access to the suite will end no later than Friday, April 4.

Steven J. Polson

Chief Labor Management Negotiator

Policy, Planning and Communication Staff

Labor Management (GTM/PPC/LM)

Room 1239, HST

Department of State

202-647-4285

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT
# 5

AGREEMENT UNDER EXECUTIVE ORDER 11636                    12/6/7

This agreement between the Department of State and the American
Foreign Service Association (AFSA) under Executive Order 11636
is effective as between the parties when signed by the Deputy
Under Secretary of State for Management and the AFSA Board
Chairman.  As a result of consultation and mediation pursuant
to Sections 8 and 9 of the Order, respectively, the Department
and AFSA, recognizing the importance to the Service of maintain-
ing a high degree of confidence in the integrity of the promotion
process, and wishing to institutionalize a number of the highly
beneficial reforms put into effect by the Director General and
his staff, agree to the following provisions concerning the
promotion process:

1)  After a selection board has submitted a rank-order
list to the Director General, no alteration shall be made in
the order of names on the list, and, without the consent of
the individual concerned, no name falling within the promotion
zone shall be excluded from the promotion list except for one
of the following reasons:

  a.  Death, retirement, resignation, or separation from
      the Service;

  b.  Language probation requirements;

  c.  Referral to a Selection Review Board on grounds that
      an individual is the subject of investigation or of
      proceedings involving loyalty, security, suitability,
      misconduct or malfeasance.

  d.  The absence of certification of an available position
      at the higher rank, in the case of an individual
      in the Resident and Limited Indefinite Resident
      Employee and Departmental Employee Standards (DES)
      pay categories in which promotion may be dependent
      upon such certification.

In each such case any employee still in the Service whose name
has been excluded shall be officially notified in writing of
the particulars.  Management shall notify AFSA of the numbers
(but not the names) of individuals excluded and the reasons for
each such exclusion.  Such information shall be held in
confidence.

2)  No person subject to review by the selection boards
whose name was not rank-ordered by a board such that he fell
within the promotion zone shall have his name placed on a
promotion list except in the case of an individual:

2.

    a.  recommended for promotion by the Secretary in accordance with a recommendation of the Foreign Service Grievance Board or by an EEO appeals examiner; or

    b.  whose name had previously been excluded in accordance with paragraph (1) of this agreement and the reason for that exclusion has ceased to exist; or

    c.  who is the next highest individual on the rank-order list and therefore moves into the promotion zone as the result of the proper exclusion from the promotion list of another name from within that zone in accordance with paragraph (1) of this agreement.

Management shall notify AFSA of the numbers of individuals placed on a promotion list in accordance with each of these exceptions, and the rationale for each such addition.

3) The number of promotions to Class I and below, by class and by each category as competed within each class, which Management expects to recommend or make shall be established prior to the submission of findings and recommendations by the selection board or staff review panel concerned. The percentage of promotions which shall be made on an interfunctional basis shall also be established prior to submission of the findings of the first of the selection boards concerned in any annual promotion cycle. It is recognized that change of circumstances may dictate changes in these numbers. Management shall provide AFSA with a copy of the memoranda establishing these numbers and any changes therein. AFSA shall hold these memoranda in confidence until Management publishes them. If there is any discrepancy between the previously established numbers and the actual number of promotions by class and category, as competed, Management shall provide to AFSA a confidential briefing which shall include a full explanation of that discrepancy.

4) The Director General may accept the rank-order lists of the selection boards or return any or all of them for review if he questions procedures or conformity with the precepts. In each such case the Director General shall give the board chairman, in writing, his reasons for returning the rank-order lists and shall provide a copy of his statement of reasons to AFSA.

5) In the event that members of selection boards or others privy to information concerning the promotion process have reason to question whether the above provisions have been adhered to, they should address their inquiry in writing to the Director

3.

General.  A copy of the inquiry and the reply shall be provided to AFSA in confidence.

6)  Either party may publish the contents of this agreement.

7)  Any grievance concerning the application or interpre-tation of the Department's practices, policies or regulations based on this agreement may be resolved by the filing of a grievance under the Foreign Service grievance system.

8)  This agreement shall be valid unless changed by con-sultation between the parties, but shall be terminated in the event that AFSA loses its certification as exclusive repre-sentative.  Either party may propose consultation on the imple-mentation of this agreement at any time.

In witness whereof, the representatives of the respective parties have hereunto affixed their signatures on this ___**6 h**___ day of December 1973.

FOR THE DEPARTMENT
OF STATE

_____

_____

_____

APPROVED

_____
Acting Deputy Under Secretary
of State for Management

DATE ___12/6/73___


FOR THE AMERICAN FOREIGN
SERVICE ASSOCIATION

_____

_____

_____

APPROVED

_____
Chairman of the Board, AFSA

DATE ___12/6/73___

## MEMORANDUM OF UNDERSTANDING

### October 18, 1973

The following memorandum of understanding has been reached
between the parties concerning the Agreement on procedural
safeguards for the promotion process, hereafter referred to
as "the Agreement."

1.  AFSA hereby expresses its intent to publish the
entirety of the contents of the Agreement, (excepting only
the signatory line), and will not publish portions of the
Agreement until AFSA or management has published the Agree-
ment in its entirety.

2.  Nothing in the Agreement shall be interpreted by
AFSA as precluding promotions pursuant to 3 FAM 568.3(i).
However, upon the submission of a written proposal by either
AFSA or the Department with respect to 3 FAM 568.3(i), both
parties agree to meet in accordance with E. O. 11636 as a
matter of priority as soon as both the new Director General
and the new Deputy Under Secretary for Management have taken
office.

3.  Both parties agree that the intent of paragraph 3
of the Agreement is to guard against the hypothetical possi-
bility of arbitrary action to adjust the numbers of promotions,
or of promotions within a given category, for the purpose of
excluding or including particular individuals within the
promotion zone.

4.  The parties agree that nothing contained in paragraph
7 of the Agreement creates new rights for AFSA or derogates
from existing rights of the organization under the Interim
Grievance Procedures presently in effect.

_____
Alexander J. Davit
Acting Special Assistant

_____
Richard L. Williamson
AFSA, Counselor

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ ) | | |
| AMERICAN FOREIGN SERVICE ) | | |
| ASSOCIATION, ) | | |
| ) | | |
| *Plaintiff*, ) | | Civil Action No. 1:25-cv-1030-PLF |
| ) | | |
| v. ) | | |
| ) | | |
| DONALD J. TRUMP, et al., ) | | |
| ) | | |
| *Defendants*. ) | | |
| _____ ) | | |

## DECLARATION OF TINA WONG

I, Tina Wong, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am the Vice President (VP) for the American Foreign Service Association (AFSA) representing members of the Foreign Service at the Department of State (State). I have held this position since July 15, 2023. As AFSA State VP, I am the primary AFSA elected official who engages in collective bargaining on behalf of Foreign Service employees with the Department of State.

2.      Prior to my election as AFSA State VP, I served as an economic officer advancing policy priorities that kept America safer, stronger, and more prosperous. Since I joined the Foreign Service in 2013, I have been a proud member of our US diplomatic teams countering China's and Russia's influence in the Western Balkans, in the Asia Pacific Economic Cooperation (APEC) Forum supporting U.S. farmers to export to new

markets, and winning back American jobs through President Trump's U.S.-China Phase One Trade Agreement.

3.    On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees at State. The bargaining unit consists of one single world-wide bargaining unit, excluding confidential employees as described in Section 1002(6) of the Foreign Service Act (FSA), management officials as described in Section 1002(12) of the FSA, employees engaged in personnel work in other than a purely clerical capacity, employees engaged in criminal or national security investigations, and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

4.    AFSA represents active-duty members of the Foreign Service across six foreign affairs agencies – USAID, Department of State, Foreign Commercial Service (FCS), Foreign Agricultural Service (FAS), Animal and Plant Health Inspection Service (APHIS) and U.S. Agency for Global Media (USAGM). Over 80 percent of the members of the Foreign Service are dues-paying members of AFSA.

5.    There are 11,949 dues-paying AFSA members at State. The bargaining unit represented by AFSA contains 14,699 Foreign Service members employed at State.

6.    Employees at State typically serve for three-year tours of duty overseas and must bid for new assignments ten months before the end of each tour

7.    On July 15, 2019, AFSA and State entered into a new, updated Framework Agreement. The Framework Agreement covers issues relating to AFSA's and the Department's labor management relations, including 100 percent official time for the AFSA President and State Vice President, office space in the Harry S. Truman building at

no charge to AFSA, use of the Department's electronic mail systems to communicate with members, the union's right to information, union dues allotments, and the requirement that the Department provide AFSA with notice and the opportunity to bargain regarding changes to conditions of employment.   The Framework Agreement was extended, without change, in January 2025, for three years.

8.      In addition to negotiating the Framework Agreement, AFSA previously met every two weeks with management at State to discuss issues affecting the bargaining unit. I attended these meetings in my capacity as State VP. Where necessary, AFSA would follow up with State's Chief Labor Management Negotiator about negotiating relevant agreements on issues discussed in our meetings. We were often able to informally resolve employee questions and issues by speaking with our management counterparts. These meetings reduced the need to file grievances.

9.      One issue we discussed in recent meetings was the implementation of President Trump's Executive Order 14,151, which ended Diversity, Equity, and Inclusion for government employees. This Executive Order conflicts with our negotiated procedural precepts, described in Paragraph 13, below. AFSA proposed a compromise that would have followed the Executive Order, but State rejected it and refused to negotiate over the implementation of the Executive Order, and instead unilaterally changed these procedural precepts just two months before April 15, 2025, the end of the performance evaluation rating period, leaving Foreign Service employees scrambling to make changes to their evaluations. AFSA then announced to its membership that it intended to take legal action over State's refusal to negotiate.

10.    AFSA bargaining unit members pay voluntary membership dues to AFSA, which is the union's overwhelming source of operational funding. The vast majority of AFSA members have elected to have their dues deducted by State.

11.    The March 27, 2025, Executive Order titled "Exclusion from Federal Labor-Management Relations Programs" will have an immediate and devastating impact on AFSA's ability to safeguard the interests and rights of State Foreign Service members and upon AFSA's finances.

12.    On March 31, 2025, the State Department's Chief Negotiator, sent me an email that stated:

> On Thursday, March 27, 2025, the President issued an Executive Order (EO), entitled "Exclusions from Federal Labor-Management Relations Programs." In compliance with the EO, effective immediately, the Department hereby terminates the Framework Agreement with AFSA and will no longer recognize AFSA as an exclusively recognized labor organization.
>
> The Department will cease all further payroll dues allotments immediately. Additionally, all recurring meetings between AFSA and the Department are cancelled. Official time for the AFSA President, AFSA State VP, and the additional AFSA representative on 100% official time under the terms of Article 5, Section 3(b) of the Framework Agreement will end at close of business today. We encourage these employees to be in contact with their CDO [Career Development Officers] to pursue appropriate follow-on assignments.
>
> AFSA elections may not proceed using agency space or government equipment (i.e., .gov messaging). AFSA must also remove all material from and vacate AFSA's Department-provided office suite in HST by COB April 4. AFSA's access to the suite will end no later than Friday, April 4.

13.    Stripping AFSA of its right to negotiate conditions of employment, procedures, and appropriate arrangements for our members at State will harm members by allowing management to unilaterally discard safeguards that have balanced the rights of employees and management for over 50 years. As an example, AFSA negotiates the annual procedural precepts and the three-year core precepts that instruct the Foreign Service

Selection Boards on promotion criteria. These precepts provide the guidelines by which Tenure and Selection Boards determine the tenure and promotability of U.S. Foreign Service employees. By stripping AFSA of its status as the exclusive representative of State Department Foreign Service employees, the Department has free reign to rewrite the Procedural Precepts and the Core Precepts, removing fairness and transparency from the process and destabilizing the predictability of evaluation and promotion standards. A copy of the 2024 – 2025 Procedural Precepts is provided as Exhibit 1 to my Declaration.

14.    AFSA and the Department of State have not yet finalized and agreed upon the 2025 promotion procedural precepts.  Now that the Department is refusing to recognize AFSA as the exclusive representative and will not meet with AFSA, AFSA will have no input on the procedural precepts for the upcoming cycle. Without AFSA's input, the Department has carte blanche to institute new rules and procedures that could adversely affect Foreign Service members.

15.    AFSA negotiated a procedure for the first step of the grievance process with State. The agreed-upon procedure is codified in State's Foreign Affairs Manual, at 3 FAM 4400.

16.    AFSA also negotiated a detailed disciplinary procedure with State. The agreed-upon procedure is codified in State's Foreign Affairs Manual, at 3 FAM 4300.

17.    State has informed me that it will make its final automatic dues deductions from AFSA members who have authorized those deductions on April 17, 2025. In other words, there will be no further automatic dues deductions from April 18 onward. The immediate cessation of automatic dues deductions from over 11,000 State Foreign Service members means that AFSA will potentially lose over $350,000 a month in revenue.

18.    AFSA's Framework Agreements provide AFSA's attorneys and grievance staff access to the State's computer networks and office space. AFSA's State Vice President, one AFSA State Representative, and ten members of AFSA's legal and grievance staff, whose salaries are paid from union dues, have offices in the State Department. On March 31, 2025, the Chief Negotiator for State notified me that AFSA must vacate AFSA's Department provided office suite by close of business on April 4, 2025. Many of AFSA's attorneys and professional staff have worked for AFSA for more than 20 or 30 years. They have documents pertaining to AFSA members' individual grievance and discipline cases, in addition to historical union documents, on their government computers.  AFSA anticipates that the Department of State is going to disable their .gov email accounts with little to no warning and that important documents stored on the .gov system will be forever lost. While AFSA has its headquarters office at 2101 E Street, NW, Washington, DC, there is not sufficient suitable space for AFSA's elected constituency Vice Presidents, legal and grievance staff.  To rent space for these AFSA officials and staff in the Washington, DC area will be costly.

19.    AFSA's Framework Agreement also provides 100% official time for the AFSA President, who is a State Department Foreign Service employee, the State Vice President, and one AFSA State Representative. Service in these positions lasts for two years, which is similar to the average length of a Foreign Service assignment.

20.    Prior to the Executive Order, I was performing union duties on official time. Because I have not been planning to run for re-election as State VP in AFSA's upcoming officer elections, I have an overseas assignment lined up to begin after new officers take office in July 2025. I had begun some training for my new position before the Executive

Order issued, but I still performed AFSA duties part-time on official time as well as planned

to perform AFSA duties full-time on official time during the months of May, June and July

when I have already finished my training. After State withdrew recognition of AFSA as

the exclusive representative, my official time ended at the close of business on March 31.

I now must be in continuous training full-time right up until my upcoming assignment, so

I no longer have time to perform my AFSA duties during the workday.

21.     AFSA also has Greg Floyd, our State representative, who I routinely work

with. The State representative was performing AFSA duties on full-time official time prior

to the Executive Order. His official time also ended on March 31. He has reported early to

full-time work at his next work assignment, in the Bureau of Consular Affairs in

Washington, D.C. The State representative is now also unable to perform AFSA duties

during the workday.

22.     The timing of the Executive Order creates additional hardships for AFSA

and for members of the Foreign Service. AFSA is in the middle of elections for the 2025-

2027 governing board, which includes the 100% official time Vice President position for

State and the 100% official time State Representative position. The new board begins its

two-year term on July 15.   Removing the incumbent VP and the incumbent State

Representative, and potentially eliminating a future VP and full-time State Representative,

during this time will remove crucial advocates for members facing extreme negative

actions by the current administration.

23.     The injuries suffered by State Foreign Service employees, AFSA elected

officials, and AFSA staff members are ongoing or imminent and will persist unless this

Court intervenes.

Executed on April 14, 2025

Tina Wong

# EXHIBIT
# 1

**PROCEDURAL PRECEPTS FOR THE 2024 FOREIGN SERVICE SELECTION BOARDS**

TABLE OF CONTENTS

PART I - PURPOSE AND PROCEDURES
    A.  OVERVIEW
    B.  MAJOR RESPONSIBILITIES
        1.  Promotion
        2.  Low-Ranking and Referral to a Performance Standards Board
    C.  ADDITIONAL AUTHORITIES AND RESPONSIBILITIES
        1.  Limited Career Extensions
        2.  Non-Rates
        3.  Bidding Privileges
        4.  Counseling Function
        5.  Commendation
        6.  Board Recommendations
    D.  BRIEFINGS, MATERIALS AND GENERAL GUIDANCE
        1.  Evaluative Material
        2.  Scoring Rubric
        3.  Cross-Functional Competency
    E.  RECUSAL
    F.  FINDINGS AND RECOMMENDATIONS
    G.  OATH OF OFFICE

PART II - ELIGIBILITY
    A.  ELIGIBILITY FOR BOARD REVIEW
    B.  ELIGIBILITY FOR LIMITED CAREER EXTENSIONS

PART III - ORGANIZATION OF THE BOARDS
    A.  ORGANIZATION OVERVIEW
    B.  SENIOR BOARDS
        1.  Minister-Counselor Board (SFS-II)
        2.  Counselor Board (SFS-III)
        3.  Senior Specialist and Specialist Threshold Board (SFS-IV)
        4.  Generalist Threshold Boards (Boards SFS-V)
    C.  INTERMEDIATE BOARDS
        1.  Boards G-II
        2.  Boards G-III
        3.  Boards G-IV
        4.  Board S-I
        5.  Boards S-II
        6.  Board S-III
        7.  Boards S-IV
        8.  Boards S-V

2

Addenda
1. Security Awareness
2. Equal Employment Opportunity Principles
3. The Department's Leadership and Management Principles for Department Employees (3 FAM 1214)
4. Requirements for OMS Promotion to FP-02
5. Requirements for Promotion into the Senior Foreign Service
6. Scoring Core Precept Narratives
7. Cross-Functional Competency Scoring Scale

3

**PROCEDURAL PRECEPTS FOR THE 2024 FOREIGN SERVICE
SELECTION BOARDS**

**Equality of Consideration**

**All Employees will be compared and judged solely on merit with absolute fairness and justice.  No
employee will be discriminated against, directly or indirectly, for reasons of race, color, religion,
sex (including pregnancy, sexual orientation, and gender identity), national origin, disability, age,
genetic information, retaliation, political affiliation, or means of entry into the Service.**

## PART I. PURPOSE AND PROCEDURES

These Procedural Precepts (Precepts) establish the organization and responsibilities of the
Foreign Service Selection Boards (Boards) and describe the criteria the Boards apply in
reaching their determinations.  These Precepts are negotiated annually with the American
Foreign Service Association (AFSA).  If the language of the Precepts varies from that in the
Foreign Affairs Manual (FAM) or Foreign Affairs Handbook (FAH), the language in the Precepts
shall be governing.

## A.  OVERVIEW

The number of employees to be promoted is based on a statistical analysis and systematic
long-term projection of personnel flows and staffing needs.  Boards make their decisions based
on the Decision Criteria for Tenure and Promotion in the Foreign Service (Core Precepts – as
negotiated every three years with AFSA) as reflected by the employee's effectiveness in policy
leadership and program management, collaboration across functional lines and human
resources development, and potential for continued success in these areas if they were to be
promoted.  The Core Precepts are a separate document, and negotiated separately with AFSA.

The Boards identify and rank order all of those who are recommended for promotion,
without regard to the number of promotion opportunities available.

**New Cross-Functional Competency:**  The 2024 Procedural Precepts include board guidance
on the new cross-functional promotion process.  The Department continues to need
employees with strong competency in their primary skill code as well as employees with
broad experience and perspective, particularly in more senior roles, across skill codes and
cones, who can lead and manage organizations across a wide array of functions.  Therefore,
the Boards that review FS-02, FS-01, and FS-OC Generalists will review the employees in
their competition pool for cross-functional promotion and cone-based promotion, and
compile rank-ordered lists for both.

**Performance Next Issues:**  Due to technical issues with the Performance Next platform,
some 2024 EERs appear to be submitted late.  As a result, GTM/PE has made a one-time
concession not to penalize **any** late EERs up to June 1 for this cycle only.  Boards should
disregard submission dates and not penalize the Employee.

4

Board responsibilities at a glance:

➢ Base recommendations solely on objective, merit-based consideration of what is in the performance folder.
➢ Identify and recommend for promotion employees whose files demonstrate their potential to succeed at positions of greater responsibility.
➢ Rank in order of merit all employees the Board recommends for promotion.
➢ Identify those whose performance merits low-ranking or direct referral to the Performance Standards Board.


**B.  MAJOR RESPONSIBILITIES**

1.  Promotion

Promotion is the recognition that an employee has demonstrated the potential to perform successfully at the next higher level.  In considering an employee for promotion, Boards review employees in direct competition with others of their skill code and grade, and identify those whose performance and potential, as documented in the Official Performance Folder (OPF) and in accordance with the Core and Procedural Precepts, qualifies them to be entrusted with the duties and responsibilities of the next higher level.  A Board's recommendation for promotion is not a reward for prior service.  Promotions will be granted according to the number of promotion opportunities authorized by the Director General (DG) and in the rank order established by the Boards.

Each Board member will score each candidate based on their performance in each of the five Core Precepts, and for Generalists grades FS-02, FS-01, and FE-OC a sixth cross-functional competency.  As an employee's file will most likely include performance evaluation documents prepared under previous versions of the Core Precepts, Boards should reference both the current Core Precept guidance and the Core Precept guide in effect at the time each evaluation document was written to assess and inform the employee's potential to perform at the next higher level, but will use the current Core Precepts and cross functional competency as the overall guiding document during the current rating cycle for scoring and final rank.

Boards do not know the number of approved promotion opportunities.  Boards are encouraged to reevaluate their findings and identify additional employees to be recommended, if a Board recommends fewer employees for promotion than the number of promotion opportunities available.  Boards must base such recommendations solely on the determination of an employee's potential to perform at the next higher level, as demonstrated through their performance vis-à-vis the Core Precepts, and for Generalists grades FS-02, FS-01, and FE-OC the cross-functional competency, without regard to the number of promotion opportunities available.

An employee's positions or assignment pattern will not be the sole basis for determining their

5

competitiveness for conal promotion, or whether to low-rank or refer an employee to the Performance Standards Board (PSB).  When determining promotability, Boards will evaluate employees against the Core Precepts and the cross-functional competency (for Generalist grades FS-02, FS-01, FE-OC), considering the complexity of work, the employee's potential, as demonstrated by strong examples of their performance, and their depth and breadth of experience.  Boards should not penalize employees for assignments out of their primary skill codes.  Creditable performance in assignments out of an employee's primary skill code – including long term training, details, and interagency assignments – shall be weighed positively, as a means of broadening one's knowledge beyond the employee's skill code and as a demonstration of potential to perform at the next higher level.  An employee's knowledge and skills gained through experience outside of his/her primary skill code is a great asset to the Department.  For example, Deputy Chief of Mission (DCM), Principal Officer (PO), Deputy Assistant Secretary (DAS) and many other senior positions require exceptional performance and knowledge across a variety of skills, a major reason cross-functional competency is now an area under review.  Notwithstanding the importance and value of out-of-cone assignments, Boards will continue to look for significant in-cone experience, including mastery of tradecraft, when scoring for conal promotion.

In addition, Generalists grades FS-02, FS-01, FE-OC, will be evaluated cross-functionally.  Boards will evaluate an employee's potential and competency across functional areas by reviewing their evaluations for demonstrated impact in cumulative cross-functional and multilateral work including out-of-cone, details, and interagency assignments, as well as long-term training, work in combined sections, and significant "acting" experience of 120 days or more (non-consecutive) in cross-functional roles such as Directors, DASs, DCMs, and Principal Officers.  The cultivation of in-depth expertise and service in critical mission areas (when outside their cone's standard portfolios), as well as training and professional development for themselves and others (e.g., subordinates, mentees, team members, and colleagues) could be demonstrative of cross-functional competency.  Each of these types of experience lead to the flexibility and well-roundedness necessary for senior leadership roles.  While this does not take away from the importance of serving in one's cone, it demonstrates the importance of cross-functional competency for success in more senior roles and provides additional opportunities for those who choose to take on varied career paths.

OPFs may include periods without an EER, which if extensive can be documented via a Gap Memo, if appropriate.  Gaps are not unusual, and Boards should not draw any conclusion from the absence of documented performance, even if not documented with a Gap Memo. (See below in "Briefings, Materials and General Guidance.")

Regarding rater and/or reviewer recommendations for or against promotion, Boards are reminded that the authority to recommend an employee for promotion resides solely with the Selection Board.  For any EER ending after July 8, 2022, raters and reviewers are prohibited from making such statements.  Selection Boards are instructed to disregard any recommendation for or against promotion by a rater or reviewer and give no weight to the presence or absence of such statements in any EER they review.  Rather, raters and reviewers must specifically comment on an employee's demonstrated potential to perform successfully at

6

the next higher level given their observations over the rating period.  In doing so, raters and reviewers must also provide strong examples supporting their assessment of the employee's demonstrated potential.  Any statements indicating an employee is demonstrating the ability to perform at a higher level should be directly tied to specific, observed behavior or examples to support such an assertion.

The Boards should consider the complexity of the work as having equal weight regardless of whether the assignment is based domestically or overseas.  Supervising Foreign Service officers and specialists is not a mandatory criterion for promotion; thus, Boards should not weigh the supervision of Foreign Service members more heavily or more favorably than supervision of Locally Employed Staff, Eligible Family Member (EFM) employees or Civil Service employees.  The supervision of all employment categories of direct reports should be weighed equally.  Boards should consider positively the successful acquisition and/or use of a foreign language, particularly across multiple assignments.  Boards should weigh challenges and accomplishments across all assignments when making their recommendations and rankings.

## 2.  Low-Ranking and Referral to a Performance Standards Board

Employees reviewed for promotion shall also be reviewed for low-ranking and possible direct referral to a Performance Standards Board (PSB) for failing to meet the standards of performance drawn from the Core Precepts.

Boards will also review for low-ranking and possible direct referral to a PSB the OPFs of employees who were eligible to apply for consideration for promotion into the Senior Foreign Service, also known as "opening the window," but who did not elect to do so.  Boards will review the OPFs of employees whose maximum time in class (TIC) or time in service (TIS) is subject to the annuity exception per 3 FAM 6213.6 for low-ranking and possible direct referral to a PSB.  These candidates will be reviewed by grade and, unless otherwise stated, primary skill code.

Low-ranking is an indication to the employee and the Department of problem areas or inadequacies in needed skills, performance, and/or potential.  It shall not be based on secondary considerations, such as relatively recent promotion, type or pattern of assignments, including service in or out of a primary skill code, or less extensively documented successful performance.  Employees should not be penalized for taking assignments out of their primary skill codes or for taking Leave Without Pay (LWOP).  Inadequacies in needed skills that lead to low-ranking must be documented by examples of performance from the most recent five years.  Boards are in a unique position to identify patterns of sub-standard performance that may otherwise be missed as employees and supervisors rotate between assignments.

As of July 8, 2022, the Developmental Area section of the EER is deactivated.  The section will be deleted completely from the form for rating periods beginning after April 15, 2023.  Boards will still be reviewing EERs that predate the deactivation of the Developmental Area , and are not precluded from relying on those "active" Developmental Areas.  Boards are reminded, however, that they must not rely solely on critical comments in the Developmental Area

7

section in making low-ranking or PSB direct referral determinations unless those comments are supported by examples there or elsewhere in evaluations from the most recent five years in the OPF.  Likewise, critical comments in the EER must be supported by clear examples supporting the criticism.  Boards are reminded that the Developmental Area section was mandatory for all employees prior to the 2022 rating period.

Boards should not rely solely on an employee's Description of Accomplishments as a basis for low-ranking.  Rater and Reviewer statements are critical to inform the boards of performance in the core precepts.  Low-ranking statements and/or PSB direct referrals also shall not be based solely on disciplinary letters, although the disciplinary letters may be used in combination with critical examples from rater narratives.  Selection Boards have no obligation to low-rank or refer to a PSB employees who have a disciplinary letter in their file.    A majority of Board members must concur in the low-ranking of an employee or direct referral of an employee to a PSB.

Demonstrated weakness in one or more of the following areas, by itself, may be grounds for a low-ranking or for direct referral to a PSB:

(1) Reluctance to accept responsibility;
(2) Failure to carry out properly assigned tasks within a reasonable time;
(3) Low productivity or work poorly done;
(4) Failure to adapt to the office environment or to a foreign culture;
(5) Refusal to accept or carry out legitimate directives from properly authorized officials;
(6) A pattern of failure to properly safeguard classified material and information.  For employees at FS/FP-02 and above, see also Addendum 1;
(7) Inability to work effectively and cooperatively with supervisors, colleagues, teammates, or subordinates, including contributing to or failing to address intimidation, humiliation, belittlement, and similar bullying or otherwise toxic behaviors in the workplace;
(8) A lack of adherence to EEO principles or lack of sensitivity to the importance of diversity, equity, inclusion, and accessibility (DEIA) (see Addendum 2); and/or
(9) Indifference to or failure to carry out supervisory responsibilities.

Boards will review the file of each low-ranked employee and identify those whose records indicate they may not have met the standards of performance for their class.  These employees may be directly referred to a PSB, which will independently make selection-out recommendations after reviewing the performance folders of the employees referred to it. Boards should be scrupulous in identifying and directly referring to the PSB employees who are obviously substandard performers.

**PSB Statements:**  For each employee who is directly referred to a PSB, Boards will prepare an individual statement explaining the reasons for the direct referral through a summary of the employee's performance weaknesses in relation to the standards of performance for their class.  These statements must draw on material at minimum from the rater's statement, supported by an additional rater's or reviewer's statement from a second rating cycle within

8

the last five years of active service.  PSB Direct referrals shall not be based solely on disciplinary letters, although the disciplinary letters may be used in combination with other critical examples.  To assist the PSB in evaluating the employee's overall career record, Boards must fully describe the employee's weaknesses in performance that resulted in direct referral to a PSB.

**Low-Rank Statements:**  For each employee who is low-ranked, but not referred to a PSB, Boards will prepare an individual statement explaining the reasons for the low-ranking through a reasonable presentation of the employee's weaknesses and addressing areas in which performance or potential might be improved.  These statements must draw on material at minimum from the rater's statement, supported by an additional rater's or reviewer's statement from a second rating cycle within the last five years of active service.  Low-rank statements shall not be based solely on disciplinary letters, although the disciplinary letters may be used in combination with other critical examples.

In situations where a low ranking is not possible, but in which boards notice concerning performance issues, boards are encouraged to prepare a counseling memo describing those issues in as much detail as the board believes appropriate.  Boards may draw on all evaluative material in the file in the preparation of a counseling memo.

Untenured Specialists may be low-ranked by a Board.  However, until tenured, they may not be referred to a PSB.

The Director General may, in consultation with the Office of Career Development and Assignments (GTM/CDA), determine that for compelling compassionate reasons, an employee should not be certified to the PSB or given a copy of the Board's low-ranking statement.  In such a case, the employee will be considered as having been "non-rated" by the 2024 Boards and the Scorecard will be so annotated in accordance with these Precepts, but the employee will not be granted any additional period of TIC/TIS.

Employees identified for low-ranking by the most recent Board who were also low-ranked by another board within the past five years, based on performance documented in different EERs from different  officials, will be administratively referred to a PSB.  This referral requires no action by Board.

## C.  ADDITIONAL AUTHORITIES AND RESPONSIBILITIES

1.  Limited Career Extensions

If the DG has determined that the Department may grant a small number of Limited Career Extensions (LCEs), the Director of GTM/PE will provide the Board the names of eligible career employees in the competition group who are in their last year of TIC or TIS.  After completing their review for promotion, possible low-ranking, or direct referral to a PSB, the Board will review the records of employees eligible for LCEs.  The DG may provide the Board additional

9

information on specialized skills that the Under Secretary of Management has determined to be in short supply for the subsequent three-year period.  The DG will grant LCEs only to employees the Board has found qualified and in the rank order established by the Board (3 FAM 6213.7).

In reviewing the OPFs of employees eligible for an LCE, the Board will apply the same criteria as for promotion.  Recognizing that employees extended will serve only in their present class, the Board will give less weight to evidence of potential to perform at the next higher class and substantial weight to the quality of performance and potential for continued outstanding service in the class in which the employee is being considered for an LCE.

2.  Non-Rates

It is normal for Foreign Service careers and assignment patterns to result in periods undocumented in the OPF.  This should not discount an employee's standing before the Board. If a Board determines that it cannot make a determination about a candidate's ranking based on the content of the file, then the Board, with the concurrence of the Director of GTM/PE, may determine that the candidate's ranking cannot be adequately assessed based upon the documents reviewed and non-rate an employee.  Boards will prepare a written explanation of each non-rate determination, with a copy to the non-rated employee.

Pursuant to 3 FAM 6213.5, periods for which a Board has non-rated a member of the Service are not included in the calculation of TIC/TIS.  The employee's TIC/TIS expiration date will thus be extended by one year.  The absence of an EER alone does not necessarily qualify for a non-rate.

Boards have the option to, but are not required to, non-rate an employee when it is apparent that the employee is serving in a domestic position that is significantly below their grade and/or skill level.  This type of assignment could indicate the employee may be constrained from demonstrating their full potential by issues that are beyond their control.

3.  Bidding Privileges

There may be more employees recommended for promotion than there are opportunities.  When this occurs in the Senior Threshold and Intermediate Boards those employees recommended for promotion who are not ranked high enough for one of the available promotion opportunities  will be deemed qualified to bid at the next higher grade in the next assignment cycle at a rate of 10% of their competition pool and will have a statement indicating this added to their OPF.  Only those employees who were recommended for promotion and rank-ordered by the Board are eligible for bidding privileges.  These bidding privileges are only applicable in the next year's assignment cycle and cannot be carried over or held to be used in any subsequent assignment cycles.

10

4.  Counseling Function

Boards have an important role to play in counseling employees.  All employees under review, including those mid-ranked or recommended for promotion, and their raters and reviewers, may benefit from a Board's guidance and perspective.  Boards may notice a small but noteworthy performance issue, poorly written evaluation, or the lack of an important skill that training could remedy.  From its unique perspective viewing the broad range of a competition group, the Board may counsel any employee, rater, reviewer, or review panel chair by issuing a counseling statement.  This is a private communication between the Board and the employee, has no formal career consequences, and will not be placed in the OPF of the employee.

Boards may prepare individual written counseling statements where raters, reviewers, or review panel chairs, in the opinion of the Board, have failed to properly execute their responsibilities with respect to content and/or inadmissible comments in performance-related documents.  Such counseling statements will not be placed in the OPF of the responsible employee but will be shared with them to encourage adherence to performance management standards.  GTM/PE will make every effort to resolve inadmissible comments in EERs brought to its attention by the boards.

5.  Commendation

Boards may identify raters and reviewers who merit commendation for the quality of evaluations they prepared in the most recent rating period.  Boards may commend raters and reviewers who show diligence in measuring performance by seeking input from the staff and peers of the employee being rated.  For each employee commended, the Board will prepare a written official statement of commendation that will be placed in the commended employee's OPF.

Boards also may identify rated employees who demonstrate superior performance in one or more of the Core Precepts.  For each employee commended, the Board will prepare an individual written official statement of commendation that will be placed in the commended employee's OPF.  Boards may not draft commendation letters for  low-ranked employees or for employees they are referring directly to a PSB.

6.  Board Recommendations

Boards will make general observations to the Director General regarding the skill code(s) and grade(s) they reviewed, and make recommendations regarding  materials used in the evaluation process, or the board's recommended improvements to the evaluation and Selection Board process.  If a Board has no recommendations to make, it shall so state.  Such recommendations will be made available to designated officials of AFSA as the Director General deems appropriate.

11

## D.    BRIEFINGS, MATERIALS AND GENERAL GUIDANCE

GTM/PE will guide the Boards on the technical procedures to be followed.  GTM/PE will provide Board members an oral briefing on voting and related procedures at the outset of Board deliberations.  The Boards will address all queries regarding their work and the facilitation thereof only to GTM/PE staff.

### 1. Evaluative Material

Boards will base their decisions only on material that is a part of the employee's OPF and, at grades FS-02 and above, on the security incident record and employee responses described in Addendum 1 to these Precepts.

Boards have access to each employee's entire performance folder and should place the greatest emphasis on the **five most recent years of evaluative material** or since the last promotion, whichever was the most recent (to include performance evaluations and training reports).  They should not give undue weight to any single evaluation report in isolation from other reports.

Board members will have available relevant reference materials, including the current and past Core Precepts and the Procedural Precepts, Instructions for the Preparation of EERs, a copy of the Foreign Service Act of 1980, as amended, a redacted Employee Profile for each candidate, and the FAM.  The redacted Employee Profile lists awards, assignments, and promotions.  It does not include EEO-protected characteristics such as age, gender, marital status, and place of birth; or previous years' Scorecard scores.  At grades FS-02 and above, the security incident record and employee responses described in Addendum 1 to these Precepts will also be provided. The OPFs of some employees who entered the FS in classes above customary levels of entry or after prior service in another foreign affairs agency, or whose service was interrupted, may contain information from previous periods of government employment; other employees who have similar prior experience may have performance folders relatively lacking in evidence of extended past performance.  Boards should not consider this other information in making their decisions.  Employees should not be disadvantaged because of such differences in their performance records or because information on earlier work experience may be lacking through no fault of the employee reviewed.

Boards should review evaluative material that covers periods within an employee's current career track.  Previous employment, such as transfers within the Foreign Service that required the employee to reacquire tenure, Limited Non-Career Appointments, or employment in the Civil Service, do not necessarily predict an employee's ability to perform at the next highest level within their current Generalist or Specialist track.

Boards are advised that the Uniformed Services Employment and Reemployment Rights Act (USERRA) provides that employees called to military service are "entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights

12

and benefits that such person would have attained if the person had remained continuously employed" at the Department.  Each Board member must take USERRA training, and the Board Advisor will certify to the Director of GTM/PE that this training has been completed prior to the start of Board reviews.  USERRA's implementing regulations require employees who are absent due to uniformed service be considered for promotion.  Therefore, Boards are instructed to consider, and weigh carefully, military evaluation reports and award nominations provided by an employee covering the time the employee was absent due to active military duty.  Boards must also review carefully any statement submitted by an employee concerning the relevance of their military service to their work in the Foreign Service and to the Core Precepts.  If there is no military evaluation, no negative or positive inference may be made on such non-documented periods.

A Gap Report is a document in an employee's OPF through which the Department recognizes and acknowledges a period of time for which there is no evaluative material.  Whether a Gap Report is present or not, Boards should not discount an employee's overall standing in any way because of a period of performance not documented in the employee's OPF or make assumptions about the employee's career trajectory.  No negative or positive inference may be made on such non-documented periods.  Boards should not discuss or consider any information about the reasons for gaps in an employee's performance file.

Board members may be acquainted with employees under review.  Board members must not reveal information about an employee or an employee's performance not properly included in the OPF.  Board members must not seek, receive, or relate any information about an employee under review to or from other Board members except that which is properly included in the OPF.

Boards should disregard any disciplinary letters in an employee's OPF that should have been removed from the folder and should bring the existence of such letters promptly to the attention of the GTM/PE staff.  See 3 FAM 4321 through 4377.

Boards are reminded that due to the prevailing worldwide security environment, Chiefs of Mission, Deputy Chiefs of Mission, and Principal Officers are required to include Emergency Action Plan responsibilities in their Work Requirements.  These Work Requirements must link those responsibilities to the goals of promoting good personal, informational, and physical security measures on an organization-wide basis; and of leading crisis management for the entire organizational unit.  These EERs should reflect any relevant actions taken in accordance with those Work Requirements and Work Responsibilities during the rating period.

Employees may choose to write their EER narrative with the name in their OPF, their name of daily usage, or another term of identification (regardless of whether an employee has obtained a name change order).  Boards must not make any inference based on this choice.

Employees may choose to write their EER narrative with the gender pronoun of their choice or a gender-neutral pronoun (regardless of any gender marker appearing in the employee's personnel records or their pronouns of daily usage).  Boards must not make any inference based on this choice.  The rater's and reviewer's narratives must use the same term of identification and

13

pronoun as the employee's narrative.  No inference should be made if the employee's previous/other evaluative material has differing terms of identification and/or pronouns.

To ensure fairness and remove the potential for bias, Board members shall adhere to the following order of operations when reviewing an employee's file:

1. Individually review all performance evaluation forms, including military evaluations and personal statements on military activities, training reports and documents necessary to assign a score according to the current Core Precepts document.
2. Individually determine a preliminary score of all competing employees for each Core Precept
3. Individually determine a preliminary score on cross-functional competency, if applicable to their Board.
4. Create a preliminary list of employees to be recommended for promotion, mid-rank, low-rank designations, and direct referrals to the Performance Standards Boards.
5. Review letters of commendation and award nominations in the employee's OPF and come to agreement as a Board whether these documents are germane to the Core Precepts and, if so, should they affect the scores, ranking and categorization of the employees.  Make adjustments accordingly.
6. Review letters of discipline in the employee's OPF and come to agreement as a Board whether these documents are germane to the Core Precepts and, if so, whether they affect the scores, ranking and categorization of the employees.  Make adjustments accordingly.
7. Create a final ranking and determination for each competing employee.

Boards will establish the internal organization of their workload, deliberations, discussions, and decisions, as they deem appropriate and consistent with these Precepts and supplementary technical guidance.

Boards will not view negatively a GTM approved reason for a late EER that is caused by a malfunction of the Performance Next EER software application, or an administrative process out of the control of the drafters.

Boards will practice and uphold EEO principles as they carry out their duties and should not consider an employee's personal characteristics, as outlined in 3 FAM 2815.1(b), when reviewing files or making promotion recommendations.

   2. Scoring Rubric

Boards will score each candidate's performance in each of the five Core Precepts, detailed in the 2022-2025 Core Precepts. Each candidate will receive a score of zero to five, using whole numbers and half points, that evaluates their ability to perform at the next level. The scoring rubric in the Addenda offers a guide to performance at the entry level, mid-level and senior level for each Precept.

Boards will see a total score for each candidate, averaged among all board members, from zero to 25.  They will use this total to determine the rank-ordered list for promotion, as well as for

14

possible low-ranking or direct referral to a Performance Standards Board.  The final rank-ordered list must match the total average scores in descending order.  Boards do not need to break tie scores, but all ties must appear consecutively on the rank-ordered list.

3. Cross-Functional Competency

Generalists who are competing for promotion to the FS-01, FE-OC, and FE-MC levels will also receive a sixth score from zero to five that evaluates their performance in out-of-cone work, IROG (inter-functional) positions, interagency, training and details.  This cross-functional competency is designed to reward service in other skill areas or professional development opportunities, with the goal of promoting well-rounded officers who will be better able to lead employees in multiple sections and agencies as they rise up the ranks into and within the Senior Foreign Service.

The cross-functional score will be added to the original scoring rubric for a total of 30 possible points. The cross-functional boards will use the total scores to determine a rank-ordered list for cross-functional promotion only.

Cross-Functional Boards will submit two rank-ordered lists, one based on the 25-point conal scale, and one based on the 30-point cross-functional scale.  The lists may include duplicate recommendations for promotion. If a name appears on both lists above the promotion line, PE will cross that name off the conal promotion list and keep the name on the cross-functional list. PE will then "drop the line" by one person on the conal promotion list and that person will be included on the list of promotions above the line. This process will be repeated until there are no more duplicate names.

The cross-functional boards will have a set number of promotion opportunities allocated to cross-functional promotion, and a set number allocated to conal promotion. These percentages will be established before the boards convene, and the boards will not know them.  The percentage of cross-functional opportunities will steadily increase at the next highest grade level, until at MC and above they are only ranked classwide.  This percentage of cross-functional promotion opportunities will be determined by the Director General, in consultation with GTM/OTA.

**E.    RECUSAL**

1. When an employee under review believes that a Board member may be unable to apply the Precepts fairly and without bias in assessing their performance and wishes to have that Board member recused, the employee under review must, within five business days of the board's convening date, submit a recusal request to the Director of GTM/PE stating the reason they believe the Board member cannot render an unbiased judgment.  This request must be in writing; an email sent to GTM-PE-recusals@state.gov will meet this requirement.  In cases where it is necessary to evaluate the basis for recusal, requests may be shared with the Board member in question and/or other offices or individuals who may have knowledge relevant to the request.  The Director of GTM/PE shall consider the request to determine whether the stated reason for the request would lead a reasonable

15

person to conclude that the Board member might be unable to apply the Precepts fairly and without bias in assessing the requester's performance file. The PE Director's decision to approve/disapprove the employee's request for a Board member's recusal is final. If the request is approved, GTM/PE will notify the Board member and the Board Advisor, who will then take the necessary administrative action to ensure that the Member will be recused from consideration of the employee.

2. The Director of PE shall approve a recusal request by an employee if the Board member in question was the rating or reviewing official of the employee under review while such employee has been in their present class, but not during the current rating cycle, if the employee being reviewed requests a recusal in writing in a timely manner. GTM/PE will notify the Board member of any such case and recuse them from consideration of the employee's file. Recusal requests by the employee must be submitted in writing in accordance with the procedures stipulated in paragraph one above.

3. An employee under review should also request the recusal of a Board member reviewing them whom they have previously named as a responsible management official or witness in a complaint if the employee believes that the Board member may be unable to apply the Precepts fairly and without bias in assessing their performance. Recusal requests by the employee must be submitted in writing in accordance with the procedures stipulated in paragraph one above.

4. A Board member must recuse themselves from the review of the file of any relative. A "relative" is a spouse or ex-spouse, domestic partner or ex-domestic partner as described in 3 FAM 1610, parent, child, sibling, aunt, uncle, first cousin, niece, nephew, parent-in-law, son-in-law, daughter-in-law, brother-in-law, sister-in-law, stepparent, stepchild, stepbrother, stepsister, or half-sibling. A Board member who must recuse will inform GTM/PE of any such recusal.

5. A Board member may recuse themselves from consideration of any employee's file, when a Board member believes that they may be unable to render a fair and unbiased judgement of an employee. Board members must inform GTM/PE promptly of any such recusal before the employee's file is discussed by the Board.

6. A Board member who was the rating or reviewing official of an employee under review in the current rating cycle must recuse themselves from the review of that employee. A board member whose spouse was the rating or reviewing officer of an employee under review in the current rating cycle must recuse themselves from review of that employee. A Board member who was the rating or reviewing official of an employee under review while such employee has been in their present class will be recused from participating in the Board's consideration of that file if the employee being reviewed requests a recusal. A Board member who must recuse based on this paragraph will inform GTM/PE of any such recusal.

16

7.  A Board member must recuse themselves from participating in a Board's consideration of any employee who they are aware has previously named them as a responsible management official or witness in a complaint, including before the EEOC or the U.S. Office of Special Counsel.

8.  A Board member may recuse themselves from consideration of any employee's file, when a Board member believes that they may be unable to render a fair and unbiased judgement of an employee. Board members must inform GTM/PE promptly of any such recusal before the employee's file is discussed by the Board.

9.  Recusal requests by a Board member will be documented by a standard recusal statement with a copy provided to the recused Board member and the Board chair. Recusal statements will be filed with the Board report.

10. When a Board member is recused from considering the file of an employee under any of the provisions above, the Board member will continue to participate in the other activities of the Board.

11. A Board member is recused from participating in the Board's consideration of their own file and is not allowed to serve on a board for a rank for which they are competing.

## F.  FINDINGS AND RECOMMENDATIONS

Each Board's findings will be forwarded to the Director General (DG) under cover of a transmittal letter signed by the Board members.  The DG may return the Board's findings for reconsideration if there are questions regarding the procedures used by the Board or conformity with the Precepts.  If the findings are not returned for one of these reasons, the DG shall accept the Board's findings.  Each Board will prepare the following as part of its report, as applicable:

1.  A rank-order list for each competition category of employees the Board recommends for promotion;

2.  An alphabetical list of the employees (if any) who were low-ranked with a low-rank statement for each employee who was not referred to a PSB;

3.  An alphabetical list of employees (if any) to be referred to a PSB with a statement explaining the reason for each direct referral;

4.  Alphabetical lists of all other employees reviewed in each competition category;

5.  Separate rank-order lists for each competition group reviewed for LCEs (Limited Career Extensions) of employees the Board finds qualified for LCEs (where appropriate);

6.  An alphabetical list for each competition group of all other employees reviewed for LCEs

17

(where appropriate);

7.   A list of raters and/or reviewers who have demonstrated superior drafting of EERs during the most recent rating period along with the written letters of commendation the Boards prepared for each;

8.   A list of raters and reviewers whose EER drafting warrants written counseling;

9.   A list of employees who receive written counseling statements;

10.  A list of employees, raters and reviewers who have demonstrated exceptional skills in one or more of the Core Precepts during the most recent rating period, along with the written letters of commendation the Boards prepared for each;

11.  Recommendations on the training, assignment, counseling, or related personnel matters for any employee or group of employees reviewed and/or recommendations concerning policies and procedures for subsequent Boards and improvements to the performance evaluation system, except that if a Board has no recommendation to make, it shall so state.

12.  A list of all approved recusal requests and Board member self-recusals.

All Board members must concur with the final report to the DG.  The contents of the Board's official report to the DG and the file scoresheets are the only official documents retained of the Board's deliberations.


**G.   OATH OF OFFICE**

Board members will heed and sign the following oath of office and adhere to the Precepts.  A copy of each signed oath will be retained as part of the final Board report.  The Oath may be performed virtually and the signature may be electronic.  Board members should report to the Director of GTM/PE any attempt to provide them information not authorized by the Precepts. Board members should report any attempts to solicit information from them, even if it is authorized by the Precepts.  Failure to observe these instructions may result in disciplinary action or penalties as prescribed by the Privacy Act.

OATH

"I ,_____, do solemnly swear (or affirm) that I will perform the duties of a member of a Selection Board faithfully and to the best of my ability; that I will adhere to the Precepts; that I will apply the Precepts and promotion criteria without prejudice or partiality; that any introduction into board deliberations of non-record material will be reported to the director of the Office of Performance Evaluation, and that I will not reveal to unauthorized persons any information concerning the personnel records used or the deliberations and

18

recommendations of the Board."

**PART II.  ELIGIBILITY**

   **A.  ELIGIBILITY FOR BOARD REVIEW**

1. Senior Boards will consider employees serving under career or senior career candidate appointments in the classes of Minister-Counselor (FE-MC), Counselor (FE-OC), and FS-01.

2. Intermediate Generalist and Specialist Boards will consider career and candidate employees in classes FS-02 through FS-05, excluding generalists not yet recommended for tenure and employees in classes and occupational categories subject to administrative promotion. Foreign Service Generalist Career Candidates recommended for tenure by the Summer 2024 Commissioning and Tenure Board or previous will be eligible for review for promotion.

3. Employees who have been separated with reemployment rights and transferred under 5 CFR 352, including to the Multinational Force in the Sinai, and employees who have been detailed to international organizations under this authority, as well as employees who are military reservists called to active duty, will be considered if otherwise eligible.

4. Employees will not be eligible for promotion during the period that their maximum time-in-TIC or TIS is subject to the annuity exception (3 FAM 6213.6).  Boards will still review the OPFs of those employees for low-ranking and possible direct referral to a PSB.

5. Boards will review the OPFs of only the employees described above who have been assigned the tenure codes 01, 02, and 03.

6. Boards will not review the OPFs of the following categories of personnel:

   a.  Employees not on career or career conditional appointments;

   b.  Employees granted interim relief from separation during the grievance process;

   c.  Employees whose effective date of separation has been postponed by the DG in the public interest, such as employees designated for separation by a PSB; whose controlling TIC has expired; who will turn age 65 prior to the effective date of promotions; or who already are on age waivers;

   d.  Employees holding non-worldwide tenure or skill codes;

   e.  Employees from other agencies;

   f.  Employees on Leave Without Pay for more than eight months during the rating period, except for military reservists called for active duty;

19

g. Employees serving on LCEs;

h. Employees recalled to Foreign Service duty under Section 308 of the Foreign Service Act.

7. Time-in-Grade

a. Employees in the following grades will be eligible for promotion consideration by the 2024 Boards only if their last promotion took place before the following dates:

| | |
|---|---|
| FE-MC * | July 1, 2020 (4 years) |
| FE-OC | July 1, 2022 (2 years) |
| FS-01, FS-02, FS-03 | July 1, 2022 (2 years) |
| FS-04**, FS-05 | July 1, 2023 (1 year) |

*Senior Foreign Service candidates are eligible for promotion by the 2024 Boards the requisite years after their last promotion recommendation, provided they have been confirmed by the time the boards convene.

**Generalist Career Candidates recommended for tenure by the Spring and Summer 2024 Commissioning and Tenure Board or previous are eligible for review by the 2024 Boards.

b. For employees who converted into the Senior Foreign Service (SFS) or to the FS Salary Schedule from non-FS pay plans or were reappointed to the FS after separation (3 FAM 2131), credit toward eligibility for promotion will be given for time spent in previous equivalent grades if the employee was converted or reappointed in the same or legal equivalent skill group. The employee's official Date of Grade reflects the basis on which eligibility for review will be considered.

c. Employees who have been approved by the DG for a change of skill code on or before May 16, 2024, will be reviewed, if eligible, by the Board appropriate for their new primary skill code. Employees whose primary skill code change is approved by the DG after May 16 will compete under the employee's primary skill code of record as of May 16.

8. Promotion into the Senior Foreign Service

Only eligible career employees in class FS-01 who formally applied for threshold review by March 1, 2024, and who have met the requirements for review, will be considered by the 2024 SFS-IV and SFS-V Boards. The employees whose requests are received in GTM/PE after March 1, 2024, are not eligible to compete for promotion into the SFS this promotion cycle.

20

JA111

B. ELIGIBILITY FOR LIMITED CAREER EXTENSIONS

Section 607(b) of the FS Act authorizes the Secretary to grant LCEs, based on recommendations of Boards, to employees in their last year of TIC or TIS if they have attained the highest grade for their respective occupational category or, in the case of employees of the SFS, in designated salary classes.  Only employees as described above whose controlling TIC will expire between July 1, 2024, and June 30, 2025, are eligible for consideration, if LCEs are available. The limited number of LCEs that may be granted will be determined by specific Service needs to retain expertise and experience that are in short supply and in accordance with 3 FAM 6213.7.


**PART III. ORGANIZATION OF THE BOARDS**

A. ORGANIZATION OVERVIEW

Foreign Service Selection Boards (FSSBs or Boards) are organized based on the grade and skill code/cone of individual employees. Boards are subsequently identified as either Senior Boards, for those being promoted into and within the Senior Foreign Service, or as Intermediate Boards, for all other Foreign Service Employees.

While there are Boards that will review multiple skill codes/cones and grades of employees, all employees' competition groups are reviewed alongside their colleagues at the same grade and within the same skill code/cone.  GTM/PE will evaluate and administratively organize the skill code/cone composition of the Boards on an annual basis to manage the number of candidates reviewed by a given board.  GTM/PE has created the below breakdown of the length of time the Boards are expected to meet, as well as when the office would consider splitting a board to avoid undue workload pressure on the Board members and ensure board completion prior to the annual announcement of the promotion lists.

> 0 – 300 Candidates: 3 – 4 Weeks
> 300 – 450 Candidates: 5 Weeks
> 450 – 600 Candidates: 6 Weeks
> 600+ Candidates: Consider Board Reorganization

B. SENIOR BOARDS

Pursuant to the Foreign Service Act, the Senior Foreign Service (SFS) is "characterized by strong policy formulation capabilities, outstanding executive leadership qualities and highly developed functional, foreign language, and area expertise."  In considering employees for promotion within and into the SFS, Boards should give due credit to evidence of achievement and competency in these and other critical areas, such as public outreach based on policy objectives.  Boards should give weight to evidence of competency and accomplishment in carrying out executive responsibilities in both the employee's primary skill code; as well as outside of cone and collaboration with other cones, specialties, sections, bureaus, and agencies.

21

In reviewing employees for promotion within the SFS, Boards will note that some SFS employees have been commended for being among those recommended by the Department Senior Review Board (DSRB) for further consideration for a Presidential Rank Award. Boards should give equal weight to such commendations regardless of whether the commendation letter/memo was signed by the Deputy Secretary of State or included by Memorandum from the Director of GTM/PE.

The Generalist and Specialist Threshold Boards will review the OPFs of FS-01 employees with primary skill codes in the occupational categories under review who were eligible to apply for promotion consideration but did not apply, to identify those who should be low-ranked or referred to a PSB. No negative implication shall be drawn from the fact that an employee eligible to request promotion consideration chose not to do so.

1. Minister-Counselor Board (SFS-II)

SFS-II will review the OPFs of eligible employees (generalists and specialists) in the class of MC on a class-wide basis. The Foreign Service needs its most capable, competent, and inspiring senior leaders to undertake the full range of its largest, most complex resource management, program, and policy challenges. The Board should seek to identify those few employees who demonstrate the exceptional qualifications warranting advancement to the class of CM. The Board should only recommend for promotion those employees who have demonstrated, through superior achievement in positions demanding broad leadership, program and resource management, policy direction, and public outreach, that they are fully qualified to fill the most senior and responsible positions. In making its determinations, the Board should give particular weight to outstanding performance as Chief of Mission or in positions of comparable responsibility such as Deputy Assistant Secretary and other senior executive positions, as well as to the employee's ability to continue to perform at this level of responsibility.

2. Counselor Board (SFS-III)

SFS-III will review the OPFs of eligible employees in the class of OC who have generalist primary skill codes as below. Employees will be reviewed by grade and skill code. The Department continues to need employees with strong competency in their primary skill code as well as employees with broad experience and perspective, particularly across skill codes and cones who can lead and manage organizations across a wide array of functions. Therefore, Board SFS-III will review the employees in their competition pool for cross-functional competency and cone-based promotion, and compile rank-ordered lists for both.

Duplicates are resolved with cross-functional promotion taking primacy. A name that appears on both lists will be removed from the cone-based promotion recommendation list. The remaining names on the cone-based list will move up.

22

| Category | Skill Code |
|---|---|
| Management | 2010 |
| Consular | 3001 |
| Public Diplomacy | 4400 |
| Economic | 5015 |
| Political | 5505 |

3. Senior Specialist and Specialist Threshold Board (SFS-IV)

SFS-IV will review the OPFs of eligible employees of the class of OC who have primary skill codes in the following specialist skill codes.  The Board will also review the OPFs of eligible employees of class FP-01 who requested consideration for promotion into the SFS and met applicable requirements.

| Category | Skill Codes |
|---|---|
| Financial Management Officer | 2101 |
| Human Resources Officer | 2201 |
| General Services Officer | 2301 |
| Security Officer | 2501 |
| Security Engineering Officer | 2550 |
| Diplomatic Courier | 2580 |
| Information Technology Manager | 2884 |
| Public Engagement | 4200 |
| English Language Programs | 4300 |
| Medical Officer | 6110 |
| Medical Provider | 6115 |
| Psychiatrist | 6125 |
| Facilities Manager | 6217 |
| Construction Engineer | 6218 |

The Board will consider employees within each class (OC and FP-01) by skill code, except that Security Officers and Security Engineering Officers at the OC level will compete together for promotion.  The Board will review by skill code, for low-ranking and possible direct referral to a PSB, the performance folders of FP-01 employees with primary skill codes under review who were eligible to apply for promotion consideration but did not.

4. Generalist Threshold Boards (Boards SFS-V)

Boards SFS-V (C, E, M, P, and PD) will review by skill code the OPFs of eligible employees of class FS-01 who requested consideration for promotion into the Senior Foreign Service (SFS) and who met applicable requirements.  The Department continues to need employees with strong competency in their primary skill code as well as employees with broad experience and perspective, particularly across skill codes and cones who can lead and manage organizations across a wide array of functions.  Therefore, Boards SFS-V will review the employees in their competition pool for both cross-functional  and conal promotions, and compile rank-ordered

23

lists for both.

Duplicates are resolved with cross-functional competency promotion opportunities taking primacy.  A name that appears on both lists will be removed from the cone-based promotion recommendation list.  The remaining names on the cone-based list will move up.  Bidding privileges will be allocated according to the percentage of promotion opportunities available cross-functionally and cone-based.  If not all bidding privileges are used in one list, they will be made available to the other list.

Promotion across the threshold into the SFS represents a determination that the employee is capable of carrying out the demanding duties of senior-level positions of the Foreign Service. Some employees under review may not have demonstrated the potential to serve in the SFS and should more appropriately complete their careers at the FS-01 level.  Others may simply need deeper or broader experience or additional competency development and should seek those experiences at the FS-02 or FS-01 level in order to be successful at crossing the threshold.

In 2024, the skill codes will be distributed among the Boards as follows:

| Board | Grade and Category/Skill Code |
|---|---|
| SFS-V A | FS-01 Political (5505)/Public Diplomacy (4400) |
| SFS-V B | FS-01 Economic (5015)/Consular (3001)/Management (2010) |

The Boards will review by skill code, for low-rank and possible direct referral to a PSB, the performance folders of FS-01 employees with primary skill codes under review who were eligible to apply for promotion consideration but did not.

C.  INTERMEDIATE BOARDS

Intermediate Boards will review by skill code and grade the eligible employees in classes as described below.  Boards will evaluate employees in accordance with the Core Precepts, with emphasis on demonstrated performance and potential in and outside the employee's primary skill code.

The Department values employees with strong competency in their primary skill codes as well as experience outside their skill codes. Service in out-of-cone assignments should be afforded the same weight as assignments in the employee's own primary skill code.

Promotion to the Generalist FS-01 level (02 to 01) represents a determination that the employee can lead and manage organizations across a wide array of functions, both within and outside the employee's primary skill code. To that end, Boards G-II will review the employees in their competition pool for both cross-functional and conal promotions, and compile rank-ordered lists for both.

Promotion across the OMS threshold (03 to 02) represents a determination that the employee

24

has taken on the demanding duties in high-level OMS positions. OMSs considered for promotion at the highest levels should demonstrate accomplishments across an array of assignments to broaden experience, deepen expertise, and amplify leadership and adaptive capacity.

1. Boards G-II

Boards G-II (C, E, M, P, and PD) will review by skill code and grade the performance folders of eligible employees who have generalist primary skill codes. In 2024, the skill codes will be distributed among the Boards as follows.

| Board | Grade and Category/Skill Code |
|---|---|
| G-II C | FS-02 Consular (3001) |
| G-II E | FS-02 Economic (5015) |
| G-II M | FS-02 Management (2010) |
| G-II P | FS-02 Political (5505) |
| G-II PD | FS-02 Public Diplomacy (4400) |

The Department continues to need employees with strong competency in their primary skill code as well as employees with broad experience and perspective, particularly across skill codes and cones who can lead and manage organizations across a wide array of functions. Therefore, Boards G-II will review the employees in their competition pool for both cross-functional and conal promotions, and compile rank-ordered lists for both.

Duplicates are resolved with cross-functional promotion taking primacy. A name that appears on both list will be removed from the cone-based promotion recommendation list. The remaining names on the cone-based list will move up. Bidding privileges will be allocated according to the percentage of promotion opportunities available cross-functionally and cone-based. If not all bidding privileges are used in one list, they will be made available to the other list.

2. Boards G-III

Boards G-III (A, B, and C) will review by skill code and grade the performance folders of eligible employees in class FS-03 who have generalist primary skill codes. In 2024, the skill codes will be distributed among the Boards as follows.

| Board | Grade and Category/Skill Code |
|---|---|
| G-III A | FS-03 Political Affairs (5505)/Management (2010) |
| G-III B | FS-03 Economic (5015)/Public Diplomacy (4400) |
| G-III C | FS-03 Consular Affairs (3001) |

3. Boards G-IV

Boards G-IV will review the performance folders of all eligible generalists in class FS-04, and Generalist Career Candidates recommended for tenure by the spring and summer

25

2024 Commissioning and Tenure Board (CTB) or previous CTBs.  FS-04 Generalist candidates reviewed by the G-IV Boards will be divided evenly between the two boards, with promotion opportunities also divided evenly between the two boards.  This will be a class-wide review.

| Board | Grade and Category/Skill Code |
|-------|-------------------------------|
| G-IV A | FS-04 Generalists |
| G-IV B | FS-04 Generalists |

4.  Board S-I

Board S-I will review by skill code and grade the eligible specialist employees in classes FP-04 through FP-02 as described below.

| Category | Skill Code |
|----------|-----------|
| Financial Management Officer | 2101 |
| Human Resources Officer | 2201 |
| General Services Officer | 2301 |
| Public Engagement | 4200 |
| English Language Programs | 4300 |
| Medical Provider | 6115 |
| Medical Laboratory Scientist | 6145 |
| Facilities Manager | 6217 |
| Construction Engineer | 6218 |

5.  Boards S-II

Boards S-II (A, B and C) will review eligible Special Agents (2501) by grade as described below.  The S-II Boards should ensure that no employee is disadvantaged because of the lack of an assignment abroad, given the preponderance of positions in the Special Agent category that are in the United States.  FP-03 Special Agent candidates reviewed by the S-II B Boards will be divided evenly between the two boards, with promotion opportunities also evenly divided between the two boards.

| Board | Grade |
|-------|-------|
| S-II A Special Agent (2501) | FP-02 |
| S-II B/1 Special Agent (2501) | FP-03 |
| S-II B/2 Special Agent (2501) | FP-03 |
| S-II C Special Agent (2501) | FP-04 |

6.  Board S-III

Board S-III will review by skill code and grade the eligible employees in classes FP-04 through FP-02 as described below.

26

JA117

| Category | Skill Code |
|---|---|
| Security Engineering Officer | 2550 |
| Security Technician | 2560 |
| Diplomatic Courier | 2580 |

7. Boards S-IV

Boards S-IV (A and B) will review by skill code and grade eligible employees as described below.

S-IV A
Information Technology Manager (2884)                 FP-02
Information Management Specialist (2880)               FP-03
Information Management Technical Specialist (2882)     FP-03

S-IV B
Information Technology Specialist  (2880)              FP-04
Information Management Technical Specialist (2882)     FP-04

At the FP-02 level, former Information Management Specialists (2880) and Information Management Technical Specialists (2882) compete for promotion as Information Technology Managers with the 2884 skill code. In considering FP-03s for promotion, the S-IV A Board should consider whether employees in skill codes 2880 and 2882 have gained leadership, management, and supervisory experience by serving in 2880 or 2882 management positions.

The Boards should evaluate employees in skill code 2880 placing emphasis on those employees who have shown initiative, to the extent opportunities exist, in acquiring (through formal or informal means) skills in the broad-based Information Management Specialist (IMS) category. The Boards shall place priority consideration on those employees who have demonstrated skills, performance, and potential in multiple disciplines (the former computer systems and telecommunications skills of the 2880 group).

The Boards shall give particular credit to those employees in the 2882 category who have shown initiative, to the extent opportunities exist, in acquiring (through formal or informal means) skills in the areas of computer systems, telecommunication, radio, telephone, and software operating systems to meet the changing information technology needs of the Department.

8. Board S-V

Board S-V will review eligible OMSs (9017) by grade as described below.

Office Management Specialist (9017)          FP-02 through 05

27

Board S-V will review FP-05, FP-04 and FP-03 OMSs for promotion. S-V will also review FP-02 OMSs for possible low-ranking or direct referral to a PSB.

The Department is aware that there are a limited number of available board members who hold the rank of FP-02, and who are qualified to consider FP-03 OMSs for promotion. When the review of FP-03 and FP-02 OMSs is complete, Board S-V may release the FP-02 OMS board members and continue the review of all FP-05 and FP-04 OMSs with a revised Board.

Board S-V is reminded that the growth of office automation, diminishing resources, and the changing face of workplace technologies have led to a more multifaceted role for OMSs and to expanding duties in office and knowledge management. These duties include substantive tasks related to the work of the office and can involve use of foreign languages. The Department views the Foreign Service OMS as an employee who has the potential to perform a variety of functions. These include staff assistant assignments, domestic human resources assignments, managing information, and public affairs responsibilities, among other functions. OMSs should be evaluated against the Core Precepts, regardless of the nature of the position they hold.

The Boards must not disadvantage any OMS who appears interested in or prepared to move to another career field or who has served a substantial part of their duties in non-traditional OMS functions. The Boards shall give full credit to the performance of OMSs in jobs involving non-traditional duties. They shall also give full credit to those filling executive OMS positions.

28

ADDENDUM 1 TO THE 2024 PROCEDURAL PRECEPTS

**SECURITY AWARENESS**

Security is an inherent, inextricable, and indispensable component of all employee positions at the Department of State, but especially in our most senior positions. Employees competing for selection to senior positions are expected to be leaders in security awareness. Selection Boards have at their disposal information regarding an employee's security record, including the security incident history report. Employees who have an egregious security record over the recent past are traditionally not competitive for senior positions.

Every employee's work responsibilities include a statement about the proper management of classified material and information. Where an employee has demonstrated a pattern of failure with respect to safeguarding classified material and information, this will be reflected in the evaluation report. Failure to safeguard classified material and information is one of the areas of weakness that may be grounds for a Selection Board's decision to low-rank an employee.

Boards will be given the security incident record for the five years prior to May 1, 2024, for each employee competing for promotion to FS-01 and above. Employees may request a copy of their security incident record from the Bureau of Diplomatic Security and may submit to GTM/PE by May 28, 2024, a response regarding their security incident record for consideration by the appropriate Selection Board.

Selection Boards will use the security incident reports, and any responses from employees regarding their own security incident reports, in conjunction with the material in the performance folders to determine the competitiveness of those employees for promotions, performance pay, and Presidential awards. Security incident reports also may be considered by Selection Boards for other decisions, such as low-ranking.

Core Work Responsibilities on security are:
Entry level: Practices security awareness; reports and/or addresses possible safety hazards and/or unsafe practices; follows security directives, regulations, and policies; safeguards classified information, material, and equipment.

Mid-level: Ensures active risk management through monitoring the security environment concurrent to the scope of official duties and responsibilities; follows security directives, regulations, and policies; safeguards classified information, material, and equipment.

Senior level: Ensures active management by staff within the scope of their duties and responsibilities, including promoting security consciousness and implementing and/or following directives, regulations, and policies; safeguards classified information, material, and equipment.

29

ADDENDUM 2 TO THE 2024 PROCEDURAL PRECEPTS

**EQUAL EMPLOYMENT OPPORTUNITY PRINCIPLES**

Employees of and applicants for employment with the Department of State (DOS) are protected from discrimination on the following bases under Federal law and/or Executive Order:

- RACE, COLOR, RELIGION, SEX (including pregnancy, sexual orientation, and gender identity), NATIONAL ORIGIN
- DISABILITY
- AGE
- GENETIC INFORMATION
- POLITICAL AFFILIATION
- RETALIATION FOR ENGAGING IN A PROTECTED ACTIVITY

As a matter of Department policy, all non-discrimination principles apply to Locally Employed Staff.

Harassment is a form of employment discrimination that violates federal law. Harassment is unwelcome conduct that is based on any of the protected bases that is so severe/ pervasive it alters working conditions and either creates a hostile work environment or results in a tangible employment action.

Discrimination, including sexual harassment (3 FAM 1525) and discriminatory harassment (3 FAM 1526), will not be tolerated within the Department.

30

ADDENDUM 3 TO THE 2024 PROCEDURAL PRECEPTS

**LEADERSHIP AND MANAGEMENT PRINCIPLES (3 FAM 1214)**

1.  **Model Integrity** – Hold yourself and others to the highest standards of conduct, performance, and ethics, especially when faced with difficult situations. Act in the interest of and protect the welfare of your team and organization.  Generously share credit for the accomplishments of the organization. Take responsibility for yourself, your resources, your decisions, and your action;

2.  **Plan Strategically** – Develop and promote attainable, shared short and long term goals with stakeholders for your project, program, team, or organization. Provide a clear focus, establish expectations, give direction, and monitor results. Seek consensus and unified effort by anticipating, preventing, and discouraging counter-productive confrontation;

3.  **Be Decisive and Take Responsibility** – Provide clear and concise guidance, training, and support, and make effective use of resources. Grant employees ownership over their work. Take responsibility when mistakes are made and treat them as an opportunity to learn. Formally and informally recognize high quality performance;

4.  **Communicate** – Express yourself clearly and effectively. Be approachable and listen actively. Offer and solicit constructive feedback from others. Be cognizant of the morale and attitude of your team. Anticipate varying points of view by soliciting input;

5.  **Learn and Innovate Constantly** – Strive for personal and professional improvement. Display humility by acknowledging shortcomings and working to improve your own skills and substantive knowledge. Foster an environment where fresh perspectives are encouraged and new ideas thrive. Promote a culture of creativity and exploration;

6.  **Be Self-Aware** – Be open, sensitive to others, and value diversity. Be attuned to the overall attitude and morale of the team and be proactive about understanding and soliciting varying points of view;

7.  **Collaborate** – Establish constructive working relationships with all mission elements to further goals. Share best practices, quality procedures, and innovative ideas to eliminate redundancies and reduce costs. Create a sense of pride and mutual support through openness;

8.  **Value and Develop People** – Empower others by encouraging personal and professional development through mentoring, coaching and other opportunities. Commit to developing the next generation. Cultivate talent to maximize strengths and mitigate mission-critical weaknesses;

31

9.  **Manage Conflict** - Encourage an atmosphere of open dialogue and trust. Embrace healthy competition and ideas. Anticipate, prevent, and discourage counterproductive confrontation. Follow courageously by dissenting respectfully when appropriate; and

10.  **Foster Resilience** – Embrace new challenges and learn from them. Persist in the face of adversity. Take calculated risks, manage pressure, be flexible and acknowledge failures. Show empathy, strength, and encouragement to others in difficult times.

32

ADDENDUM 4 TO THE 2024 PROCEDURAL PRECEPTS

**Requirements for Promotion to FP-02 for Office Management Specialist**

Office Management Specialists seeking promotion to the FP-02 level must meet all the following Professional Development Plan (PDP) requirements:

OPERATIONAL EFFECTIVENESS.  Mandatory Requirements:

1) Be at grade FP-03; and
2) Be eligible for promotion pursuant to the Selection Board Precepts; and
3) A **completed\*** tour in an executive office as the OMS to a Chief of Mission, Deputy Chief of Mission, Under Secretary, Assistant Secretary, Principal Deputy Assistant Secretary, Deputy Assistant Secretary, or their equivalents.

33

JA124

LEADERSHIP AND MANAGEMENT EFFECTIVENESS.  Mandatory Requirements:

1) One year of leadership service (including but not limited to EEO Counselor, EER Review Panel member, post housing board member, post employee association board member, overseas school board member, or other overseas community board member); and
2) One year of supervisory responsibility.  Such assignments could include positions that assign work, develop and set priorities, counsel employees and evaluate performance, resolve disputes, recommend or implement minor disciplinary measures, and interview and recommend candidates for positions within the executive office; and
3) Completion of FSI leadership training courses Fundamentals of Supervision (PT-230) and EEO Diversity and Awareness for Managers and Supervisors (PT-107); and
4)  Leading at State (PT-501).

PROFESSIONAL AND TECHNICAL PROFICIENCY.  Mandatory Requirements:

Successfully complete a minimum of three professional development training courses in addition to all other mandatory course requirements above and training received upon entry into the Foreign Service.  The following meet the training requirements:
A. FSI-sponsored coursework delivered in a classroom.
B. Coursework pursued at recognized/accredited organizations.
C. Documented language training of a minimum of 240 hours (to include post language training or a combination of a FAST Course followed by post language training).

Applicants must include documentation of any training not administered by FSI and/or reflected in their Employee Profile.

SERVICE NEEDS.  Mandatory Requirements:
1) One completed tour at a 25 percent or greater (hardship and/or danger pay) differential post after entry into the Foreign Service; OR A completed tour at a one-year unaccompanied post after entry into the Foreign Service. For roving and regional positions, 50% or more of the employee's tour must be spent on regional travel where the portfolio includes 25% or greater differential posts to satisfy this requirement; and
2)  One completed tour at a 20 percent or greater (hardship and/or danger pay) differential post after tenure in the Foreign Service. For roving and regional positions, 50% or more of the employee's tour must be spent on regional travel where the portfolio includes 20% or greater differential posts to satisfy this requirement.

34

ADDENDUM 5 TO THE 2024 PROCEDURAL PRECEPTS

**Requirements for Promotion into the Senior Foreign Service**

- All employees seeking to cross the senior threshold in the 2024 promotion cycle must meet the requirements listed here.  All those eligible for promotion across the senior threshold in 2024 must self-certify that they meet the relevant requirements.

- All employees promoted to FS-01 in 2005 or before must serve at least one full tour after tenure at a post with a differential of five percent or greater before consideration for promotion into the SFS. Regional Medical Officers are exempt.

- All employees promoted to FS-01 in 2006 or after must serve at least one full tour after tenure at a post with a differential of 15 percent or greater before consideration for promotion into the SFS.  Regional Medical Officers are exempt.

- All employees must complete required leadership and management training

- Generalists must have demonstrated language proficiency at the 3/3 level or above as indicated by an FSI-approved test.  Language proficiency under the CDP generally requires a test score of 3/3 within seven years of requesting to compete for promotion into the SFS.  There currently is no minimum language proficiency requirement for specialists.

- All Recruitment Language Program service commitments must be satisfied before employees can compete for promotion into the SFS.

35

ADDENDUM 6 TO THE 2024 PROCEDURAL PRECEPTS

**Scoring Core Precept Narratives**

A scoring guide has been developed for evaluating the Employee Evaluation Report (EER) narratives based on the Five Core Precepts: (1) Communication, (2) Diversity, Equity, Inclusion, & Accessibility, (3) Leadership, (4) Management, and (5) Substantive and Technical Expertise.

The narratives should be scored using a five-point scale based on the Core Precept's overall definition and the presence of proficiency illustrations.  The scoring scale is as follows. Between each scoring number, if an individual Board Member felt the candidate is stronger than the lower whole number and approaching the higher whole number in one or more elements, default to the mid-point:

5—Leading Others:  Demonstrates mastery of this precept and leads and/or mentors others in the same

4.5

4—Mastery:  Demonstrates talented skill level in all facets of this precept

3.5

3—Talented:  Consistently demonstrates skilled competence in majority of behaviors described in this precept

2.5

2—Satisfactory:  Demonstrates skilled competence in some behaviors described in this precept

1.5

1—Developing:  Little demonstration of competence in majority of behaviors described in this precept

0.5

0—None:  No demonstration or poor demonstration of performance related to the precept.  Performance file has no mention or indication of any activities promoting the precept.

The narrative should clearly demonstrate that the candidate is skilled in the Core Precepts through examples of supporting behaviors and/or direct inference.

**Promotion Panel Scoring Guide**

\* Please note the "Proficiency Examples" are not intended to be exact wording for FSSB members to look for, or exact language that should be found in evaluative material.  They are a guide to assist FSSB members in assigning a score based on language or examples found in evaluative material.  Boards should not penalize candidates whose EERs do not contain the exact wording that is found in these examples.

The examples below can be applied to employees at all ranks by reviewing the examples under the lens of their areas of control.  For example, a mid-level officer may achieve a high score by influencing their office.  A senior officer may achieve a high score by influencing the Department.

**Core Precept: Communication**

Writes and speaks clearly, concisely, and effectively, using well-organized, grammatically correct, and persuasive language. Demonstrates persuasion and negotiation skills as appropriate to position; influences internal and external stakeholders. Listens actively and respectfully, including to differing viewpoints. Develops proficiency at communicating across cultures and organizational lines. In language-designated positions, uses language skills appropriately and effectively as required by the position. When possible, addresses diverse audiences as a representative of the U.S. Government and the American people. Uses social media, emerging technologies, and traditional methods for public outreach as appropriate to position.

Consistently demonstrates and models all the elements above. Writes and speaks clearly and persuasively; ensures policy and operational concerns are articulated in ways most helpful to the intended audience. Communicates a comprehensive understanding of issues in a professional manner to achieve mission-oriented results. Shows sophisticated ability to analyze, synthesize, and advocate in a timely manner. Influences and collaborates with others to advance mission and/or Department goals. Instills trust, motivates others to speak candidly, and understands and respects cultural sensitivities and constraints. Communicates effectively across organizational lines. Advocates U.S. perspectives to a variety of audiences, as appropriate. Maintains equanimity and a professional demeanor. Projects calm; is decisive and communicates clearly to all stakeholders.

*If encumbering a supervisory position (of USDH, EFM, LE Staff, or other):*

Guides staff to develop effective written and oral communication skills; edits products to established Department standards.

Consistently demonstrates and exemplifies all the previous elements; and leads and mentors others to develop the same skills. Communicates promptly, respectfully, and effectively internally and externally, at all levels. Demonstrates superior levels of tact, diplomacy, and perceptiveness in interactions with foreign interlocutors, USG colleagues (including the interagency), and American citizens. Provides policy and strategy advice to leaders based on an understanding of strategic and tactical considerations. Negotiates effectively; manages and resolves major disagreements in a goal-oriented manner; exhibits a faculty for compromise while achieving ultimate goals. Creates an environment that facilitates an open exchange of ideas. Shows mastery of cross-cultural and inter-organizational communication skills. Is active and effective in public outreach.

| Scoring Scale | Score | Proficiency Examples |
|---|---|---|
| **Leading Others:** Demonstrates mastery of the precept, whether in a supervisory role or not; and leads and/or mentors others in same | 5 | • Consistently uses multiple methods to develop communication skills in others.<br>• Consistently and proactively coaches others in writing or public speaking skills.<br>• Effectively delegates and is accountable for following up on routine and complex communication activities with others for developmental purposes.<br>• Consistently exhibits precept description and elements above. |
| | 4.5 | |
| **Mastery:** Demonstrates talented skill level in all facets of the precept | 4 | • Proactively manages communication at all levels to ensure efficiency and effectiveness, and to manage expectations across the enterprise.<br>• Models and encourages expression of diverse ideas and opinions.<br>• Finds common ground or acceptable alternatives satisfying stakeholder needs.<br>• Understands interpersonal and group dynamics; reacts in an effective manner.<br>• Engages input from others constantly, listens with empathy and concern.<br>• Effectively aligns interests of multiple, diverse stakeholders. |
| | 3.5 | |
| **Talented:** Consistently demonstrates skilled competence in majority of behaviors described in the precept | 3 | • Is effective in a variety of communication settings: one-on-one, groups, or among diverse styles and position levels.<br>• Wins concessions without damaging relationships.<br>• Acts with diplomacy and tact. |
| | 2.5 | |
| **Satisfactory:** Demonstrates skilled competence in some behaviors described in the precept | 2 | • Provides timely and helpful information to others across the organization.<br>• Relates comfortably with people across levels, functions, culture, geography.<br>• Effectively accomplishes communication tasks.<br>• Considers cultural and ethical factors in the decision-making process. |
| | 1.5 | |

| Developing: Little demonstration of competence in behaviors described in the precept. | 1 | • Little indication of clear written and/or verbal communication. <br> • Little indication of winning support or buy-in from others. <br> • Little indication of communicating with people different from self. <br> • Little indication of interest in others' needs. <br> • Little indication of managing differing interests. |
| | 0.5 | |
| No demonstrated competence. | 0 | • No demonstration or poor demonstration of performance related to communication. <br> • Performance file has no mention or indication of any activities promoting communication principles. |

**Core Precept: Diversity, Equity, Inclusion, and Accessibility (DEIA)**

Takes advantage of opportunities to promote diversity, equity, inclusion, and accessibility in interactions with colleagues and interlocutors. Demonstrates inclusivity and respect in relations with colleagues and interlocutors. Proactively seeks and is receptive to feedback to improve one's own self-awareness with respect to promoting inclusivity in the workplace. Builds, maintains, and fosters healthy, productive workplace relationships with all colleagues. Collaborates with others and achieves Department goals through inclusive teamwork. Exhibits cultural sensitivity with colleagues, including Locally Employed Staff and foreign interlocutors. Identifies and reports disrespectful and inappropriate workplace behaviors.

Consistently demonstrates and models all the elements above. Advances diversity, equity, accessibility, and inclusion in words and actions. Consistently treats all individuals fairly, justly, and impartially, particularly in supervisory duties. Where feasible, consults with impacted staff before finalizing decisions. Models and fosters a safe, inclusive, mutually respectful work environment – up, down, and laterally. Cultivates professional relationships, including across organizational lines and with host country contacts. Develops accessible communications, events, engagements, and interactions to the full complement of employees, interlocuters, and the public.

*If encumbering a supervisory position (of USDH, EFM, LE Staff, or other):*

Actively seeks to recruit and retain diverse teams and improve methods of attracting diverse candidates for positions. Ensures candidates of all backgrounds are given equitable consideration for vacant positions. Supports equity in staff opportunities, roles, and recognition. Supports efforts to ensure office workspaces and necessary technology are accessible for all employees, especially those with disabilities. Addresses inappropriate behaviors immediately in accordance with Department policy. Holds self and others accountable for behavior and performance. Recognizes that unconscious biases can affect decisions and actions and takes steps to identify and mitigate them in the evaluation of others' performance. Promotes fairness, equity, and inclusion in the treatment of others. Supports workplace flexibilities and the reasonable accommodation process to strengthen equity and accessibility.

Consistently demonstrates and exemplifies all the previous elements; and leads and mentors others to develop the same. Promotes a culture of inclusion that incorporates the values and efforts of staff. Creates and cultivates diverse, equitable, inclusive, productive, and collaborative work environments. Fosters a culture that supports the recruitment and retention of a diplomatic workforce that reflects the diversity of our country, including underrepresented communities. Reacts immediately in accordance with Department policy in response to allegations of discrimination, harassment, and bullying, and all other inappropriate, non-inclusive, disrespectful, and toxic workplace behaviors; takes action to address such behaviors organization-wide.

| Scoring Scale | Score | Proficiency Examples |
|---|---|---|
| **Leading Others:** Demonstrates mastery of the precept, whether in a supervisory role or not; and leads and/or mentors others in same | 5 | • Consistently uses multiple methods to develop DEIA skills in others.<br>• Advances DEIA principles through training, mentoring, and taking the lead in all activities.<br>• Consistently exhibits precept description and elements above. |
|  | 4.5 |  |
| **Mastery:** Demonstrates talented skill level in all facets of the precept | 4 | • Leverages different experiences, styles, backgrounds, and viewpoints.<br>• Seamlessly adapts leadership style to fit a wide variety of others' specific needs.<br>• Actively seeks a diverse array of applicants and values diversity of experience, thought, and background.<br>• Advances precept elements] through a variety of actions and programs. |
|  | 3.5 |  |
| **Talented:** Consistently demonstrates skilled competence in majority of behaviors described in the precept | 3 | • Actively seeks information about wide variety of cultures and viewpoints.<br>• Adapts interpersonal behaviors to the needs of others.<br>• Observes situational and group dynamics, selecting the best-fit approach. |
|  | 2.5 |  |
| **Satisfactory:** Demonstrates skilled competence in some behaviors described in the precept | 2 | • Contributes to a work climate in which differences are valued and supported.<br>• Demonstrates that different situations may call for different approaches.<br>• Promotes team environment valuing encouraging, supporting differences. |
|  | 1.5 |  |
| **Developing:** Little demonstration of competence in behaviors described in the precept. | 1 | • Little indication of adapting to differences.<br>• Little indication of seeking diversity in staff.<br>• Little indication of promoting DEIA principles through activities, programs, or training. |

42

| | 0.5 | |
|---|---|---|
| ***None:*** No demonstration of the precept. | 0 | • No demonstration or poor demonstration of performance related to DEIA.<br>• No mention or indication of any activities promoting DEIA principles. |

**Core Precept: Leadership**

Manages conflict constructively. Exhibits self-awareness, compassion, professionalism, and composure under pressure. Adapts behavior and work methods as needed in response to new information, changing conditions, or unexpected obstacles. Demonstrates critical reasoning and adaptability. Identifies the strengths and weaknesses of various approaches; outlines realistic options. Holds oneself accountable; seeks informal feedback in order to grow. Raises concerns appropriately and, when necessary, uses appropriate avenues for dissent. Demonstrates open-mindedness to change and innovation.

Consistently demonstrates and models all the elements above. Makes sound, timely, and ethical decisions. Determines the best solution or action from a range of options; objectively analyzes problems and motivations of others. Provides feedback to colleagues and seeks feedback on own performance. Exhibits willingness to take strategic risks and to advance innovative ideas and processes. Develops and shares lessons learned from mistakes and failures. Encourages strategic, innovative, and results-oriented approaches with peers and staff. Champions and guides staff in adjusting to change; models and reinforces flexibility in staff. Encourages well-founded constructive dissent and solicits, weighs, and clearly articulates its appropriate expression. Shows empathy, respect, and encouragement to others in difficult times.

*If encumbering a supervisory position (of USDH, EFM, LE Staff, or other):*

Deepens and broadens own supervisory skills and develops the skills of the employees for whom they are responsible; treats subordinates with professionalism, respect, and fairness. Identifies employees' needs and adapts supervisory style accordingly and as appropriate. Takes an active, involved approach to the performance development of those supervised, regardless of background. Empowers staff to take ownership of their work. Encourages innovative, creative, and strategic thinking as well as initiative-taking among those supervised. Takes responsibility when mistakes are made, or calculated risks do not work out. Fosters an environment that prioritizes training and encourages staff to develop new skills. Models and supports work/life balance.

Consistently demonstrates and exemplifies all the elements above; and leads and mentors others to develop the same skills. Models integrity, respect, and dedication to public service. Demonstrates creativity and courage in crafting policy and strategy. Makes substantial contributions to the advancement of Department and whole-of-government goals; motivates, supports, and leads others toward the same. Fosters an organizational culture which instills a willingness to fail while taking strategic risks that further U.S. foreign policy and Department objectives. Responds wisely to situations in which information and analysis are incomplete; makes considered decisions in the face of such ambiguity. Embraces and drives institutional and cultural change in support of the Department and its objectives. Empowers and enables others to develop their skills as leaders. Works at the institutional level to build and sustain a strong supervisory

ethic and the career-long development of supervisory skills.  Anticipates, identifies, and deals effectively with workplace interpersonal conflict.

Strengthens the institution by developing a diverse cross -section among the next generation of Department of State employees and through service to the organization. Encourages personnel to express opinions and to use dissent channels; accords importance to well-founded constructive dissent.  Recognizes and supports moral courage.

| Scoring Scale | Score | Proficiency Examples |
|---|---|---|
| **Leading Others:** Demonstrates mastery of the precept, whether in a supervisory role or not; and leads and/or mentors others in same | 5 | • Finds common ground, drives to consensus, ensuring all feel heard.  Provides feedback.<br>• Leads others to champion creative ideas and move them into implementation.<br>• Consistently uses multiple methods to develop leadership skills in others.<br>• Rallies others to persist in the face of challenges and setbacks. |
|  | 4.5 |  |
| **Mastery:** Demonstrates talented skill level in all facets of the precept | 4 | • Decisively makes informed decisions with incomplete information.<br>• Builds excitement in others to explore creative options. |
|  | 3.5 |  |
| **Talented:** Consistently demonstrates skilled competence in majority of behaviors described in the precept | 3 | • Works out tough agreements and settles disputes equitably.<br>• Aligns employees' career development goals with organizational objectives. |
|  | 2.5 |  |
| **Satisfactory:** Demonstrates skilled competence in some behaviors described in the precept | 2 | • Makes decisions impacting short-term results, not long-term goals.<br>• Comes up with useful ideas that are new, better, or unique and engages others to work toward implementation. |

| | 1.5 | |
|---|---|---|
| *Developing:* Little demonstration of competence in behaviors described in the precept. | 1 | • Little indication of helping others work through disagreements.<br>• Little indication of decisiveness or quality decision-making under pressure.<br>• Little indication of experimenting with new strategies.<br>• Little indication of rallying others to adapt or adjust to interruptions. |
| | 0.5 | |
| *None:* No demonstrated competence. | 0 | • No demonstration or poor demonstration of performance related to leadership.<br>• No mention or indication of any activities promoting leadership principles. |

**Core Precept: Management**

Is well-prepared, dependable, and conscientious. Offers courteous customer service that responds to customers' needs. Effectively manages human, financial, physical, and time resources, as appropriate to position. Utilizes internal controls to prevent waste, fraud, and mismanagement; reports concerns appropriately for further investigation. Takes responsibility for mistakes and learns from them. Remains calm and professional, and contributes to the protection of lives, property, and American interests in times of crisis. Protects classified information; observes security practices.

Consistently demonstrates and models all the elements above. Develops and shares best practices to eliminate redundancies, reduce costs, improve transparency, and make appropriate use of limited resources. Ensures effectiveness of internal controls; allocates resources efficiently, equitably, and in accordance with policy and regulatory guidelines. Exercises accountability. Develops preventive plans to mitigate risk. Develops and upholds mission goals in accordance with security policies and practices. Implements strategies to balance mission requirements with threat environment.

*If encumbering a supervisory position (of USDH, EFM, LE Staff, or other):*

Ensures to the extent possible others have needed tools to work effectively. Delegates effectively, appropriately, and consistently. Works to prevent and resolve workplace conflict among staff. Addresses misconduct and poor performance by those within the supervisory chain. Delivers thorough and on-time work plans, performance management discussions, and performance evaluations of direct and indirect reports.

Consistently demonstrates and exemplifies all the previous elements; and leads and mentors others to develop the same. Supports an environment that safeguards people, resources, and information. Confronts emerging transnational or organization-level challenges by making effective use of available U.S. Government resources. Demonstrates effective and innovative direction and stewardship of policy initiatives, programs, people, finances, time, property, and other resource s. Delegates at the executive level. Effectively manages operations at domestic locations and overseas posts, as relevant.

Evaluates internal control strengths, ensures improvements are implemented as warranted; holds managers accountable for their decisions; seeks resource adjustments as needed. Promotes the practice of good personal, information, and physical security measures. Makes sound decisions and delegates as appropriate in crises.

| Scoring Scale | Score | Proficiency Examples |
|---|---|---|
| ***Leading Others:*** Demonstrates mastery of the precept, | 5 | • Helps others recognize trends/needs and develop and implement polices accordingly. <br> • Enables others to transform information into mission policies and practices. <br> • Consistently uses multiple methods to develop |

| whether in a supervisory role or not, and leads others in same | | • management skills in others.<br>• Focuses efforts on leading others to continuous improvement, identifying and seizing opportunities for synergy and integration. |
|---|---|---|
| | 4.5 | |
| **Mastery:** Demonstrates talented skill level in all facets of the precept | 4 | • Strategically promotes mission/bureau/agency priorities.<br>• Identifies and monitors key budget indicators; gauging effectiveness.<br>• Separates and combines tasks into efficient, simple workflows.<br>• Spots possible future polices, practices, trends in the mission or agency.<br>• Identifies needs and develops and implements policy accordingly. |
| | 3.5 | |
| **Talented:** Consistently demonstrates skilled competence in majority of behaviors described in the precept | 3 | • Has an in-depth understanding of regulatory guidelines.<br>• Uses financial analysis to generate, evaluate, and act on strategic mission activities.<br>• Aligns employees' career development goals with organizational objectives.<br>• Operates with agency-wide perspective and consideration.<br>• Contributes to the development or implementation of policy. |
| | 2.5 | |
| **Satisfactory:** Demonstrates skilled competence in some behaviors described in the precept | 2 | • Stays abreast of current and possible future policies and trends impacting the mission, bureau or agency.<br>• Understands the meaning and implications of key budget indicators.<br>• Does the minimum to accomplish tasks. |
| | 1.5 | • |
| **Developing:** Minimal demonstration of competence in behaviors described in the precept. | 1 | • Little indication of actions that focus on the bigger picture.<br>• Little indication of budget/resource consideration in decision making.<br>• Little indication seeking of opportunities for synergy and efficiency.<br>• Little indication of working toward policy understanding or development. |

| **None:** No demonstration of the precept. | 0 | • No demonstration or poor demonstration of performance related to management.<br>• No mention or indication of any activities promoting management principles. |
|---|---|---|

**Core Precept: Substantive and Technical Expertise**

Masters one's portfolio, to include pertinent rules, regulations, procedures, and specific technical skills. Maintains and applies institutional and subject matter knowledge and relevant technical expertise, as applicable to position. Embraces innovation and improves processes. Pursues training opportunities to keep abreast of professional standards, policies, programs, and trends. Develops as appropriate the ability to read, understand, create, and communicate data as information. Identifies the strengths and weaknesses of various approaches based on data-driven analysis, as appropriate. Develops interagency knowledge and understanding of foreign cultures and languages as appropriate to position. Understands the roles and authorities of the Department and other USG agencies. Applies that knowledge to build interagency cooperation and provide effective customer service. Meets language requirements for tenure; uses foreign language skills to enhance job performance and better serve customers.

Consistently demonstrates and models all the elements above. Deepens professional expertise and applies this knowledge to achieve mission and/or Department goals. Uses expertise to evaluate policies and programs, and to advise, develop, and assist others. Bases recommendations and decisions on data-driven analysis, as appropriate. Uses knowledge of interagency as well as foreign cultures and languages to achieve policy and customer service goals. Builds language skills to meet Career Development Program requirements for Senior Foreign Service eligibility. Uses language skills to exercise influence and build relationships.

*If encumbering a supervisory position (of USDH, EFM, LE Staff, or other):*

Supports continuous learning by employees. Encourages subordinates to deepen their substantive knowledge and to build technical skills. Enhances own and staff's understanding of work -related technologies.

Consistently demonstrates and exemplifies all the elements above; and leads and mentors others to develop the same. Promotes an organization-wide culture of innovation. Demonstrates both mastery of own specialty and a broad knowledge of processes and practices throughout the Department. Anticipates the need for new knowledge for self and staff; identifies and communicates sources of new information; fosters a culture of professional growth and staff's full utilization of professional and technical skills, and technology to achieve bureau/mission customer objectives. Uses data -driven analysis as appropriate to influence and steer policy and processes and guides others to do the same. Uses sophisticated knowledge of foreign cultures and other USG agencies to advance U.S. goals and solve complex problems. Works to develop this ability in subordinates. Maintains and further develops proficiency in foreign language(s). Uses language skills to promote U.S. interests with a wide range of audiences.

| Scoring Scale | Score | Proficiency Examples |
|---|---|---|
| **Leading Others:** Demonstrates mastery of the precept, whether in a supervisory role or not, and leads others in same | 5 | • Sets stretch goals for others to learn and adopt new technologies or methods.<br>• Leads others to champion creative ideas and move them into implementation.<br>• Helps others develop scenarios to deal with the global challenges the mission, bureau or agency faces.<br>• Consistently uses multiple methods to develop expertise in others.<br>• Leads collaboration efforts across diverse teams. |
|  | 4.5 |  |
| **Mastery:** Demonstrates talented skill level in all facets of the precept. | 4 | • Uses experiences to navigate difficult situations.<br>• Applies accrued knowledge and experience to try new ideas.<br>• Thinks globally; excels at acting with the big picture in mind.<br>• Engages a wide variety of contributors and stakeholders to make well-informed decisions. |
|  | 3.5 |  |
| **Talented:** Consistently demonstrates skilled competence in majority of behaviors described in the precept. | 3 | • Continually scans the environment for new ideas and approaches.<br>• Applies experience and/or expertise to resolve unique, complex, or unforeseen challenges.<br>• Creates and/or modifies standard operation procedures based on accrued knowledge, experience, and information. |
|  | 2.5 |  |
| **Satisfactory:** Demonstrates skilled competence in some behaviors described in the Precept. | 2 | • Utilizes strengths/experience to solve common problems.<br>• Applies expertise to develop quality analyses.<br>• Seeks to improve processes by applying accrued knowledge and experience.<br>• Follows standard operating procedures with little error. |
|  | 1.5 |  |

JA142

51

| | | |
|---|---|---|
| **Developing:** Minimal demonstration of competence in behaviors described in the precept. | 1 | • Little indication of strategic analysis<br>• Little indication of making an impact on processes or goals.<br>• Little indication of utilizing expertise. |
| | 0.5 | |
| **None:** No demonstration of the precept. | 0 | • No demonstration or poor demonstration of performance related to substantive and technical skills.<br>• No mention or indication of any actions using substantive knowledge and technical expertise. |

ADDENDUM 7 TO THE 2024 PROCEDURAL PRECEPTS

A scoring guide has been developed for evaluating the Employee Evaluation Report (EER) narratives based on the Cross-Functional Competency.

The EER should be scored using a five-point scale based on the Cross-Functional Competency's overall definitions and the presence of proficiency illustrations.  The scoring scale is as follows.  Between each scoring number, if you feel the candidate is stronger than the lower whole number and approaching the higher whole number in one or more elements, default to the mid-point.

> **\*5—Leading Others:**  Demonstrating excellent cross-functional performance with at least two years of responsibility for oversight/leadership across functions ***outside*** of the employee's primary skill code; including senior roles (including but not limited to COM, DAS, DCM, EX, and Office Directors), long term skills training, details, interagency assignments, or significant portions in an Acting or TDY capacity in a leadership role.  The performance file contains excellent examples of cross functional impact with agency level institutional impact.
>
> **\*4.5**
>
> **\*4— Mastery**:  Demonstrating excellent cross-functional performance with at least two years of variation of assignments and/or work ***outside*** of the employee's primary skill code; including long term skills training assignments, details, interagency assignments, or significant portions in an Acting role or TDY capacity.  The performance file contains excellent examples of cross functional impact with Post or Bureau level institutional impact.
>
> **\*3.5**
>
> **\*3— Talented**:  Demonstrating strong cross-functional performance with less than two years of variation of assignments or work ***outside of*** the employee's primary skill code; including long-term skills training, details, and interagency assignments or significant portions in an Acting or TDY capacity.  The performance file contains impactful examples of cross functional activity outside the primary skill code in the past two years.
>
> **2.5**
>
> **2—Satisfactory:**  Demonstrating strong cross-functional performance with at least two years of variation between assignments or work ***within*** the employee's primary skill code.  The performance file contains impactful examples of cross functional activity inside the primary skill code in the past two years.
>
> **1.5**
>
> **1—Developing:**  Demonstrating some cross-functional performance with less than two years of variation between assignments or work ***within*** the employee's primary skill code.  The performance file has a passing mention to cross functional activity but no real impact is demonstrated.

**0.5**

**0**—No demonstration of variation between assignments or cross-functional performance.  The performance file has no mention or indication of any cross functional activity.

*\*Significant portions in an acting capacity equal 120 or more days, not necessarily consecutive.*

The EER narratives should clearly demonstrate that the candidate is skilled in the Cross-Functional Competency through examples of supporting behaviors and/or direct inference.

**Promotion Panel Scoring Guide**

**Please note the "Proficiency Examples" are not intended to be exact wording for FSSB members to look for, or exact language that should be found in evaluative material.  They are a guide to assist FSSB members in assigning a score based on language or examples found in evaluative material.  Boards should not penalize candidates whose EERs do not contain the exact wording that is found in these examples.  Occasionally, boards may need to go back farther than the previous five years or to the last promotion to credit cross-functional diversification.**

| Cross-Functional Competency |
| --- |
| Cross-functional competence is the demonstration of cross-functional performance through a variation of assignments and/or work outside of the employee's primary skill code.  This can include long-term skills training assignments (not including language training), details, interagency assignments, or significant portions in an Acting role or TDY capacity.  This can also include dual or triple hatted positions that effectively demonstrate ability to lead in cross-cutting roles. |
| Cross-functional competence is the ability to effectively collaborate, communicate, and perform tasks across different functional areas within an organization.  It extends beyond technical proficiency in the employee's primary skill code and encompasses a broad range of skills, including adaptability, communication, problem-solving, and teamwork.  It is the employee's ability to seamlessly integrate one's expertise with other departments or other areas of expertise, fostering a collaborative environment that advances mission goals. |
| Cross-functional competence includes taking the initiative in balancing stakeholders, leading high-performing cross-functional teams, influencing mindsets, leading transformational change, inspiring shared vision, cultivating buy-in and ownership, and aligning strategy across the enterprise with organizational goals and objectives. |

| Scoring Scale | Score | Proficiency Examples |
| --- | --- | --- |

| *Leading Others*: Demonstrates mastery of this competency and leads and/or mentors others in same | 5 | • Taking charge of projects that involve multiple departments or teams outside of one's primary skill code, demonstrating the ability to coordinate efforts, set objectives, and drive results across diverse functional areas spanning at least two years.<br>• Engaging in long-term skills training programs (not including language training) or actively mentoring individuals from different departments, sharing expertise, and fostering a culture of continuous learning and collaboration.<br>• Assuming acting or temporary duty (TDY) assignments in senior leadership roles for 120 or more days, showcasing the capacity to oversee and influence decision-making at the agency level.<br>• Participating in interagency assignments or initiatives that require collaboration with external organizations or government agencies, effectively representing the organization's interests while building partnerships and achieving shared objectives.<br>• Demonstrating a track record of cross-functional impact that extends beyond individual projects, with documented examples of contributions that have had a significant and lasting institutional impact on operations or strategic priorities. |
| | 4.5 | |
| *Mastery*: Demonstrates talented skill level in majority facets of precept | 4 | • Demonstrating the ability to successfully undertake varied assignments or roles outside of one's primary skill code over at least two years. This includes willingly taking on new challenges, adapting quickly to changing environments, and effectively leveraging transferable skills to excel in different contexts.<br>• Engaging in extended skills training programs that span multiple disciplines or functional areas, showcasing a commitment to continuous learning and professional development. This may involve pursuing certifications, attending workshops, or participating in specialized training courses relevant to diverse roles within the organization or inter-agency.<br>• Accepting temporary assignments or details to other offices, bureaus, or agencies, where the individual can apply their expertise in new and unfamiliar settings. This demonstrates a willingness to collaborate across organizational boundaries, gain exposure to different perspectives, and contribute to broader U.S. government objectives.<br>• Assuming significant responsibilities in acting roles or temporary duty (TDY) capacities for extended periods (120 days or more), showcasing the ability to lead, manage, and make decisions beyond one's usual scope of duties. This includes instances where individuals step into leadership positions to fill gaps or address critical needs, contributing to institutional stability and continuity.<br>• Generating tangible outcomes and driving positive change at the post or bureau level through cross-functional collaboration and |

| | | |
|---|---|---|
| | | performance. This may involve leading cross-departmental initiatives, implementing process improvements, or contributing to strategic decision-making that enhances organizational effectiveness and achieves broader institutional goals. |
| | 3.5 | |
| *Talented:* **Consistently demonstrates skilled competence in several of behaviors described in competency** | 3 | • Providing clear and impactful examples of cross-functional activity outside the primary skill code within the past two years, demonstrating the ability to collaborate effectively across functional areas and make meaningful contributions to organizational objectives. This may include project outcomes, process improvements, or other tangible results that showcase the individual's cross-functional competence and impact.<br>• Engaging in ongoing skills training programs or workshops relevant to roles outside of one's primary skill code, demonstrating a proactive approach to expanding knowledge and capabilities across functional areas within the organization.<br>• Taking on short-term details or assignments that collectively amount to 120 days or more in different departments or teams, effectively applying skills and expertise to support diverse projects or initiatives. This includes demonstrating adaptability and the ability to quickly acclimate to new environments and responsibilities.<br>• Collaborating with external organizations or government agencies on interagency projects or initiatives, multilateral projects, or public-private partnerships contributing valuable insights and expertise to achieve shared objectives. This involves building relationships, communicating effectively across organizational boundaries, and representing the department's interests with professionalism and diplomacy.<br>• Assuming temporary duty (TDY) assignments or acting roles outside of one's primary skill code for at least 120 days, showcasing the ability to step up and fulfill leadership responsibilities in challenging circumstances. This may involve leading teams, making decisions, and driving results in unfamiliar contexts, demonstrating versatility and leadership potential. |
| | 2.5 | |
| *Satisfactory:* **Demonstrates skilled competence in some behaviors described in competency** | 2 | • Exhibiting a track record of successfully tackling diverse assignments or projects within the employee's primary skill code over at least two years. This includes showing adaptability and proficiency in handling different types of tasks, challenges, and responsibilities within their area of expertise.<br>• Actively seeking opportunities to collaborate with colleagues from other departments or teams, leveraging their expertise and insights to enhance the quality and impact of projects. This involves communicating effectively, sharing knowledge, and working collaboratively to achieve shared goals. |

| | | |
|---|---|---|
| | | • Taking the lead in initiating and managing cross-functional projects or initiatives that require collaboration between multiple departments or teams. This includes setting objectives, coordinating efforts, and driving results while ensuring alignment with organizational priorities and objectives.<br>• Providing documented examples of impactful cross-functional activity within the primary skill code in the past two years. This may include project outcomes, process improvements, or other tangible results that demonstrate the employee's ability to collaborate effectively across functional areas and contribute to organizational success. |
| | 1.5 | |
| *Developing:* Little to no demonstration of competence in majority of behaviors described in competency | 1 | • Actively seeking out opportunities to collaborate with colleagues from other departments or teams, even within the employee's primary skill code, to gain exposure to different perspectives and approaches.<br>• Volunteering to participate in cross-functional projects or meetings, contributing ideas, insights, and expertise to discussions and decision-making processes. Offering assistance or support to colleagues outside the employee's primary skill code when needed, demonstrating a willingness to lend a helping hand and contribute to the success of broader team efforts.<br>• Proactively seeking opportunities to attend training sessions or workshops inside or outside the employee's primary skill code, aiming to broaden knowledge and skills and facilitate future cross-functional collaboration.<br>• While no real impact is demonstrated, the performance file may contain passing mentions of involvement in cross-functional activities, such as attending meetings or contributing ideas, indicating an awareness of the importance of cross-functional collaboration and a willingness to engage in such initiatives. |
| | 0.5 | |
| No demonstrated competence. | 0 | • No demonstration of variation between assignments or cross-functional performance.<br>• The performance file has no mention or indication of any cross functional activity. |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| *Plaintiff*, | ) | Civil Action No. 1:25-cv-1030-PLF |
| | ) | |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| *Defendants*. | ) | |
| _____ | ) | |

## DECLARATION OF RANDALL CHESTER

I, Randall Chester, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.    I am a Vice President (VP) for the American Foreign Service Association (AFSA), representing members of the Foreign Service at the United States Agency for International Development (USAID).  I have held this position since July 15, 2023.

2.    Prior to my election as AFSA USAID VP, I served as a Foreign Service Officer in Afghanistan, Bosnia Herzegovina, Ethiopia, Pakistan, Tanzania, Madagascar, and Washington, D.C. I joined USAID in 2004 as an Agriculture Officer.

3.    On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees at USAID. The bargaining unit consists of one single world-wide bargaining unit, excluding confidential employees as described in Section 1002(6) of the Foreign Service Act (FSA), management officials as described in Section 1002(12) of the FSA, employees engaged in personnel work in other than a purely clerical capacity,

employees engaged in criminal or national security investigations, and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

4.    Over 80 percent of active-duty members of the Foreign Service across six foreign affairs agencies, including USAID, are dues-paying members of AFSA. There are 2,254 dues-paying AFSA members at USAID, out of 2,465 Foreign Service members (including Foreign Service limited employees) in the bargaining unit at USAID. A USAID Foreign Service member, also known as a "development diplomat," designs, implements, and evaluates development projects and programs, often working with local communities, organizations, and governments to deliver effective development results. Members working for USAID are primarily focused on promoting development and humanitarian assistance in partner countries. Development projects they design, implement, and evaluate may include providing humanitarian aid, supporting infrastructure development, strengthening healthcare systems and improving health outcomes, improving education opportunities, promoting private sector development and small businesses, increasing agriculture productivity, linking US business to new market opportunities, and improving delivery of government services in host countries. USAID Foreign Service members often have technical expertise in specific areas like public health, economic growth, democracy and governance, education, or agriculture, which allows them to design and manage complex projects worth tens of millions of dollars, ensuring that funds are used effectively and efficiently. Finally, FSOs work closely with local communities, organizations, and governments to develop strategies and partnerships that ensure effective development outcomes. They coordinate the programs and portfolios in different offices within USAID

Missions and across US Government Agencies in an embassy to ensure that the activities they design meet congressional mandated requirements and serve the communities they work in.

5.      Foreign Service members working at USAID typically serve in 2- to 4-year long tours of duty and must bid on new assignments 6-9 months before the end of their tour.

6.      AFSA bargaining unit members pay voluntary membership dues to AFSA, which is the union's overwhelming source of operational funding. The vast majority of AFSA members have elected to have their dues deducted by USAID.  Approximately 86 percent of AFSA's overhead costs are paid for by union dues.

7.      On December 7, 2022, AFSA and USAID signed a new Framework Agreement governing such things as timelines for conducting negotiations, use of official time by the AFSA USAID Vice President and Representative, the union's right to information, office space, and dues withholding. As the AFSA USAID Vice President, my job duties require me to be familiar with the contents of the Framework Agreement; I routinely rely on the Framework Agreement when I meet and negotiate with USAID management and perform other union representational duties. A true and accurate copy of the Framework Agreement is provided as Exhibit 1 to this Declaration.

8.      AFSA also has negotiated a series of Memoranda of Understanding with USAID on a variety of topics relating to the unique conditions of service of Foreign Service members.

9.      AFSA and USAID Human Capital Talent Management (HCTM), Employee Labor Relations (ELR) engage in rolling negotiations, all year long, on a wide

variety of topics relating to terms and conditions of Foreign Service employees' employment. Up until January 22, 2025, AFSA and ELR met on a bi-weekly basis. I participated in these meetings. The last AFSA – ELR meeting was held on January 22, 2025. Since then, the Agency has made significant changes to conditions of employment, with no notice, consultation, or negotiation with AFSA. On March 17, 2025, I received a "canceled event" email for our bi-weekly AFSA/ELR meeting, with a note that read, "ELR has been instructed by leadership *not to communicate with the Unions*." Before management stopped meeting with AFSA, we were often able to informally resolve employee questions and issues by speaking with our management counterparts. These meetings reduced the need to file grievances.

10.    AFSA legal and grievance staff represent members in individual cases, such as grievances, discipline cases, and investigations.  AFSA also files implementation disputes and unfair labor practices against USAID when it violates one of our agreements or unilaterally changes our members' conditions of employment. We recently filed two implementation disputes against USAID relating to our displacement from the union's office at the Ronald Reagan Building and the Agency's failure to bargain over procedures and appropriate arrangements relating to USAID's widescale reduction in force. Along with AFSA's President, I filed the implementation dispute regarding the reduction in force by sending a memorandum to USAID HCTM-ELR on March 26, 2025. A true and correct copy of the implementation dispute is attached as Exhibit 2 to this Declaration.

11.    The March 27, 2025, Executive Order titled "Exclusion from Federal Labor-Management Relations Programs" will have an immediate and devastating impact

on AFSA's ability to safeguard the interests and rights of USAID Foreign Service members and upon AFSA's finances and existence.

12.     USAID has not contacted me or reached out to AFSA about the actions it is taking in response to the Executive Order. However, AFSA anticipates that USAID will rescind its recognition of AFSA as the exclusive representative and will revoke the Framework Agreement, in light of the Executive Order.

13.     Stripping AFSA of its right to negotiate conditions of employment, procedures, and appropriate arrangements for our members at USAID will harm members by allowing management to unilaterally discard negotiated agreements and safeguards that have balanced the rights of employees and management for over 50 years.

14.     In addition, AFSA's collective bargaining agreements grant office space to the AFSA USAID Vice President and AFSA staff. This provides bargaining unit members a place to meet with their exclusive representative and for AFSA to maintain its documents and files.  AFSA Offices in the Ronald Reagan Building were vacated on March 19, 2025, after USAID gave up its lease on the building and forcibly removed AFSA from the premises.  While AFSA has its headquarters office at 2101 E Street, NW, Washington, DC, there is not sufficient suitable space for the AFSA Vice Presidents, legal and grievance staff.  To rent space for these AFSA officials and staff in the Washington, DC area will be costly.

15.     AFSA's collective bargaining agreement with USAID also provides 100% official time for the USAID Vice President and "reasonable official time" for the AFSA USAID Representative.  Official time permits AFSA representatives to perform union representational duties during the workday, such as negotiating agreements with USAID

and meeting with employees about grievances or disciplinary issues. My full-time union duties as USAID Vice President have consistently required at least 40 hours per week. If AFSA elected representatives are not permitted to use official time and are required to return to agency duties full-time, there will be no elected union representatives who can advocate during the workday, including on Capitol Hill. This will remove a crucial advocate for members facing extreme negative actions by the current administration, at the very time that they need AFSA most.

16. The timing of the Executive Order creates additional hardships for AFSA and for members of the Foreign Service. AFSA is in the middle of elections for the 2025-2027 governing board, which includes the 100% official time position of USAID VP. The new board begins its two-year term on July 15. Eliminating official time will reduce or possibly eliminate the number of candidates who are able to serve in the USAID VP position, since union representational duties will have to be performed outside of working hours.

17. Since January 20, 2025, the administration has been engaged in an unconstitutional effort to shutter USAID. On Sunday, February 23, 2025, without any prior notice, USAID announced that, with limited exceptions, all direct hire employees would be placed on administrative leave by the end of the day, and that the agency would implement a Reduction in Force (RIF) that would terminate approximately 1,600 USAID personnel. That evening, USAID issued individual RIF notices, with a termination date of April 24 for domestic employees and May 26 for overseas employees, hitting an estimated 600 Foreign Service members. AFSA has engaged in legal efforts to prevent this action by

filing a lawsuit which seeks an injunction ordering the recall of all USAID employees on administrative leave and preventing further RIFs or mass terminations.

18.    In recent days, USAID has made moves to terminate even more staff. Specifically, on March 28 a new RIF notice was sent to most of the workforce, with the exception of a handful of individuals including myself, who remained on administrative leave. Since March 28, the AFSA member email account and my USAID VP email account have been receiving over 100 emails per day with questions, asking for support, and other issues relating to the RIFs. On April 7, I received a RIF letter stating that my last date with USAID will be July 1, 2025. I will no longer be employed as of July 2, 2025. I will be forced to look for new employment opportunities as of that time. Many USAID Foreign Service members' RIF dates have been extended to September 2.

19.    Eliminating AFSA's presence and the AFSA USAID Vice President will hamper AFSA's ability to challenge these unconstitutional actions and support its members.  I have attempted to engage with USAID leaders and counterparts in its HCTM office on a number of unresolved, contentious issues impacting members.  These issues include USAID's refusal to:  1) certify tenure approval recommendations from the Winter Tenure Board; 2) collect annual performance reports as required by USAID policy; 3) meet with AFSA and have meaningful discussions about the recall of USAID Foreign Service Officers from their overseas assignments; 4) provide AFSA with date and information, including Reduction in Force registers, as required by our Framework Agreement; and 5) meet with AFSA and provide information as part of any actions related to the on-going Reduction in Force as required by USAID policy that was negotiated with AFSA. USAID has refused to communicate with me about these issues.

20.    AFSA's professional staff provide critical advice and guidance to members on all facets of their employment, including during investigatory interviews or with grievances pending before the Foreign Service Grievance Board (FSGB). Removing AFSA as the exclusive representative will harm individual members by limiting their access to a vital resource during an especially critical time. Terminating union dues deductions may result in layoffs at AFSA, further harming Foreign Service employees who are seeking redress for negative actions taken by USAID.

21.    As the representative of nearly 2,500 Foreign Service employees, I have been in regular contact with a variety of media sources to discuss the negative actions of the Administration and the profound impact on the personal and professional lives and families of AFSA's constituents. Due to the nature of their positions, employees are unable to talk to the media, making AFSA the only voice to the public. Since January 20, I have appeared on CNN, PBS, CBS 60 Minutes, given on the record interviews to Canadian Broadcasting Service, BBC, ABC, NBC, and have given multiple interviews on background to various print and electronic media. Without this access, the impact and true story of what is happening to USAID employees would not be in the public record.

22.    A video of the interview I gave to CBS 60 Minutes can be found here: https://www.cbsnews.com/news/usaid-dismantling-trump-60-minutes-transcript/.

23.    A video of the interview I gave to PBS News Hour can be found here: https://www.youtube.com/watch?v=dVRnSOvvBXI.

24.    On April 8, 2025, my USAID electronic accounts were deactivated. This includes my .gov email account and access to electronic files, which I previously used for union representational duties.

25.     The injuries suffered by USAID Foreign Service employees, AFSA elected

officials, and AFSA staff members are ongoing or imminent and will persist unless this

Court intervenes.


Executed on April 14, 2025

Randall Chester

# EXHIBIT 1

# AFSA-USAID FRAMEWORK AGREEMENT

# Table of Contents

**PREAMBLE** .............................................................................**3**

**ARTICLE 1:  PARTIES TO THE AGREEMENT AND RECOGNITION OF THE BARGAINING UNIT** ...........................................**4**

**ARTICLE 2:  DEFINITIONS** .............................................**5**

**ARTICLE 3:  EFFECTIVE DATE, DURATION, AND GROUNDS TO REOPEN** ..........................................................................**7**

**ARTICLE 4:  EMPLOYEE RIGHTS AND RESPONSIBILITIES** ................**8**

**ARTICLE 5:  UNION RIGHTS AND RESPONSIBILITIES** ........................**10**

**ARTICLE 6:  MANAGEMENT RIGHTS AND RESPONSIBILITIES** ........**13**

**ARTICLE 7:  NEGOTIATIONS** ........................................**14**

**ARTICLE 8:  USE OF OFFICIAL FACILITIES AND SERVICES** ............**18**

**ARTICLE 9:  USE OF TELECOMMUNICATIONS SYSTEM** ...................**20**

**ARTICLE 10:  DUES WITHHOLDING** ..............................**21**

**Attachment A - AFSA Service Memo Template** ...........................**23**

**SIGNATURES** ..............................................................**24**

USCA Case #25-5150    Document #2134122    Filed: 09/09/2025    Page 163 of 302

## PREAMBLE

Pursuant to the policy set forth by Chapter 10 of the Foreign Service Act of 1980 (FS Act) governing Labor-Management Relations, the following articles of this Framework Agreement ("Agreement"), together with any and all supplemental agreements and amendments to this Agreement that may be subsequently agreed to, constitute the total Agreement between the Foreign Service of the United States Agency for International Development, (hereinafter called "USAID" or the "Agency" or "Employer"), and the American Foreign Service Association (hereinafter called the "Union" or "AFSA"). The Agency and the Union are collectively referred to as the "Parties."

The Parties agree that the statutory protection of the right of employees to organize, bargain collectively, and participate through the Union safeguards the public interest, contributes to the effective conduct of business, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment. The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Foreign Service. This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship.

With the foregoing in mind, the Parties subscribe to the following statements of the respective rights and obligations of the Agency and the Union:

## ARTICLE 1:  PARTIES TO THE AGREEMENT AND RECOGNITION OF THE BARGAINING UNIT

On January 22, 1973, AFSA was certified as the exclusive representative of all Foreign Service employees of the United States Agency for International Development, as reaffirmed by Chapter 10 of the FS Act.  The bargaining unit constitutes a single world-wide bargaining unit, excluding confidential employees described in Section 1002(6) of the Foreign Service Act (FS Act),[1] management officials as described in Section 1002(12) of the FS Act,[2] employees engaged in personnel work in other than a purely clerical capacity, employees engaged in criminal or national security investigations and employees who audit the work of individuals to ensure that their functions are discharged with honesty and integrity.

The Parties agree that for purposes of domestic positions, there is a presumption that management officials include Assistant Administrators, Assistants to the Administrator, and their Deputies within each Bureau and Independent Office or equivalent positions and above.  This Agreement does not preclude AFSA or a management employee from challenging that presumption in the appropriate forum, i.e., before the Foreign Service Labor Relations Board.

---

[1] 22 USC §4102(6).
[2] 22 USC §4102(12).

# ARTICLE 2:  DEFINITIONS

For the purposes of this Agreement, the terms listed below are defined as follows:

**BARGAINING UNIT:**  The group of USAID employees for whom AFSA has been designated the exclusive representative, subject to the exclusions detailed in Article 1.

**CONDITIONS OF EMPLOYMENT:**  Personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions, but does not include policies, practices, and matters:

1) Relating to political activities prohibited abroad or prohibited under subchapter III of chapter 73 of title 5, U.S. Code;

2) Relating to the designation or classification of any position under section 501 of the FS Act;

3) To the extent such matters are specifically provided for by Federal statute; or

4) Relating to Government-wide or multiagency responsibility of the Secretary affecting the rights, benefits, or obligations of individuals employed in agencies other than those which are authorized to utilize the Foreign Service personnel system.

**CONFIDENTIAL EMPLOYEE:**  An employee who acts in a confidential capacity with respect to an individual who formulates or effectuates management policies in the field of labor-management relations.

**DAYS:**  Unless otherwise indicated, use of the word "days" refers to calendar days.  In computing any period of time prescribed in this Agreement, the day of the act from which the designated period of time begins to run shall not be included.  For example, if a party receives a proposal on April 1st, a 14-day response period would begin on April 2nd.  Where the day the response is due falls on a weekend or federal holiday, the due date is the next business day.

**EMPLOYEE:**  A member of the Foreign Service who is a citizen of the United States, wherever serving as further described in the Foreign Service Act.[3]

**FRAMEWORK AGREEMENT:**  The articles of this Agreement, together with any and all supplements and amendments to this Framework Agreement.

**MANAGEMENT OFFICIAL:**  An individual who:

1) Is a chief of mission or principal officer;

2) Is serving in a position appointed by the President, by and with the advice and consent

---

[3] FS Act §1002(8), 22 USC §4102(8).

AFSA-USAID Framework Agreement
Article 2

of the Senate, or by the President alone;

3) Occupies a position which in the sole judgment of the Secretary is of comparable importance to the offices mentioned in subparagraph (a) or (b);

4) Is serving as a deputy to any individual described by subparagraph (a), (b), or (c);

5) Is assigned to carry out functions of the Inspector General of the Agency and the Foreign Service under section 209 of the FS Act; or

6) Is engaged in the administration of this subchapter or in the formulation of the personnel policies and programs of the Agency.

Page 6

## ARTICLE 3:  EFFECTIVE DATE, DURATION, AND GROUNDS TO REOPEN

### Section A.  Effective Date and Duration

The effective date of this Agreement shall be the date of Agency Head Approval or thirty days after the last date of signature on page 24.

Subject to Section B, this Agreement shall remain in effect for three years from the effective date.  Thereafter, the Agreement shall be renewed for additional one-year periods dating from the anniversary of the effective date, unless between 120 and 60 days (the reopener window) prior to that date either party gives written notice to the other of its desire to reopen the Agreement.  The other party must acknowledge the notice promptly upon receipt.  The Parties will meet in a timely manner to begin negotiations over that reopening, including ground rules if any.  The current USAID-AFSA Framework Agreement shall remain in full force and effect until all proposed changes have been negotiated and agreed to.

### Section B.  Grounds for Reopening the Agreement Outside the Reopener Window

This Agreement may be amended or supplemented outside the reopener window by mutual agreement.

The Parties are governed by existing and future statutory law.  In the event of a perceived conflict between the law and this Agreement, either party may give written notice to the other of their intent to reopen the Agreement outside the reopener window to address the conflict.

The Parties are governed by existing government-wide rules and regulations.  Should any conflict arise between the terms of this Agreement and any government-wide rules or regulations issued after the effective date of this agreement, the Agreement will govern.  The Parties may reopen the Agreement by mutual agreement or unilaterally during the next reopener window.

To the extent that provisions of the Agency's current or future policies are in specific conflict with this Agreement, the provisions of this Agreement will govern.  The Parties may reopen the agreement by mutual agreement or unilaterally during the next reopener window.

## ARTICLE 4:  EMPLOYEE RIGHTS AND RESPONSIBILITIES

**Section A.  Union Membership**

1) An employee has the right to form, join, or assist a labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal.  No employee shall be required as a condition of employment, assignment, promotion, or retention, to join or refrain from joining any labor organization.  Each employee shall be protected in the exercise of such right.  Except as otherwise provided by the FS Act, such right includes the right:

   a. To act for a labor organization in the capacity of a representative and, in that capacity, to present the views of the labor organization to the Secretary and other officials of the Government including Congress, or other appropriate authorities; and

   b. To engage in collective bargaining with respect to conditions of employment through representatives chosen by the employees as provided by law.

2) No interference, restraint, coercion, discrimination, or reprisal will be practiced by the Agency against an employee for exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement; nor shall the Agency discourage or encourage employee membership in a labor organization.  Neither shall an employee be disciplined or otherwise discriminated against by the Agency because they participated in a grievance, appeal, unfair labor practice complaint or any other proceeding brought under the provisions of law.

3) Nothing in this Agreement shall require an employee to become or to remain a member of a labor organization.

4) This Agreement does not prevent any employee in the bargaining unit from bringing, on their own initiative, a grievance, complaint, or any matter of personal concern to the attention of the appropriate officials without fear of penalty or reprisal.

AFSA-USAID Framework Agreement
Article 4

**Section B.  Representation Rights - Formal Discussions**

1) An exclusive representative shall be given the opportunity to be present at:

    a.  Any formal discussion between one or more representatives of the Employer and one or more employees or their representatives concerning any grievance or any personnel policy, practice, or other general condition of employment; and

    b.  Any examination of the employee by a representative of the Employer in connection with an investigation if the employee reasonably believes that the examination may result in disciplinary action against the employee and the employee requests such representation.

2) The Agency shall annually inform all USAID personnel via Agency Notice of the requirement to give the Union the opportunity to be present at all formal discussions (as defined in Section B(1)(a) above).  In addition, the Agency shall annually inform AFSA bargaining unit employees via Agency Notice of their Weingarten rights and identify AFSA as the exclusive representative for FS employees.  Prior to sending these annual Notices, the Agency will provide AFSA with a draft Notice.  AFSA has five days to provide comments or suggested changes to the Agency.

Page 9

# ARTICLE 5: UNION RIGHTS AND RESPONSIBILITIES

## Section A. Recognition and Representation[4]

The Agency recognizes the Union's right to act for and negotiate agreements covering all employees in the unit.  The Union will represent all employees in the unit in those matters where it is acting as the exclusive representative without discrimination and without regard to Union membership.

## Section B. Officers and Representation

While the Agency reserves the right to assign work, including the issuance of a directed reassignment where appropriate, the Agency will respect the statutory rights of the Union and will recognize duly elected or appointed AFSA officers and other representatives of AFSA, including their rights to act freely and without fear of penalty or reprisal.  As such, the elected or appointed AFSA Vice President will, upon request, be excepted from participation in the assignments processes.  However, where the AFSA Vice President will have served continuously in the United States for any period of continuous service exceeding eight years, they must seek an extension from the Administrator.  AFSA service will normally be considered a special circumstance warranting approval pursuant to 22 USC 3984(a).

AFSA will provide the Agency with a complete list of officers and representatives on a timely basis after each election of general officers and when new officers are appointed within the Union.

## Section C. Official Time,[5] Time-in-Class, and Telework

1) The AFSA USAID Vice President shall be granted 100% official time to perform representational activities.  Official time is not authorized for internal Union business.

   The Agency agrees to provide an outgoing AFSA USAID Vice President 100% official time for a two-week period after the end of the official term so that the outgoing Vice President can orient the incoming AFSA USAID Vice President on matters relating to representational activities.

2) The Parties agree that employees designated by AFSA as representatives in advance shall be authorized a reasonable amount of official time when the employee would otherwise be in a duty status to perform representational duties.  Reasonable amounts of official time may include requests for 100% official time for an additional representative for a definitive period of time.  Such requests must include a description of the activities the representative will engage in.  When approved, the Agency will so notify the supervisors of employees involved.

---

[4] FS Act §1013, 22 USC §4113.
[5] FS Act §1018(d), 22 USC §4118(d).

3) The Agency will extend the time-in-class limitation of the AFSA VP for the period served as AFSA VP, not to exceed a cumulative extension of four years.

4) The AFSA VP may request regular and recurring telework of up to eight (8) days per pay period, which shall be approved barring prohibition by the Telework Enhancement Act or its successor.

**Section D.  Participation in Promotion Process**

1) While serving as the AFSA VP, the AFSA VP may elect to participate in the promotion process.

2) The promotion evaluation file or equivalent of a current or former AFSA VP will include the most recent five years of their USAID service excluding their time as AFSA VP.

3) The Agency will include an AFSA Service Memo (see Attachment A) in the AFSA VP's eOPF.  The Agency will include the AFSA Service Memo in a current or former AFSA VP's promotion evaluation file or equivalent for all years where their service as AFSA VP is part of a promotion board's review.

**Section E.    Post Representatives**

The Agency agrees to recognize AFSA's designation of Agency employees as AFSA representatives at post.  Upon timely written notice of an individual's designation from AFSA to the Agency's Labor Management point of contact, they or their designee will certify the designation and promptly notify post management of the designation and authorization to deal with the named individual.  The Parties agree that all dealings at post shall be consistent with 3 FAH-1H-5120.

**Section F.  Changes in Bargaining Unit Status**

When the Agency decides to change the Bargaining Unit Status (BUS) code of a position coded as 2283, the Union will be notified of the change prior to implementation.

**Section G.  Listings of FS Personnel**

The Agency will provide the Union a list of Foreign Service personnel, both bargaining unit and non-bargaining unit employees.  This listing will be alphabetical with grade, email address, and current post of assignment.  The Agency agrees to provide a full listing as of September 30 of the year that this Agreement goes into force, and then at least on a monthly basis.

AFSA shall be advised of the schedule for orientation sessions for new USAID employees.  The Agency shall provide new bargaining unit members the opportunity to attend an AFSA orientation session at AFSA headquarters or virtually.  A listing of employees for orientation showing their name, position, Bureau/Office, and back stop and bio will be provided to the Union in advance of the sessions.

**Section H.  Union Right to Information**

In accordance with the provisions of Section 1013(e)(4) of Chapter 10 of the FS Act, the Agency agrees to provide the Union, upon request and to the extent not prohibited by law, data:

1) Which is normally maintained by the Agency in the regular course of business;

2) Which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of collective bargaining; and,

3) Which does not constitute guidance, advice, counsel, or training provided for management officials or confidential employees, related to collective bargaining.

USAID will acknowledge receipt and will furnish data to the extent not prohibited by law, which is compliant with 22 USC 4113(e)(4), in a timely manner, normally within seven (7) days.  If the Agency is not able to furnish appropriate data within this timeframe, it will provide estimates on data production timelines.  The Agency is encouraged to provide partial responses as data becomes available.

## ARTICLE 6:  MANAGEMENT RIGHTS AND RESPONSIBILITIES

### Section A.  Management Rights

Nothing in this section shall affect the authority of any management official, in accordance with applicable law to:

1) Determine the mission, budget, organization, and internal security practices of the Agency, and the number of individuals in the Foreign Service or in the Agency;

2) Hire, assign, direct, lay off, and retain individuals in the Foreign Service or in the Agency, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member in accordance with regulations prescribed under the FS Act;[6]

3) Conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force conducted under Section 611 of the FS Act;[7]

4) Assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Agency shall be conducted;

5) Fill positions from any appropriate source;

6) Determine the need for uniform personnel policies and procedures between or among the Foreign Affairs agencies; and

7) Take whatever action may be necessary to carry out the mission of the Agency during emergencies.

### Section B.  Permissive and Mandatory Bargaining Authority

Nothing shall preclude the Agency and the Union from negotiating:

1) At the election of the Agency, the numbers, types and classes of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

2) Procedures which management officials will observe in exercising any function under this section; or

3) Appropriate arrangements for employees affected by the exercise of any function under this section by such management officials.

---

[6] FS Act §1005, 22 USC §4105.
[7] FS Act §611, 22 USC §4010a.

Page 13

# ARTICLE 7:  NEGOTIATIONS

## Section A.  General

The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest.  While this article is predominantly focused on formal bargaining procedures, the Parties believe that pre-decisional involvement over matters that impact the bargaining unit can further that public interest, without regard to whether those matters are negotiable subjects of bargaining under 22 USC 4105(b)(1).  This is not intended to have AFSA involved in day-to-day matters of the Agency but reflects an effort to work collaboratively on issues of mutual concern.  Pre-decisional involvement does not, however, waive Management's or Union's statutory rights.

## Section B.  Notice of Proposed Changes to Conditions of Employment

The Parties recognize the right of either party to propose changes to conditions of employment not covered by this Framework Agreement, where appropriate.  Until the Parties satisfy their obligations under Chapter 10 of the Foreign Service Act, current conditions of employment will remain in effect, barring exigent circumstances.  Written notices of proposed changes to conditions of employment may be made by either party at any time, unless there is a memorandum of agreement governing when such proposals may be made.

1) The written notice of the proposed change shall include:

   a. The nature and scope of the proposed change;

   b. Identification of the employees impacted by the proposed change;

   c. A description of the change;

   d. For changes that require revisions to existing documents, the proposing party will clearly indicate the proposed revisions using "track changes" or a similar function;

   e. An explanation of the proposing party's plans for implementing this change;

   f. An explanation of why the proposed change is necessary;

   g. The proposed implementation date;

   h. The proposing party's Point of Contact; and,

   i. Any other relevant information that is necessary to facilitate bargaining, as required by law.

Case 1:25-cv-01030-PLF    Document 10-4    Filed 04/14/25    Page 25 of 45
USCA Case #25-5098    Document #2134122    Filed: 09/09/2025    Page 175 of 302

AFSA-USAID Framework Agreement
Article 7

2) Notification may include a final date for the Parties to request negotiations with respect to the proposed change.  In no case shall such final date be less than fourteen (14) days from receipt of the notification of the proposed change.  When notification does not include a final date for the receiving party to request negotiations, and the Parties wish to negotiate, they shall make a request to negotiate within thirty (30) days from the date of receipt of the notification.

3) Should the receiving party wish to request to bargain over the proposed change, they must respond in writing by the deadline with their request and initial proposals, unless they have requested a briefing or clarification pursuant to Part 4 below.

4) If the receiving party wishes to request a briefing, written clarification, or both prior to determining whether to submit a request to bargain and submit initial proposals, it must do so within seven (7) days of receipt of the written notice.  Requests for written clarification may include, but are not limited, requests for data covered by 22 USC 4111.

5) If the receiving party requests a briefing, the briefing will be conducted within seven (7) days of receipt of the written request.  Briefings may be held using the Agency's teleconference, video conference, or web conference equipment in lieu of in-person meetings.  The receiving party may request written clarification within seven (7) days of any briefing.

6) If the receiving party requests written clarification before or after any briefing, the proposing party shall respond in writing normally within seven (7) days of receipt of the written request.  If the receiving party is not able to provide a complete response within this timeframe, it will provide estimates on response timelines.  The receiving party is encouraged to provide partial responses as data becomes available.

7) The receiving party must submit its request to bargain and initial proposals as soon as possible, but no later than seven (7) days after the briefing or receipt of the proposing party's response to the request for written clarification, whichever is later.

8) Each party at the request of the other, shall be required to meet virtually or in person for good faith negotiations no sooner than seven (7) days after the proposing party has received a request to bargain and initial proposals.

9) The Union may, at any time, request data that is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining pursuant to 22 USC 4111(e)(4), as outlined in Article 5, Section H.  Prior to implementation of any proposed changes, the Agency will satisfy its statutory and contractual obligations associated with that request.

**Section C.  Ground Rules for Negotiations**

The Parties may by mutual agreement establish ground rules for negotiations that differ from the procedures outlined in Article 7, Section B and that dictate the labor-management engagement to

Page 15

follow.  All engagements will be in compliance with the Foreign Service Act's labor management provisions.

**Section D.  Extensions**

Either party may request a 10-day extension to submit bargaining proposals and such requests shall be granted.  In addition, nothing herein shall preclude the Parties by mutual consent from extending any time limits imposed under this Article.

**Section E.  Conclusion of Negotiations**

1) To the extent conditions of employment are negotiated to agreement with AFSA, the terms of that agreement will be documented by a Memorandum of Agreement (MOA). The Parties may document the conclusion of their engagement through other means, by mutual agreement.

2) The Parties hereby agree that all future MOAs will include a section that addresses the term limits of that MOA, to include if the MOA is intended to continue indefinitely. Where a term limit is set, the section will specify the length of the MOA, whether the Parties will allow an MOA to rollover if not reopened in a timely manner, and as needed, the window of opportunity to reopen an MOA by either party at the end of its term. Nothing prevents the Parties from reopening an MOA at any time by mutual agreement.

3) If the agreement is intended to serve as a supplement to this Framework Agreement, the agreement must state so explicitly and the Framework Agreement must be amended accordingly.

4) In the event a party is unable to implement the agreement in a timely manner, that party will provide written notice and the justification for the delay.

**Section F.  Negotiability Disputes and Impasse**

1) If a party believes a proposal by the other party is not negotiable because it is inconsistent with or contrary to applicable law, rule, or regulation, or because it otherwise does not believe it has a duty to bargain, the Parties are encouraged to explore alternative language that will achieve the purpose of the proposal and would not render the proposal non-negotiable if unsuccessful, the Parties may submit the issue for resolution in an appropriate forum, such as the Foreign Service Labor Relations Board.

2) When good faith negotiations do not result in agreement and the Parties are at impasse over negotiable proposals, the Parties will first seek mediation to try and resolve the matter.  If the Parties are unable to reach agreement through mediation, either party may request that the Foreign Service Impasse Disputes Panel (FSIDP) consider the impasse. While the impasse is before the FSIDP or a mediator, neither party will implement the proposed change except to the extent mutually agreed to or if the change is necessary to the effective functioning of the Agency.

**Section G.  Implementation Disputes and Unfair Labor Practices**

1)  Any dispute between the Agency and the Union concerning the effect, interpretation, or a claim of breach of a collective bargaining agreement may be resolved as an implementation dispute or as an Unfair Labor Practice.

2)  The Parties mutually agree to make reasonable, good faith, efforts to resolve disputes concerning the effect, interpretation, or a claim of breach of a negotiated agreement informally prior to initiating any formal proceeding.

3)  Prior to filing an Unfair Labor Practice concerning any matter, the filing party shall give the other party at least seven (7) days advance notice.

## ARTICLE 8:  USE OF OFFICIAL FACILITIES AND SERVICES

**Section A.  Purpose**

Unless otherwise specified, the services and facilities described in this article shall be provided by the Agency to the Union free of charge.  AFSA's use of these services and facilities shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act unless expressly authorized below.

**Section B.  Space and Furniture**

For the convenience and efficient servicing of employees within the bargaining unit, the Agency agrees to provide suitable office space, containing individual offices, meeting space, and surplus office furniture, if available, for the use of the Union.  Such space shall be within the facility considered USAID Headquarters, currently the Ronald Reagan Building (RRB).  The Agency shall provide appropriate signage for AFSA's office space as well as general services, including a reasonable amount of toner and paper for provided printers, for any facility related issues under their authority to include office equipment provided by the Agency.  The Agency, with advance notice, also agrees to provide the Union with access to a cleared space, within RRB, containing a computer and telephone for classified discussions and drafting on an as needed basis.

Additionally, the Agency agrees to make reasonable efforts to provide conference rooms and auditoriums within RRB to enable the Union to conduct general membership and other such meetings.  Requests for use of such space must be initiated by the Union in writing, at least three days prior to the requested date.  The Union understands that the Agency may need to preempt the space, with little notice, for its own use.  The Agency will make every effort to provide alternative arrangements when possible.

**Section C.   Telephones, IT Equipment, and Other Equipment**

The Union may use Agency telephones for all international and local calls in conducting its representational business.  The Agency will provide office-standard computer equipment, to include a scanner/printer/multi-function device if requested and available.

**Section D.  Submission to USAID Official News Media**

Materials that AFSA wishes to submit for publication in official Agency media outlets will be submitted simultaneously to HCTM/ELR and the appropriate point of contact (e.g., Editor, Frontlines; Point of Contact, Global Announcement).

**Section E.  Bulletin Boards**

1) AFSA may have access to Agency Bulletin Boards.  Bulletin board material must be properly identified as belonging to AFSA and relate to employees, their employment by the Agency or AFSA's role as the exclusive representative.  AFSA assumes all

responsibility incident to the preparation, reproduction, distribution, posting, and maintenance of material on bulletin boards.  Postings will be devoid of libelous, scandalous, or scurrilous material.

2) The Agency agrees to permit AFSA representatives at overseas posts to display AFSA material in an area where other organizational material is located, e.g., on the CLO Notice Board, USAID Mission break area or in a similarly visible location.  Specific notices of AFSA events can be displayed in general use spaces, such as on a cafeteria notice board or other general use bulletin board.

### Section F.  Correspondence to Members

The use of the Agency's facilities for registered mail is made necessary by AFSA's need to transmit documents between its Washington headquarters and its membership worldwide.

AFSA may use the Agency's facilities on a reasonable basis for the distribution of general printed matter and individually addressed correspondence arising from AFSA's role as the exclusive representative.

### Section G.  Electronic Mail Systems

1) The Agency shall provide AFSA e-mail access for representational purposes, such as communicating directly with employees on announcements of meetings, obtaining employee input on issue between Management and AFSA, and to assist employees with grievances, investigations, disciplinary and other similar employment related matters.

2) Normally, USAID does not consider communications between and among AFSA and its members about exclusively AFSA representational activities and AFSA business to be Agency records subject to the Freedom of Information Act.  If the Agency receives a request under the Freedom of Information Act for e-mails or other communications to or from AFSA, and upon review of the responsive information concludes that the request includes government records, prior to producing any such documents, the Agency shall contact AFSA to make them aware of the request and the Agency's planned response.

3) Any Agency issued mobile devices requested and issued to the AFSA Vice President or staff member, will be paid for by AFSA.

4) AFSA will abide by all relevant provisions of the ADS when using the Agency's intranet and unclassified email system.

5) As an exception to the general prohibition on the use of email systems for internal union business, AFSA may transmit no more than three broadcast emails during AFSA's election season related to that election using the USAID e-mail system.

## ARTICLE 9:  USE OF TELECOMMUNICATIONS SYSTEM

Unless otherwise stated, AFSA's access to the Agency's Notice and other telecommunications systems shall be confined exclusively to matters arising from the performance of its obligations as exclusive representative under Chapter 10 and 11 of the FS Act.

### Section A.  Standard Procedures

1) AFSA will observe Agency transmittal guidelines for the various types of correspondence it sends through Agency systems.

2) AFSA-submitted Agency Notices will be written in the appropriate style and clearly identified to indicate that transmission is from AFSA through the Agency.  AFSA-submitted Agency Notices must be devoid of libelous, scurrilous, or scandalous material.

3) AFSA-submitted Agency Notices shall be unclassified except in extraordinary circumstances and by agreement of both Parties.  AFSA-submitted Agency Notices shall be sent routine unless there is mutual agreement for a higher priority.

4) An AFSA-submitted Agency Notice must be published provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous, or scandalous material.  The Agency may disseminate the notice for wider input from management officials; however, redrafting of the Agency Notice is not the prerogative of the Agency.

### Section B.  Overseas Procedures

Any communication presented by a USAID AFSA representative at post for transmission to staff will be presented to the designated management official at post or regional management officer to be cleared for transmission.  Communication must be cleared provided it is in compliance with the provisions of this Article and is devoid of libelous, scurrilous, or scandalous material.  Redrafting of the communication is not the prerogative of the clearing official.

# ARTICLE 10:  DUES WITHHOLDING

## Section A.  General

Payroll deductions for the payment of Union dues may be made from the pay of bargaining unit employees and non-bargaining unit employees, if authorized by the employee.

## Section B.  Supply of Forms

The Union will be responsible for the distribution of Standard Form 1187 for use by an employee who wishes to authorize the deduction of their dues.

## Section C.  Changes in Dues Structure

The AFSA President or authorized AFSA official (e.g., AFSA Member Services) shall notify the Agency's Director, HCTM/ELR or designee when the dues structure changes.  HCTM/ELR will immediately notify the Agency's Payroll Office of the change.  AFSA agrees that changes to dues structure can only occur once every calendar year.

## Section D.  Bi-Weekly Deductions

Authorized deductions will be made each bi-weekly pay period from the pay of all employees who have authorized such allotment.  The deduction will normally be effective the next full pay period following the receipt by HCTM/ELR of the SF1187.  No deduction will be made in any period for which the employee's net earnings after other deductions are insufficient to cover the full amount of the allotment for dues.

On or about June of each year, USAID will review the dues withholding amounts of all AFSA members to ensure the correct amount of dues is being withheld.  USAID will share the results of that review with AFSA.

USAID will address and correct in a timely manner errors identified by either party.

The Union will not be charged or assessed a fee for services rendered, by the Agency, in connection with these deductions.

## Section E.  Bi-Weekly Listings

The Agency will transmit to AFSA on a bi-weekly basis:

1) A list of all employees for the previous period.

2) A list of employees who are enrolled in payroll deductions for the previous pay period and the amount of dues they paid; and,

AFSA-USAID Framework Agreement
Article 10

3) A list of all accessions and separations of bargaining unit members during the previous pay period, if any, as well as any changes to the bargaining unit status of employees.

These reports shall include all relevant information, to include nature of action codes and unique identifiers such as the social security numbers where appropriate.

## Section F.  Annuity Deductions

Annuity deductions for the payment of AFSA dues will be made from the annuity of retired Foreign Service members if authorized by the annuitant by completing Standard Form 1187A. The Agency will apprise retiring Foreign Service members of this option as part of the Agency's ongoing retirement education and counseling efforts.

## Section G.  Discontinuance of Dues

An employee may seek to cease payroll dues deduction by contacting HCTM directly or by contacting AFSA Member Services and processing the necessary paperwork (SF-1188).  In the event the employee contacts AFSA, AFSA shall inform the Agency to cease payroll dues deduction and send the necessary paperwork to HCTM.  The Agency shall process the SF-1188 within 14 days of receipt.  AFSA may also request that the Agency automatically cease dues deduction of any member AFSA no longer considers to be in good standing.  Should AFSA no longer remain the exclusive representative of the Foreign Service bargaining unit, all related dues deduction shall cease on the effective date of that loss of recognition.  If an employee is no longer a member of the Foreign Service, the Agency shall discontinue the automatic dues deduction.

Page 22

## Attachment A - AFSA Service Memo Template

The following employee served as the Vice President for USAID of the American Foreign Service Association (AFSA) during the time period listed.

_____    _____    _____
Employee Name                        Start of Service                        End of Service

AFSA is both the professional association and exclusive representative for the U.S. Foreign Service.  AFSA's over 16,000 members include active-duty and retired members of the Foreign Service at USAID, the Department of State, Foreign Commercial Service, Foreign Agricultural Service, Animal and Plant Health Inspection Service and U.S. Agency for Global Media.

AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members. AFSA also seeks to increase understanding among the American people about the vital role of the U.S. Foreign Service in sustaining American global leadership.

The Vice President serves as the primary labor negotiator for employees in the Foreign Service bargaining unit at USAID. They advise the AFSA president and other board members on workforce policies affecting their constituencies. They have a duty of fair representation as the exclusive employee representative of all employees within their bargaining units and negotiate collective bargaining agreements covering all employees in each unit described in Sections 1012 and 1013 of the Foreign Service Act. In coordination and with guidance from the president, they represent their constituents with the public, including the Congress.

Service in this role safeguards the public interest, contributes to the effective conduct of public business, facilitates and encourages the amicable settlement of disputes between employees and their employers involving conditions of employment.

Per 22 USC 4003, no negative inference is permitted as a result of an employee's service in this capacity.

AFSA-USAID Framework Agreement
Signature Page

## SIGNATURES

The American Foreign Service Association and the U.S. Agency for International Development
hereby agree to this negotiated Framework Agreement on December 7, 2022. This Agreement is
executed to become effective within thirty (30) days or upon approval by the Agency Head,
whichever is earlier.

| For USAID | For AFSA |
|---|---|
| Nicholas M. Gottlieb<br>Director, Employee and Labor Relations | Jason K. Singer<br>Vice President, USAID |
| Kenneth M. Bledsoe, Esq.<br>Attorney Advisor, Office of General Counsel | Sharon L. Papp, Esq.<br>General Counsel |
| Joseph L. Laster III<br>Deputy Director, Employee and Labor<br>Relations | Sue L. Bremner<br>Labor-Management Adviser |
| James Truong<br>HR Specialist | LORRAINE SHERMAN  Digitally signed by LORRAINE SHERMAN  Date: 2022.12.07 16:19:07 -05'00'<br>Lorraine Sherman<br>AFSA Representative |

| Agency Head Approval | |
|---|---|
| Paloma Adams-Allen<br>Deputy Administrator, Management and Resources | 1/4/2023<br>Date |

Page 24

# EXHIBIT
# 2



March 26, 2025

**To:**       Employee Labor Relations, HCTM/USAID

**From:**    Tom Yazdgerdi, AFSA President
            Randy Chester, AFSA USAID Vice President

**Subject:**  Implementation Dispute
            Violations of Framework Agreement Related to Reduction in Force

Pursuant to 3 FAM 4470, the American Foreign Service Association (AFSA) files the following implementation dispute against the United States Agency for International Development (USAID) for violations of the parties' January 24, 2023, Framework Agreement ("Framework Agreement"), as detailed below. Attachment A, AFSA – USAID Framework Agreement, Article 6.A.3.

An implementation dispute is one which directly concerns the rights and obligations of an agency and labor organization toward each other … as set forth in a collective bargaining agreement. *See* Foreign Service Act ("FS Act" or "the Act"), Section 1014 (22 USC §4114), *see also* 3 FAM 4471.[1]

Pursuant to the parties Framework Agreement, "any dispute between the Agency and the Union concerning the …claim of breach of a collective bargaining agreement may be resolved as an implementation dispute *or* as an Unfair Labor Practice." Attachment A at 7(G)(1). The party's agreement further states, "the Parties mutually agree to make reasonable, good faith, efforts to resolve disputes concerning … a claim of breach of a negotiated agreement informally prior to initiating any formal proceeding." *Id*. at 7(G)(2). As the facts show, despite numerous attempts by AFSA to engage with the Agency and to resolve any disputes, AFSA has been met with complete silence. It is for this reason that AFSA has no other choice but to pursue this implementation dispute.

---

[1] Section 1014 of the Act, as amended establishes procedures for resolving such cases in which AFSA and the Agencies have a dispute about the "effect, interpretation, or a claim of breach of a collective bargaining agreement." Among other things, the statutory provision states that such implementation disputes will be resolved through procedures negotiated by the Foreign Affairs agencies and AFSA. AFSA and the Foreign Affairs agencies negotiated such procedures in 3 FAM 4470. The statute also provides for an appeal to the Foreign Service Grievance Board if the parties cannot bilaterally resolve their dispute. *See* FSGB 2014-028 (September 3, 2015).

1

Implementation disputes must be filed within 120 days of the alleged breach of the collective bargaining agreement. As the first of several breaches by the Agency occurred on February 1, 2025, AFSA's implementation dispute is timely.

## I.    Relevant Facts

### *1. Issuance of RIF Notices to Foreign Service Employees*

On Sunday, February 23, 2025, without any prior notice, USAID announced that, with limited exceptions, all direct hire employees would be placed on administrative leave by the end of the day, and that the agency would implement a Reduction in Force (RIF) that would terminate approximately 1,600 USAID personnel **stationed in the United States**. That evening, USAID employees began receiving individual RIF notices, with a termination date of April 24 for domestic employees and May 26 for overseas employees, despite the prior statement that the RIF would be implemented for employees that are domestic.

The "Specific Notice of Reduction in Force" (RIF Notice) was a form letter distributed to FS employees. It was not tailored to the individual in that it did not properly address specific competitive areas, grades, service dates or veterans' preference.[2] The RIF Notice provided the following:

> I regret to inform you that you are affected by a Reduction in Force (RIF) action. This RIF is necessary to **restructure USAID's operations** to better reflect Agency priorities and the foreign policy priorities of the United States.
>
> This is your **specific** notice of RIF. In accordance with RIF procedures specified in ADS 454, you are being **released from your competitive level because your competitive area is being eliminated**. Consequently, you will be separated from the Federal service effective [April 24, 2025 or May 26, 2025.... (Emphasis added). Attachment B, Redacted sample RIF notices.

USAID's ADS Chapter 454 on Reduction in Force in the Foreign Service provides the agency's procedures for conducting RIFs. Attachment C, ADS 454. Section 454.3.1

---

[2] The RIF notice stated "[t]he above information did not affect your standing or treatment in this RIF action, which eliminated your entire competitive area."

2

provides that "at the time management decides a Reduction in Force is necessary, and after *appropriate consultation with Foreign Service employee representatives*, the Director of the Office of Human Capital and Talent Management (DAA/HCTM) *will issue* an *Agency-wide announcement* of the RIF." In this case, AFSA was not consulted, and no agency-wide announcement was made. This ADS section also states that the RIF will contain "information on the *number of employees* to be released, the *Competitive Levels affected*, and the probable timing of the RIF as proposed at the time of the Agency's decision." This information was not provided, signifying a unilateral change in the Agency's RIF procedures.

With respect to the retention registers for RIFs, ADS 454.3.3 clearly states that the "competitive area for the Senior Foreign Service and the Foreign Service *is service wide and world-wide*." [Emphasis added]. The RIF notices do not apply the correct definition of 'competitive area' and incorrectly notes, in all the RIF notifications, that the individual employee's "competitive area is being eliminated." The RIF notifications also violate the order of separation, which is extensively detailed in ADS 454.3.4. USAID, pursuant to its own regulations, must consider veteran's preference, career status, and retention standing of Senior Foreign Service (SFS) and FS employees. This was not done, once again signifying a unilateral change in the Agency's RIF procedures.

The Agency's issuance of these RIF notifications similarly violated the FS Act and the party's Framework Agreement, as it did not provide AFSA, the exclusive representative of Foreign Service employees at USAID, prior notice or an opportunity to negotiate. *See* FS Act Section 1005(b)(2),(3), 22 U.S.C. 4105(b)(2),(3), *see also* Framework Agreement, Article 6(b)(2),(3). Not surprisingly given the events that have unfolded at USAID to date, AFSA later learned that these notices were also issued without the knowledge of USAID Human Capital Talent Management [HCTM] personnel. Attachment D, HCTM Statement.[3]

As AFSA had no prior notice of the Agency's intent to reduce its FS workforce, on February 24, 2025, AFSA sent representatives for USAID an information request on the reduction in force and corresponding notices. *See generally* Attachment A at Article 5(H)(in line with 22 USC 4113(e)(4)); Attachment E, February 24, 2025, AFSA Information Request.

---

[3] It is also worth noting that the Agency's own ADS on RIFs provides for notice and consultation with the Union.  *See* ADS 454.2b. And ADS 454.3.1. The agency's RIF notifications failed to comply with multiple provisions of its own ADS 454 on RIFs.

3

The Agency's unilateral change in policy resulting in a significant change in conditions of employment, without prior notice, deprived AFAS of its right to negotiate procedures and/or appropriate arrangements for employees adversely impacted by this change.

### 2. Formal Requests for Information

In January of 2025 the parties longstanding professional and collaborative relationship changed. The change resulted from a series of unilateral actions by the Agency, without prior notice, consultation or negotiation with AFSA. As a result, AFSA submitted multiple formal information requests to gather information regarding the Agency's actions.

The first information request was sent to the Agency on January 25, 2025, as a follow up to an unanswered letter regarding the placement of Foreign Service employees on administrative leave. Attachment F, January 23, 2025, AFSA Letter to USAID Administrator.[4]

The second information request was sent to the Agency on February 24, 2025, in response to the RIF notifications sent to AFSA's constituents. *See supra* at 3. Attachment E, February 24, 2025, AFSA Information Request.

The third and fourth information requests were sent to the Agency on March 11 and March 17 respectively. These requests were regarding the Agency's orders, without guidance or explanation, for all overseas FS personnel to log into the Permanent Change of Station (PCS) portal and fill out information, including dates, for their PCS. Attachment G, March 11, 2025, and Attachment H, March 17, 2025, AFSA Information Requests.

The fifth information request was sent to the Agency on March 24, 2025, and pertains to violations of ADS 463, on the annual performance review cycle. Attachment I, March 24, 2025, AFSA Information Requests.

Despite to 7-day response time in the Framework Agreement, to date, the agency has not acknowledged receipt, let alone respond to a single one of these requests for information.

---

[4] As AFSA USAID VP is on administrative leave, he is unable to access his USAID email and system, from which he sent the information request on administrative leave.

4



### 3. Refusal to Engage with Union

For the last decade, AFSA and USAID Human Capital Talent Management [HCTM], Employee Labor Relations [ELR] met on a bi-weekly and/or regularly scheduled basis. These meetings included notices of upcoming events and/or changes to policies and procedures, status updates of ongoing grievances and/or disciplinary cases. In line with the Framework Agreement, it was used as a forum for pre-decisional involvement of the union, regardless of the negotiability of an issue. Finally, it served as a forum for consultation and/or negotiation when needed.

The last AFSA – ELR meeting was held on January 22, 2025. Since then, the Agency has made significant changes to conditions of employment, with no notice, consultation or negotiation with AFSA. Actions include, but are not limited to, placing Foreign Service employees on administrative leave, shutting them out of USAID headquarters and USAID systems, and perhaps most significantly, the issuance of Reduction in Force notices that violate the ADS. As a result of these significant actions, AFSA has drafted multiple emails requesting information and the opportunity meet, as well as several information requests. AFSA has countless unanswered emails and letters it can produce as evidence. As noted above, all of these communications and requests have gone unanswered.

To date, USAID continues to ignore AFSA and engage in conduct that makes clear it no longer intends to engage with the union.  This intentional violation of an established labor management practice is irrefutably evidenced by the "canceled event" notification AFSA received on March 17, 2025, for the parties bi-weekly AFSA/ELR meeting, with a note that read, "ELR has been instructed by leadership ***not to communicate with the Unions***." Attachment J, March 17th Statement from ELR to AFSA.[5]

## II.    Violation of AFSA-USAID Framework Agreement

The preamble of the party's Framework Agreement begins with:

> The Parties agree that the statutory protection of the right of
> employees to organize, bargain collectively, and participate through

---

[5] Unfortunately, once you 'accept' the cancelled event to be removed from your calendar, the email disappears. As such, we have attached AFSA USAID VP Randy Chester's follow up email to management in response to the cancelled event and accompanying message.

5

the Union **safeguards the public interest, contributes to the effective conduct of business**, and facilitates and encourages the amicable settlement of disputes between the Parties involving conditions of employment. The Parties also recognize that the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and **cooperative relationships between management officials and organizations representing members of the Foreign Service**. This Agreement should be interpreted and administered in a manner consistent with the requirement of an effective and efficient Government. The **Parties hereby affirm their commitment to build a positive and cooperative bilateral relationship**.

Attachment A at Preamble. The parties also affirmed their commitment "to conduct negotiations and other dealings in good faith and in such manner as will further the public interest." *Id*. at Article 7(a). In drafting its Framework Agreement, the parties memorialized, in writing, their firm belief that "pre-decisional involvement over matters that impact the bargaining unit can further that public interest, **without regard to whether those matters are negotiable** subjects of bargaining under 22 USC 4105(b)(1)."

The parties agreed to a Framework Agreement that provides clear guidance on how to engage with one another. Unfortunately, despite this the Agency has opted to blatantly violate its obligations and has openly refused to engage with AFSA.

### 1. Reduction in Force Notices

As clearly stated in the Framework Agreement, the parties have a 'responsibility' to deal with one another in good faith. In line with this, Article 7(B) of the Framework Agreement provides for the notice of proposed changes to conditions of employment, with an explicit list of information that **must** be included in a written notice of the proposed change. Attachment A at 7(B)(1).[6] Article 6(b)(2),(3) of the Framework

---

[6] The written notice "shall" include:

    a. The nature and scope of the proposed change;
    b. Identification of the employees impacted by the proposed change;
    c. A description of the change;

Agreement provides that nothing in the section on Management Rights, "shall preclude the Department and the exclusive representative from ***negotiating—(2) procedures which management officials will observe in exercising any function under this section; or (3) appropriate arrangements for employees adversely affected by the exercise of any function under this section by such management officials***." (Emphasis added). Attachment A at Article 6(B)(2),(3), Article 7(a),[7] *see generally* 22 U.S.C. 4105(b)(2),(3).

On February 23, 2025, with no prior notice to AFSA, the Agency issued RIF notices to AFSA bargaining unit members. The notices evidenced clear, significant and unilateral changes to the Agency's RIF policies and procedures. This action was taken in violation of Articles 6 and 7 of the Framework Agreement.

The intentional failure to provide AFSA notice of this critical change prevented AFSA from exercising its right to negotiate changes to procedures and/or appropriate arrangements, prior to the issuance of RIF notices, to ensure minimal disruption and hardship to FS employees, especially those assigned overseas.

USAID's actions not only violate its own ADS RIF procedures, the Framework Agreement and the FS Act, but it ignores explicit guidance issued by the current administration. The Office of Personnel Management's March 12, 2025, Guidance on Collective Bargaining in Connection with RIFs, confirms management's obligation to negotiate procedures and appropriate arrangements and reinforces that agencies must "***fulfill their labor obligations and incorporate those activities into their***

---

d. For changes that require revisions to existing documents, the proposing party will clearly indicate the proposed revisions using "track changes" or a similar function;

e. An explanation of the proposing party's plans for implementing this change;

f. An explanation of why the proposed change is necessary;

g. The proposed implementation date;

h. The proposing party's Point of Contact; and,

i. Any other relevant information that is necessary to facilitate bargaining, as required by law.

[7] Article 7(a) states: The Parties have the responsibility to conduct negotiations and other dealings in good faith and in such manner as will further the public interest. While this article is predominantly focused on formal bargaining procedures, the Parties believe that pre-decisional involvement over matters that impact the bargaining unit can further that public interest, without regard to whether those matters are negotiable subjects of bargaining under 22 USC 4105(b)(1).

7



***planning processes***. (emphasis added).” *See* Guidance on Collective Bargaining in Connection with RIFs, *see also* ADS 454.3.1, 454.2.[8]

## 2. *Formal Requests for Information*

Article 5(H) of the Framework Agreement gives AFSA the right to information from the Agency that is normally maintained in the regular course of business, reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects which fall within the scope of … bargaining; which does not constitute guidance, advice, counsel, or training…. The Agency is given seven (7) calendar days to furnish the data or, if the Agency cannot furnish data within this timeline, it must provide estimates on the production timelines. Attachment A at Section 5(H).

As stated above, as of the date of this filing, the Agency has failed to respond to any of AFSA’s requests for information and has ignored requests by AFSA to meet.

## 3. *Refusal to Engage with Union*

USAID continues to ignore AFSA and engage in conduct that makes clear it no longer intends to engage with the union. In doing so, the Agency is violating several foundational articles of the Framework Agreement.

Section 4(A) (Union Membership) makes clear that the Agency cannot interfere with or restrain an employee from exercising any of the rights guaranteed by Chapter 10 of the FS Act or this Agreement.” Attachment A at Section 4(A). Section 5(A)(Union Rights and Responsibilities) affirms the Agency’s recognition of AFSA’s right to act for and negotiate agreements covering employees in its bargaining unit. *Id*. at Section 5(A). In failing to communicate with or respond to AFSA, the exclusive representative of USAID Foreign Service employees, on significant changes to conditions of employment, the Agency is interfering with and restraining the ability of AFSA’s bargaining unit members, and its full time USAID Vice President, from exercising their rights under the FS Act and the Framework Agreement.

---

[8] ADS 454.2 requires the Agency to consult with AFSA, as the exclusive representative of Foreign Service employees ***prior*** to issuance of a RIF notice. Specifically, ADS 454.2(b) requires the Office of Human Capital and Talent Management (HCTM) “implements a RIF … when it has been authorized by the Administrator, and ***in consultation with*** the bureaus, field missions, and the ***exclusive representatives of the Foreign Service employees***….”

8

The Framework Agreement makes clear that the parties have a "responsibility to conduct negotiations and other dealings in good faith." The parties respected their relationship enough to explicitly extend these good faith dealings to pre-decisional involvement over matters that impact AFSA's bargaining unit, without regard to whether "those matters are negotiable…." *Id*. at Section 7(A). The Agency has knowingly and willfully violated these terms. There is, arguably, not a more direct way to violate the Framework Agreement than by explicitly stating, in writing, "ELR has been instructed by leadership ***not to communicate with the Unions***."

These significant and irrefutable violations of the Agency's obligations towards the union cannot be ignored.

## III.    Request for Relief

For the reasons set forth herein, AFSA requests an expedited decision on this grievance and the following relief:

1.  A finding that the Agency has violated the Parties' Framework Agreement.

2.  That the Agency provide AFSA with a point of contact within the Agency who will respond to AFSA communications and engage with AFSA as the exclusive representative of USAID Foreign Service employees;

3.  That the Agency ceases and desists from changing conditions of employment for AFSA's bargaining unit employees without providing AFSA notice and an opportunity to procedures and appropriate arrangements.

4.  That the Agency rescind all RIF Notices to Foreign Service employees that have been issued and cease and desist from the issuance of new RIF Notices to Foreign Service employees;

5.  That the Agency reinstate any employees who have been separated as a result of the RIF, with back pay and interest;

6.  That the Agency comply with the requirements in the parties' Framework Agreement as it relates to Information Requests;

7.  Reimbursement of attorney fees and expenses, if warranted; and



8.  All other appropriate relief.

Please note that AFSA General Counsel, Sharon Papp (papp@afsa.org) and Deputy
General Counsel, Raeka Safai (safai@afsa.org) are representing AFSA in this
implementation dispute. Please send all correspondence regarding this dispute to Mrs.
Papp and Mrs. Safai.

JA193

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN FOREIGN SERVICE )
ASSOCIATION, )
 )
        *Plaintiff,*  )        Civil Action No. 1:25-cv-1030-PLF
 )
    v. )
 )
DONALD J. TRUMP, et al., )
 )
        *Defendants.*  )
 )

## DECLARATION OF ASGEIR SIGFUSSON

I, Asgeir Sigfusson, declare under the penalty of perjury, pursuant to 28 U.S.C.

§ 1746, that the following is true and correct:

1.    I am the Executive Director of the American Foreign Service Association

(AFSA).

2.    I have been AFSA Executive Director since November 2019. Prior to being

hired as AFSA Executive Director, I served as AFSA's Director of Communications,

Director of New Media, Communications and Marketing Manager, Education Assistant,

Assistant to the USAID Vice President, and as an intern, starting in 2001.

3.    AFSA issues statements to the press about significant issues affecting our

members and about AFSA's activities advocating for our members. AFSA publishes these

press releases on our website. True and correct copies of press releases that AFSA has

issued for the purpose of communicating with the media can be found on AFSA's website,

at https://afsa.org/press, which contains links to true and correct copies of individual press releases.

4.      AFSA is the professional association and exclusive representative for the U.S. Foreign Service across six foreign affairs agencies, which include the Department of State, U.S. Agency for International Development (USAID), Foreign Commercial Service (FCS), Foreign Agricultural Service (FAS), Animal and Plant Health Inspection Service (APHIS) and U.S. Agency for Global Media (USAGM). Nearly 80 percent of the active-duty members of the Foreign Service have chosen to become dues-paying members of AFSA.

5.      AFSA enters into collective bargaining negotiations with the six foreign affairs agencies on a wide variety of terms and conditions of employment and represents or assists members with issues relating to their employment.

6.      As the Executive Director of AFSA, I oversee AFSA's executive functions, human resources, infrastructure, accounting, and finances. I am also the primary liaison between all of AFSA's staff and the elected officers and representatives on AFSA's Governing Board.

7.      AFSA employs 40 staff members who engage in all facets of Foreign Service representation, advocacy, and communication. AFSA's offices include:

> a. Office of the General Counsel – AFSA has a professional staff of 11 employees, including eight attorneys, who represent and advise members across the six foreign affairs agencies in all aspects of their employment, including investigations, discipline cases, grievance proceedings, assignment appeals, to name a few. The Office of the General Counsel also

provides support to AFSA elected officials in collective bargaining and files implementation disputes and unfair labor practices when the agencies violate AFSA's collective bargaining agreements or violate the labor management provisions of the Foreign Service Act.

b.    Communications and Outreach – Staff develops public relations strategies and engage with various external audiences to include all forms of media in support of AFSA's mission and goals.

c.    Member Engagement and Programs – Staff are responsible for membership recruitment, internal communications, membership retention and programming, and issues relating to automatic dues deductions.

d.    *The Foreign Service Journal* and FS Books – *The Foreign Service Journal* has a circulation of 18,000 and is published ten times a year.

e.    Advocacy and Professional Policy Issues – Staff are responsible for analyzing, developing and articulating policy issues affecting the Foreign Service to strategic partners. In addition, AFSA's legislative director advocates for federal and state legislation impacting members of the Foreign Service.

f.    Finance and Administration – Staff oversees human resources, budgeting, reporting, infrastructure, information technology, and daily administration.

6.    AFSA's annual operating costs are approximately $5 million.

7.    AFSA bargaining unit members pay voluntary membership dues to AFSA. Automatic payroll deductions from AFSA members constitute between $360,000 and

$389,000 a month in dues revenue. These dues constitute approximately 86% of the union's source of operational funding.

8.      The March 27, 2025, Executive Order titled "Exclusion from Federal Labor-Management Relations Programs" will have an immediate and devastating impact on AFSA's ability to meet its operating costs.

9.      The loss of membership revenue caused by the cessation of automatic dues deductions will cause immediate cash flow issues. At some point, AFSA will not be able to pay utilities, vendor costs and most concerning, employee salaries and benefits. The difficulties in paying AFSA obligations could significantly harm the organization's credit as well as its reputation. Although AFSA's LM-2 form recently filed with the Department of Labor indicates investments that exceed annual operating costs, most of those funds are in AFSA's scholarship fund, which is a separate 501(c)(3) entity and cannot be used for operating expenses.

10.     The loss of membership dues could cause immediate layoffs for AFSA staff in addition to cuts in salaries and benefits.

11.     In addition, AFSA's collective bargaining agreements grant office space in the Department of State to certain AFSA officers and AFSA staff at no cost to AFSA. This provides bargaining unit members a place to meet with their exclusive representative and for AFSA to maintain its documents and files. The files maintained in the office include email accounts and electronic files, where AFSA officers and staff have significant documents such as correspondence with members, legal pleadings and memoranda, and records of collective bargaining history. The inability to access these files will be devastating and severely complicate the work of AFSA's officers and staff.

12.    Our electronic accounts also enable AFSA staff to access the Foreign Service directory, which contains contact information for all agency employees, including agency officials, bargaining unit members, and contacts in offices such as the Foreign Service Grievance Board. Access to the directory is essential for AFSA staff to maintain contact and communication with members and department personnel.

13.    The loss of agency office accommodations would require AFSA to obtain additional workspace, which we estimate could cost approximately $300,000/year based on average DC square foot pricing.

14.    AFSA members will be significantly harmed by the Executive Order as AFSA's collective bargaining agreements provide 100% official time for the President of AFSA, the AFSA Vice Presidents from State, USAID, FCS, and FAS, and an AFSA State Representative, meaning that those officers perform union duties full-time during the workday. If these elected representatives are not permitted to use official time, they will be reassigned to a Foreign Service assignment and will not have adequate time to perform their union duties.

15.    The timing of the Executive Order creates additional hardships for AFSA and for members of the Foreign Service. AFSA is in the middle of elections for the governing board. Positions to be filled include the 100% official time President and Vice President positions. With the elimination of official time, AFSA anticipates that it will not be able to fill the full-time AFSA positions as individuals will not be able to serve in those positions without official time. Employees who decided to run for those positions will be harmed because they have foregone bidding on Foreign Service assignments.    These

employees will be prejudiced in finding assignments this late in the assignment cycle, which could in turn impact future promotion opportunities.

16.    The injuries suffered by Foreign Service employees, AFSA members and AFSA staff are ongoing or imminent and will persist unless this Court intervenes.

Executed on April 14, 2025

Asgeir Sigfusson

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____ )
)
AMERICAN FOREIGN SERVICE )
ASSOCIATION, et al., )
)
                         _Plaintiff_, )      Civil Action No. 1:25-cv-1030-PLF
)
                 v. )
)
DONALD J. TRUMP, et al., )
)
                 _Defendants_. )
_____ )

**DECLARATION OF NEERA A PARIKH**

     I, Neera A. Parikh, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

     1.     I am a Senior Attorney Advisor with the American Foreign Service Association (AFSA). I have worked in the Office of the General Counsel (OGC) for 25 years.

     2.     I counsel and represent AFSA members on numerous legal issues under the Foreign Service Act, the Foreign Affairs Manual (FAM) and other laws and regulations. My work includes advising members on their grievance rights, representing members at Diplomatic Security, Office of Inspector General and Office of Civil Rights investigations, and assisting members with administrative processes including grievances, disciplinary actions, security clearance matters, Equal Employment Opportunity (EEO) matters, and other issues.

3.     The AFSA OGC office typically handles 500 grievances a year, with 90% of those being from State Department Foreign Service employees. These numbers are strictly related to grievance work and do not include the high volume of investigations, EEO complaints, security clearance matters and member counseling that we undertake.

4.     Since January 2025, USAID employees have already filed approximately 150 grievances on various employment related violations, most of which relate to actions in connection with the current administration's efforts to dismantle USAID. In addition to its normal high-volume caseload, AFSA OGC is currently handling an unprecedented number of grievances from USAID.

5.     Following issuance of the Executive Order (EO) stripping AFSA of its right to represent Foreign Service employees at State and USAID, members have been reaching out to AFSA OGC staff fearful that they will no longer be represented by AFSA in pending cases.  We have received several inquiries from members who are worried that AFSA will no longer be able to represent them and concerned about the costs of retaining private counsel.  Members have expressed the anxiety and distress of having to navigate administrative processes without the expertise of AFSA's OGC staff.

6.     The first step of the grievance process is filing a grievance with the agency. Grievance appeals then go to the Foreign Service Grievance Board (FSGB). On April 2, 2025, the FSGB informed AFSA that, based on the Executive Order, it no longer considered AFSA the exclusive representative of Foreign Service employees at the Department of State and USAID and that it would amend its Policies and Procedures to remove a requirement to include AFSA on pleadings involving those agencies. Prior to the EO, FSGB's Policies and Procedures required parties to copy AFSA and agency

representatives on all filings, even when employees filed grievance appeals directly with FSGB or through privately retained counsel. A true and correct copy of excerpts of the previous FSGB Policies and Procedures is attached as Exhibit 1 to this Declaration. Now, AFSA will not receive notice of its members' grievances unless the members request AFSA's assistance with those grievances.

7.    The FSGB sent emails to grievants being represented by AFSA stating the new policy. This caused significant confusion and panic, as members reached out to OGC stating that they were unsure if AFSA could still represent them because of the emails.

8.    In addition, AFSA's General Counsel previously received a copy of all FSGB Orders and Decisions at the same time that the grievants and their outside counsel (if any) received the Orders and Decisions. If AFSA is unaware of a grievance, AFSA cannot intervene in cases that are of institutional importance to AFSA, ensure consistent administration of its collective bargaining agreements, or take other action to challenge the agencies' actions.

Executed on April 14, 2025

Neera Parikh    4/14/2025

Neera A. Parikh

3

JA202

# EXHIBIT
# 1

**FOREIGN SERVICE GRIEVANCE BOARD**
**POLICIES AND PROCEDURES**
**February 6, 2023**

## Contents

**1. GENERAL RULES OF PRACTICE** ......................................................................**1**

1.1. The Nature of Board Proceedings ................................................... 1

1.2. Mandatory Nature of Policies and Procedures............................... 1

1.3. Settlement/Mediation ................................................................... 1

1.4. Method of Filing with the Board .................................................... 2

1.5. Format, Length and Contents of Filings.......................................... 2

1.6. Requirement of Service Upon All Parties........................................ 3

1.7. *Ex Parte* Communications .............................................................. 3

1.8. Calculating Time Periods ............................................................... 3

1.9. Individualized Filing Schedules ...................................................... 4

1.10. Evidence and Discovery................................................................ 4

1.11. Incomplete Filings ....................................................................... 5

1.12. Sensitive Information ................................................................... 5

1.13. Duplicative Information ............................................................... 5

1.14. Contents of the Record of Proceedings ....................................... 5

1.15. Closing the Record of Proceedings .............................................. 6

1.16. Issuance of Decisions .................................................................. 6

**2. TYPES OF BOARD CASES AND ASSOCIATED BURDENS OF PROOF**....................**6**

2.1. Appeals of Agency-Level Grievances ............................................. 6

2.2. Separations for Cause .................................................................... 6

2.3. Implementation Disputes/Institutional Disputes........................... 7

2.4. Annuity Overpayment Appeals ...................................................... 7

2.5. Pension and Disability Retirement Determination and/or Computation Appeals.......................................................................................... 7

**3. PROCEDURES IN GRIEVANCE APPEALS DECIDED ON THE WRITTEN RECORD**....**8**

3.1. Grievance Appeal Submission ....................................................... 8

3.2. Grievant's Discovery Period .......................................................... 9

3.3. Grievant's Supplemental Submission ............................................ 9

3.4. Agency's Discovery Period ............................................................ 9

3.5. Agency's Response........................................................................ 9

3.6. Grievant's Rebuttal ...................................................................... 10

i

pendency of mediation, except for any dates scheduled for hearings or prehearing conferences.

### 1.4. Method of Filing with the Board

Unless otherwise permitted by the Board's Executive Secretary, all filings must be made by email. Initial filings must be emailed to FSGB@state.gov, copying the agency representatives and the American Foreign Service Association (AFSA) in the same message. *See* Section 1.6,. Requirement of Service Upon All Parties.

### 1.5. Format, Length and Contents of Filings

Each filing (Grievance Appeal Submission, Supplemental Submission, agency's Response, Rebuttal, Motion, Opposition, Reply, etc.) must be on 8.5x11-inch pages with one-inch margins on all sides.  Calibri 14-point font is recommended for legibility. Unless a different page limit is provided in these Policies and Procedures any filing in 14-point font is limited to 70 double-spaced or 35 single-spaced pages, and any filing in 12-point font is limited to 50 double-spaced or 25 single-spaced pages. The filing party may attach to the submission copies of any documentary evidence (not argument) that supports the position(s) stated in the filing. The attachments must be properly identified (*e.g.*, Attachment or Exhibit A, B, C, or 1, 2, 3) and documents must be in Microsoft Word or .pdf format.  Parties must ensure that any documents in .pdf format are of sufficient quality to be easily read. The pages of each filing must be numbered, provided that attachments and exhibits need not have page numbers if the filing includes an index of attachments and exhibits, as well as a divider page preceding each attachment or exhibit bearing the attachment or exhibit letter or number. Attachments may also be provided as separate, properly identified documents. If a party wishes to file a non-document exhibit, such as a video or audio recording, that party must contact the Board's Executive Secretary for instructions on how to file the exhibit.

The Board may reject any filing all or part of which it determines to be illegible or that otherwise fails to comply with these Policies and Procedures. The filing party will have ten days to file a replacement, and any timeline that begins with the filing will begin with the replacement filing. If the replacement filing is illegible or otherwise fails to comply with these Policies and Procedures, the filing party will not be permitted to make a further replacement unless approved in advance by the Board for exceptional cause shown by a motion

filed pursuant to Section 7., Motions. A party that wishes to make a filing that exceeds the page limitations specified herein, or that otherwise does not comply with these Policies and Procedures, must file a motion pursuant to Section 7., Motions, seeking prior approval of the Board to vary from these procedures. The deadline for the filing will be tolled pending the Board's ruling on the motion. Non-compliant filings will not be included in the Record of Proceedings.

#### 1.6. Requirement of Service Upon All Parties

A party filing any document with the Board must simultaneously email a copy to all other parties and to the AFSA, unless provided otherwise by the Board.

#### 1.7. *Ex Parte* Communications

Oral or written communications between the Board or its staff and an interested party to a proceeding which are made without providing the other parties a chance to participate ("*ex parte*" communications) are prohibited. Any communication made in contravention of this section shall be made a part of the Record of Proceedings and an opportunity for response allowed for any party wishing to file a response. If the communication was oral, a memorandum stating the substance of the discussion shall be placed in the Record of Proceedings. This section does not apply to communications concerning such matters as the status of a case, the methods for transmitting evidence to the Board, and other procedural matters which do not concern the merits of any matter before the Board for adjudication.

#### 1.8. Calculating Time Periods

The effective date of any filing with the Board is the date of its electronic transmission to the Board. If the effective date of filing falls on a Saturday, Sunday, or federal holiday, the next business day will be considered the effective date of filing. Filings will be considered timely if transmitted before midnight, Eastern Time, on the date a filing is due. The Board may extend or waive time limits at its discretion in individual cases. *See* Section 7.5.2., Motions for Extension of Time. As used in these Policies and Procedures, the term "days" refers to calendar days, unless otherwise indicated. In computing any period of time prescribed by these policies, the day of the act from which the designated period of time begins to run shall not be included. For example, if a motion is filed on

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| AMERICAN FOREIGN SERVICE | ) | |
| ASSOCIATION, et al., | ) | |
|  | ) | |
| , | ) | Civil Action No. 1:25-cv-1030-PLF |
|  | ) | |
| v. | ) | |
|  | ) | |
| DONALD J. TRUMP, et al., | ) | |
|  | ) | |
| . | ) | |
| _____ | ) | |

<u>**DECLARATION OF SHARON L. PAPP**</u>

     I, Sharon L. Papp, declare under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

     1.     I am the General Counsel of the American Foreign Service Association ("AFSA"). I have held this role since 1992.

     2.     On April 1, 2025, the Executive Secretary of the Foreign Service Grievance Board (FSGB) sent me and the Director of the Department of State Grievance Staff an email regarding changes to the FSGB Policies and Procedures in light of the March 27, 2025 Executive Order, "Exclusions from Federal Labor-Management Relations Programs." The Executive Secretary sent us a follow-up email on the same subject on April 2, 2025. Attached as Exhibit 1 to this Declaration is a true and correct copy of these two emails, along with a true and correct copy of excerpts of the amended FSGB Policies and Procedures, which I received as an attachment to the April 1 email.

     3.     On April 5, 2025, I was copied on a series of identical emails from the three Special Assistants to the FSGB to grievants (or their attorneys, if they were represented by private counsel) who had appeals pending before the FSGB. These emails discussed the Executive Order and the

resulting changes in FSGB procedures. A true and correct copy of a sample email that I received from one of the special assistants is attached as Exhibit 2 to this Declaration; the email has been redacted to remove the grievant's identifying information and the case number.

4.      Attached as Exhibit 3 to this Declaration is a letter dated June 17, 1981, addressed to the then-President of AFSA from the then-Director of the Office of Employee Relations in the Department of State. This letter was filed in AFSA's hard-copy files in AFSA's office at State; specifically, it was located in files containing historical documents relating to AFSA's role as the exclusive representative at State. AFSA maintains a practice of storing such files in the regular course of its business.

Executed on April 7, 2025

Sharon L. Papp

Sharon L. Papp

JA208

# EXHIBIT 1

| From: | Aversa, Martin J |
|---|---|
| To: | Creekman, Daniel M; Papp, Sharon; Sharon Papp |
| Cc: | Carron, Charles M; Moore, Wendela C |
| Subject: | Update FW: [EXTERNAL]FSGB - Impact of 3/27/2025 Executive Order - Revisions to Policies and Procedures |
| Date: | Wednesday, April 2, 2025 10:54:17 AM |

Sharon and Dan,

On further review, we have determined that the word "legal" is inapplicable
here and will not include it when we notify the parties.

In addition, we want to clarify that the Board considers the March 27, 2025,
Executive order to exclude AFSA as exclusive representative of only State and
USAID foreign service bargaining unit members; it remains the exclusive
representative for FCS, FAS (including APHIS), USAGM and (in limited applicable
circumstances) Peace Corps. Therefore, AFSA only need notify those agencies
(State and USAID) and the Board if it is providing representation to an
employee.

Thanks,
Marty
**Martin J. Aversa**
Executive Secretary
Foreign Service Grievance Board
AversaMJ@state.gov
*Cell Phone:* 571-494-0332

**From:** Sharon Papp <papp@afsa.org>
**Sent:** Tuesday, April 1, 2025 5:24 PM
**To:** Aversa, Martin J <AversaMJ@state.gov>; Creekman, Daniel M <CreekmanDM@state.gov>; Papp,
Sharon <papps@state.gov>
**Cc:** Carron, Charles M <CarronCM@state.gov>; Moore, Wendela C <MooreWC@state.gov>
**Subject:** Re: [EXTERNAL]FSGB - Impact of 3/27/2025 Executive Order - Revisions to Policies and
Procedures

Thank you for letting us know Marty.

Get Outlook for iOS

**From:** Aversa, Martin J <AversaMJ@state.gov>
**Sent:** Tuesday, April 1, 2025 5:18:42 PM
**To:** Creekman, Daniel M <CreekmanDM@state.gov>; Sharon Papp-Contact <papps@state.gov>;
Sharon Papp <papp@afsa.org>
**Cc:** Carron, Charles M <CarronCM@state.gov>; Moore, Wendela C <MooreWC@state.gov>
**Subject:** [EXTERNAL]FSGB - Impact of 3/27/2025 Executive Order - Revisions to Policies and
Procedures

Dan and Sharon,

Pursuant to the Executive Order "Exclusions from Federal Labor-Management
Relations Programs" issued March 27, 2025, we have amended (effective
tomorrow) Sections 1.4 and 1.6 of our Policies and Procedures (copy attached)
to replace the AFSA references with the phrase "the employee's collective
bargaining representative, if any." We will notify parties and their legal
representatives of this change and the list of agencies/subdivisions subject to
the exclusion in the Executive Order. If the Executive Order should be revised
or enjoined, we will notify parties and their legal representatives of the lifting
of the exclusion and the need to resume copying AFSA on filings. If AFSA is
providing legal representation to an employee, AFSA should notify the agency
and the Board so that AFSA will receive filings in that capacity.

If you have any questions, please do not hesitate to contact me.

[DAN – could you please share this message with your counterparts at the
other foreign affairs agencies?]

Thank you,
Marty
**Martin J. Aversa**
Executive Secretary
Foreign Service Grievance Board
AversaMJ@state.gov
*Cell Phone:* 571-494-0332

**FOREIGN SERVICE GRIEVANCE BOARD**
**POLICIES AND PROCEDURES**
**April 2, 2025**

## Contents

**1. GENERAL RULES OF PRACTICE** ........................................................................**1**

1.1. The Nature of Board Proceedings ................................................ 1
1.2. Mandatory Nature of Policies and Procedures............................ 1
1.3. Settlement/Mediation ................................................................. 1
1.4. Method of Filing with the Board ................................................. 2
1.5. Format, Length and Contents of Filings...................................... 2
1.6. Requirement of Service Upon All Parties..................................... 3
1.7. *Ex Parte* Communications ........................................................... 3
1.8. Calculating Time Periods ............................................................. 3
1.9. Individualized Filing Schedules ................................................... 4
1.10. Evidence and Discovery.............................................................. 4
1.11. Incomplete Filings ...................................................................... 5
1.12. Sensitive Information ................................................................. 5
1.13. Duplicative Information ............................................................. 5
1.14. Contents of the Record of Proceedings ..................................... 5
1.15. Closing the Record of Proceedings ............................................ 6
1.16. Issuance of Decisions ................................................................. 6

**2. TYPES OF BOARD CASES AND ASSOCIATED BURDENS OF PROOF....................6**

2.1. Appeals of Agency-Level Grievances ........................................... 6
2.2. Separations for Cause ................................................................. 6
2.3. Implementation Disputes/Institutional Disputes........................ 7
2.4. Annuity Overpayment Appeals .................................................... 7
2.5. Pension and Disability Retirement Determination and/or Computation Appeals ............................................................................................. 7

**3. PROCEDURES IN GRIEVANCE APPEALS DECIDED ON THE WRITTEN RECORD....8**

3.1. Grievance Appeal Submission ..................................................... 8
3.2. Grievant's Discovery Period ........................................................ 9
3.3. Grievant's Supplemental Submission .......................................... 9
3.4. Agency's Discovery Period .......................................................... 9
3.5. Agency's Response...................................................................... 9
3.6. Grievant's Rebuttal .................................................................... 10

i

pendency of mediation, except for any dates scheduled for hearings or prehearing conferences.

### 1.4. Method of Filing with the Board

Unless otherwise permitted by the Board's Executive Secretary, all filings must be made by email. Initial filings must be emailed to FSGB@state.gov, copying the agency representatives and the employee's exclusive collective bargaining representative, if any, in the same message. *See* Section 1.6,. Requirement of Service Upon All Parties.

### 1.5. Format, Length and Contents of Filings

Each filing (Grievance Appeal Submission, Supplemental Submission, agency's Response, Rebuttal, Motion, Opposition, Reply, etc.) must be on 8.5x11-inch pages with one-inch margins on all sides. Calibri 14-point font is recommended for legibility. Unless a different page limit is provided in these Policies and Procedures any filing in 14-point font is limited to 70 double-spaced or 35 single-spaced pages, and any filing in 12-point font is limited to 50 double-spaced or 25 single-spaced pages. The filing party may attach to the submission copies of any documentary evidence (not argument) that supports the position(s) stated in the filing. The attachments must be properly identified (*e.g.*, Attachment or Exhibit A, B, C, or 1, 2, 3) and documents must be in Microsoft Word or .pdf format.  Parties must ensure that any documents in .pdf format are of sufficient quality to be easily read. The pages of each filing must be numbered, provided that attachments and exhibits need not have page numbers if the filing includes an index of attachments and exhibits, as well as a divider page preceding each attachment or exhibit bearing the attachment or exhibit letter or number. Attachments may also be provided as separate, properly identified documents. If a party wishes to file a non-document exhibit, such as a video or audio recording, that party must contact the Board's Executive Secretary for instructions on how to file the exhibit.

The Board may reject any filing all or part of which it determines to be illegible or that otherwise fails to comply with these Policies and Procedures. The filing party will have ten days to file a replacement, and any timeline that begins with the filing will begin with the replacement filing. If the replacement filing is illegible or otherwise fails to comply with these Policies and Procedures, the filing party will not be permitted to make a further replacement unless

2

approved in advance by the Board for exceptional cause shown by a motion filed pursuant to Section 7., Motions. A party that wishes to make a filing that exceeds the page limitations specified herein, or that otherwise does not comply with these Policies and Procedures, must file a motion pursuant to Section 7., Motions, seeking prior approval of the Board to vary from these procedures. The deadline for the filing will be tolled pending the Board's ruling on the motion. Non-compliant filings will not be included in the Record of Proceedings.

### 1.6. Requirement of Service Upon All Parties

A party filing any document with the Board must simultaneously email a copy to all other parties and to the employee's exclusive collective bargaining representative, if any, unless provided otherwise by the Board.

### 1.7. *Ex Parte* Communications

Oral or written communications between the Board or its staff and an interested party to a proceeding which are made without providing the other parties a chance to participate ("*ex parte*" communications) are prohibited. Any communication made in contravention of this section shall be made a part of the Record of Proceedings and an opportunity for response allowed for any party wishing to file a response. If the communication was oral, a memorandum stating the substance of the discussion shall be placed in the Record of Proceedings. This section does not apply to communications concerning such matters as the status of a case, the methods for transmitting evidence to the Board, and other procedural matters which do not concern the merits of any matter before the Board for adjudication.

### 1.8. Calculating Time Periods

The effective date of any filing with the Board is the date of its electronic transmission to the Board. If the effective date of filing falls on a Saturday, Sunday, or federal holiday, the next business day will be considered the effective date of filing. Filings will be considered timely if transmitted before midnight, Eastern Time, on the date a filing is due. The Board may extend or waive time limits at its discretion in individual cases. *See* Section 7.5.2., Motions for Extension of Time. As used in these Policies and Procedures, the term "days" refers to calendar days, unless otherwise indicated. In computing any period of time

# EXHIBIT 2

Chen, Hunter B

Roane, Akia F; Papp, Sharon; Sharon Papp
Creekman, Daniel M; Foreign Service Grievance Board; Aversa, Martin J
[EXTERNAL]FSGB███████████: Notice of Revision to Policies and Procedures re Exclusive Representation
Friday, April 4, 2025 1:55:13 PM
FSGB Policies and Procedures (April 2, 2025 Edition).pdf
Exclusions from Federal Labor-Management Relations Programs.pdf

Dear parties,

Executive Order "Exclusions from Federal Labor-Management Relations
Programs," issued March 27, 2025 (copy attached), made significant changes to
the bargaining unit status of Foreign Service employees, and to the status of
the American Foreign Service Association (AFSA) as the exclusive
representative for Foreign Service bargaining units.  For this reason, the Board
has revised Sections 1.4 and 1.6 of its Policies and Procedures (copy attached)
to remove specific reference to AFSA and use the following language in its
place: "the employee's exclusive collective bargaining representative, if any."

Grievant in this case is an employee of the U.S. Department of State, which the
Executive Order expressly excludes from Subchapter X of Chapter 52 of title 22,
United States Code. Therefore,  grievant is not a bargaining unit employee, and
22 C.F.R. § 903.5 does not require the parties to copy AFSA on correspondence
and documents related to this case.

However, the Foreign Service Act of 1980 grants parties in FSGB cases "the
right to a representative of [their] own choosing at every stage of" the Foreign
Service grievance process.  22 U.S.C. § 4133(b)(1).  A representative must be
"identified in writing to the Board as assisting the party . . .  in the presentation
of the case." 22 C.F.R. § 901.22. Once identified in writing, a party "may act
through its duly designated representative."  22 C.F.R. § 901.20.

We note that in grievant's original attempt to file an appeal on February 28,
2025, no other parties were included, and in the March 3 submission, only
AFSA's general email address, afsa@afsa.org, is listed.  We are not clear,
therefore, whether grievant listed AFSA simply to comply with the P&P in effect
at the time or grievant was designating AFSA as a representative.  If the latter,
we ask grievant to please reply to all on this message to identify

<u>representative(s) of AFSA assisting with this appeal.</u>

The Board will notify the parties and representatives if there are any further developments with regard to this or related issues.

Regards,

Hunter

Hunter B. Chen
Special Assistant
Foreign Service Grievance Board
Room 3100, SA-15
chenhb@state.gov

SENSITIVE BUT UNCLASSIFIED

# EXHIBIT 3

NOT FOR DISTRIBUTION

DEPARTMENT OF STATE

Washington, D.C. 20520

June 17, 1981

Ms. Anthea S. de Rouville
President
American Foreign Service Association
Department of State

Dear Ms. de Rouville:

Enclosed is a proposed list of management officials, con-
fidential employees and others to be excluded from the
bargaining unit under the provisions of 1002 and 1012 of
the Foreign Service Act of 1980.

Although section 1003 (b) of the Act provides that the Pre-
sident may exclude any subdivisions of the Department
from coverage under Chapter 10, management has decided
such a Presidential action would be unnecessary in imple-
menting the Act.  We believe that the definitions of the
Act are clear enough that the nature of the bargaining
unit can be defined through the unit clarification pro-
cedures of part 1422.2(c) of the Interim Rules of the
FSLRB.  Such a course of action, however, naturally does
not preclude the President's exercising section 1003 (b)
authority at a future time if required.

I would hope that management and the Exclusive Representative
could reach agreement on this list in a short period of
time so we may submit it together to the FSLRB and ask
them to rectify it.

We look forward to receiving your comments and proposals
on the list, if any.

Sincerely,

John A. Collins, Director
Office of Employee Relations

Enclosure:
    List of Management Officials

JA219

# Exhibit A



UNITED STATES OF AMERICA
**FEDERAL LABOR RELATIONS AUTHORITY**
**CHICAGO REGIONAL OFFICE**
224 S. Michigan Avenue, Suite 445 ● Chicago, Illinois 60604-2505
(872) 627-0020; FAX: (312) 281-6500

April 9, 2025

**VIA EMAIL**

███████████

Associate General Counsel
Employment and Labor Law Division
Office of the General Counsel
DoD Education Activity
4800 Mark Center Drive, 04D14-03
Alexandria, VA 22350-1400
██████████@dodea.edu

Richard Hirn, Attorney
Richard J. Hirn Attorney at Law
5335 Wisconsin Ave NW
Washington, D.C. 20015
richard@hirnlaw.com

Re:    CH-CA-25-0105: Depart of Defense
Eduaction Activity, Alexandria, Virginia and
Antilles Consolidated Eduation Association

Dear Parties:

This Office docketed the above-captioned unfair labor practice ULP charge on January 21, 2025. The Agent assigned to investigate this charge is ██████████ who can be reached via phone at █████████ or via email at ███████████

On March 27, 2025, President Trump issued an Executive Order titled *Exclusions from Federal Labor-Management Relations Programs*, which amended Executive Order 12171, dated November 19, 1979 (as amended), and excluded a number of Federal agencies from collective bargaining pursuant to Section 7103(b)(1) of the Federal Service Labor-Management Relations Statute (Statute).

Because the Executive Order impacts the processing of this ULP charge, processing of this charge will be deferred so as to afford the Office of the General Counsel time to reevaluate the case in view of the Executive Order and in view of cases pending before the Authority.

Sincerely,

/Timothy Sullivan/

Timothy Sullivan
Acting Regional Director

# Exhibit B

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

————

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**(Agency)**

**and**

**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES**
**COUNCIL 238**
**(Union)**

**0-AR-6001**

———

**ORDER TO SHOW CAUSE**

**April 4, 2025**

————

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Agency to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Union may reply to the Agency's response to this order.

The Agency must file its response to this order with the Authority by **April 18, 2025**.  The Agency's response must also include a statement of service that complies with the Authority's Regulations showing that the Agency served its response on all counsel of record or other designated representatives.[3]

The Agency should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW, Suite 300, Washington, D.C. 20424-0001.  The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4]  As outlined in the

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).

[2] *See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).

[3] 5 C.F.R. § 2429.27(a), (c).

[4] *Id.* § 2429.24(e).

Authority's Regulations, the Agency's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Agency's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Agency's filing in this case.

If the Union chooses to file a reply to the Agency's response, then the reply must be filed with the Authority within *fourteen days* after service of the Agency's response. The Union's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Union served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7] The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, *the deadlines for any remaining filings in this case – except for responses or replies to this order – are temporarily suspended*. Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

Erica Balkum, Chief
Office of Case Intake and Publication

---

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance* by calling [(771) 444-5805]." (emphasis added)).
[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).
[7] *Id.* § 2429.23(a).
[8] *Id.*

2

# Exhibit C

**FEDERAL LABOR RELATIONS AUTHORITY**
**WASHINGTON, D.C.**

————

**DEPARTMENT OF DEFENSE**
**DEPARTMENT OF DEFENSE EDUCATION ACTIVITY**
**DOMESTIC DEPENDENT ELEMENTARY AND SECONDARY SCHOOLS**
**SOUTHEASTERN DISTRICT**
**(Respondent)**

**and**

**NATIONAL EDUCATION ASSOCIATION**
**FEDERAL EDUCATION ASSOCIATION, STATESIDE REGION**
**(Charging Party)**

**AT-CA-21-0324**

————

**ORDER TO SHOW CAUSE**

**April 4, 2025**

————

On March 27, 2025, President Donald J. Trump amended Executive Order 12,171 (1979), pursuant to 5 U.S.C. § 7103(b)(1) and 22 U.S.C. § 4103(b), to exclude certain agencies and agency subdivisions from the coverage of the Federal Service Labor-Management Relations Statute (the Statute).[1]  Accordingly, the Authority directs the Charging Party to show cause why the Authority should not dismiss this matter for lack of jurisdiction.[2]  As described further below, the Respondent may reply to the Charging Party's response to this order.

The Charging Party must file its response to this order with the Authority by **April 18, 2025**.  The Charging Party's response must also include a statement of service that complies with the Authority's Regulations showing that the Charging Party served its response on all counsel of record or other designated representatives.[3]

The Charging Party should direct its response to Erica Balkum, Chief, Office of Case Intake and Publication, Federal Labor Relations Authority, 1400 K Street NW,

---

[1] Exclusions from Federal Labor-Management Relations Programs, Exec. Order No. 14251 (Mar. 27, 2025), 90 Fed. Reg. 14553 (Apr. 3, 2025).
[2] *See generally U.S. Att'y's Off., S. Dist. of Tex., Hous., Tex.*, 57 FLRA 750 (2002) (where President amended Executive Order 12,171 to exclude additional entity from Statute's coverage, Authority ordered affected parties to brief whether Authority lacked jurisdiction over their cases).
[3] 5 C.F.R. § 2429.27(a), (c).

Suite 300, Washington, D.C. 20424-0001. The proper methods for filing documents with the Authority are set forth at § 2429.24(e) of the Authority's Regulations.[4] As outlined in the Authority's Regulations, the Charging Party's response to the Authority must be filed by personal delivery, commercial delivery, first-class mail, or certified mail.[5]

The Charging Party's failure to comply with this order by **April 18, 2025**, may result in dismissal of the Charging Party's filing in this case.

If the Respondent chooses to file a reply to the Charging Party's response, then the reply must be filed with the Authority within **fourteen days** after service of the Charging Party's response. The Respondent's reply must also be filed in accordance with the Authority's Regulations, including the requirement to file a statement of service showing that the Respondent served its reply on all counsel of record or other designated representatives.[6]

Requests for extensions of time must be in writing and received by the Authority not later than five days before the established time limit for filing.[7] The request must state the position of the other party and must be served on the other party.[8]

Because the Authority's jurisdiction over this matter is in question, *the deadlines for any remaining filings in this case – except for responses or replies to this order – are temporarily suspended*. Except for responses or replies to this order, you are not required to submit any further filings in this case until the Authority notifies you otherwise.

Procedural questions regarding this case should be directed to the Office of Case Intake and Publication at (771) 444-5805.

For the Authority:

Erica Balkum, Chief
Office of Case Intake and Publication

---

[4] *Id.* § 2429.24(e).

[5] *Id.*; *see also id.* § 2429.24(a) ("To file documents by personal delivery, *you must schedule an appointment at least one business day in advance* by calling [(771) 444-5805]." (emphasis added)).

[6] *Id.* §§ 2429.24(e); 2429.27(a), (c).

[7] *Id.* § 2429.23(a).

[8] *Id.*

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION, <br><br> *Plaintiff,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, et al., <br><br> *Defendants.* | Civil Action No. 25-1030 (PLF) |

## **DEFENDANTS' NOTICE OF EXHIBITS**

Defendants are attaching to this notice two exhibits printed from Plaintiff's website that

were not referenced in Defendants' opposition to Plaintiff's motion for preliminary injunction

but that Defendants may rely upon at the hearing scheduled for 2 p.m. on Monday, May 5, 2025.


Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
LYDIA JINES
JEREMY MAURITZEN
Trial Attorneys
U.S. Department of Justice, Civil Division

Federal Programs Branch

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _ /s/ Jeremy S. Simon_
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

*Attorneys for the United States of America*

EXHIBIT ONE

# American Foreign Service Association

## THE VOICE OF THE FOREIGN SERVICE



## ABOUT AFSA

Since 1924, AFSA has been the unwavering voice of the U.S. Foreign Service. As both a professional association and the exclusive labor representative of the Foreign Service, we represent members from six federal agencies.

With over 80% of active-duty Foreign Service members choosing AFSA, our impact is undeniable. We champion the long-term vitality of a nonpartisan, professional Foreign Service—advocating on Capitol Hill, offering expert legal and career guidance, hosting impactful programs and events, and ensuring our members' voices are heard at the highest levels.

## MEMBERSHIP



**>18,000**
MEMBERS

**14,275**
ACTIVE DUTY

**3,900**
RETIREES

■ Active Duty Members

■ Retiree Members

## U.S. FOREIGN SERVICE AGENCIES WE REPRESENT


The Department of State protects and promotes U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive.


The United States Agency for International Development (USAID) is the world's premier international development agency and a catalytic actor driving development results. USAID's work advances U.S. national security and economic prosperity.


The Foreign Commercial Service (FCS) is part of the U.S. Department of Commerce's International Trade Administration and serves American interests abroad by offering companies a full range of expertise in international trade.


The Foreign Agricultural Service (FAS) links U.S. agriculture to the world to enhance export opportunities and global food security.


The Animal and Plant Health Inspection Service (APHIS) protects the health and value of America's agricultural and natural resources because healthy and profitable American agriculture provides food and clothing for countless people worldwide and is a key pillar of our economy.


The U.S. Agency for Global Media (USAGM) aims to inform, engage, and connect people around the world in support of freedom and democracy.

## WHAT WE DO

AFSA offers a variety of benefits to members, including but not limited to:

- **OFFICE OF THE GENERAL COUNSEL (OGC)** Our team of legal experts provides guidance and individualized assistance to thousands of members each year on employment-related issues. As the union for the Foreign Service, AFSA is the sole bargaining unit and is responsible for collective bargaining agreements. Our team negotiates with the agencies for the best outcomes for our members.

- **EVENTS, PROGRAMS, AND PROFESSIONAL DEVELOPMENT** AFSA hosts in-person networking events and monthly webinars covering professional development, retirement planning, and advocacy-focused town halls.

- **GOVERNMENT ADVOCACY** AFSA is proud to champion the interests of the Foreign Service on Capitol Hill and with state and local governments. Advocacy efforts include protecting the International Affairs budget and warding off cuts during congressional appropriations, Foreign Service family support, in-state tuition, and mobile lifestyle financial protections.

- **EXCLUSIVE FOREIGN SERVICE CONTENT** We provide updates on key issues affecting FS employees; newsletters, including AFSA's curated Media Digest sent weekdays; and a subscription to *The Foreign Service Journal*.

EXHIBIT TWO



# Frequently Asked Questions

MEMBERS (/MEMBERSHIP) > FAQS (/FAQS)

### What is AFSA?

AFSA is the professional association of all members of the Foreign Service. It is also the exclusive representative of the bargaining unit, which encompasses all Foreign Service employees of FCS, FAS, APHIS and USAGM, as defined by the 1980 Foreign Service Act. The Foreign Service is unique in that employees move in and out of the bargaining unit based on the position in which they are serving.

### Who can join AFSA?

All active-duty members of the Foreign Service at the six foreign affairs agencies are welcome to join AFSA as regular members, as are those who have retired from those agencies or left a Foreign Service career before becoming retirement-eligible. We also welcome associate members (see below). AFSA membership is available to all Foreign Service members regardless of whether they are a part of our bargaining unit. Currently, only members of FCS, FAS, APHIS, and USAGM are also considered members of the labor union part of AFSA when they join.

### What is the difference between the professional association and the union?

The four agencies still recognized as being represented by AFSA have the added benefits of collective bargaining and negotiations with the agencies on precepts, regulations, and impact and implementation. The professional association offers all other benefits of membership, including individual counseling on issues such as grievances, security clearances, etc. (See list of benefits – link to new one-pager.)

### Do I have to be a tenured member to join AFSA?

No, AFSA welcomes all incoming Foreign Service personnel as regular, voting members of the association.

### Can Consular Fellows join AFSA?

JA234

Yes, Consular Fellows are welcome to join AFSA as regular members.

# Can I Ms Join AFSA?

Eligible Family Members can join AFSA as associate members (/associate-membership) unless they are members of the Foreign Service Family Reserve Corps (FSFRC), in which case they may join as regular members.

## Who is a bargaining unit member?

AFSA is the exclusive representative of the bargaining unit, which encompasses all Foreign Service employees of FCS, FAS, APHIS and USAGM, as defined by the 1980 Foreign Service Act, with the following exceptions: Employees currently serving in positions designated as "management officials" or "confidential employees" are excluded from the bargaining unit, as are employees engaged in personnel work (in other than a purely clerical capacity) and those assigned to carry out functions of the Office of the Inspector General.

In practical terms, this means that those excluded are Foreign Service members serving as chief of mission, deputy chief of mission, management counselors or management officers, human resources officers, Regional Security Officers and Office Management Specialists who work in the front office or for a management counselor. However, there may be exceptions to these guidelines, so members should contact AFSA headquarters if questions arise as to whether a specific employee is in the bargaining unit. In addition, please bear in mind that non-bargaining unit employees can still be regular AFSA members.

## Can AFSA still provide guidance if I'm not in the bargaining unit?

Yes, AFSA frequently provides guidance to senior executive officers, members in the Office of the Inspector General's office, confidential employees and employees engaged in personnel work.

## How do I pay my membership dues?

You can pay online or by downloading and mailing in a membership application. Dues can be paid by check or credit card. You can select a few payment options, including quarterly installments and auto-renew, which automatically renews your membership each year.

## How does the installments option work?

When you sign up or renew, you will have the option to select quarterly installment payments on the payment page. In selecting this option, you will be charged 25% of your dues immediately, and then another 25% every three months for a year. In selecting this option, you authorize AFSA to charge your credit card every three months for your quarterly dues payment until you request that payments stop.

## What are the dues rates for active-duty and alumni Foreign Service members?

The annual and quarterly dues rates can be found by clicking here (/afsa-membership-dues-charts).

## I left the Foreign Service before becoming pension-eligible. Can I still join AFSA?

Absolutely! Such individuals are welcome to join AFSA as non-annuitant alumni members (/retired-membership).

# What do I need to know about associate membership?

We welcome anyone with an interest in the Foreign Service or diplomacy to join AFSA as an associate member. Note that as per the AFSA bylaws (/bylaws), article III section 3, all applications for associate membership must be approved by the membership committee. All those applying for AFSA associate membership will be asked to provide a statement of interest (no more than 200 words) about why they wish to join the association. Click here to learn more about associate membership (/associate-membership).

# I paid for an annual membership but am retiring or have decided to cancel my membership before the end of that 12-month period. Do I get a refund of membership dues for the remaining time?

AFSA only provides refunds in case of an error on our part or if ia member requests a refund of an annual payment within 2 weeks of the payment date. If you are anticipating a change to your employment status, we recommend selecting the quarterly installment option as that provides more flexibility. Note that there is not a refund option if you are paying via installments.

# I signed up online, but how can I be sure my membership is active?

You can check your membership status by logging in to the AFSA website and navigating to your My Account page. There you will see you membership status. Alternatively, email us at member@afsa.org (mailto:member@afsa.org).

# How do I log in to the web site?

Click here to log in (https://ams.afsa.org/eweb). AFSA members do not need to create a new account or register, all members have existing accounts. To log in, use your primary email address (*where you receive AFSA email correspondence*) as your username. Please use the Forgot Password feature to re-set your password if needed.

# Are AFSA membership dues tax-deductible?

AFSA membership dues are tax-deductible as a business expense for active-duty employees, subject to the usual 2-percent threshold of Adjusted Gross Income for itemized deductions.

# How does AFSA safeguard my personal information?

AFSA stores member information in a highly secure, third-party customer relationship management (CRM) system. AFSA has a very strict policy of never selling, sharing, or giving out member information.

# Why did my membership lapse?

Members who pay their dues annually via check or credit card and do not renew within 30 days of their expiration date are considered a **lapsed** member. This may have happened if you missed an invoice. Please make sure your address and email are updated on your account. It's easy to re-join online and if you haven't already consider opting in for auto-renewal so you don't have to worry about missing an invoice.

# As a new member, when should I begin receiving benefits?

5/5/25, 7:18 AM                                    FAQs

Case 1:25-cv-01030-PLF     Document 28     Filed 05/05/25     Page 9 of 12
USCA Case #25-5184     Document #2134122     Filed: 09/08/2025     Page 239 of 302

If you joined with your incoming class during orientation, then all your AFSA member benefits begin immediately. You will regularly receive AFSA emails including our daily media digest, invitations to events, advocacy updates, and notices from the AFSA President. You will also receive *The Foreign Service Journal (fsj)* on or around the first week of the month. You can contact AFSA's Office of the General Counsel with any questions or guidance. (Please note, if you joined AFSA after your orientation period, there is a 6-month waiting period to access OGC legal guidance (/afsa-labor-management-explanation-services-and-scope-representation)

## I'm part of a tandem couple; do both of us need to pay membership dues?

Yes. In order to ensure that we can provide you with top legal guidance, personal assistance with travel vouchers, medical clearances and disciplinary actions, we rely on the full support of all members. Additionally, AFSA advocates for all its members collectively on assignments, promotions, travel regulations and other conditions of employment. Membership dues are collected to ensure that we can provide the services you expect, in the event that you need us.

## Can I purchase a lifetime membership?

The lifetime membership option was suspended in 2011 and is not currently available.

## How do I find out my membership number?

Your membership number can be found on the mailing label of *The Foreign Service Journal*, above your name. Alternatively, you will find it on the My Account page when you log into your account on the AFSA website.

## How do I update my mailing address?

You can update your mailing address by logging into your account on the AFSA website. On your My Account page you will see the option to update your address. Alternatively, you can complete our online Address Change request form (/address-change).

## Why does AFSA prefer to use DPO/FPO/APO addresses for overseas mailing?

In 2023, AFSA negotiated with the Department of State to reduce the amount of paper sent through the diplomatic pouch. As such, we encourage members to provide us with their DPO, APO or FPO address when serving abroad.

## Why does AFSA prefer residential addresses as opposed to internal agency addresses for those working domestically?

The Department of Labor requires that we use the last known home address when mailing ballots and election-related material to members during our biennial AFSA Governing Board elections.

## How do I cancel my AFSA membership?

We hate to see you go, but we make it easy. To cancel your membership, please send an email to us at member@afsa.org (mailto:member@afsa.org). If you are an active-duty member of the Foreign Service at FCS, FAS, APHIS, or USAGM and are paying via payroll deduction, you will have to fill out the required form SF1188 so that we can submit it to your agency. This process may take up to two pay periods to be completed at your agency.

## I haven't received *The Foreign Service Journal* for months. Where is it?

If you notice that the *Journal* is not being delivered, then that usually means we do not know where you are. Please update your address (/address-change) every time you move, no matter how brief the move may be.

## Can I discontinue delivery of the physical copy of the *FSJ* if I prefer to read it online?

Yes. To cancel your print subscription, please send an email to journal@afsa.org (mailto:journal@afsa.org).

## In This Section

➡ **ACTIVE DUTY MEMBERSHIP**

➡ **ALUMNI/RETIREE MEMBERSHIP**

➡ **ASSOCIATE MEMBERSHIP**

➡ **RENEW YOUR MEMBERSHIP**

➡ **BENEFITS OF MEMBERSHIP**

➡ **ALUMNI/RETIREMENT RESOURCES**

➡ **RETIREMENT NEWSLETTER**

➡ **AFSA POST REPRESENTATIVES**

➡ **YOUR ELECTED REPRESENTATIVES**

➡ **ELECTIONS**

➡ **LABOR-MANAGEMENT GUIDANCE FROM OGC**

JA238



**PET ISSUES**

**CHANGE YOUR ADDRESS**

**INSURANCE INFORMATION**

**FAQS**

**CONTACT US**

(/)

**2101 E Street NW**

**Washington, DC 20037**

Phone: (202) 338-4045

Fax: (202) 338-6820

## Contact Us (/contact-us)

**Members (/membership)**

**Publications (/publications)**

**Outreach (/outreach)**

**Students (/students)**

**Resources (/resources)**

JA239

5/5/25, 7:18 AM FAQs

Case 1:25-cv-01030-PLF    Document 28    Filed 05/05/25    Page 12 of 12
USCA Case #25-5184    Document #2134122    Filed: 09/09/2025    Page 242 of 302



**Awards & Honors (/awards-and-honors)**

**Policy (/policy)**

**About AFSA (/about-afsa)**

**Follow Us**

Stay up to date with the latest news

And information on our social accounts

(https://facebook.com/afsapage)

(https://www.instagram.com/afsagram/)

(https://www.lin
foreiç

© 2023 by American Foreign Service Association. All Rights Reserved. **Privacy Policy
(/sites/default/files/afsa_privacy_statement_and_conditions_of_use.pdf)**

JA240

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| _____ ) | | |
| AMERICAN FOREIGN SERVICE ) | | |
| ASSOCIATION, ) | | |
| ) | | |
| *Plaintiff*, ) | Civil Action No. 25-cv-1030-PLF | |
| ) | | |
| v. ) | | |
| ) | | |
| DONALD TRUMP, et al., ) | | |
| ) | | |
| *Defendants*. ) | | |
| _____ ) | | |

**SUPPLEMENTAL DECLARATION OF THOMAS YAZDGERDI**

I, Thomas Yazdgerdi, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I am currently serving as the President of the American Foreign Service Association ("AFSA"). I am also a member of the Senior Foreign Service at the Department of State.

2. On April 22, 2025, I received an email from Deputy Secretary of State Christopher Landau, which described a "reorganization" of the Department of State that "Secretary Rubio announced this morning." A true and correct copy of this email is attached as Exhibit 1 to this Declaration.

3. The email described in Paragraph 2 contained a link to an "internal site to provide ongoing updates and guidance" on the reorganization and stated that the internal website "contains the Department's new organizational chart, an initial set of FAQs, and a fact-sheet on the reorganization." On April 28, 2025, I clicked on that link, visited the internal website on the reorganization, and downloaded documents posted on the internal website. A true and correct copy of the "State Department Reorganization Fact Sheet," dated April 22, 2025, that I downloaded is

1

attached as Exhibit 2 to this Declaration. A true and correct copy of the "Department

Reorganization FAQs (as of April 22, 2025)" that I downloaded is attached as Exhibit 3 to this

Declaration. A true and correct copy of the "New Org Chart" that I downloaded is attached as

Exhibit 4 to this Declaration.


Executed on April 29, 2025


_____

Thomas Yazdgerdi

2

# EXHIBIT
# 1

**From:** Thomas Yazderdi <yazdgerditk@state.gov>
**Sent:** Monday, April 28, 2025 3:48 PM
**To:** Thomas Yazgderdi
**Subject:** [EXTERNAL]Fw: The State Department Reorganization

_____
           |
                       |        _____

[American Foreign Service Association](#)



**From:** Deputy Secretary Landau (D)
**Sent:** Tuesday, April 22, 2025 10:15 AM
**Subject:** The State Department Reorganization

FROM THE DESK OF:



Dear Colleagues,

As Secretary Rubio announced this morning, the Department of State is undertaking a reorganization to better align our people and capabilities with our core diplomatic mission. I write to you now to provide a brief overview of the thinking underlying these changes—which, as you will see, bear scant resemblance to some recently (and inaccurately) reported proposals.

Every day, our Department is tasked with supporting the President and the Secretary in establishing, implementing, and communicating American foreign policy. We promote and defend our people and our national interests around the world.

Steady bureaucratic accretion and ossification under Administrations of both parties has distracted our Department from its core mission, consequently undermining our effectiveness and relevance. As a

recent Ambassador, I observed firsthand how the feedback loop between our headquarters in Washington and our foreign missions has degenerated. Over the course of the last few decades, we've allowed our organizational chart to fracture into a dizzying and often arbitrary constellation of boxes, many of which reflect the policy priorities of bygone Administrations, and we've fallen into a morass of complex reporting structures, overlapping functions, unnecessary and oppressive paper, turgid clearance procedures, and antiquated processes and policies.

No longer. The reorganization announced today will streamline Department reporting lines, optimize our workforce, and drive efficiencies in our operations. Secretary Rubio is committed to restoring our Department to its roots: results-driven diplomacy, powered primarily by our overseas posts and the regional bureaus in Washington. Returning to our traditional focus on particular regions and countries, both at our headquarters in Washington and at our foreign missions, will ensure that our foreign policy priorities are aligned with, and driven by, the President and his agenda.

Implementation will be led by an internal working group that will report to the Deputy Secretary for Management and Resources (D-MR). Until D-MR is confirmed, the working group will be organized by Acting Under Secretary Jose Cunningham (M), with leadership from D-MR staff, support from C staff, and messaging leadership from D. Between now and July 1, M and the task force will work with each of the Under Secretaries to develop thoughtful plans to implement these changes within each bureau and family.

We remain committed to carrying out this process in a smooth, timely, and straightforward manner to allow us to get about our work of serving the American people. To that end, we have created a dedicated internal site to provide ongoing updates and guidance. As of today, that site (accessible HERE) contains the Department's new organizational chart, an initial set of FAQs, and a fact-sheet on the reorganization. As the various Under Secretaries develop their bureaus' plans, we will share additional information about how this realignment will affect individual offices, functions, and employees.

For now, let me emphasize a few key points:

First, while this reorganization will streamline the Department's reporting lines and workforce, it will not result in any changes to the Department's ongoing programming. As the Secretary underscored following the conclusion of the recent full-scope programming review, the Department will continue, as necessary and consistent with relevant authorities, to align its activities and programs with the foreign policy priorities of the President and the Secretary.

Second, the reorganization announced today focuses only on the Department's domestic offices and will not affect any overseas embassies, posts, or operations. Our colleagues around the world will continue their work in the normal course, and we will continue to support them and ensure that they remain safe and supported from Washington. Indeed, one of the main objectives of this reorganization is to promote closer communication and alignment between our Washington headquarters and our missions around the world.

Third, while the Department is announcing its new structure, no offices are being reorganized today and no employment actions are occurring today. Rather, as noted, leadership will work to faithfully implement these changes by July 1. We welcome your feedback as we develop plans in the coming weeks. To that end, we've opened up a comment portal (available HERE), and encourage employees to share their ideas and suggestions.

Finally, as the Secretary has explained, one of the more significant long-term changes to the Department will be the realignment of the functions currently under the Under Secretary for Civilian Security, Democracy, and Human Rights (J) to the Office of Foreign Assistance and Humanitarian Affairs (F). None of the bureaus or offices in J are expected to experience any immediate change.

I'd like to thank you all in advance for your hard work and commitment to executing this reorganization, consistent with the Secretary's vision for our Department. I look forward to working with all of you to deliver a more efficient and effective State Department for our fellow Americans.

Sincerely yours,

Deputy Secretary of State (D)
United States of America

# EXHIBIT
# 2

**STATE DEPARTMENT REORGANIZATION FACT SHEET**
April 22, 2025

President Trump and Secretary Rubio are focused on realigning U.S. foreign policy to reflect America's core national interests and deliver better results for Americans.  Over the past several decades, the Department's unchecked growth has created a proliferation of bureaus and offices with unclear or overlapping mandates, as well as blurred reporting lines.  The Department does not speak with one voice, responsibility for policy implementation is divided and unaccountable, transparency is diminished, and, most importantly, outcomes for Americans are not optimized.

Secretary Rubio is committed to leading] a State Department that puts America First and that empowers the Department from the ground up, from bureaus to embassies.

The new organization chart (linked HERE) will allow the Department to better set and communicate the direction of American foreign policy.  It will consolidate Department reporting lines, drive efficiencies in our operations, strengthen our workforce, and produce better outcomes for Americans both domestically and abroad.

To achieve this proposed structure and operational efficiency, the Under Secretaries have been charged with creating implementation plans that will be reviewed and approved by Department leadership.

As part of the plan, the Under Secretaries will also submit a path to reducing staff in domestic offices by 15 percent, consistent with the President's Workforce Optimization Initiative.

Consistent with all statutory obligations, some of the major components of the proposed reorganization plan include:

- <u>Overall toplines</u>: The Department will be consolidated from 734 bureaus / offices to 602, in addition to transitioning 137 offices to another location within the Department to increase efficiency.
- <u>Political Affairs (P)</u>: The reorganization will empower regional bureaus under P. These bureaus, along with our embassies, are the tip of the spear in our diplomatic efforts. Moving forward, the regional bureaus will absorb a number of functional issues to increase the authority, responsibility, and accountability of regional bureau heads, allowing them to seamlessly align policy with non-security foreign assistance and to provide leadership within the Department.
  - o Each of the regional bureaus will create an Office of Assistance that coordinates aid for the bureau.  Some bureaus (e.g, EUR and NEA) already have such offices and so will not need to create something entirely new.
- <u>Arms Control and International Security (T)</u>: Security assistance, which has unique functions and authorities, will be consolidated in the T family so it can be managed comprehensively.
  - o To better align with this remit, the Bureau of International Narcotics and Law Enforcement Affairs (INL) and Bureau of Counter Terrorism (CT) will move into the T family.
  - o A new Bureau of Emerging Threats (ET) will consolidate various authorities and lines of effort to cohesively address 21st century threats related to cyber, AI, and space.
  - o Elements of Arms Control, Deterrence, and Stability (ADS) will be merged with the Bureau of International Security and Nonproliferation (ISN) and renamed to Bureau of Arms Control, Nonproliferation, and Stability (ANS).
- <u>Economic Growth, Energy, and Environment (E)</u>: Economic and commercial statecraft will be consolidated within the E family, absorbing functions that had previously been spread across other parts of the Department.
  - o This includes the Bureau of Cyberspace and Digital Policy (CDP), Office of the Science and Technology Adviser (S/STAS), Office of the Special Envoy for Critical and Emerging Technology (S/TECH), Bureau

2

of Global Health Security and Diplomacy (GHSD), Office of Sanctions Coordination (S/SC), and Special Presidential Coordinator for the Partnership for Global Infrastructure and Investment (S/PGII).

- o The Bureau of Energy Resources (ENR) will also fold into the Economic and Business Affairs to ensure a laser-like focus on expanding and exporting American energy.

- Public Diplomacy (R): The R family will continue to serve as lead policymaker for the Department's overall public outreach and Department press strategies, as well as countering censorship globally.

  - o The Office of Global Partnerships (E/GP) will move from the E-family.

- Management (M): The M family will continue to lead on issues related to the Department's budget, personnel, and physical assets, as well as its security and technology efforts.

  - o All hiring authorities will be consolidated in Bureau of Global Talent Management (GTM), which will be renamed as Bureau of Personnel (PER) and be inclusive of the Foreign Services Institute (FSI).

  - o Procurement authorities will be consolidated in a new Office of Global Acquisitions (M/GA) answering directly to the Under Secretary for Management.

  - o Financial management functions will be consolidated under the Bureau of the Comptroller and Global Financial Services (CGFS) and IT functions under the Bureau of Diplomatic Technology (DT).

- Foreign and Humanitarian Affairs (F): A reimagined Office of the Coordinator of Foreign and Humanitarian Affairs will coordinate Department foreign assistance, which will be administered and managed by the regional bureaus.  Many of the functions from the Office of the Under Secretary for Civilian Security, Democracy, and Human Rights (J family) bureaus will be transferred and combined within F.

  - o This will include folding the Offices of International Religious Freedom (IRF) and Special Envoy to Monitor and Combat Antisemitism (SEAS) into a Bureau of Democracy, Human Rights, and Labor (DRL).

3

- o The Office to Monitor and Combat Trafficking in Persons (TIP) will fold into the Bureau of Population, Refugees, and Migration (PRM).
- o The Office of Global Criminal Justice (GCJ) and Conflict and Stabilization Operations (CSO) will be sunset.
- o There will no longer be an Under Secretary for Civilian Security, Democracy, and Human Rights following the change in reporting lines.
- Executive Secretariats: Across the Department, the majority of EX offices will be consolidated at the Under Secretary level with several exceptions, e.g., INL, CA

Next steps:
- The Deputy Secretary for Management and Resources (D-MR) will lead the implementation.  Until D-MR is confirmed, the working group will be organized by Acting Undersecretary for Management Jose Cunningham, with leadership from D-MR staff and support from C staff.
- Under Secretaries will submit reorganization plans for the bureaus and offices under their responsibility. The plans will be submitted to the Office of the Deputy Secretary of State for Management and Resources (D-MR).

As part of this process, a *comment portal (linked HERE)* is available for members of the workforce to provided feedback.

# # #

4

JA251

# EXHIBIT
# 3

## Department Reorganization FAQs

### (as of April 22, 2025)

**\*Note: As needed, this FAQ will be updated with relevant information.  Please submit any questions you have to the comment portal (available HERE).\***

**Q: My office is being eliminated.  What happens to me and my colleagues?**
A: Consistent with applicable law, employees in offices being eliminated will receive Reduction-in-Force (RIF) notices within the next sixty (60) days. The specific effect of a RIF notice will depend on individual employment classifications, circumstances, seniority, and office assignment. GTM/CDA will work with employees and bureaus to facilitate new assignments as appropriate.

In general, Civil Service employees subject to RIF will be separated from the Department at the conclusion of a legally-sufficient notice period, with the exception of Senior Executive Service (SES) employees, who may be reassigned to other vacant SES positions.

Foreign Service employees subject to a RIF may be separated from federal service, or may be assigned to a different open global role within the Department. Foreign service employees who receive a RIF notice should contact their CDO for further guidance.

Generally, contract employees in offices being eliminated will receive termination notices within sixty (60) days, consistent with the contractual terms and rights in their individual agreements with the Department and third-party contractors.

The Secretary has tasked each Under Secretary with formulating specific reorganization and workforce optimization plans. Following approval of those plans by the Secretary, the Under Secretaries will communicate how these Department-wide changes will affect specific bureaus and offices that report to them.

1

JA253

**Q: My bureau is being moved to another office.  What happens to me and my colleagues?**

A: The Department will evaluate the staffing needs of the bureau on a position-by-position basis.  Decisions to realign or abolish positions may result in employees being reassigned or separated from federal service. As noted, Under Secretaries will be preparing reorganization and implementation plans for their bureau families. As those plans develop, there will be more specific guidance regarding what these changes mean for specific bureaus and employees.

**Q: Will my office physically move at this time?**

There are no immediate changes to work locations or schedules resulting from today's reorganization announcement. As bureau and family reorganization plans are developed, Under Secretaries will communicate any office or work location changes, and provide sufficient adjustment resources as required by law and Department policy.

**Q: During the reorganization, can employees in eliminated offices apply for open jobs in other bureaus?**

A: For employees affected by an upcoming RIF action, forthcoming RIF packets will contain specific and detailed information about transfer, separation, and career services rights and procedures. The following information reflects general practice under federal rules and regulations but is merely advisory and may not reflect individual circumstances.

Civil Service: When an office is eliminated as part of a reorganization, Civil Service employees affected by a reduction in force (RIF) are eligible for the Department's Career Transition Assistance Plan (CTAP).  Under CTAP, employees who meet the eligibility criteria receive priority consideration for vacancies in the Department.  To comply with CTAP procedures, the Department must post vacancies for a minimum of five business days before filling the position through reassignment or other means.  This gives eligible employees an opportunity to apply and be considered before other candidates.  After the employee's final separation date, if they have not secured another position, they may be eligible for the Interagency Career Transition Assistance Plan, or ICTAP, which provides similar priority consideration for vacancies in other federal

2

agencies. However, the CTAP and ICTAP provide limited opportunities due to the current hiring freeze.

Foreign Service: Foreign Service RIF procedures are set forth in the FAM. Foreign Service Officers may be eligible for reassignment to another open global position at the Department, depending on their individual circumstances and Department needs. Foreign Service Officers subject to a RIF should contact their CDO for further guidance.

**Q: Who is subject to Reduction in Force (RIF) procedures?  Are they different for Foreign Service and Civil Service?**
A: RIF procedures differ for Civil Service and Foreign Service employees, based on the legal authorities and policies that govern each personnel system.

Civil Service employees are subject to RIF procedures outlined in 5 CFR Part 351, which include factors such as organization, tenure group, length of service, performance ratings, and veterans' preference.  These rules determine the order of retention when positions are eliminated.  The Senior Executive Service (SES) are subject to different RIF rules (i.e., 5 U.S.C. 3595) than those that apply to General Schedule RIFs. Retention and job placement opportunities may depend on other factors, including whether an entire competitive area is being eliminated in the RIF action, and the applicability of the government-wide hiring freeze.

Foreign Service employees are subject to RIF procedures as outlined in Section 611 of the Foreign Service Act of 1980, which provides the legal authority for such actions.  The detailed procedures for implementing a RIF are specified in 3 FAM 2580 and explain the compilation of service wide retention registers by skill and grade – which include factors such as tenure groups, selection board ratings, veterans' preference and length of service. The present assignment of Foreign Service employees is not a factor for RIFs.

**Q: Will the centralization to the executive secretariat change the immediate functioning of the Department?**

3

No, this change will be communicated to the Department once a plan for centralization has been approved by Department leadership.

**Q: How will this affect transfer season?  What if my onward position is being eliminated?**
A: If a Foreign Service employee is assigned to a position that has been eliminated, they should contact their CDO for guidance.  GTM/CDA will work with employees and bureaus to facilitate new assignments.  You may have to rebid for your onward assignment depending on the reorganization plan submitted by your Under Secretary.

**Q: When will TalentMAP be updated to reflect the reorganization's changes?**
A: The Department evaluates staffing needs on an ongoing basis.  As with any bidding season, current projected vacancies may change.  Bidders are encouraged to take a close look at TalentMAP once the bid cycle opens, as their bidding preferences and strategies may be affected.  Our goal is to be transparent and to keep the workforce updated as decisions are made regarding the available positions in the Summer 2026 Cycle.

**Q: What is the status of additional voluntary retirement options?**
A: The Department of State is actively exploring voluntary retirement mechanisms and will have more information in the very near future.

**Q: What happens to overseas employees (Locally Employed Staff, Foreign Service, Civil Service, contractors) at posts during the reorganization?**
A: The reorganization announced today only affects domestic offices and personnel. No embassy, consulate or overseas post closure decisions have been made at this time. Likewise, no overseas personnel actions are being announced at this time. Operations at overseas posts should continue in the normal course.

**Q: When will I know what the new reorganization plan will be for my bureau?**
A: Once Department leadership has reviewed and approved a bureau/family plan, your Under Secretary will communicate how the reorganization will affect your bureau or office, and what your new reporting and organizational structure will look like.

4

**Q: What will happen to my benefits if I am RIFed?**
A: If you receive a RIF notice, it will include information on your benefits. All Department employees will receive all benefits and compensation to which they are entitled, and nobody will lose earned benefits as a result of this reorganization.

**Q: How much notice can I expect if I am subject to a RIF?**
A: All affected Department employees will receive a RIF notice period at least as long as the period required by law. Depending on individual circumstances, generally this means at least 60 or 90 days.

**Q: How does this impact ongoing programming?**

A: This reorganization will not result in any immediate changes to the Department's ongoing programming.  As the Secretary has made clear, following the conclusion of the recent full-scope programming review, the Department's ongoing programs will be fully supported and are expected to remain active. The Department will continue, as necessary and consistent with relevant authorities, to align its activities and programs to the foreign policy priorities of the President and Secretary.

**Q: How does this reorganization affect the J Family?**

As the Secretary has announced, the bureaus currently under the Under Secretary for Civilian Security, Democracy, and Human Rights (J) will be realigned to the Office of Foreign Assistance and Human Rights (F), transferred elsewhere within the Department, or abolished consistent with applicable law.

As with the rest of the Department, J family bureaus and offices will not experience any immediate change. Employees in these areas remain on active duty and approved programs will remain active, ongoing, and fully supported. A detailed implementation plan will be developed by July 1 to integrate or restructure functions currently within the J family.  No other organizational or reporting changes have been made at this time.

**Q: How does this reorganization relate to the USAID Integration?**

5

This Departmental reorganization is separate from the ongoing efforts to integrate certain USAID foreign assistance programs and functions to the Department. The existing USAID Transition Working Group, led by Ambassador Howard VanVranken, will continue to lead the Department's efforts to assume responsibility for USAID's ongoing foreign assistance programming by July 1. Today's announcements do not change the USAID integration plan or timeline.

While implemented separately, these two distinct reorganization efforts are highly complementary, and the Secretary and Department leadership continue to carefully consider the integration of former USAID programs and functions in developing and implementing the Department's reorganization plan.

**\*Note: As needed, this FAQ will be updated with relevant information.  Please submit any questions you have to the comment portal (available HERE).\***

6

# EXHIBIT
# 4



**NEW ORG CHART**

Secretary of State (S) and Administrator for USAID

Counselor (C)

Chief of Staff (COS)

United States Mission to the United Nations

Deputy Secretary of State (D)

Deputy Secretary of State (D-MR)

Executive Secretariat (S/ES)
Executive Secretary

Under Secretary for Political Affairs (P)

- African Affairs (AF) Assistant Secretary
- East Asian and Pacific Affairs (EAP) Assistant Secretary
- European and Eurasian Affairs (EUR) Assistant Secretary
- Near Eastern Affairs (NEA) Assistant Secretary
- South and Central Asian Affairs (SCA) Assistant Secretary
- Western Hemisphere Affairs (WHA) Assistant Secretary
- International Organizations (IO) Assistant Secretary

Under Secretary for Economic Growth, Energy, and Environment (E)

- Economic & Business Affairs (EB) Assistant Secretary
- Oceans, Environment, and Int'l Scientific Affairs (OES) Assistant Secretary
- Global Health Security and Diplomacy (GHSD) Ambassador-At-Large
- Cyberspace and Digital Policy (CDP) Ambassador-At-Large
- Office of the Chief Economist (OCE)
- Office of Global Food Security (GFS) Director

Under Secretary for Arms Control and International Security (T)

- Arms Control, Nonproliferation and Stability (ANS) Assistant Secretary
- International Narcotics and Law Enforcement (INL) Assistant Secretary
- Political-Military Affairs (PM) Assistant Secretary
- Counterterrorism (CT) Ambassador-At-Large*
- Emerging Threats (ET) Assistant Secretary

Under Secretary for Public Diplomacy and Public Affairs (R)

- Educational and Cultural Affairs (ECA) Assistant Secretary
- Global Public Affairs (GPA) Assistant Secretary

Under Secretary for Management (M)

- Administration (A) Assistant Secretary
- Budget and Planning (BP) Director
- Comptroller, Global Financial Services (CGFS) Comptroller
- Consular Affairs (CA) Assistant Secretary
- Diplomatic Security (DS) Assistant Secretary*
- Office of Foreign Missions (OFM) Director

- Office of Global Acquisition (GA) Procurement Exec
- Global Talent Management (GTM) Director General of Foreign Service & Director of Global Talent
- Diplomatic Technology (DT) Chief Information Officer*
- Office of Management Strategy and Solutions (M/SS) Director
- Medical Services (MED) Director
- Overseas Buildings Operations (OBO) Director

Office of the Coord. for Foreign Assistance and Humanitarian Affairs (F)

- Democracy, Human Rights, and Religious Freedom (DRL) Assistant Secretary
- Population, Refugees, and Migration (PRM) Assistant Secretary

Office of Civil Rights and Ombudsman (S/OCR) Director

Intelligence and Research (INR) Assistant Secretary

Office of Inspector General (OIG) Inspector General

Legislative Affairs (H) Assistant Secretary

Office of the Legal Adviser (L) Legal Advisor

Office of Policy Planning (S/P) Director

Office of the Chief of Protocol (S/CPR) Ambassador

Special Envoys and Special Representatives

Office of the Spokesperson (S/SPOX)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION,<br><br>        Plaintiff,<br><br>    v.<br><br>DONALD J. TRUMP, et al.,<br><br>        Defendants. | Civil Action No. 25-1030 (PLF) |

<u>ORDER</u>

For the reasons set forth in the Opinion issued this same day, it is hereby

ORDERED that Plaintiff American Foreign Service Association's Motion for a Preliminary Injunction [Dkt. No. 10] is GRANTED; it is

FURTHER ORDERED that Section 3 of the Executive Order entitled <u>Exclusions from Federal Labor-Management Relations Programs</u>, Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order"), is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDERED that the Office of Personnel Management's <u>Guidance on Executive Order Exclusions from Federal Labor-Management Programs</u> (Mar. 27, 2025) ("OPM Guidance") is unlawful as applied to the Defendants who are heads of agencies with employees represented by the Plaintiff; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing Section 3 of the Executive Order; it is

FURTHER ORDERED that all Defendants, with the exception of President Trump, are enjoined from implementing the OPM Guidance as applied to Plaintiff; and it is

FURTHER ORDERED that the parties shall meet and confer and file a joint status report on or before May 20, 2025, proposing a schedule for how this case should proceed.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE: 5|14|25

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
                                                    )
AMERICAN FOREIGN SERVICE                            )
ASSOCIATION,                                        )
                                                    )
            Plaintiff,                              )
                                                    )
      v.                                            )        Civil Action No. 25-1030 (PLF)
                                                    )
DONALD J. TRUMP et al.,                             )
                                                    )
            Defendants.                             )
_____)


OPINION

      This matter is before the Court on plaintiff American Foreign Service

Association's ("AFSA") Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 10]. On

March 27, 2025, the President issued an executive order that removed various agencies and

agency subdivisions from coverage of the Foreign Service Labor-Management Relations Statute

and Federal Service Labor-Management Relations Statute. Both statutes – which protect federal

employees' rights to "organize, bargain collectively, and participate through labor organizations

of their own choosing," 22 U.S.C. § 4101(1); 5 U.S.C. § 7101(a)(1) – provide nearly identically

worded provisions that permit the President to exclude components of the federal government

from coverage of the statutes. To invoke these exclusionary provisions, the President must

determine that "the subdivision has as a primary function intelligence, counterintelligence,

investigative, or national security work," and that the statutes' provisions "cannot be applied to

that subdivision in a manner consistent with national security requirements and considerations."

22 U.S.C. § 4103(b); <u>see</u> 5 U.S.C. § 7103(b)(1) (same except refers to "any agency or

subdivision"). The effect of the Executive Order was substantial: it removed collective

bargaining rights from approximately two-thirds of the federal workforce.

On April 25, 2025, in a related case, the Court issued a preliminary injunction

enjoining implementation of Section 2 of the Executive Order, which excluded numerous

agencies and subdivisions from the Federal Service Labor-Management Relations Statute. See

Nat'l Treasury Emps. Union v. Trump, Civil Action No. 25-0935 (PLF), 2025 WL 1201696

(D.D.C. Apr. 25, 2025) (Order); Nat'l Treasury Emps. Union v. Trump, Civil Action

No. 25-0935 (PLF), 2025 WL 1218044 (D.D.C. Apr. 28, 2025) (Opinion).

In the instant case, AFSA, a federal labor union, challenges Section 3 of the

Executive Order, which excludes subdivisions of the Department of State and United States

Agency for International Development from coverage of the Foreign Service Labor-Management

Relations Statute. The Court held oral argument on the motion on May 5, 2025. Upon careful

consideration of the parties' written submissions, arguments made at the oral argument, and the

relevant authorities, the Court grants AFSA's motion for a preliminary injunction.[1]

---

[1]    The papers reviewed by the Court in connection with this matter include:
Complaint for Declaratory and Injunctive Relief ("Compl.") [Dkt. No. 1]; Plaintiff American
Foreign Service Association's Motion for a Preliminary Injunction ("Pl.'s Mot.") [Dkt. No. 10];
Memorandum of Points and Authorities Supporting Plaintiff American Foreign Service
Association's Motion for Preliminary Injunction ("Pl.'s Mem.") [Dkt. No. 10-1]; Defendants'
Opposition to Plaintiff's Motion for Preliminary Injunction ("Opp.") [Dkt. No. 23]; Reply Brief
in Support of Plaintiff American Foreign Service Association's Motion for Preliminary
Injunction ("Pl.'s Reply") [Dkt. No. 25]; Declaration of Thomas Yazdgerdi ("Yazdgerdi Decl.")
[Dkt. No. 10-2]; Declaration of Tina Wong ("Wong Decl.") [Dkt. No. 10-3]; Declaration of
Randall Chester ("Chester Decl.") [Dkt. No. 10-4]; Declaration of Asgeir Sigfusson ("Sigfusson
Decl.") [Dkt. No. 10-5]; Declaration of Neera Parikh ("Parikh Decl.") [Dkt. No. 10-6];
Declaration of Sharon Papp ("Papp Decl.") [Dkt. No. 10-7]; and Supplemental Declaration of
Thomas Yazdgerdi ("Yazdgerdi Supp. Decl.") [Dkt. No. 31].

I.  BACKGROUND

*A.  Statutory Background*

The Foreign Service Labor-Management Relations Statute (the "Statute"), 22

U.S.C. §§ 4101-4140, set forth in Chapter 10 of Title 1 of the Foreign Service Act of 1980,

provides certain protections of the "right of workers to organize, bargain collectively, and

participate through labor organizations of their own choosing in decisions which affect

them . . . ."  22 U.S.C. § 4101(1).  In passing the statute, Congress found that based on

"experience in both private and public employment," the protections were necessary to

"safeguard[] the public interest," "contribute[] to the effective conduct of public business," and

"facilitate[] and encourage[] the amicable settlement of disputes between workers and their

employers involving conditions of employment."  Id.  In sum, Congress found that "labor

organizations and collective bargaining in the Service are in the public interest and are consistent

with the requirement of an effective and efficient Government."  22 U.S.C. § 4101.  The

protections of the Statute apply "only with respect to the Department of State, the Broadcasting

Board of Governors, the Agency for International Development, the Department of Agriculture,

and the Department of Commerce."  22 U.S.C. § 4103(a).

Among other things, the Statute protects employees right "to engage in collective

bargaining with respect to conditions of employment through representatives chosen by

employees under this subchapter."  22 U.S.C. § 4104(b)(2).  The statute provides a role for

"labor organizations" in this collective bargaining process, stating:

> A labor organization which has been accorded exclusive recognition
> is the exclusive representative of, and is entitled to act for, and
> negotiate collective bargaining agreements covering, all employees
> in the unit described in section 4112 of this title.  An exclusive
> representative is responsible for representing the interests of all

employees in that unit without discrimination and without regard to labor organization membership.

22 U.S.C. § 4113(a).

Despite extending collective bargaining rights broadly to employees of the foreign service, Congress granted the President the authority to "exclude any subdivision of the Department from coverage" of the Statute.  See 22 U.S.C. § 4103(b).[2]  Section 4103(b) provides:

> The President may by Executive order exclude any subdivision of the Department from coverage under this subchapter if the President determines that –
>
> > (1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and
> >
> > (2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

22 U.S.C. § 4103(b).  The exclusion in Section 4103(b) has never been invoked.  Compl. ¶ 34.

The exclusionary provision in Section 4103(b) is nearly identical to the exclusionary provision contained in Federal Service Labor-Management Relations Statute ("FSLMRS"), 5 U.S.C. §§ 7101-35, which, inter alia, protects collective bargaining rights for federal employees outside of the foreign service.  In that statute, the exclusion states:

> (1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that –
>
> > (A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

---

[2]        The term "Department" means the "Department of State, except that with reference to the exercise of functions under this chapter with respect to another agency authorized by law to utilize the Foreign Service personnel system . . . ."  22 U.S.C. § 3902(4); see Pl.'s Mem. at 23 n.19; Opp. at 5 n.1.

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

5 U.S.C. § 7103(b)(1); <u>see</u> Opp. at 24 ("The type of determination to be made under section 4103(b) is similar to that in 5 U.S.C. § 7103(b)(1) . . . .").

Indeed, the statutory text and structure of the Statute at issue in this case and the FSLMRS are similar in many material respects.  <u>See</u> <u>Am. Foreign Serv. Ass'n v. Trump</u>, Civil Action No. 25-0352 (CJN), 2025 WL 573762, at *8 (D.D.C. Feb. 21, 2025) ("[T]he Foreign Service Act of 1980 (FSA) was passed as a 'companion measure' to the [Civil Service Reform Act] . . . .") (quoting <u>U.S. Info. Agency v. Krc</u>, 989 F.2d 1211, 1217 (D.C. Cir. 1993)).  Both the Statute and the FSLMRS protect the rights of federal employees to collectively bargain. <u>Compare</u> 22 U.S.C. § 4101(1) <u>with</u> 5 U.S.C. § 7101(a)(1).  The statutes provide the President a provision to make exclusions to the coverage of the statutes.  <u>Compare</u> 22 U.S.C. § 4103(b) <u>with</u> 5 U.S.C. § 7103(b)(1).  And both statutes reflect the same Congressional intent of extending the protections of collective bargaining broadly because "labor organizations and collective bargaining . . . are in the public interest."  22 U.S.C. § 4101; 5 U.S.C. § 7101(a).

### B.  Factual Background

#### 1.  The Executive Order

On March 27, 2025, President Trump issued an executive order titled "Exclusions from Federal Labor-Management Relations Programs."  Exec. Order No. 14251, 90 Fed. Reg. 14553 (Mar. 27, 2025) ("Executive Order").  Section 3 of the Executive Order amends a previous executive order – Executive Order 12171 of November 19, 1979 – which had excluded various agencies and subdivisions from the FSLMRS pursuant to Section 7103(b).  <u>See</u> Exec. Order No. 12171, 44 Fed. Reg. 66565, 66565 (Nov. 19, 1979).  The March 27, 2025 Executive

Order states that "[t]he agency subdivisions set forth in section 3 of this order are hereby determined to have as a primary function intelligence, counterintelligence, investigative, or national security work," and that it has been "determined that Subchapter X of Chapter 52 of title 22, United States Code, cannot be applied to these subdivisions in a manner consistent with national security requirements and considerations."  Executive Order § 1(b).

As is relevant to AFSA, the Executive Order excludes from the Statute "agency subdivisions" of the Department of State ("State Department") and the United States Agency for International Development ("USAID").  Executive Order §§ 1(b), 3.  According to AFSA, the Executive Order "remove[s] all State [Department] and USAID Foreign Service members from the [Statute]'s coverage," Pl.'s Mem. at 1-2, which constitutes ninety-seven percent "of the Foreign Service members in the bargaining unit represented by AFSA."  Id. at 29.

A "Fact Sheet" was issued by the White House the same day that the Executive Order was issued.  See Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements (Mar. 27, 2025), https://www.whitehouse.gov/fact-sheets/2025/03/fact-sheet-president-donald-j-trump-exempts-agencies-with-national-security-missions-from-federal-collective-bargaining-requirements/ [https://perma.cc/Y7HR-4W3H] ("Fact Sheet").  The Fact Sheet is divided into three parts.  First, it lists eight "national security missions" – "National Defense," "Border Security," "Foreign Relations," "Energy Security," "Pandemic Preparedness, Prevention, and Response," "Cybersecurity," "Economic Defense," and "Public Safety" – and provides descriptions of each of these missions.  See Fact Sheet.  Second, in a section titled "Ensuring that Agencies Operate Effectively," the Fact Sheet explains that the Civil Service Reform Act "enables hostile Federal unions to obstruct agency management," and that this "is dangerous in agencies with national

security responsibilities." See id. Finally, in a section titled "Safeguarding American Interests," the Fact Sheet explains:

> President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.
>
> - Certain Federal unions have declared war on President Trump's agenda.
>
>   - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
>
>   - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration –an average of over one a day.
>
> - Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.
>
> - President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

Fact Sheet at 3.

On the same day, the Office of Personnel Management ("OPM") issued a memorandum titled "Guidance on Executive Order Exclusives from Federal Labor-Management Programs." See Charles Ezell, Guidance on Executive Order Exclusions from Federal Labor-Management Programs, OPM, Mar. 27, 2025, https://www.opm.gov/policy-data-oversight/latest-memos/guidance-on-executive-order-exclusions-from-federal-labor-management-programs.pdf [https://perma.cc/QH4A-MQ9F] ("OPM Guidance"). The OPM Guidance states that pursuant to the Executive Order, "covered agencies and subdivisions are no longer subject to the collective-

bargaining requirements" of the Statute and "are no longer required to collectively bargain with

federal unions."  OPM Guidance at 3.  The document also states that "Federal unions" "lose their

status as the 'exclusively recognized' labor organizations for employees of the agencies and

agency subdivisions covered by Exclusions" in the Executive Order.  Id. (alterations omitted)

(referencing 5 U.S.C. § 7111(a)); see 5 U.S.C. § 7111(a) ("An agency shall accord exclusive

recognition to a labor organization if the organization has been selected as the

representative . . . by a majority of the employees in an appropriate unit who cast valid ballots in

the election.").

## 2.  The Instant Litigation

On April 7, 2025, AFSA filed this lawsuit.  See Compl.  AFSA brings three

counts:  (1) Section 3 of the Executive Order is ultra vires because it is "tantamount to repealing

the entire statute," thereby violating separation of powers principles; (2) Section 3 of the

Executive Order is ultra vires because it was not based on the criteria in Section 4103(b); and

(3) Section 3 of the Executive Order reflects retaliation against AFSA in violation of its First

Amendment rights.  See Compl. ¶¶ 40-64.[3]  AFSA seeks, inter alia, an injunction enjoining all

the defendants – excluding the President – from "implementing" Section 3 of the Executive

Order and OPM Guidance related to the Executive Order.

---

[3]        AFSA also argues that Sections 1(b) and 6 of the Executive Order are unlawful.
See Pl.'s Mem. at 1-2; see also Executive Order § 1(b) (stating that the agency subdivisions in
Section 3 of the Executive Order satisfy the criteria in 22 U.S.C. § 4103(b)); id. § 6 (providing
guidance for the "[i]mplementation" of the Executive Order).  Both sections of the Executive
Order are inextricably linked to the Court's analysis of Section 3 of Executive Order because
they raise of the same issue of whether the President's determinations related to the agency
subdivisions listed in Section 3 were ultra vires.

## II.  JURISDICTION

The government's first argument is that that the Court lacks jurisdiction over this case.  See Opp. at 15-21.  In support, the government contends that Congress created a "special statutory review scheme" in the Statute, and that such a scheme precludes this Court's review under Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994).

The Supreme Court has recognized that "[a] special statutory review scheme . . . may preclude district courts from exercising jurisdiction over challenges to federal agency action."  Axon Enter., Inc. v. FTC, 598 U.S. 175, 185 (2023) (citing Thunder Basin Coal Co. v. Reich, 510 U.S. at 207).  While Congress may create such a "statutory review scheme" explicitly, it may also do so implicitly by "specifying a different method to resolve claims about agency action," such as by providing for "review in a court of appeals following the agency's own review process."  Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., Civil Action No. 24-3354 (RDM), 2025 WL 637416, at *4 (D.D.C. Feb. 27, 2025).  To determine whether district court review is precluded, courts apply a two-step approach.  At the first step, the court determines whether Congress has "preclude[d] district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d 748, 754 (D.C. Cir. 2019).  Congress can be found to have done so "when (i) such intent is fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type Congress intended to be reviewed within [the] statutory structure."  Id. (citation and quotation marks omitted).

At the second step, courts consider whether the plaintiff's claim falls within this "alternative statutory scheme for administrative and judicial review."  Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 754.  To answer this question, courts consider three

factors:  (1) whether precluding district court jurisdiction would "foreclose all meaningful

judicial review" of the claim; (2) whether the claim is "wholly collateral to [the] statute's review

provisions"; and (3) whether the claim is "outside the agency's expertise."  Axon Enter., Inc. v.

Fed. Trade Comm'n, 598 U.S. at 186 (quoting Thunder Basin Coal Co. v. Reich, 510 U.S.

at 212-13); see Nat'l Ass'n for the Advancement of Colored People v. United States Postal Serv.,

496 F. Supp. 3d 1, 14 (D.D.C. 2020) (subsequent history omitted).  "When the answer to all three

questions is yes, '[the Court] presume[s] that Congress does not intend to limit jurisdiction.'"

Axon Enter., Inc. v. Fed. Trade Comm'n, 598 U.S. at 186 (quoting Free Enter. Fund v. Pub. Co.

Acct. Oversight Bd., 561 U.S. 477, 489 (2010)).  In the event the factors "point in different

directions," "[t]he ultimate question is how best to understand what Congress has done – whether

the statutory review scheme, though exclusive where it applies, reaches the claim in question."

Id.; see Vape Cent. Grp., LLC v. U.S. Food & Drug Admin., 2025 WL 637416, at *5 ("[I]f the

factors point in different directions . . . . courts must return to the lodestar of whether Congress

intended the type of claim at issue to be swept into the statutory enforcement scheme.") (internal

citation and quotation marks omitted).

        In the instant case, the government argues that this Court's jurisdiction is

precluded because the Statute provides a "special statutory review scheme."  See Opp. at 15-21.

Specifically, the government contends that the Statute requires AFSA to bring its claims to the

Federal Labor Relations Authority ("FLRA").  See Opp. at 8; 22 U.S.C. § 4116(a); see also Am.

Foreign Serv. Ass'n v. Baker, 895 F.2d 1460, 1461 (D.C. Cir. 1990) (outlining administrative

review scheme for allegedly unfair labor practices).[4]  The FLRA's General Counsel will then

---

        [4]    The FLRA also provides review of alleged violations of the Federal Service
Labor-Management Relations Statute.  See 22 U.S.C. § 4102(1) (defining "Authority" in the

investigate the claims and "may issue and cause to be served upon the Department . . . a complaint." 22 U.S.C. § 4116(a). The Foreign Service Labor Relations Board ("FSLRB") will conduct a hearing on the complaint, id. §§ 4116(b), (f), and can subsequently order any appropriate relief. Id. § 4116(g).[5] In the event AFSA does not obtain the relief it seeks, it can appeal a final order from FSLRB to the United States Court of Appeal for the District of Columbia Circuit. Id. § 4109(a).

The government's arguments related to jurisdiction fail because the "special statutory review scheme" it contends precludes this Court's jurisdiction is unavailable to AFSA. As the Court recently explained in rejecting a similar jurisdictional argument made in the context of the FSLMRS, "the administrative process of the FSLMRS cannot and does not govern here because the Executive Order at issue removed the agencies and subdivisions in question from coverage of the FSLMRS." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *6. The analysis is identical here: the Executive Order "exclude[s]" the agency subdivisions at issue in this case "from coverage" of the Statute, and thus the Statute's administrative review scheme cannot be used to challenge that exclusion. The administrative review scheme established by Congress was intended to remedy failures of the agency to "comply with provisions of the [Statute]." See Opp. at 8; see also id. ("An employee or a union alleging that an agency has 'refuse[d] to consult or negotiate in good faith with a labor organization, as required by [the Statute],' or that an agency has 'otherwise fail[ed] or refuse[d] to comply with any provision of [the Statute]," 22 U.S.C. § 4115(a)(5) and (a)(8), may file a charge of an unfair labor practice

_____

Statute to mean "the Federal Labor Relations Authority, describe in" Section 7104(a) of the Federal Service Labor-Management Relations Statute).

[5]    The FSLRB was created within the FLRA. See Am. Foreign Serv. Ass'n v. Baker, 895 F.2d at 1461 (citing 22 U.S.C. § 4106).

with the [FLRA].") (emphasis added).  But because the Executive Order excludes the agency

subdivisions from the Statute, AFSA cannot seek enforcement of the Statute's provisions

through the administrative review scheme established by Congress.  See Nat'l Treasury Emps.

Union v. Trump, 2025 WL 1218044, at *5-6.

Furthermore, the FSLRB – which applies FLRA precedent, see 22 U.S.C.

§ 4107(b) – likely will lack jurisdiction to review AFSA's claims as a result of the Executive

Order excluding the agency subdivisions from coverage of the Statute.  See Nat'l Treasury

Emps. Union v. Trump, 2025 WL 1218044, at *5-6.  FLRA precedents related to the analogous

exclusion provision in the FSLMRS strongly suggest that the FLRA lacks jurisdiction over a

case brought by AFSA challenging the President's invocation of Section 4103(b).  See United

States Att'ys Off. S. Dist. of Texas Houston, Texas (Respondent) & Am. Fed'n of Gov't Emps.

Loc. 3966 (Charging Party), 57 F.L.R.A. 750 (Apr. 25, 2002).  The government provides no

reason why the FSLRB's analysis of its jurisdiction in the context of Section 4103(b) would

result in a different outcome.  The cases the government relies on to support its contention that

the Court's jurisdiction is precluded therefore are inapposite because those cases involved

circumstances where the aggrieved union had "several administrative options for challenging the

executive orders . . . ."  See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump, 929 F.3d at 757

(internal quotation marks omitted); see also Am. Foreign Serv. Ass'n v. Baker, 895 F.2d at 1462

("Were we to accept AFSA's plea for immediate access to a court of first instance, we would be

establishing that court as a parallel enforcement mechanism to the [FSLRB], a result Congress

did not intend."); Am. Fed'n of Gov't Emps. v. Sec'y of Air Force, 716 F.3d 633, 637 (D.C.

Cir. 2013) ("Because the FSLMRS's remedial regime is exclusive, providing [plaintiff] with

multiple options to challenge the [policy], [plaintiff] cannot circumvent this regime by instead

bringing a suit in district court."); Widakuswara v. Lake, No. 25-5144, 2025 WL 1288817, at *3

(D.C. Cir. May 3, 2025) (concluding district court likely lacked jurisdiction over plaintiffs' APA

claims because "Congress has [ ] established comprehensive statutory schemes for adjudicating

employment disputes with the federal government"); cf. Am. Foreign Serv. Ass'n v. Trump,

Civil Action No. 25-0352 (CJN), 2025 WL 573762, at *10 (D.D.C. Feb. 21, 2025) ("Where

plaintiffs are entitled to review before the MSPB, FLRA, FSGB, or FSLRB and subsequent

judicial review, there is no reason to fear that plaintiffs' constitutional claims could wholly evade

consideration.") (emphasis in original).

At oral argument, the government referenced the D.C. Circuit's decision in

Sandpiper Residents Ass'n v. United States Dep't of Hous. & Urb. Dev., for the proposition that

the Court must "assume that [AFSA] will prevail on the merits of [its] claim" when addressing

whether the Court's jurisdiction is precluded. See Sandpiper Residents Ass'n v. United States

Dep't of Hous. & Urb. Dev., 106 F.4th 1134, 1141 (D.C. Cir. 2024); see also Transcript ("Tr.")

[Dkt. No. 34] at 30:02-16. Put differently, the government argues that the Court's jurisdiction is

precluded because under AFSA's theory, the Executive Order is invalid and thus the provisions

of the Statute – including the requirement that AFSA seek redress from the FSLRB – apply to

AFSA. This argument is unavailing for at least two reasons. First, the D.C. Circuit in Sandpiper

held that a court must "assume that Plaintiffs will prevail on the merits of their claims" "in

evaluating mootness." Sandpiper Residents Ass'n v. United States Dep't of Hous. & Urb. Dev.,

106 F.4th at 1141. The government provides no reason why Sandpiper's holding should be

applied to the issue presented in this case related to whether an administrative review scheme

precludes judicial review. Second, and more importantly, "assum[ing] that [AFSA] will prevail

on the merits of [its] claim" does not change the fact that there is no dispute between the parties

that the agency subdivisions at issue in this case <u>currently</u> are excluded from the Statute as a result of the Executive Order.  While the government contends that the Court's jurisdiction is still precluded notwithstanding the exclusion from the Statute, this contention is an issue the Court must decide irrespective of the parties' positions on the issue.

The administrative process of the Statute cannot and does not govern here because the Executive Order at issue removed the agencies and subdivisions in question from coverage of the Statute.  Because there is no "special statutory review scheme" that is actually available to AFSA for reviewing its claim, this Court is not deprived of jurisdiction.  <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *6; <u>see</u> <u>Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson</u>, 475 F.3d 341, 348 (D.C. Cir. 2007) (holding that the district court had jurisdiction because the claims brought by the plaintiff were "expressly outside of the FLRA's purview"); <u>see also</u> <u>Lamb v. Holder</u>, 82 F. Supp. 3d 416, 422-23 (D.D.C. 2015) (exercising subject matter jurisdiction over plaintiff's constitutional claims regarding termination where plaintiff was not entitled to review under the Civil Service Reform Act).

## III. PRELIMINARY INJUNCTION

### A.  *Legal Standard*

A movant seeking preliminary injunctive relief must make a "clear showing that four factors, taken together, warrant relief:  likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest."  <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d 314, 321 (D.C. Cir. 2018) (quoting <u>League of Women Voters v. Newby</u>, 838 F.3d 1, 6 (D.C. Cir. 2016)); <u>see also</u> <u>Sherley v. Sebelius</u>, 644 F.3d 388, 392 (D.C. Cir. 2011) (noting that a preliminary injunction "may only be awarded upon a clear showing that the plaintiff is entitled to

such relief" (quoting <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 22 (2008))). Of these, the most important factor is whether a movant has established a likelihood of success on the merits. <u>See</u> <u>Aamer v. Obama</u>, 742 F.3d 1023, 1038 (D.C. Cir. 2014); <u>Bailey v. Fed. Bureau of Prisons</u>, Civil Action No. 24-1219 (PLF), 2024 WL 3219207, at *3 (D.D.C. June 28, 2024)

   Before the Supreme Court's decision in <u>Winter</u>, courts in this Circuit weighed these four factors on a "sliding scale," under which the movant need not "make as strong a showing" on one factor if they "make[ ] an unusually strong showing" on another. <u>Davis v. Pension Benefit Guar. Corp.</u>, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (quoting <u>Davenport v. Int'l Bhd. of Teamsters</u>, 166 F.3d 356, 361 (D.C. Cir. 1999)); <u>accord</u> <u>Damus v. Nielsen</u>, 313 F. Supp. 3d 317, 326 (D.D.C. 2018). This Circuit has suggested, however, that "a likelihood of success" and "a likelihood of irreparable harm" are "independent, free-standing requirement[s] for a preliminary injunction." <u>Sherley v. Sebelius</u>, 644 F.3d at 392-93 (quoting <u>Davis v. Pension Benefit Guar. Corp.</u>, 571 F.3d at 1296 (Kavanaugh, J., concurring)); <u>see</u> <u>Archdiocese of Washington v. Wash. Metro. Area Transit Auth.</u>, 897 F.3d at 334 (declining to resolve whether the "sliding scale" approach is still valid after <u>Winter</u>); <u>Nat'l Treasury Emps. Union v. Vought</u>, Civil Action No. 25-0381 (ABJ), 2025 WL 942772, at *19 (D.D.C. Mar. 28, 2025). Regardless, "a failure to show a likelihood of success on the merits alone is sufficient to defeat a preliminary-injunction motion." <u>Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs</u>, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (citing <u>Ark. Dairy Coop. Ass'n v. U.S. Dep't of Agric.</u>, 573 F.3d 815, 832 (D.C. Cir. 2009)); <u>see also</u> <u>M.G.U. v. Nielsen</u>, 325 F. Supp. 3d 111, 117-18 (D.D.C. 2018).

   For each of its claims, AFSA bears the burden of persuasion. <u>Chaplaincy of Full Gospel Churches v. England</u>, 454 F.3d 290, 297 (D.C. Cir. 2006). AFSA also "bears the burden

of producing credible evidence sufficient to demonstrate [its] entitlement to injunctive relief."

Workman v. Bissessar, 275 F. Supp. 3d 263, 267 (D.D.C. 2017).

### B. Likelihood of Success on the Merits

The core of the parties' dispute centers on whether the President exceeded the

authority afforded to him in the Statute when he excluded the agency subdivisions of the State

Department and USAID under Section 4103(b).  AFSA contends that the President's Executive

Order was ultra vires, arguing that the agency subdivisions listed in Section 3 of Executive Order

do not meet the criteria listed in Section 4103(b).  See Pl.'s Mem. at 23-30.  AFSA argues in part

that the sheer scope of the Executive Order alone – which as a whole removes collective

bargaining rights from approximately two-thirds of the federal workforce – negates any

possibility that the President validly invoked the narrow exception in Section 4103(b).  See Pl.'s

Reply at 10-11.  The government makes two general arguments in response.  First, the

government maintains that the Court lacks the authority to review the President's "national

security-related determinations under" Section 4103(b) or, at a minimum, that it owes significant

deference to the President's conclusion that the particular agencies and subdivisions subject to

the Executive Order are excludable from the Statute.  See Opp. at 15-25.  Second, in the event

the Court does review the President's determination, the government contends that the identified

agencies and subdivisions meet the criteria listed in Section 4103(b).  See id. at 26-36.

The Court recently analyzed the President's invocation of Section 7103(b) of

FSLMRS in the same Executive Order at issue here.  See Nat'l Treasury Emps. Union v. Trump,

2025 WL 1218044.  In that case, the Court reasoned that D.C. Circuit precedent made clear that

the validity of the President's invocation of Section 7103(b) centered around two issues:

"(1) whether the 'presumption of regularity' applies to the President's exercise of authority; and

(2) whether the President's exercise of authority was <u>ultra vires</u>."  <u>Id</u>. at *8; <u>see</u> <u>Am. Fed'n of</u>

<u>Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d 723 (D.C. Cir. 1989) (holding that "the presumption

of regularity [was] pivotal" to the issue of whether the President validly invoked

Section 7103(b)).  As to the first issue, the Court concluded that the plaintiff union had "rebutted

the presumption of regularity by presenting clear evidence that 'the President was indifferent to

the purposes and requirements of the [FSLMRS], or acted deliberately in contravention of

them.'"  <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *9 (quoting <u>Am. Fed'n of</u>

<u>Gov't Emps., AFL-CIO v. Reagan</u>, 870 F.2d at 728).  Specifically, the Court reached this

conclusion for three reasons:

> (1) the Executive Order and the Administration's surrounding
> statements are at odds with Congress's findings in the FSLMRS;
> (2) the White House Fact Sheet reflects retaliatory motive; and
> (3) the Administration's guidance related to the Executive
> Order – specifically, the OPM Guidance – suggests that the
> invocation of Section 7103(b)(1) was in furtherance of unrelated
> policy goals rather than based on the statutory criteria.

<u>Id</u>.  The Court therefore determined that it was not required to "presume that the President has

'properly discharged [his] official duties' in the absence of justification for the Executive Order"

because presumption of regularity had been rebutted.  <u>Id</u>. at *12 (quoting <u>United States v.</u>

<u>Chemical Foundation</u>, 272 U.S. 1, 14-15).

The Court next addressed the issue of whether the President exceeded his power

to exclude agencies and subdivisions from the FSLMRS pursuant to Section 7103(b)(1).  <u>See</u>

<u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *12-16.  The Court concluded that

the President's Executive Order likely was <u>ultra vires</u> because he appeared to either disregard or

apply an overly broad interpretation of two terms within the statutory text of Section 7103(b)(1):

(1) "primary function" and (2) "national security." <u>See</u> <u>id</u>.  As to "primary function," the Court

reasoned that the President disregarded the statutory term, reasoning:

> While the government never explicitly states how it interprets "primary function," its arguments related to each of the agencies and subdivisions reflect either an overly broad interpretation of the term or a disregard of the term entirely. The government's arguments related to each of the agencies and subdivisions illustrate this point by either pointing to generalized mission statements of the agencies referencing national security, or by pointing to individual functions that segments of the agencies or subdivisions perform that have a national security valence, and then concluding that the entire agencies' or subdivisions' "primary function" is national security.

<u>Id</u>. at *14.  As to the term "national security," the Court concluded that the President applied an

overly broad interpretation of the term "national security," both contrary to the Congressional

intent in passing the FSLMRS and Supreme Court precedent.  In relevant part, the Court

reasoned:

> In passing the FSLMRS, Congress clearly expressed a desire to extend collective bargaining rights broadly because it determined that those rights were "in the public interest."  5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil service are in the public interest").  Congress provided a narrow exception that allowed the President to exclude agencies and subdivisions from these protections if the provisions of the law "cannot be applied . . . in a manner consistent with national security requirements and considerations."  5 U.S.C. § 7101(b)(1)(B).  And as in <u>Cole v. Young</u>, it is "clear from the statute" that the term "national security" "comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . ."  <u>Cole v. Young</u>, 351 U.S. [536, 544 (1956)].  But President Trump instead has applied a startlingly broad application of "national security," which – directly contrary to the Supreme Court's definition in <u>Cole v. Young</u> – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare."  <u>Cole v. Young</u>, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself."  <u>Nat'l Fed'n of Fed. Emps. v. McDonald</u>, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f

> Congress intended the term to have such a broad meaning that all
> positions in the Government could be said to be affected with the
> 'national security,' the result would be that the [FSLMRS], though
> in form but an exception to the general personnel laws, could be
> utilized effectively to supersede those laws."  Cole v. Young, 351
> U.S. at 548.

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16.  In sum, the Court concluded

that the plaintiff union was likely to succeed on the merits of its claim that the Executive Order

was ultra vires.  Id.

      In the instant case, the government acknowledges that "[t]he type of

determination to be made under section 4103(b) is similar to that in 5 U.S.C. § 7103(b)(1)."

Opp. at 24.  As a result, the Court will analyze the issue of whether the Executive Order's

invocation of Section 4103(b) was ultra vires in the same way that it did in Nat'l Treasury Emps.

Union v. Trump.  The Court concludes that the President's invocation of Section 4103(b) was

ultra vires for the same reasons outline in Nat'l Treasury Emps. Union v. Trump.

### 1.  Presumption of Regularity

      Turning first to the presumption of regularity, AFSA has rebutted the presumption

by clear evidence.  As discussed above, see supra Section III.B, the Court concluded in Nat'l

Treasury Emps. Union v. Trump that the Executive Order – specifically, its unprecedented scope

that seemingly conflicts with Congress's intent – coupled with the contemporaneous statements

contained in the White House Fact Sheet and OPM Guidance reflected that the President was

either indifferent to or acted in contravention of the requirements of the FSLMRS.  See Nat'l

Treasury Emps. Union v. Trump, 2025 WL 1218044, at *9-11.  The analysis is identical here

because this case implicates the exact same Executive Order, White House Fact Sheet, and OPM

Guidance.[6]

       In addition to the reasons explained in <u>Nat'l Treasury Emps. Union v. Trump</u>,

AFSA provides further argument and evidence that demonstrates a retaliatory motive for the

Executive Order.  <u>See</u> <u>Hartman v. Moore</u>, 547 U.S. 250, 263-64 (2006) (concluding that

"prosecutor's disclosure of retaliatory thinking on his part" was significant in determining

whether the presumption of regularity should be applied).  For example, AFSA highlights the

fact that the Executive Order – despite excluding two-thirds of the federal workforce from

coverage of the statutes – does not strip collective bargaining rights from the United States

Customs and Border Protection ("CBP"), whose union "endorsed the President in last year's

election."  <u>See</u> Pl.'s Mem. at 30.  AFSA argues that "[i]f those who are guarding the border do

not have national security as a primary mission, then none of the employees excluded do," and

that therefore the President's decision to exempt CBP – which is represented by a union that

endorsed him – from the Executive Order offers further evidence of a retaliatory motive.  <u>Id.</u>

at 30-31.

---

     [6]     At oral argument, the government asserted that the White House Fact Sheet was not relevant to the Court's analysis in this case since the Fact Sheet only dealt with exclusions from the Civil Service Reform Act – <u>i.e.</u>, exclusions pursuant to Section 7103(b) of the FSLMRS – not exclusions made pursuant to Section 4103(b) of the Statute.  <u>See</u> Tr. at 33:19-34:05.  This contention directly conflicts with the government's arguments made in its opposition memorandum, where the government argued that the statements in the Fact Sheet support the President's Section 4103(b) determinations.  <u>See</u> Opp. at 36 ("The cited portion of the Fact Sheet concludes with the statement that the President 'will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.'  Section 4103(b) exists to allow the President to address such concerns.") (internal citations omitted).  Moreover, notwithstanding the explicit references to the Civil Service Reform Act, the White House Fact Sheet was published in support of the same Executive Order at issue in this case, and it reflects retaliatory motive towards federal unions broadly, not just those falling under the FSLMRS.  The Court therefore considers the White House Fact Sheet relevant to its adjudication of this case.

AFSA also argues that a recent implementation of Section 4 of the Executive

Order – which, among other things, delegates authority to the Secretary of Veterans Affairs "to

issue orders suspending the application" of the Executive Order as applied to the Department of

Veterans Affairs ("VA"), see Executive Order § 4 – reflects a retaliatory motive.  See Pl.'s Reply

at 15.  Specifically, AFSA points to the Secretary of Veterans Administration Doug Collins's

recent decision to restore collective bargaining rights – pursuant to the authority delegated to him

under Section 4 of the Executive Order – "not to particular subdivisions [of the Department of

Veterans Affairs], but to particular unions in the Department."  Id. (emphasis in original).  In

justifying the decision, VA Press Secretary Pete Kasperowicz stated that the decision to restore

the statutory protections to certain unions was based on the fact that those unions "have filed no

or few grievances against VA and [ ] have not proved an impediment to the department's ability

to effectively carry out its mission . . . ."  Id. at 15 (quoting Erich Wagner, VA is selectively

enforcing Trump's order stripping workers of union rights, GOVERNMENT EXECUTIVE (April 18,

2025), available at https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-

trumps-order-stripping-workers-union-rights/404694/ (quoting VA Press Secretary Pete

Kasperowicz)).  The additional evidence and argument provided by AFSA bolsters the Court's

earlier conclusion in Nat'l Treasury Emps. Union v. Trump that the White House Fact Sheet and

other contemporaneous evidence "reflects retaliatory motive towards certain unions."  Nat'l

Treasury Emps. Union v. Trump, 2025 WL 1218044, at *10.

Accordingly, the Court concludes that AFSA has successfully rebutted the

presumption of regularity.

2.    Statutory Interpretation

Having successfully rebutted the presumption of regularity, the Court turns to the

issue of whether the Executive Order was <u>ultra</u> <u>vires</u>.  <u>See</u> Nat'l Treasury Emps. Union v. Trump,

2025 WL 1218044, at *12-17.  To remind, Section 4103(b) provides that:

> The President may by Executive order exclude any subdivision of
> the Department from coverage under this subchapter if the President
> determines that –
>
>> (1) the subdivision has as a primary function intelligence,
>> counterintelligence, investigative, or national security work,
>> and
>>
>> (2) the provisions of this subchapter cannot be applied to that
>> subdivision in a manner consistent with national security
>> requirements and considerations.

22 U.S.C. § 4103(b).  Section 4103(b) is identical to Section 7103(b)(1) of the FSLMRS, except

that Section 4103(b) only refers to "any subdivision," whereas Section 7103(b)(1) refers to "any

agency or subdivision."  <u>Compare</u> 22 U.S.C. § 4103(b) <u>with</u> 5 U.S.C. § 7103(b)(1).  As the Court

explained in <u>Nat'l Treasury Emps. Union v. Trump</u>, the President applied overly broad

interpretations of Section 7103(b)(1)'s terms "primary function" and "national security" in the

context of Section 2 of the Executive Order.  <u>See</u> <u>Nat'l Treasury Emps. Union v. Trump</u>, 2025

WL 1218044, at *12-17.  The government's arguments in this case reflect that the same

interpretations were applied in excluding agency subdivisions from the Statute pursuant to

Section 4103(b).

a.  <u>"Primary Function"</u>

Turning first to the term "primary function" in Section 4103(b)(1), the

government's arguments reflect either an overly broad interpretation of the term or a disregard of

the term entirely.  As the Court explained in <u>Nat'l Treasury Emps. Union v. Trump</u>:

> While the government never explicitly states how it interprets
> "primary function," its arguments related to each of the agencies and
> subdivisions reflect either an overly broad interpretation of the term
> or a disregard of the term entirely.  The government's arguments
> related to each of the agencies and subdivisions illustrate this point
> by either pointing to generalized mission statements of the agencies
> referencing national security, or by pointing to individual functions
> that <u>segments</u> of the agencies or subdivisions perform that have a
> national security valence, and then concluding that the <u>entire</u>
> agencies' or subdivisions' "primary function" is national security.

<u>Nat'l Treasury Emps. Union v. Trump</u>, 2025 WL 1218044, at *14.  The government takes the

same approach here, arguing that the State Department's and USAID's "work focuses on, among

other things," a plethora of areas such as "critical and emerging technology . . ., global health

security . . ., intelligence . . ., diplomatic security . . ., arms control and international security . . .,

civilian security . . ., economic growth, energy, and environment . . ., counterterrorism . . ., and

public diplomacy . . . ."  Opp. at 29; <u>see id</u>. ("USAID is the principal U.S. agency responsible for

extending development assistance to countries around the world and its programs aim to support

economic growth, combat the spread of disease, promote democratic reform, and address food

insecurity.") (citation and internal quotation marks omitted).  Setting aside for the moment

whether the broad areas of work the government identifies constitute "national security work" as

is used in Section 4103(b), the government's approach of pointing to different categories of work

that segments of the State Department and USAID perform and concluding that the "primary

function" of the <u>entire</u> State Department and USAID is "national security" was the exact

approach rejected in Nat'l Treasury Emps. Union v. Trump.  See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *14.

The government argues that because the Foreign Service Act defines the term "function" as "any duty, obligation, power, authority, responsibility, right, privilege, discretion, or activity," 22 U.S.C. § 3902(6), a subdivision can have "multiple 'primary' functions – for instance, one related to a 'duty,' another related to a 'discretion,' and another related to an 'activity,' among others."  Opp. at 30.  The government's argument misses the point of the Court's analysis in Nat'l Treasury Emps. Union v. Trump:  the issue there was not whether an agency can have multiple "primary functions;" rather, the issue was whether the government's approach of pointing to "some work that implicates national security" was sufficient to conclude that the agency's "primary function" is "national security work."  See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *14 (emphasis in the original).  The Court concluded that this approach was deficient, reasoning that the government omitted the critical step of explaining why each of those categories of work are the "primary function" of the agency.  See id.  The lack of argument connecting the identified work to the "primary function" of the agency made clear that the government's interpretation of "primary function" was either overly broad, or that the government's interpretation disregarded the statutory term entirely.  Because the government takes the same approach here, the Court must again reject the government's interpretation of "primary function" as overly broad.  See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *14.

> b.   "National Security" and "National Security Work"

Turning next to the term "national security," the government in this case stands by the same interpretation the Court rejected in Nat'l Treasury Emps. Union v. Trump.  Specifically,

the government contends that "national security" in Section 4103(b) "refer[s] to work 'directly related to protection and preservation of the military, economic, and productive strength of the United States." Opp. at 27 (quoting Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 FLRA 644, 655-56 (1980)). In rejecting this interpretation of "national security" in Nat'l Treasury Emps. Union v. Trump, the Court explained:

> [T]his Court must conclude that the President's interpretation of "national security" exceeds the scope of the meaning intended by Congress. In passing the FSLMRS, Congress clearly expressed a desire to extend collective bargaining rights broadly because it determined that those rights were "in the public interest." 5 U.S.C. § 7101(a) ("[L]abor organizations and collective bargaining in the civil service are in the public interest"). Congress provided a narrow exception that allowed the President to exclude agencies and subdivisions from these protections if the provisions of the law "cannot be applied . . . in a manner consistent with national security requirements and considerations." 5 U.S.C. § 7101(b)(1)(B). And as in Cole v. Young, it is "clear from the statute" that the term "national security" "comprehend[s] only those activities . . . that are directly concerned with the protection of the Nation from internal subversion or foreign aggression . . . ." Cole v. Young, 351 U.S. at 544. But President Trump instead has applied a startlingly broad application of "national security," which – directly contrary to the Supreme Court's definition in Cole v. Young – encompasses "those activities of Government . . . which contribute to the strength of the Nation only through their impact on the general welfare." Cole v. Young, 351 U.S. at 544. This interpretation of "national security" therefore is inconsistent with the statute and "risks allowing the exception to swallow the rule, thereby undermining the purpose of the statute itself." Nat'l Fed'n of Fed. Emps. v. McDonald, 128 F. Supp. 3d 159, 172 (D.D.C. 2015). "[I]f Congress intended the term to have such a broad meaning that all positions in the Government could be said to be affected with the 'national security,' the result would be that the [FSLMRS], though in form but an exception to the general personnel laws, could be utilized effectively to supersede those laws." Cole v. Young, 351 U.S. at 548.

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16. The same analysis applies here: the government's interpretation of "national security" covers everything from "global health security" to "civilian security" to "economic growth, energy, and [the] environment." See

Opp. at 29.  Because this expansive interpretation would allow "an exception to the general

personnel laws" to be utilized to "effectively to supersede those laws," it must be rejected.  Cole

v. Young, 351 U.S. at 548.

       The government makes several arguments in response to the Court's analysis in

Nat'l Treasury Emps. Union v. Trump.  First, the government contends that its interpretation "is

not inconsistent with Cole v. Young" because the statute at issue in that case is materially

different from the statute at issue here.  Opp. at 27.  More specifically, the government argues

that the Supreme Court's conclusion that the term "national security" should be interpreted

narrowly rested heavily on the fact that the eleven named agencies in the statute were "directly

concerned with the national defense."  Id. (quoting Cole v. Young, 351 U.S. at 544).  In the

instant case, however, "[t]he national security exemption in Section 7103(b)(1)" – and "its

counterpart in section 4103(b)" – "is not limited to any specific agency but to those that the

President 'determines' have as a primary function national security work."  Opp. at 27.

       As an initial matter, the government's suggestion that Cole v. Young's

interpretation of "national security" is not relevant to the instant case is belied by the fact that the

government's lone support for its expansive interpretation is essentially a truncated citation to an

FLRA decision that applies Cole v. Young's interpretation of "national security."  See Dep't of

Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 FLRA at 655-56;

see also Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *15 (explaining Oak

Ridge's reliance on Cole v. Young).  Moreover, while the Supreme Court in Cole v. Young

found relevant Congress's decision to include in the statute agencies with a specific "character"

of "national security," the Supreme Court's holding was also motivated by the concern that an

expansive interpretation of "national security" may allow the President to "supersede" the law.

Cole v. Young, 351 U.S. at 547.  The government's expansive interpretation of "national security" creates the risk that Section 4103(b) could be used to supersede the Statute, and therefore must be rejected.[7]

      Next, the government asserted at oral argument that the Supreme Court's analysis in Cole v. Young makes clear that the State Department has a primary function of "national security work."  See Tr. at 37:04-25.  Specifically, the government points to language in Cole v. Young where the Supreme Court stated that the particular agencies covered by the statute at issue in that case – which included the State Department, see Cole v. Young, 351 U.S. at 538 n.1 – were "without a doubt . . . directly concerned with the national defense . . . ."  Id. at 544.  Relatedly, the government argues that the foreign policy valence of the State Department and USAID means that both agencies perform "national security work" because "foreign policy inevitably involve[s] the exercise of predictive judgment about risks to national security."  Opp. at 33 (citation omitted).

      The "national defense" and "foreign policy" character of the State Department and USAID does not support the government's broad interpretation of "national security" in this case.  The Supreme Court in Cole v. Young made clear that, notwithstanding an agency's relationship to "national security," the term "national security" in the statute must be interpreted

---

       [7]     The government's reliance on Trump v. Hawaii, 585 U.S. 667 (2018), is unavailing.  See Opp. at 25.  In that case, the Supreme Court stated that "a searching inquiry into the persuasiveness of the President's justifications is inconsistent with the broad statutory text and the deference traditionally accorded the President in" the national security sphere.  Trump v. Hawaii, 585 U.S. at 686.  The Court, however, is not questioning whether the President's actions are justified from "a policy perspective;" rather, the Court is considering "the scope of" the President's powers under Section 4103(b).  See id.; see also Ctr. for Biological Diversity v. Mattis, 868 F.3d 803, 827 (9th Cir. 2017) ("When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis.").

in light of Congress's intent in passing the statute, and that a federal employees' "relationship to the 'national security'" could not simply "follow from the very fact of employment." Cole v. Young, 351 U.S. at 543-44, 547. Indeed, the government's sole authority in support of its interpretation of "national security" expressly acknowledges that the term "national security" must be understood in light of Congress's determination that "[l]abor organizations and collective bargaining in the civil service have been determined by the Congress to be 'in the public interest.'" See Dep't of Energy, Oak Ridge Operations, & Nat'l Ass'n of Gov't Emps. Local R5-181, 4 F.L.R.A. at 655-56 (citation omitted). To apply an expansive interpretation of "national security" that does not account for Congress's intent, the Supreme Court reasoned, would mean that an "exception to the general personnel laws[] could be utilized effectively to supersede those laws." Cole v. Young, 351 U.S. at 547.

Congress could not have been clearer in passing the Statute that it intended for the protections of the Statute to extend broadly to the covered departments and agencies in the foreign service. See supra Section I.A; see also 22 U.S.C. § 4101. It therefore is plainly unreasonable to conclude that the exclusion in Section 4103(b) can be satisfied merely by pointing to the general national security and foreign policy "character" of the departments and agencies that Congress included in the Statute. To do so would essentially render Section 4103(b) meaningless since an agency subdivision necessarily would satisfy the provision by nature of their inclusion in the Statute.

In light of its analysis above, the Court concludes that AFSA is likely to succeed on its claim that the Executive Order is ultra vires. This conclusion is reached in light of the

strong evidence rebutting the "presumption of regularity" and the Court's interpretation of

Section 4103(b).[8]

## C. Irreparable Harm

The next factor to consider is whether AFSA will suffer irreparable injury without

the requested preliminary injunction.  See Archdiocese of Washington v. Wash. Metro. Area

Transit Auth., 897 F.3d at 321.  The D.C. Circuit "has set a high standard for irreparable injury."

Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006).  "Not only

must the injury 'be both certain and great,' and 'actual and not theoretical,' but 'the injury must

be beyond remediation.'"  Brennan Ctr. for Just. at NYU Sch. of L. v. Dep't of Com., 498 F.

Supp. 3d 87, 101 (D.D.C. 2020) (quoting Chaplaincy of Full Gospel Churches v. England, 454

F.3d at 297).  Importantly, "obstacles [that] unquestionably make it more difficult for the

[plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of

establishing] irreparable harm."  League of Women Voters v. Newby, 838 F.3d at 9.

AFSA advances two primary bases by which it argues it will face irreparable

harm absent a preliminary injunction.  First, it argues that the Executive Order significantly

diminishes its bargaining power by "strip[ping] ninety-seven percent (97%) of Foreign Service

members represented by AFSA of their rights to organize and bargain collectively under the

[Statute]."  Pl.'s Mem. at 36.  This loss of bargaining power and the statutory protections of

collective bargaining "have weakened AFSA's ability to represent Foreign Service employees."

Pl.'s Reply at 18.  For example, the State Department and USAID "have ceased all

---

[8]    Because the Court concludes that AFSA is likely to succeed on its ultra vires
claims, see Compl. ¶¶ 40-56 (Counts One and Two), the Court does not reach the issue of
whether AFSA has satisfied the requirements for a preliminary injunction on its First
Amendment retaliation claim.

communications and meetings with union representatives about Foreign Service members'

employment conditions," see Yazdgerdi Decl. ¶ 10; Wong Decl. ¶¶ 8, 12; Chester Decl. ¶¶ 9, 19,

"eliminated the ability of AFSA's officers to represent employees during work hours," see Wong

Decl. ¶ 20; Chester Decl. ¶ 15; Sigfusson Decl. ¶¶ 14, 15, "limited AFSA's involvement before

the Foreign Service Grievance Board," Parikh Decl. ¶ 6; Papp Decl. ¶ 3, "excluded AFSA

representatives from their offices, limiting AFSA's access to members and collective bargaining

records," Sigfusson Decl. ¶¶ 11, 12, and "terminated dues deduction."  Pl.'s Reply at 18.

AFSA argues that these significant obstructions to representing its members have

come at a critical moment where both the State Department and USAID have signaled – and

have begun – large-scale reorganization efforts and reductions-in-force.  See Pl.'s Reply

at 19-21.  As to USAID, the agency has already begun to implement reductions-in-force where

employees will be terminated on July 1, 2025, and September 2, 2025.  See Chester Decl. ¶ 18.

As for the State Department, Secretary of State Marco Rubio announced on April 22, 2025, that

"Defendant State will reorganize itself by decreasing the number of bureaus or offices from 734

to 632 and downsizing of the domestic staff by fifteen percent."  Pl.'s Reply at 18; see Exs. 1

and 2, Yazdgerdi Supp. Decl. ¶¶ 2-3.  Absent preliminary relief, AFSA contends that its

members will be severely disadvantaged during the reductions-in-force and reorganization by

"hav[ing] to navigate that process without their bargained-upon frameworks and without their

collective bargaining representative," which in turn "will further erode the employees'

confidence and trust in the collective bargaining process and their bargaining representative."

Pl.'s Reply at 20 (citing Moore-Duncan ex rel. NLRB v. Horizon House Developmental

Svcs., 155 F. Supp. 2d 390, 396-97 (E.D. Pa. 2001) ("The impotence of the union and the loss of

employee interest can create a mutually reinforcing cycle, as lack of support among employees

further diminishes the union's strength and, consequently, its ability to press for improvements that would demonstrate its worthiness to members of the bargaining unit.")).

Second, AFSA argues that it is currently suffering "crippling losses" – approximately 86% of its monthly operational revenue, see Yazdgerdi Decl. ¶ 17 – caused by the loss of dues revenue. Pl.'s Reply at 21. AFSA's Executive Direct, Asgeir Sigfusson, states that the loss of dues revenue "will cause immediate cash flow issues," making it so that "AFSA will not be able to pay utilities, vendor costs, and most concerning, employee salaries and benefits." Sigfusson Decl. ¶ 9; see id. ¶ 10 ("The loss of membership dues could cause immediate layoffs for AFSA staff in addition to cuts in salaries and benefits."). AFSA's President, Thomas Yazdgerdi, illustrates the lasting harm that such layoffs would have on AFSA, stating that "[m]any of [AFSA's] staff have been with AFSA for over 20 years and have a wealth of legal and other experience and knowledge representing Foreign Service members in what is a very specialized, niche area of law." Yazdgerdi Decl. ¶ 18; see also Yazdgerdi Supp. Decl. ¶ 1.

As the Court has recently described in depth, each of the injuries suffered by AFSA represent irreparable harm warranting a preliminary injunction. See Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *17-19. As to the loss of bargaining power, the Court explained the lasting harms that an employer's refusal to collectively bargain have on employees' morale and interest in union membership, stating:

> Courts have long recognized that "the unlawful refusal of an employer to bargain collectively with its employees' chosen representatives disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions." Franks Bros. Co. v. NLRB, 321 U.S. 702, 704 (1944). "The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable." NLRB. v. Electro-Voice, Inc., 83 F.3d 1559, 1573 (7th Cir. 1996). Furthermore, "[a]s time passes, the benefits of unionization are lost and the spark to organize is extinguished." Id.; see Int'l Union of Elec., Radio &

> Mach. Workers, AFL-CIO v. NLRB, 426 F.2d 1243, 1249 (D.C.
> Cir. 1970) ("Employee interest in a union can wane quickly as
> working conditions remain apparently unaffected by the union or
> collective bargaining.").  Therefore, any relief a court may provide
> "must come quickly." In re Am. Fed'n of Gov't Emps., AFL-CIO,
> 790 F.2d 116, 117-18 (D.C. Cir. 1986) (citation and quotation marks
> omitted).

Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *17.  Outside of the effects on

union membership, "the loss of representation and status as an exclusively recognized labor

organization creates 'obstacles [that] make it more difficult for the [plaintiff] to accomplish [its]

primary mission,'" which "in itself constitutes irreparable harm." Id. (quoting League of Women

Voters v. Newby, 838 F.3d at 9).  In sum, the loss of bargaining power and statutory protections

for the right to collectively bargain represent irreparable harm.  See id.; see also Donohue v.

Mangano, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012) (finding irreparable harm where union

could "no longer represent their members in any meaningful way . . . ."); Moore-Duncan ex rel.

NLRB v. Horizon House Developmental Svcs., 155 F. Supp. at 396-97 ("An interim injunction

requiring that the employer bargain in good faith may be therefore be necessary to prevent

irreparable damage to the union's position and to the bargaining process."); SEIU Health Care

Michigan v. Snyder, 875 F. Supp. 2d 710, 725 (E.D. Mich. 2012) ("Plaintiff will be irreparably

harmed by being deprived its contractual rights, its ability to advocate and bargain for its

members, and the loss of revenue to operate effectively and exercise its First Amendment

rights . . . .").

Significant losses in revenue like the ones suffered by AFSA – approximately

86% loss of its operational revenue – cause irreparable harm both because they threaten the very

existence of the union, see Pl.'s Reply at 21, and because "the loss of revenue creates a serious

obstacle for [AFSA] to 'accomplish [its] primary mission' of representing its members." Nat'l

Treasury Emps. Union v. Trump, 2025 WL 1218044, at *19 (quoting League of Women Voters

v. Newby, 838 F.3d at 9).  Furthermore, layoffs of AFSA staff that result from the loss of dues

revenue threaten to have a lasting impact on AFSA's effectiveness given the "wealth of legal and

other experience and knowledge representing Foreign Service members" AFSA's staff possess.

See Yazdgerdi Decl. ¶ 18.  In sum, the "'crippling losses' that threaten AFSA's existence"

represent irreparable harm.  Pl.'s Reply at 21; see Nat'l Treasury Emps. Union v. Trump, 2025

WL 1218044, at *19.

   The government's arguments in opposition were addressed and rejected in the

Court's earlier opinion in Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *16-19.

Accordingly, AFSA has established that it will suffer irreparable harm absent a preliminary

injunction.

### D.  Equities and Public Interest

   The remaining preliminary injunction factors – the balance of the equities and

assessment of the public interest – weigh in AFSA's favor.  These factors "merge when, as here,

the Government is the opposing party.'"  Singh v. Berger, 56 F.4th 88, 107 (D.C. Cir. 2022)

(quoting Karem v. Trump, 960 F.3d 656, 668 (D.C. Cir. 2020)).

   As the Court explained in Nat'l Treasury Emps. Union v. Trump, Congress's

unequivocal identification of collective bargaining rights and federal unions as being "in the

public interest," coupled with the public interest "in ensuring that the laws enacted by their

representatives are not imperiled by executive fiat," compel the conclusion that AFSA satisfies

the remaining preliminary injunction factors.  Nat'l Treasury Emps. Union v. Trump, 2025

WL 1218044, at *20.  The government's primary argument in response – that "[a] preliminary

injunction would displace and frustrate the President's decision about how to best address issues

of national security," Opp. at 40 – must be rejected because it "presuppose[s] that the President's

decisions are in fact "national security" determinations, rather than a recasting of decisions

related to "the general welfare" as "national security" determinations." Nat'l Treasury Emps.

Union v. Trump, 2025 WL 1218044, at *20 (quoting Cole v. Young, 351 U.S. at 544).

Accordingly, the balance of the equities and assessment of the public interest

weigh in favor of granting a preliminary injunction. Indeed, each of the preliminary injunction

factors weighs in favor of granting AFSA's motion.


## IV. SECURITY AND SCOPE OF INJUNCTION

The government requests that the Court impose a bond pursuant to Rule 65(c) of

the Federal Rules of Civil Procedure. See Opp. at 41. While the government does not provide

any analysis of the "costs and damages" it will suffer as a result of the preliminary injunction in

its opposition memorandum, see FED. R. CIV. P. 65(c), the government subsequently has

requested that bond be set at $120,000. See Defendants' Response to Proposed Order

("Response to Prop. Order") [Dkt. No. 30] at 2 n.1. This amount represents the costs the

government will need to pay in "union time" assuming a one-year duration for the preliminary

injunction. See id.

Courts have "broad discretion" in determining "the appropriate amount of an

injunction bond, including the discretion to require no bond at all." Simms v. D.C., 872 F. Supp.

2d 90, 107 (D.D.C. 2012) (internal citation and quotation marks omitted). As the Court

explained in Nat'l Treasury Emps. Union v. Trump, requiring a significant bond "would conflict

with both the Court's findings that each of the preliminary injunction factors weigh heavily in

[AFSA's] favor and the principles of the right to seek judicial review of unlawful government

action." Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *21; see Plaintiff's

Response to Defendants' Response to Proposed Order ("Pl.'s Reply to Prop. Order") [Dkt. No. 32] at 2.  While the total amount requested by the government is unwarranted, the Court, in its discretion, orders AFSA to post a bond in the amount of $100 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

        In addition to the imposition of a bond, the government requests that the Court limit the scope of the preliminary injunction in two respects:  first, the Court should exempt agency subdivisions from the preliminary injunction order that meet the criteria in Section 4103(b); and second, the Court should exempt OPM from the order because "Plaintiff has failed to identify any basis for injunctive relief against OPM . . . ."  Response to Prop. Order.  The Court denies both of the government's requests.  As to the request to exempt particular agency subdivisions from the preliminary injunction order, the Court denies this request for the reasons explained in Nat'l Treasury Emps. Union v. Trump – namely, the Court's "conclusions all speak to the fact that [Section 3] of the Executive Order is entirely ultra vires."  Nat'l Treasury Emps. Union v. Trump, 2025 WL 1218044, at *22.  As to the government's request to exempt OPM from the order, AFSA has shown that the preliminary injunction should include OPM because OPM has issued guidance to agencies on how to implement the Executive Order.  See Pl.'s Reply to Prop. Order at 2; see also OPM Guidance.

## V.  CONCLUSION

For the foregoing reasons, AFSA's Motion for a Preliminary Injunction [Dkt.

No. 10] is hereby GRANTED.

An Order consistent with this Opinion will issue this same day.

SO ORDERED.

PAUL L. FRIEDMAN
United States District Judge

DATE:  5│14│25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN FOREIGN SERVICE ASSOCIATION,<br><br>*Plaintiff,*<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, et al.,<br><br>*Defendants.* | Civil Action No. 25-1030 (PLF) |

## <u>DEFENDANTS' NOTICE OF APPEAL OF PRELIMINARY INJUNCTION</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of

Appeals for the District of Columbia Circuit from this Court's May 14, 2025 Order (ECF No. 36)

and Memorandum Opinion (ECF No. 37) granting Plaintiff's motion for a preliminary injunction.

Dated: May 21, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
EMILY M. HALL
SARAH E. WELCH
Counsel to the Assistant Attorney General
Civil Division

ERIC HAMILTON
Deputy Assistant Attorney General
Civil Division, Federal Programs Branch

ALEXANDER K. HAAS
Director
JACQUELINE COLEMAN SNEAD
Assistant Branch Director
LISA ZEIDNER MARCUS
Senior Counsel
LYDIA JINES
JEREMY MAURITZEN
Trial Attorneys
U.S. Department of Justice, Civil Division
Federal Programs Branch

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ Jeremy S. Simon*
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
601 D. Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.simon@usdoj.gov

*Attorneys for the United States of America*

2

JA300