# In the United States Court of Appeals
# For the District of Columbia Circuit

---

AMERICAN FOREIGN SERVICE ASSOCIATION,

Plaintiff-Appellee

*v.*

DONALD J. TRUMP, PRESIDENT OF THE UNITED STATES, ET AL.,

Defendants-Appellants

---

On Appeal from the Entry of Preliminary Injunctive Relief by the
United States District Court for the District of Columbia

---

## BRIEF FOR APPELLEE

---

RICHARD J. HIRN
*Counsel of Record*
5335 Wisconsin Ave., NW
Suite 440
Washington, D.C. 20015
(202) 274-1812

SHARON L. PAPP
RAEKA SAFAI
American Foreign Service Association
2101 E Street, NW
Washington, D.C. 20037

KEITH R. BOLEK
APRIL H. PULLIUM
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Ave., NW
Suite 800
Washington, D.C. 20015
(202) 362-0041

# CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

The undersigned certifies the following pursuant to D.C. Cir. Rule 28(a)(1):

## A.    Parties and Amici

The Plaintiff-Appellee is the American Foreign Service Association ("AFSA"). The Defendant-Appellants are Donald J. Trump; Office of Personnel Management ("OPM"); U.S. Department of State, U.S. Agency for International Development ("USAID"); Marco Rubio, in his official capacity as Secretary of State and Acting Administrator of USAID; and Scott Kupor, in his official capacity as Director of OPM. No other parties, intervenors or amici curiae appeared before the district court or have entered appearances in this Court.

## B.    Rulings Under Review

Defendant-Appellants seek review of the May 14, 2025 order and opinion of the district court (Honorable Friedman, J., presiding) granting a preliminary injunction to AFSA. The district court's opinion is available at 783 F.Supp.3d 248.

## C. Related Cases

This case has not previously been before this Court. The following cases involve overlapping sets of defendants and raise similar issues to this case:

- *Nat'l Treas. Emps. Union v. Trump*, No. 25-cv-00935-PLF, pending appeal, No. 25-5157 (D.C. Cir.);

- *Am. Fed'n of Gov't Emps. v. Trump*, No. 3:25-cv-03070 (N.D. Cal.), pending appeal, No. 25-4014 (9th Cir.);

- *Fed. Educ. Ass'n v. Trump*, No. 25-cv-01362-PLF (D.D.C.), pending appeal, No. 25-5303;

- *Am. Fed'n of Lab.-Cong. of Indus. Orgs. v. Trump*, No. 25-cv-02445-PLF (D.D.C.);

- *Nat'l Ass'n of Agric. Emps. v. Trump*, No. 25-cv-02657-PLF (D.D.C.);

- *Nat'l Weather Serv. Emps. Org. v. Trump*, No. 25-cv-02947-PLF (D.D.C.);

- *Nat'l Treasury Emps. Union v. Trump*, No. 25-cv-02990-PLF (D.D.C.); and

- *Am. Fed'n of State, County & Muni. Empls. v. Trump.*, No. 25-cv-03306 (D.D.C.)


DATED:   October 9, 2025        */s/Richard J. Hirn*
                                Richard J. Hirn

# CORPORATE DISCLOSURE STATEMENT

Pursuant to the Fed. R. App. P. 26.1 and D.C. Cir. Rule 26.1, the American Foreign Service Association ("AFSA") makes the following disclosures:

1.     AFSA is not a subsidiary or affiliate of a publicly traded corporation.

2.     As a trade association, AFSA is not required to list identities or persons that have represented the party's general nature.

DATED: October 9, 2025          */s/Richard J. Hirn*
                                Richard J. Hirn

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... vi

GLOSSARY ............................................................................................ xv

PERTINENT STATUTES ....................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 1

STATEMENT OF THE CASE ................................................................. 2

I.  Background on AFSA and the Foreign Service Act ............................. 2

II. The President Issues Executive Order 14,251 in Retaliation for Speech and Petitioning Activity by AFSA and Other Unions .......................... 5

III. Procedural Background ...................................................................... 8

SUMMARY OF ARGUMENT ................................................................ 9

ARGUMENT ......................................................................................... 15

I.  AFSA is Likely to Prevail on the Merits. ........................................... 15

   A. The District Court has Jurisdiction Because AFSA's Challenge to the Executive Order Does Not Fall Within the Foreign Service Act's Remedial Scheme. ................................................................. 15

   B. AFSA can Assert an *Ultra Vires* Claim Because the FSA Placed Limits on the President's Discretion to Exempt Agency Subdivisions on National Security Grounds. ............................... 24

   C. AFSA is Likely to Succeed on the Merits of its *Ultra Vires* Claim. 32

     1. The District Court's Finding that AFSA Rebutted the Presumption of Regularity was Not Clear Error. ....................... 32

     a. The Evidence of Irregularity ..................................................... 33

     b. Defendants-Appellants Embrace that Irregularity ................... 40

iv

2. The District Court Correctly Determined That the President Exceeded his Authority by Either Applying Overly Broad Interpretations of the Terms of § 4103(b) or by Disregarding the Terms Entirely. ............................................................... 45

a. "Primary Function." ...................................................... 45

b. "National Security." .................................................... 50

c. "Consistent with National Security Requirements". .................. 50

II. The District Court Did Not Abuse its Discretion in Finding That AFSA Would Suffer Irreparable Injury Absent a Preliminary Injunction. . 54

III. The District Court Did Not Abuse its Discretion in Determining that the Balance of Equities Favored AFSA. ............................................. 58

CONCLUSION .......................................................... 59

CERTIFICATE OF COMPLIANCE ...................................... 62

APPENDIX A – STATUTORY ADDENDUM ......................... A i

APPENDIX B – WHITE HOUSE FACT SHEET ................................ B i

# TABLE OF AUTHORITIES

## Cases

*Ace Motor Freight, Inc. v. I. C. C.,*
557 F.2d 859 (D.C. Cir. 1977)........................................................49

*Aid Assn. for Lutherans v. U.S. Postal Serv.,*
321 F.3d 1166 (D.C. Cir. 2003)......................................................26

*Ala. Ass'n of Realtors v. HHS,*
141 S. Ct. 2485 (2021) ..................................................................59

*Am. Fed'n of Gov't Emps. v. Reagan,*
870 F.2d 723 (D.C. Cir. 1989)......................................25, 33, 43, 51

*Am. Fed'n of Gov't Emps. v. Trump,*
929 F.3d 748 (D.C. Cir. 2019)........................................................23

*Am. Foreign Serv. Ass'n v. Baker,*
895 F.2d 1460 (D.C. Cir. 1990)......................................................19

*Am. Foreign Serv. Ass'n v. Trump,*
766 F.Supp.3d 25 (D.D.C. 2025) ..............................................36, 43

*Am. Forest Res. Council v. United States,*
77 F.4th 787 (D.C. Cir. 2023)....................................................28, 31

*Am. Sch. of Magnetic Healing v. McAnnulty,*
187 U.S. 94 (1902) ........................................................................29

*Asseo v. Centro Medico del Turabo,*
900 F.2d 445 (1st Cir. 1990)..........................................................54

*Axon Enter., Inc. v. Fed. Trade Comm'n,*
598 U.S. 175 (2023) ......................................................................17

*Bennett v. U.S. Sec. & Exch. Comm'n,*
844 F.3d 174 (4th Cir. 2016) ........................................................17

*Bowen v. Mich. Academy of Family Phys.*,
    476 U.S. 667 (1986) ................................................ 29, 30

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ..................................................... 49

*Chamber of Comm. v. Reich*,
    74 F.3d 1322 (D.C. Cir. 1996) ....................... 24, 25, 28, 29

*Chicago & S. Air Lines v. Waterman Steamship Corp.*,
    333 U.S. 103 (1948) ..................................................... 28

*City of Los Angeles, CA v. Patel*,
    576 U.S. 409 (2015) ..................................................... 47

*Cole v. Young*,
    351 U.S. 536 (1956) ........................................ 13, 34, 41, 49

*Comm. for Nuclear Resp., Inc. v. Seaborg*,
    463 F.2d 788 (D.C. Cir. 1971) ....................................... 24

*Ctr. for Biological Diversity v. Mattis*,
    868 F.3d 803 (9th Cir. 2017) ........................................ 31

*Cuomo v. Clearing House Assn., 5*
    57 U.S. 519 (2009) ...................................................... 47

*Dakota Cent. Tele. Co. v. S. D. ex rel. Payne*,
    250 U.S. 163 (1919) ..................................................... 28

*Dalton v. Spector*,
    511 U.S. 462 (1994) ..................................................... 28

*Dart v. United States*,
    848 F.2d 217 (D.C. Cir. 1988) ....................................... 29

*Echevarria-N. v. Shinseki*,
    437 F. App'x 941 (Fed. Cir. 2011) ................................. 32

*Env'tl Prot. Agency v. Calumet Shreveport Refining, LLC*,
    145 S. Ct. 1735 (2025) ................................................. 47

*Fed. Educ. Ass'n v. Trump,*
No. 25-5303, 2025 WL 2738626
(D.C. Cir. Sep. 25, 2025) .......................................... 23, 27, 31, 47, 59

*Fed. Educ. Ass'n v. Trump,*
No. 25-cv-1362-PLF, 2025 WL 2355747
(D.D.C. Aug. 14, 2025) ............................................................. 27, 44

*Flynt v. Ohio,*
451 U.S. 619 (1981) ........................................................................ 47

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ........................................................................ 17

*Gov't of Guam v. Guerrero,*
11 F.4th 1052 (9th Cir. 2021) ......................................................... 32

*Grundmann v. Trump,*
770 F. Supp. 3d 166 (D.D.C. 2025) .................................................. 23

*Hanson v. District of Columbia,*
120 F.4th 223 (D.C. Cir. 2024) ....................................................... 32

*Harmon v. Brucker,*
355 U.S. 579 (1958) ........................................................................ 29

*Hartman v. Moore,*
547 U.S. 250 (2006) ........................................................................ 37

*Hercules, Inc. v. Env'tl Prot. Agency,*
598 F.2d 91 (D.C. Cir. 1978) .......................................................... 48

*Huisha-Huisha v. Mayorkas,*
27 F.4th 718 (D.C. Cir. 2022) ......................................................... 59

*Int'l Union of Elec. Workers v. NLRB,*
426 F.2d 1243 (D.C. Cir. 1970) ....................................................... 55

*Leedom v. Kyne,*
358 U.S. 184 (1958) ........................................................................ 29

*Mitchell v. Forsyth,*
    472 U.S. 511 (1985) ...................................................................... 30

*Moore-Duncan ex rel. NLRB v. Horizon House Developmental Servs.,*
    155 F. Supp. 2d 390 (E.D. Pa. 2001) ............................................ 55

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002) ..................................................... 27

*Nat'l Archives & Recs. Admin. v. Favish,*
    541 U.S. 157 (2004) ...................................................................... 32

*Nat'l Treas Emps. Union v. FLRA,*
    910 F.2d 964 (D.C. Cir. 1990) ....................................................... 56

*Nat'l Weather Serv. Emps. Org. v. FLRA,*
    966 F.3d 875 (D.C. Cir. 2020) ....................................................... 21

*Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,*
    26 F.4th 960 (D.C. Cir. 2022) ....................................................... 26

*Newsom v. Trump,*
    141 F.4th 1032 (9th Cir. 2025) ..................................................... 28

*NFIB v. Dep't of Lab.,*
    142 S. Ct. 661 (2022) .................................................................... 58

*NLRB v. Electro-Voice,*
    83 F.3d 1559 (7th Cir. 1996) ........................................................ 54

*O'Banion v. Collins,*
    No. 2023-2069, 2025 WL 1466712 (Fed. Cir. May 22, 2025) ......... 32

*Pac. Gas & Elec. Co. v FERC,*
    113 F.4th 943 (D.C. Cir. 2024) ..................................................... 47

*Parsippany Hotel Mgmt. Co. v. NLRB,*
    99 F.3d 413 (D.C. Cir. 1996) ........................................................ 37

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
    758 F.3d 296 (D.C. Cir. 2014) ....................................................... 30

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.,*
    926 F. Supp. 2d 71 (D.D.C. 2013) ................................... 29

*Romero v. Tran,*
    33 Vet. App. 252 (2021) ................................................ 48

*SEIU Health Care of Mich. v. Snyder,*
    875 F.Supp.2d 710 (E.D. Mich. 2012) ............................... 54, 57, 58

*Sinclair Wyoming Ref. Co. LLC v. Env'tl Prot. Agency,*
    114 F.4th 693 (D.C. Cir. 2024) ...................................... 47

*Small v. Avanti Health Sys., LLC,*
    661 F.3d 1180 (9th Cir. 2011) ................................... 54, 56

*Spokane & Inland Empire R.R. Co. v. United States,*
    241 U.S. 344 (1916) ................................................... 47

*Stark v. Wickard,*
    321 U.S. 288 (1944) ................................................... 29

*Talbott v. United States,*
    775 F. Supp. 3d 283 (D.D.C. 2025) ................................ 35

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1994) .............................................. 10, 17

*U.S. Attorney's Office, Southern Dist. of Texas,*
    57 F.L.R.A. 750 (2002) ............................................... 16

*United States v. Roses Inc.,*
    706 F.2d 1563 (Fed. Cir. 1983) .................................... 48

*Webster v. Doe,*
    486 U.S. 592 (1988) ................................................... 28

*Wendt Corp. v. NLRB,*
    26 F.4th 1002 (D.C. Cir. 2022) .................................... 37

*Wilmer, Cutler, Pickering, Hale and Dorr LLP v. Exec. Office of the Pres.*,
774 F. Supp. 3d 86 (D.D.C. 2025)............................................... 35, 57

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ....................................................................58

*Ziglar v. Abbasi*,
582 U.S. 120 (2017) ...................................................................30

*Zweibon v. Mitchell*,
516 F.2d 594 (D.C. Cir. 1975)......................................................31

**Statutes**

5 U.S.C. § 7104 .........................................................................18, 23

5 U.S.C. § 7103 ............................................ 4, 16, 27, 41, 43, 46

5 U.S.C. § 7106 ...............................................................................51

5 U.S.C. § 7118 ...............................................................................18

5 U.S.C. § 7123 ...............................................................................21

22 U.S.C. § 4101 ...................................................................3, 46, 47

22 U.S.C. § 4102 ...............................................................................18

22 U.S.C. § 4103   ...................................3, 4, 6, 13, 22, 23, 24, 26, 27, 28
31, 41, 42, 43, 44, 45, 46, 48, 50

22 U.S.C. § 4105 .......................................................................13, 51

22 U.S.C. § 4106 ...............................................................................16

22 U.S.C. § 4107 .......................................................................16, 24, 52

22 U.S.C. § 4109 ...............................................................................21

22 U.S.C. § 4114 .......................................................................20, 21

22 U.S.C. § 4115 ................................................................ 18

22 U.S.C. § 4116 ................................................................ 18

22 U.S.C. § 4118 ....................................................... 3, 7, 58

22 U.S.C. § 4131 ................................................................ 21

22 U.S.C. § 4135 ................................................................ 20

22 U.S.C. § 4140 ................................................................ 21


**Agency Decisions:**

*Am. Fed'n of Gov't Emps., Loc. 2118,*
    2 F.L.R.A. 916 (1980) .................................................. 16

*Army & Air Force Exch. Serv. Waco Distribution Ctr. Waco, Texas,*
    53 F.L.R.A. 749 (1997) ................................................ 56

*Dep't of the Air Force, 913th Air Wing, Willow Grove Air Reserve*
  *Station,*
    57 F.L.R.A. 852 (2002) ......................................... 52, 56

*Dep't. of Health & Human Servs.,*
    16 F.L.R.A. 288 (1984) ................................................ 56

*Dep't of the Navy, Naval Telecom. Ctr., Ward Circle Activity,*
    6 F.L.R.A. 498 (1981) .................................................. 16

*Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms,*
  *Bos. Dist. Off., Crim. Enf't Activity,* 3 F.L.R.A. 30 (1980) ............ 16

*Dept. of Treas., Customs Serv.,*
    38 F.L.R.A. 989 (1990) ................................................ 56

*Env'tl Prot. Agency,*
    21 F.L.R.A. 786 (1986) ................................................ 56

*Fed. Aviation Admin.,*
    23 F.L.R.A. 209 (1986) ................................................ 56

*Fed. Deposit Ins. Co.*,
40 F.L.R.A. 75 (1991) ...................................................... 56

*Health Serv., Crownpoint Comp. Health Care Fac.*,
53 F.L.R.A. 1161 (1998) ................................................. 56

*SPORT and Dep't of Air Force, Edwards AFB*,
68 F.L.R.A. 9 (2014) ....................................................... 52

**Regulatory Materials:**

Executive Order No. 11,636,
36 Fed. Reg. 24,901 (Dec. 24, 1971) .................................. 3

Executive Order No. 14,169,
90 Fed. Reg. 8,619 (Jan. 20, 2025) .................................... 5

Executive Order No. 14,211,
90 Fed. Reg. 9,831 (Feb. 18, 2025) ................................... 42

Executive Order No. 14,215,
90 Fed. Reg. 10,447 (Feb. 18, 2025) ................................. 11, 22, 23

Executive Order No. 14,251,
90 Fed. Reg. 14,553 (Mar. 27, 2025) ................... 2, 4, 5, 6, 9, 11, 12
35, 38, 39, 44, 59

Order Suspending the Application of Section 1-402 or 1-404
of Executive Order 12,171, 90 Fed. Reg. 16,427
(Apr. 17, 2025) ............................................................... 39

**Other Authorities:**

Alexandra Marquez, *et al.*, *Firefighters Union IAFF Declines to
Endorse a Candidate*, NBC NEWS (Oct. 3, 2024) ........................... 38

Charles Ezell, *Guidance on Executive Order Exclusions from Federal
Labor-Management Programs*, OPM (Mar. 27, 2025) ............... 7, 53

Erich Wagner, *Trump Order Aims to Outlaw Most Government Unions on 'National Security" Grounds*, GOVT. EXEC. (March 27, 2025)...43

Erich Wagner, *VA is Selectively Enforcing Trump's Order Stripping Workers of Union Rights,* GOV'T EXEC. (Apr. 18, 2025)................40

FRATERNAL ORD. OF POLICE, *FOP Endorses Trump!* (Sept. 6, 2025)......38

Michael Crowley, *New Trump Executive Order Calls For 'Reform' to U.S. Diplomatic Corps*, N. Y. TIMES (Feb. 12, 2025).....................43

NAT'L BOARDER PATROL COUNCIL, *About NBPC* ....................................39

*National Boarder Patrol Council Endorses President Trump*, AM. PRES. PROJECT (Aug, 18, 2025)................................................................39

Rebecca Davis O'Brien, *Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts*, N. Y. TIMES (Mar. 29, 2025) ..........35

THE WHITE HOUSE, *Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Requirements* (Mar. 27, 2025) ............................................ 6, 34, 48

# GLOSSARY

AFGE ..............................American Federation of Government Employees

AFSA.................................................American Foreign Service Association

CBP ......................................................... Customs and Border Protection

FLRA..................................................... Federal Labor Relations Authority

FSA.................................................................................. Foreign Service Act

FSGB .....................................................Foreign Service Grievance Board

FSLMRS ............... Federal Service Labor-Management Relations Statute

FSLRB........................................... Foreign Service Labor Relations Board

IAFF..........................................International Association of Fire Fighters

NTEU.................................................National Treasury Employees Union

OPM ....................................................... Office of Personnel Management

USAGM.......................................................U.S. Agency for Global Media

USAID.....................................U.S. Agency for International Development

VA....................................................... U.S. Department of Veterans Affairs

## PERTINENT STATUTES

Pertinent statutes are reproduced in Appendix A – Statutory Addendum. For the sake of completeness, this Addendum includes the entirety of Subchapter X of the Foreign Service Act, 22 U.S.C. §§ 4101-4118, as well as other provisions cited by AFSA.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly determined that Executive Order No. 14,251's removal of the State Department and USAID from coverage of Subchapter X of the Foreign Service Act precludes AFSA from challenging those exclusions before the Foreign Service Labor Relations Board ("FSLRB")?

2. Whether the district court abused its discretion by granting the preliminary injunction against the enforcement of Section 3 of Executive Order No. 14,251?

# STATEMENT OF THE CASE

## I.    BACKGROUND ON AFSA AND THE FOREIGN SERVICE ACT

The American Foreign Service Association ("AFSA") is a labor union that has represented nearly 18,000 Foreign Service members in worldwide bargaining units at the U.S. Department of State ("State"), the U.S. Agency for International Development ("USAID"), the U.S. Department of Agriculture, the U.S. Department of Commerce, and the U.S. Agency for Global Media.[1] JA30. Approximately 97% of the active-duty employees in the bargaining units represented by AFSA work for either State or USAID. JA30, JA85, JA150. As of April 14, 2025, of the

---

[1] The bargaining unit and membership numbers in this paragraph are the same as those submitted to the district court in AFSA's motion for a preliminary injunction. AFSA faces continuing losses of dues-paying members and dues revenue, but the amounts of those losses that have occurred since the preliminary injunction filing are not in the record, given that this Court's review is limited to the preliminary-injunction proceedings. AFSA notes, however, that since the district court issued the preliminary injunction, State has conducted a reduction in force, and USAID has ceased operations and terminated most of its employees.

Before Executive Order 14,251 was issued, AFSA and other plaintiffs filed a lawsuit challenging the dismantling of USAID, whose employees then were on administrative leave. No. 25-cv-352-CJN (D.D.C.). The district court granted the government's motion to dismiss the case for lack of jurisdiction, but that decision is now pending on appeal before this Court in Case No. 25-5290. USAID's status thus remains uncertain.

bargaining unit employees who were voluntary dues-paying members of AFSA, approximately 92% paid dues by payroll allotments,[2] which constituted approximately 86% of the Union's operational funding. JA30, JA196–97.

AFSA became the certified exclusive bargaining representative of Foreign Service members at State and USAID in 1973, pursuant to an executive order issued by President Nixon. Exec. Order No. 11,636, 36 Fed. Reg. 24,901 (Dec. 24, 1971); JA85, JA149. Congress codified collective bargaining rights for Foreign Service members in Subchapter X of the Foreign Service Act ("FSA") in 1980, recognizing that "labor organizations and collective bargaining in the [Foreign] Service are in the public interest and are consistent with the requirement of an effective and efficient Government." 22 U.S.C. § 4101.

Section 4103(b) of the FSA permits the President to "exclude any *subdivision* of the Department from coverage under this subchapter" by executive order "*if* the President determines that (1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or

---

[2] The Foreign Service Act requires agencies to honor allotments from their pay "for the payment of regular and periodic dues of the exclusive representative." 22 U.S.C. § 4118(a).

national security work, *and* (2) the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b) (emphases supplied). The Federal Service Labor Management Relations Statute ("FSLMRS"), which covers civil service employees, contains a similar exclusion provision but allows the President to exempt an entire "agency or subdivision," not just a subdivision. 5 U.S.C. § 7103(b).

While previous Presidents excluded agencies or agency subdivisions from coverage of the FSLMRS under § 7103(b) by executive orders, Defs.' Br. at 6–7, those orders are far narrower than Executive Order 14,251. And no President had ever excluded any subdivision of State, USAID, or any other subdivision of the four other agencies employing Foreign Service members from coverage under the FSA before President Trump issued the Executive Order. Indeed, in 1981, the Department of State informed AFSA that an exclusion under § 4103(b) "would be unnecessary in implementing the [Foreign Service] Act." JA208, JA219.

Through ten presidencies (including President Trump's first administration), seventeen Secretaries of State, along with twenty-one

4

Administrators and acting Administrators of USAID, have recognized and bargained with the American Foreign Service Association. This bargaining has occurred during the Vietnam War, the Cold War, and the fall of the Soviet Union, 9/11 and the War on Terror, as well as during the war in Afghanistan, the longest war the United States has ever fought. Nothing has changed, other than America is now at peace.

## II. THE PRESIDENT ISSUES EXECUTIVE ORDER 14,251 IN RETALIATION FOR SPEECH AND PETITIONING ACTIVITY BY AFSA AND OTHER UNIONS.

Since the beginning of his second administration, President Trump has attacked Foreign Service members and the agencies they serve – and AFSA has defended those employees. The President started with USAID when he issued Executive Order 14,169, 90 Fed. Reg. 8,619 (Jan. 20, 2025), directing a ninety-day pause in foreign development assistance. AFSA issued press releases criticizing the dismantling of USAID, the placement of its employees on administrative leave, and other actions by the Trump administration. JA194–95. AFSA officers also appeared for interviews with national and international media outlets to discuss the devastating impact of President Trump's attacks on USAID. JA39–40,

JA156. And on February 6,[3] AFSA filed a lawsuit challenging the President's dismantling of USAID and seeking injunctive relief. *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-00352 (D.D.C.). AFSA filed another lawsuit on March 21 to enjoin President Trump's disbandment of the U.S. Agency for Global Media ("USAGM"), another agency that employs Foreign Service members. *Widakusawara v. Lake*, No. 1:25-cv-02390 (S.D.N.Y).

On March 27, the President issued Executive Order No. 14,251, invoking Section 4103(b) of the FSA to exclude the entirety of State and USAID from collective bargaining, and invoking the corresponding provision of the FSLMRS to exclude multiple Cabinet-level departments and numerous agencies across the Executive Branch. Exec. Order. No. 14,251, 90 Fed. Reg. 14,553 (Mar. 27, 2025) (the "Executive Order"). The White House simultaneously issued a "Fact Sheet" explaining that the exclusions were issued because "[c]ertain Federal unions have declared war on President Trump's agenda" through actions such as "filing grievances."[4] Yet, the Executive Order does *not* exclude police,

---

[3] All dates hereinafter are in 2025.

[4] THE WHITE HOUSE, *Fact Sheet: President Donald J. Trump Exempts Agencies with Nat'l Sec. Missions from Fed'l Coll. Barg. Requirements*

firefighter, and Customs and Border Protection ("CBP") employees from the coverage of the FSLMRS. *Id.* at 14,554. The Fact Sheet confirms that "police and firefighters will continue to collectively bargain," presumably on the ground that the unions representing those employees are political supporters of the President, as "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction." Fact Sheet, *supra*, at 6 n.4.

Also on March 27, Defendant OPM issued a memorandum instructing agencies on how to implement the Executive Order.[5] The memorandum directed agencies to cease participation in grievance proceedings, disregard collective bargaining agreements, terminate statutorily authorized provisions for employee union dues allotments, and end union representatives' use of "official time"[6] for representational purposes. Following the OPM Guidance, on March 31, State repudiated

---

(Mar. 27, 2025), [https://perma.cc/Y7HR-4W3H] [hereinafter Fact Sheet]. A copy of the Fact Sheet is attached as Appendix B to this brief.

[5] Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, OPM (Mar. 27, 2025), [https://perma.cc/Z2ZJ-Y8U7].

[6] Official time is time spent by a government employee to engage in representational activities on behalf of a union when they would otherwise be in a duty status. 22 U.S.C. § 4118(d).

AFSA's collective bargaining agreement, withdrew recognition of AFSA as the exclusive representative of State's Foreign Service members, canceled future meetings with AFSA, ceased payroll deduction of union dues, ended official time for three AFSA officers who had been performing full-time union duties, and instructed AFSA to vacate its office on State's premises. JA33, JA78; *see also* JA33–39, JA86–90, JA152–56, JA196–99, JA201–02, JA207–08.

## III.   PROCEDURAL BACKGROUND

AFSA filed a complaint in the district court on April 7, JA9–28, and a motion for a preliminary injunction on April 14. The district court granted AFSA's motion and issued a preliminary injunction on May 14, finding that AFSA was likely to succeed on the merits of its claim that the Executive Order was *ultra vires*; that AFSA faced irreparable harm from, among other things, the loss of bargaining opportunities and financial losses so severe as to threaten its existence; and that the balance of the equities and public interest favored AFSA. JA261–98.

The government appealed the grant of a preliminary injunction to this Court. JA299. An emergency motions panel of this Court granted Defendants' motion to stay the preliminary-injunction order pending

resolution of this appeal. No. 25-5157, Order (June 20, 2025). That stay remains in effect, permitting Defendants to continue implementing the Executive Order.

## SUMMARY OF ARGUMENT

**I.    A.**    The district court has jurisdiction over AFSA's claims because the challenge to the Executive Order falls outside the scope of the FSA's remedial scheme. AFSA cannot pursue the claims in this case through the unfair labor practice procedure because the Federal Labor Relations Authority ("FLRA") has held that it lacks jurisdiction to hear claims brought by unions who have been excluded from the coverage of the labor-management relations statute. The FSA requires the FSLRB to follow the FLRA's precedent, absent special circumstances, which are not present. Even assuming the FSLRB had jurisdiction, the position of General Counsel—who must issue a complaint for a case to proceed—has been vacant since 2017. Moreover, the person with authority to fill that vacancy is the same person who issued Executive Order No. 14,251, *viz.*, the President, and he has not appointed anyone since January 20, 2025 to fill that role.

Furthermore, all of the factors set forth in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994) weigh in favor of finding that the FSA does not limit the court's jurisdiction. Most importantly, the FSA does not guarantee meaningful judicial review of a challenge to the Executive Order. Such a challenge is also collateral to the FSA's review provisions and is also outside the FSLRB's expertise.

In order to obtain review by the FSLRB and ultimately the courts, AFSA must first convince the General Counsel of the FLRA that a violation of Subchapter X has occurred, and that the General Counsel should issue a formal unfair labor practice complaint against the State department or USAID. However, the General Counsel's decision whether to issue an unfair labor practice complaint is discretionary and is not subject to judicial review.

Similarly, AFSA cannot pursue its claims through the grievance procedure, known as an implementation dispute, before the Foreign Service Grievance Board (FSGB). First, the FSGB has informed AFSA that, because of the Executive Order, AFSA no longer has status as the exclusive representative of State Department or USAID employees. Second, even if the FSGB could hear the dispute, there is only an appeal

to the FSLRB. The FSA does not provide for judicial review in implementation dispute cases filed by AFSA.

Furthermore, the claims in this case are wholly collateral to the FSA and outside the FSLRB's expertise. Congress did not intend for the FSLRB to determine whether the presumption of regularity underlying the President's exclusion of State and USAID from the FSA's coverage has been rebutted. Likewise, the President has prevented any such determination with the issuance of Executive Order No. 14,215, which provides that the interpretation of the law by the President or the Attorney General shall bind all employees in the executive branch, including independent agencies like the FSLRB. Thus, there is no opportunity for meaningful review unless the claims reach the courthouse steps.

**B.** AFSA can pursue a non-statutory *ultra vires* cause of action challenging the legality of Executive Order No. 14,251. A court's review of the Executive Order is not limited to violations that run afoul of the Constitution or a statute, but extends to questions such as whether the executive has exceeded other statutory limitations on its authority. In this case, the FSA includes two specific limitations on the President's

authority to exclude agencies from statutory coverage: first, a subdivision must have as its primary function intelligence, counterintelligence, investigative, or national security work; and, second, the provisions of Subchapter X cannot be applied to that subdivision in a manner consistent with national security requirements and considerations. Those limitations provide the outer limits of the President's authority; and courts have jurisdiction to review whether the President has exceeded that authority.

C. In this case, the district court concluded that the President exceeded his authority with respect to both limitations. First, the district court found that, based upon the record, the presumption of regularity underlying Executive Order No. 14,251 was rebutted. These findings are reviewable for clear error, which does not exist given the court based its determination upon the Trump administration's own statements in a contemporaneous fact sheet, which revealed both animus against unions, like AFSA, as well as the intent to retaliate against them for exercising their First Amendment rights by opposing President Trump's policies. This led to the issuance of the Executive Order, which stripped the overwhelming majority of Foreign Service employees of their rights to

bargain collectively. The President achieves that result by invoking the exception in Section 4103(b) to swallow the whole of the FSA's labor-management provisions.

This President exceeded the two limitations in the FSA by making overly expansive interpretations of the statutory language that allowed for the exclusion set forth in Section 4103(b) to swallow the entirety of the FSA itself. This includes an overly expansive interpretation of "national security," beyond "the protection of *the Nation* from internal subversion or foreign aggression," *Cole v. Young*, 351 U.S. 536, 543–44 (1956) (emphasis added), to include everything that a Foreign Service employee may do for both State and USAID. Such an outcome ignores the fact that not only did Congress find that collective bargaining in the Foreign Service serves the public interest, but also the fact that Congress crafted the FSA with provisions, such as the management rights provision in 22 U.S.C. § 4105(a), to enable the government to make substantive decisions, as well as act in times of emergencies, even with a collective bargaining obligation.

II.     AFSA will suffer irreparable harm if the Executive Order is not enjoined. The Supreme Court and federal courts, including the D.C.

Circuit, recognize that the deprivation of collective bargaining rights leads to a loss of employees' support, not only for their collective bargaining representative, but for the collective bargaining process itself. This harm cannot be remedied by money damages or even repaired by a court order, as such an order cannot, by itself, restore the confidence lost in employees' minds. In remedying unfair labor practices that arise under the FSLMRS, the FLRA often denies retroactive bargaining orders and often forgoes restoration of the *status quo ante* if such a remedy would disrupt agency operations. Even in the unlikely event that AFSA could obtain a retroactive bargaining order, that order could not fully repair the harms inflicted on AFSA and its members while they could not exercise their union rights—a deprivation that will naturally weaken members' support for the Union and the Union's bargaining leverage.

AFSA suffers an additional irreparable harm, namely, the threat of financial ruin, caused by State and USAID cutting off the dues allotments that are otherwise required by the FSA. The loss of this dues income affects the ability of AFSA to represent and advocate on behalf of Foreign Service employees, as well as operate effectively, while the executive order remains in place. Moreover, it is impossible to withhold

dues from members' paychecks retroactively when those members have been laid off in the interim. There is little incentive for those members who remain employed to continue their membership in AFSA if the union cannot protect them against future layoffs.

**III.** The district court properly concluded that the balance of equities and the public interest favor AFSA over the government. Unlike the irreparable injury being inflicted upon AFSA, the government suffers no harm in being prevented from doing something that violates a Federal statute like the FSA. Likewise, as Congress determined in passing the FSA, there is a substantial public interest in allowing for collective bargaining in the Foreign Service.

## ARGUMENT

## I. AFSA is Likely to Prevail on the Merits.

### A. The District Court has Jurisdiction Because AFSA's Challenge to the Executive Order Does Not Fall Within the Foreign Service Act's Remedial Scheme.

The district court correctly concluded that AFSA cannot use the administrative channels in Subchapter X of the FSA because the Executive Order removed the agencies and subdivisions in question from the Statute's coverage. JA 271–76. The FLRA has consistently dismissed

unfair labor practice charges and other cases filed by unions that have lost recognition as a result of executive orders excluding agencies or subdivisions based on "national security" under 5 U.S.C. § 7103(b)(1). *U.S. Attorney's Office, Southern Dist. of Texas*, 57 F.L.R.A. 750 (2002) (dismissing three unfair labor practices cases); *Dep't of the Treasury, Bureau of Alcohol, Tobacco & Firearms, Bos. Dist. Off., Crim. Enf't Activity*, 3 F.L.R.A. 30, 31 (1980) (dismissing representation petition); *Am. Fed'n of Gov't Emps., Loc. 2118*, 2 F.L.R.A. 916, 917 (1980) (dismissing negotiability appeal). "Where the President has specifically excluded an agency or activity from coverage under the Statute by issuing an executive order, the Authority is clearly without jurisdiction." *Dep't of the Navy, Naval Telecom. Ctr., Ward Circle Activity*, 6 F.L.R.A. 498, 500 (1981) (dismissing representation petition). Decisions of the Foreign Service Labor Relations Board ("FSLRB") "shall be consistent with" decisions of the FLRA "under chapter 71 of title 5, other than in cases in which the [FSLRB] finds that special circumstances require otherwise." 22 U.S.C. §§ 4106(a), (b); § 4107(b). By excluding State and USAID from the coverage of Subchapter X of the FSA, President Trump has deprived the FSLRB of jurisdiction to hear AFSA's challenges in this case.

The government nevertheless – and erroneously – argues that the "channeling" requirements under *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212–13 (1994), require AFSA to bring its challenge before the FSLRB rather than the district court. But the channeling requirements do not apply here. As the Supreme Court explained, "we presume that Congress does not intend to limit jurisdiction if 'a finding of preclusion **could** foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions; and if the claims are 'outside the agency's expertise.' These considerations point against any limitation on review here." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 489–90 (2010), quoting *Thunder Basin*, 510 U.S. at 212–13 (emphasis supplied).

*1.* The availability of "meaningful judicial review is the most important factor in the *Thunder Basin* analysis." *Bennett v. U.S. Sec. & Exch. Comm'n*, 844 F.3d 174, 183 n.7 (4th Cir. 2016). "The first *Thunder Basin* factor recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023). The FSA does not assure "meaningful judicial review" of a challenge to the Executive Order, even if, as noted

above on pages 15–16, the executive order itself had not already shut the door to such administrative review.

Section 1015 of the FSA, 22 U.S.C. § 4115, identifies unfair labor practices prohibited by the Act. The FLRA's General Counsel investigates unfair labor practice charges and decides whether to issue an unfair labor practice complaint and bring the matter to hearing before the FSLRB, just as the General Counsel does under the Federal Service Labor Management Relations Statute ("FSLMRS") when it brings an unfair labor practice case before the FLRA or its designee (an Administrative Law Judge). *Compare* 22 U.S.C. § 4116, *with* 5 U.S.C. § 7118. However, there is no General Counsel: the position has been vacant since 2017; and, the President has yet to appoint anyone to fill that vacancy. 5 U.S.C. § 7104(f)(1); 22 U.S.C. § 4102(10). The lack of a General Counsel brings the entire administrative scheme to an abrupt halt, and its restart depends upon the very person who issued the Executive Order. *Id.* This is a step that the government overlooked in its brief.

Moreover, even if a General Counsel is appointed and confirmed, "[t]he Foreign Service Act does not provide for judicial review of a General

Counsel decision not to file a complaint." *Am. Foreign Serv. Ass'n v. Baker*, 895 F.2d 1460, 1461 (D.C. Cir. 1990). The government claims that "AFSA can litigate its claims through the statutory review scheme by alleging that the defendant agencies have committed unfair labor practices" and then obtain judicial review. Defs.' Br. at 24. This claim ignores the fact that AFSA must first convince the General Counsel of the FLRA to exercise their non-reviewable discretion to issue a complaint. If a complaint does not issue, then AFSA will be foreclosed from obtaining any judicial review of its claims.

The government also erroneously argues that "AFSA could challenge the executive order in cases already pending before the FSLRB." Defs.' Br. at 25. *There are no such cases currently pending before that Board.*

Nor may AFSA obtain judicial review by filing a grievance under their collective bargaining agreement (known as an "implementation dispute" under Subchapter X of the FSA). The FSA provides, "[a]ny dispute between the Department and the exclusive representative concerning the effect, interpretation, or a claim of breach of a collective bargaining agreement shall be resolved through procedures negotiated

by the department and the exclusive representative." 22 U.S.C. §§ 4114(a), (b). The FSA also provides that unresolved implementation disputes can be appealed to the Foreign Service Grievance Board ("FSGB"). *Id.* The FSGB is created by Subchapter XI of the FSA. 22 U.S.C. § 4135.

However, the FSGB has informed AFSA that, because of the Executive Order, AFSA no longer has status as the exclusive representative of State Department or USAID employees. JA 207–10. And while AFSA could appeal decisions of the FSGB in "implementation disputes" to the FSLRB (22 U.S.C. § 4114(b)), the FSLRB would dismiss any such appeal because, once again (as stated on pages 15–16 above), the Executive Order deprives the FSLRB of jurisdiction.

But even after two dismissals by two separate administrative agencies (*i.e.*, FSGB and FSLRB), AFSA still cannot obtain judicial review. The FSA unambiguously states that resolution of implementation disputes "shall not be subject to judicial review." 22 U.S.C. § 4114(d). The FSA underscores the unavailability of judicial review in its "Judicial Review and Enforcement" section of Subchapter X, which reiterates that decisions of the FSLRB in "implementation

disputes" are excluded from judicial review. "*Except as provided in section 4114(d)* of this title, any person aggrieved by a final order of the Board may . . . institute an action for judicial review of such order in the United States Court of Appeals for the District of Columbia." 22 U.S.C. § 4109(a) (emphasis added).[7] This preclusion of judicial review of any and all FSLRB decisions involving "implementation disputes" differs from the FSLMRS, which allows judicial review of FLRA decisions in arbitration cases which involve an unfair labor practice. 5 U.S.C. § 7123(a)(1); *Nat'l Weather Serv. Emps. Org. v. FLRA*, 966 F.3d 875, 879-80 (D.C. Cir. 2020).

   *2.*    AFSA's claims are also "wholly collateral" to the Statute's review provisions and outside of the FSLRB's expertise. The "regularity"

---

[7]    These are two distinct grievance procedures in two separate sections of the FSA (although they involve the same FSGB). There is a grievance procedure found in Subchapter XI of the FSA, under which individual members of the Foreign Service can grieve matters pertaining to their individual employment conditions. 22 U.S.C. § 4131. The decisions of the FSGB on Subchapter XI grievances are judicially reviewable in federal district court under 22 U.S.C. § 4140(a). But "implementation disputes" that arise under Subchapter X that are decided by the FSGB are appealed to the FSLRB (as they raise issues with breaches of collective bargaining agreements as opposed to personal employment disputes) and the Board's decisions in those cases are *not* judicially reviewable. 22 U.S.C. § 4114(d).

of the President's decision to exclude the State Department and USAID from the coverage of the Statute under the authority of section 1003 of the FSA (22 U.S.C. § 4103(b)) is not something that Congress intended a body such as the FSLRB to determine.

In fact, it is the President's position that the FSLRB members, like those of other so-called "independent agencies," lack the ability to exercise judgment contrary to his own. According to Section 7 of Exec. Order No. 14,215, *Ensuring Accountability for All Agencies*, 90 Fed. Reg. 10,447 (Feb. 18, 2025):

> The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law, including but not limited to the issuance of regulations, guidance, and positions advanced in litigation, unless authorized to do so by the President or in writing by the Attorney General.

Similarly, under the "unified executive" theory embraced by Exec. Order No. 14,215, the FSLRB is not authorized to decide independently whether the President's determination that the exclusion of the State Department

and USAID complies with 22 U.S.C. § 4103(b).[8] This is especially so given that the President summarily removed the Chair of the FLRA (who also serves as Chair of the FSLRB) even though the FSA requires cause. 5 U.S.C. § 7104(b); *Grundmann v. Trump*, 770 F. Supp. 3d 166 (D.D.C. 2025), *stay granted*, No. 25-5165, 2025 WL 1840641 (July 3, 2025).

In fact, even before Exec. Order No. 14,215, the FLRA held that executive orders involving the FSLMR Statute have the force and effect of law that it must apply. *Patent Office Prof'l Assn.,* 71 F.L.R.A. 1223, 1224 (2020). The government clearly erred when it wrote that "[t]here is no reason to think that the FSLRB would refuse to consider the validity of an executive order where doing so is necessary to determining its jurisdiction." Defs.' Br. at 31. The FSA requires the FSLRB's decisions to

---

[8] For this reason, the D.C. Circuit's decision in *Am. Fed'n of Gov't Emps. v. Trump*, 929 F.3d 748 (D.C. Cir. 2019), is distinguishable. The unions in that case could still obtain "much of the … relief that they sought from the district court" because the underlying collective bargaining framework in the FSLMRS remained in place for those unions to invoke. *Id.* at 757. In this case, the Executive Order removed State and USAID completely from the FSA's labor-management relations framework, depriving AFSA of any access to the FSLRB. Thus, the FSLRB cannot grant any "effective relief" to AFSA. *Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, *6 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring).

track the FLRA's precedent absent special circumstances, 22 U.S.C. § 4107(b). No such circumstances are present here.

If Congress intended for there to be meaningful judicial review of Presidential determinations made pursuant to Section 4103(b), then it would have included a clear avenue for AFSA to follow so that it could obtain review by a federal court. Instead, there are just a couple of paths that end nowhere near the courthouse steps. The district court properly read the statutory map in concluding that the court has jurisdiction to hear the claims in this case.

**B. AFSA can Assert an *Ultra Vires* Claim Because the FSA Placed Limits on the President's Discretion to Exempt Agency Subdivisions on National Security Grounds.**

AFSA is "entitled to bring a non-statutory cause of action questioning the legality of the Executive Order." *Chamber of Comm. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). "An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with . . . the mandates of Congress which define and limit the authority of the executive." *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971). "Any claim to executive absolutism cannot override the duty of the court

to assure that an official has not exceeded his charter or flouted the legislative will." *Id.*

An executive order excluding agencies or their subdivisions from collective bargaining on national security grounds is reviewable, although "the challenged order is entitled to a rebuttable presumption of regularity." *Am. Fed'n of Gov't Emps. v. Reagan,* 870 F.2d 723, 724 (D.C. Cir. 1989) ("*AFGE*"). The Court referred in *AFGE* to "other cases in which courts have invalidated executive action that did not satisfy statutory demands" as "unexceptional holdings." *Id.* at 726 & n. 26.

Judicial review of the President's conduct is not limited to "actions that run afoul of the Constitution or which contravene direct statutory prohibitions," but can encompass other "statutory limitations on governmental authority." *Reich,* 74 F.3d at 1332. "In sum, we think it untenable to conclude that there are no judicially enforceable limitations on presidential actions, besides actions that run afoul of the Constitution or which contravene direct statutory prohibitions . . . ." *Id.* "It does not matter whether the unlawful action arises because the disputed [action] defies the plain language of the statute or because the [President's]

construction is utterly unreasonable and thus impermissible." *Aid Assn. for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1174 (D.C. Cir. 2003).

Section 4103(b) does not simply say the President has the discretion to exclude employees from the FSA's coverage by executive order for "national security" reasons. Rather, the statute clearly provides that such exclusions can take place only if the President determines that "a subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work" *and* "the provisions of this [FSA] subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b). These two conditions constitute specific limitations on the President's authority to exclude members of the Foreign Service from coverage of the labor statute and thus "delineate[ ] the outer limits" of his authority. "So long as a statutory provision plainly delineates the outer limits of agency authority and Congress has not expressly precluded judicial review, the provision may be susceptible to review for *ultra vires* acts that clearly violate its terms." *Nat'l Ass'n of Postal Supervisors v. U.S. Postal Serv.,* 26 F.4th 960, 971 (D.C. Cir. 2022). And, in this case, the FSA, like the FSLMRS, "contains not one, but two fairly exacting

limitations on the President's authority to invoke the statutory provision," whether it be 5 U.S.C. § 7103(b) or 22 U.S.C. § 4103(b). *Fed. Educ. Ass'n v. Trump*, No. 25-cv-1362-PLF, 2025 WL 2355747, *9 (D.D.C. Aug. 14, 2025) (describing nearly identical language in § 7103(b) of the FSLMRS), *stay denied*, No. 25-5303, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025).

In this case, the district court concluded that the President's construction of the FSA reflected "either an overly broad interpretation of the term[s]" "primary function" and "national security" in Section 4103(b) "or a disregard of term[s] entirely," that "is plainly unreasonable" and "would essentially render Section 4103(b) meaningless." JA280, JA284, JA290. This Court has held that *ultra vires* review is available when the President's exercise of discretion pursuant to a statute exceeds the scope of discretion granted to him by Congress under that statute: "Although the limits on Presidential authority at issue derive from the [FSA] itself rather than an independent statute, *Reich* is instructive," and "[c]ourts remain obligated to determine whether statutory restrictions have been violated." *Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002).

And because Section 4103(b) contains *specific* criteria that limit the President's discretion, the government's reliance on *Dalton v. Spector*, 511 U.S. 462 (1994), *Dakota Central Telephone Co. v. South Dakota ex rel. Payne,* 250 U.S. 163 (1919), *Chicago & Southern Air Lines v. Waterman Steamship Corp.*, 333 U.S. 103 (1948) and *Webster v. Doe*, 486 U.S. 592 (1988) is misplaced. For example, in contrast to the specificity in Section 4103(b), the statute examined in *Webster* broadly permitted the termination of any CIA employee when "necessary or advisable in the interests of the United States." 486 U.S. at 594. As for *Dalton*, the Court's "holding merely stands for the proposition that when a statute entrusts a discrete specific decision to the President and *contains no limitations on the President's exercise of that authority*, judicial review of an abuse of discretion claim is not available." *Reich*, 74 F.3d at 1331 (emphasis added); *accord Newsom v. Trump*, 141 F.4th 1032, 1047 (9th Cir. 2025); *Am. Forest Res. Council v. United States*, 77 F.4th 787, 797 (D.C. Cir. 2023). In *Reich*, this Court also rejected the applicability of *Waterman*, noting that judicial review was denied in that case on the grounds that it "embod[ied] Presidential discretion as to political matters." 74 F.3d at 1331 n.5.

The government also misreads *Dakota Central Telephone Co.,* 250 U.S. at 184, which supports a finding that AFSA has an *ultra vires* cause of action, because the Court actually considered a claim that "there was an absence of power in the President." *Id.* "*Dakota Central* appears to suggest that there is non-statutory authority permitting a court to interpret the legislation in question and articulate the boundaries of a statutory grant of power to the executive." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.,* 926 F. Supp. 2d 71, 86 (D.D.C. 2013)*, rev'd and remanded on other grounds,* 758 F.3d 296 (D.C. Cir. 2014).

That suggestion is well anchored in Supreme Court and D.C. Circuit precedent. *Leedom v. Kyne*, 358 U.S. 184, 188–89 (1958); *Harmon v. Brucker*, 355 U.S. 579, 581–82 (1958); *Stark v. Wickard*, 321 U.S. 288, 310 (1944); *Am. Sch. of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108-10 (1902); *Reich*, 74 F.3d at 1327–28; *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "The message of this line of cases is clear enough," observed the D.C. Circuit: "courts will 'ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.'" *Reich*, 74 F.3d at 1328 (quoting *Bowen v.*

*Mich. Academy of Family Phys.*, 476 U.S. 667, 681 (1986)). In other words, "[t]he responsibility of determining the limits of statutory grants of authority . . . is a judicial function entrusted to the courts by Congress." *Id.* at 1327 (quoting *Wickard*, 321 U.S. at 310)

Finally, the government's reliance on *Ziglar v. Abbasi*, 582 U.S. 120 (2017) is similarly misplaced. In that case, the concerns about judicial inquiry into the national-security realm were "more pronounced when the judicial inquiry comes in the context of a claim seeking money damages rather than a claim seeking injunctive or other equitable relief." 582 U.S. at 142. The Court also recognized that "[t]here are limitations of course, on the power of the Executive under Article II of the Constitution and in the powers authorized by congressional enactments, even with respect to matters of national security," and cautioned that "national security concerns must not become a talisman used to ward off inconvenient claims – a 'label' used to 'cover a multitude of sins.'" *Id.* at 143 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 523 (1985)).

Therefore, courts recognize that, "we do not automatically decline to adjudicate legal questions if they implicate foreign policy or national security" but instead "conduct a discriminating analysis of the particular

question posed in the specific case." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.,* 758 F.3d 296, 313 (D.C. Cir. 2014) (internal quotations omitted). "When confronting a statutory question touching on subjects of national security and foreign affairs, a court does not adequately discharge its duty by pointing to the broad authority of the President and Congress and vacating the field without considered analysis." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 827 (9th Cir. 2017). Indeed, when the executive invokes its authority or seeks to "infringe liberty in the name of security and order …, the judiciary must remain vigilantly prepared to fulfill its own responsibility to *channel* Executive action within constitutional bounds." *Zweibon v. Mitchell*, 516 F.2d 594, 604–05 (D.C. Cir. 1975) (emphasis added), *quoted in Fed. Educ. Ass'n v. Trump*, No. 25-5303, 2025 WL 2738626, *13 (D.C. Cir. Sep. 25, 2025) (Pan, J., concurring) ("*FEA*").

In summary, "Congress can and often does cabin the discretion it grants to the President and it remains the responsibility of the judiciary to ensure that the President act within those limits." *Am. Forest Resource Council*, 77 F.4th at 797. That is the case with Section 4103(b). As explained *infra*, the district court's determination that there was clear

evidence to rebut the presumption of regularity underlying the Executive Order was not clear error.

## C. AFSA is Likely to Succeed on the Merits of its *Ultra Vires* Claim.

### 1. The District Court's Finding that AFSA Rebutted the Presumption of Regularity was Not Clear Error.

The presumption of regularity of official action may be rebutted by clear evidence. *Nat'l Archives & Recs. Admin. v. Favish,* 541 U.S. 157, 174 (2004). Whether the presumption of regularity has been rebutted is a factual determination beyond an appellate court's jurisdiction to make. *O'Banion v. Collins*, No. 2023-2069, 2025 WL 1466712, at *2 (Fed. Cir. May 22, 2025); *Echevarria-N. v. Shinseki*, 437 F. App'x 941, 946 (Fed. Cir. 2011). Therefore, the district court's finding that "AFSA has rebutted the presumption by clear evidence" (JA281-83) may only be reversed for clear error. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (per curiam); *Gov't of Guam v. Guerrero*, 11 F.4th 1052, 1055 (9th Cir. 2021). Where the record supports those findings, "they are unlikely to be clearly erroneous. *FEA*, 2025 WL 2738626, *8 (Pan, J., concurring).

### a. The Evidence of Irregularity

AFSA presented, and the district court found, clear evidence that the "President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them" sufficient to rebut the presumption of regularity. *See AFGE*, 870 F.2d at 728. This includes the overbroad and indiscriminate scope and number of the agencies exempted (encompassing at least two-thirds of the Federal government's unionized workforce, including the entirety of the Department of State and USAID); the inexplicable exclusion of CBP, as well as all police and firefighters regardless of the agencies for whom they work; the timing of the Executive Order in the absence of a precipitating national security event that might justify it; and, perhaps above all, the personalized, unhinged, anti-union vitriol contained in the White House "Fact Sheet" issued simultaneously with the Order.

### i. In the White House Fact Sheet

This Fact Sheet unabashedly discloses the real reason the President issued the Executive Order. The President did not act to protect national security; rather, he sought to punish and disempower

those unions (like AFSA) that have opposed his policies, and to protect those unions who have not:

- The Fact Sheet calls out "hostile Federal unions" who ostensibly "obstruct agency management."

- "Certain Federal unions have declared war on President Trump's agenda."

- "President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests."

- "President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security concerns."

Fact Sheet, *supra*, at 6 n.4. In the government's view, national security equals fealty to the President and his agenda, when it should mean "the protection of *the Nation* from internal subversion or foreign aggression." *Cole v. Young*, 351 U.S. 536, 543–44 (1956) (emphasis added).

Courts have recognized and called out the vituperative nature of Fact Sheets, as revealing the President's intent when issuing executive orders. In the words of Judge Leon, writing about an Executive Order

targeting a prominent law firm: "The retaliatory nature of the Executive Order at issue here is clear from its face . . . but also from the Fact Sheet published the same day." *Wilmer, Cutler, Pickering, Hale and Dorr LLP v. Exec. Office of the Pres.*, 774 F. Supp. 3d 86, 88 (D.D.C. 2025). And, in the words of Judge Reyes, addressing the Administration's ban on transgender troops, Executive Order No. 14,183, and its accompanying Fact Sheet are "soaked in animus and dripping with pretext." *Talbott v. United States*, 775 F. Supp. 3d 283, 326 (D.D.C. 2025) (declining to defer to military judgment).

And the White House "Fact Sheet" does not stand alone in revealing the President's true motivations. Immediately following issuance of the Executive Order, a White House spokesperson confirmed that the Order was designed to cripple unions who were opposing the President's policies: "The goal [of Executive Order 14,251] is to stop employees in certain security-related agencies from unionizing *in ways that disrupt the president's agenda.*"[9]

---

[9]     Rebecca Davis O'Brien, *Trump Order Could Cripple Federal Worker Unions Fighting DOGE Cuts*, N. Y. TIMES (Mar. 29, 2025), https://www.nytimes.com/2025/03/29/us/politics/federal-worker-unions-doge.html (emphasis added).

The White House was targeting AFSA (and other unions) through the Executive Order, as evidenced by the claim that "[c]ertain Federal unions have declared war on President Trump's agenda." That agenda has included dismantling Foreign Service agencies and politicizing the Foreign Service, both of which AFSA has vigorously and vociferously opposed in the press and in the courts. JA39–40, JA156. AFSA and another union filed a lawsuit in the district court on February 6, 2025 to seek a declaratory judgment that the President's dismantling of USAID is unconstitutional, as well as injunctive relief directing the defendants to cease shutting down USAID, to reopen the agency, and to recall employees to work. AFSA initially obtained a temporary restraining order that was later dissolved. *Am. Foreign Serv. Ass'n et al. v. Trump*, 766 F.Supp.3d 25, *order dissolved*, 768 F.Supp.3d 6 (D.D.C. 2025). On March 21, 2025, AFSA and others filed suit to enjoin the disbandment of the U.S. Agency for Global Media, which employs AFSA-represented Foreign Service members. A district court granted a preliminary injunction on April 22, 2025, which is pending appeal in this Court in Case No. 25-5144. *Widakusawara v. Lake*, 779 F.Supp.3d 10 (2025). Since January 20, AFSA USAID Vice President Randall Chester has

repeatedly spoken to the media and the public about the devastating consequences of dismantling USAID. JA156. He has appeared in his capacity as a union officer on CNN, PBS, CBS, and 60 Minutes. *Id.* He has also given on the record interviews to Canadian Broadcasting Service, BBC, ABC, and NBC. *Id.* AFSA President Thomas Yazdgerdi similarly appeared for an interview with CNN about the lawsuit seeking to prohibit President Trump from dismantling USAID. (JA39-40.)

Thus, the statement in the Fact Sheet that "President Trump refuses to let union obstruction interfere with his efforts" is an admission that he invoked the national security exemption, not because of any national security considerations, but to retaliate for the constitutionally protected activities of AFSA and other unions. The President said the quiet part out loud – his motivation was simple anti-union animus, which is sufficient to rebut the presumption of regularity. *See Hartman v. Moore*, 547 U.S. 250, 263–64 (2006) (observing, in the context of the "longstanding presumption of regularity according to prosecutorial decision-making," that "[a] prosecutor's disclosure of retaliatory thinking on his part, for example, would be of great significance in addressing the presumption…."). *See also Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010–

11 (D.C. Cir. 2022) (quoting *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 423 (D.C. Cir. 1996) for "[a] company's open hostility toward union activity," which included a manager's anti-union speech, was "clearly sufficient to establish anti-union animus on the part of the company").

### ii.  In the Executive Order Itself

The President's admissions in the Fact Sheet are underscored by the terms of the Executive Order. Section 2 of the order selectively excluded police and firefighter unions from exemption. The Fraternal Order of Police and other police unions endorsed President Trump for election in 2024.[10] The International Association of Fire Fighters ("IAFF") withheld an endorsement sought after by his opponent.[11] And, most notably, the CBP was *not* included among the numerous agencies

---

[10] *See* FRATERNAL ORD. OF POLICE, *FOP Endorses Trump!*, (Sept. 6, 2025) https://fop.net/2024/09/fop-endorses-trump/.

[11] Alexandra Marquez, *et al.*, *Firefighters Union IAFF Declines to Endorse a Candidate*, NBC NEWS (Oct. 3, 2024) https://www.nbcnews.com/politics/2024-election/firefighters-union-iaff-declines-endorse-presidential-candidate-rcna173918. Thus, IAFF-represented firefighters on military bases retain their collective bargaining rights, but teachers in the Department of Defense dependent schools on those bases, who are represented by unions that oppose the President and his policies, do not. Exec. Order 14,251, Sec. 2.

and subdivisions of the Department of Homeland Security that were excluded from coverage of the labor statute. *See* Exec. Order 14,251, Section 2, subsection 1-407. The CBP's union also endorsed the President in last year's election.[12] If those who protect the border do not have national security as a primary mission, then neither does any of the employees who are excluded by the Executive Order.

Section 4 of the Executive Order allowed for further exemptions from its scope by the Secretaries of the Department of Veterans Affairs ("VA") and the Department of Defense. On April 17, Secretary Collins restored collective bargaining rights, not to particular subdivisions, *but to particular unions* in his Department. Order Suspending the Application of Section 1-402 or 1-404 of Executive Order 12,171, 90 Fed. Reg. 16,427 (Apr. 17, 2025). A VA spokesperson explained that

---

[12] The National Border Patrol Council is the exclusive representative of approximately 18,000 Border Patrol agents and support personnel assigned to the U.S. Border Patrol, which is under the direction of CBP. NAT'L BOARDER PATROL COUNCIL, *About NBPC*, https://bpunion.org/about-nbpc/ (last visited Oct. 3, 2025). It endorsed President Trump for election in 2024 (as it did in 2020 and 2016). *National Boarder Patrol Council Endorses President Trump*, AM. PRES. PROJECT (Aug, 18, 2025), https://www.presidency.ucsb.edu/documents/trump-campaign-press-release-national-border-patrol-council-endorses-president-trump-joe/

bargaining rights were restored to these unions, not because continued bargaining in their organizational subdivisions were "consistent with national security requirements and considerations," but because these unions were compliant:

> The unions in the exempted units have posed no or minimal hinderance to VA operations," he said. "They have filed no or few grievances against VA and they have not proved an impediment to the department's ability to effectively carry out its mission . . . AFGE, NAGE, NNU and SEIU by contrast are using their authority under the Federal Service Labor-Management Relations Statute to broadly frustrate the administration's ability to manage the agency.

Erich Wagner, *VA is Selectively Enforcing Trump's Order Stripping Workers of Union Rights,* GOV'T EXEC. (Apr. 18, 2025), available at, https://www.govexec.com/workforce/2025/04/va-selectively-enforcing-trumps-order-stripping-workers-union-rights/404694/.

### b. Defendants-Appellants Embrace that Irregularity

Thus, the Executive Order and the Fact Sheet are mutually reinforcing demonstrations of animus-fueled retaliation, which the government does not deny, but embraces. They claim that the Fact Sheet "does not reflect any motivations inconsistent with the statute" but "merely explains how unions' activities have impaired the functioning of

agencies . . . a circumstance that is plainly relevant to the President's determination under § 4103(b)." Defs.' Br. at 43. The government concedes that, in the President's view, it is not the collective bargaining provisions of the FSA *per se* that cannot be applied in a manner consistent with national security, but "the union's *use* of those provisions." *Id.* at 45. They further concede that "union activity" was relevant to the President's Section 4103(b) determination and that "past union practices" were a consideration when it was issued. *Id.* at 46.

So here is why what the President did was *ultra vires*: Section 4103 of the FSA and § 7103(b) of the FSLMR Statute allows him to exclude *particular subdivisions* from collective bargaining based on their primary function; and whether the FSA can be applied "consistent with national security requirements and considerations." The President parroted those requirements in the Executive Order, but then he went one step further, pulling back his own curtain. The President admitted in a contemporaneous release that he excluded *particular unions* from coverage based on their activities and whether they supported the President's agenda, which is not encompassed by any good-faith interpretation of "national security"—*see Cole v. Young*, *supra*—and

which is not a determination that he can make under Section 4103. With the reality exposed, it cannot be ignored or swept aside with judicial deference.

Moreover, the invocation of the national security exemption to disable AFSA was not the President's first retaliatory attack on what he views as a disloyal Foreign Service. Immediately after his inauguration, President Trump began a wholesale assault on Foreign Service members and their work. Within days after AFSA obtained a temporary restraining order halting the placement of USAID employees on administrative leave and expedited evacuation of USAID employees overseas in *Am. Foreign Serv. Ass'n v. Trump* discussed *supra.*, the President issued another Executive Order, "One Voice for America's Foreign Relations," to reshape the Foreign Service into a compliant "workforce of patriots." Exec. Order No. 14,211, 90 Fed. Reg. 9,831 (Feb. 18, 2025). The Order warns that "[f]ailure to faithfully implement the President's policy is grounds for professional discipline" and that the Secretary of State could choose to refer any offenders in the Foreign Service directly to the President in lieu of customary discipline. *Id.,* Sec. 2, 4. AFSA responded by stating it would "always defend the integrity

and nonpolitical nature of the Foreign Service so that our members can continue to serve the American people."[13]

The sheer breadth of the exclusions contained in the Executive Order demonstrates that the President "was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." (*AFGE*, *supra*.) when he issued it. Before the Executive Order at issue here, no President had ever used the Statute's narrow national security exemption in Sections 7103(b)(1) or 4103(b) to exempt an entire Cabinet-level agency from the Statute. But this Executive Order exempts *six*, nearly one-half of all Cabinet-level agencies. President Trump's Executive Order strips collective bargaining rights from three-quarters of the federal employees who are currently represented by federal sector unions and over ninety-seven percent (97%) of the Foreign Service members represented by AFSA.[14] JA 30, JA85, JA150.

---

[13]    Michael Crowley, *New Trump Executive Order Calls For 'Reform' to U.S. Diplomatic Corps*, N. Y. TIMES (Feb. 12, 2025) https://www.nytimes.com/2025/02/12/us/politics/ trump-foreign-service.html.

[14] Erich Wagner, *Trump Order Aims to Outlaw Most Government Unions on 'National Security" Grounds*, GOVT. EXEC. (March 27, 2025), https://www.govexec.com/workforce/2025/03/trump-order-aims-outlaw-most-government-unions-national-security-grounds/404113/.

The finding of irregularity based on factors other than the statutory criteria alone supports the lower court's finding that Executive Order No. 14,251 was *ultra vires*. And in a later case which granted a preliminary injunction against the enforcement of the Executive Order with respect to the teachers working the DOD dependent schools, the district court concluded that it likely was. *Fed. Educ. Ass'n v. Trump,* 2025 WL 2355747, *15 (D.D.C. Aug. 14, 2025), *stay denied*, 2025 WL 2738626 (D.C. Cir. Sep. 25, 2025).[15] But, in the next section, AFSA will explain why the lower court also correctly found that the President exceeded the scope of the statutory authority granted him by § 4103(b).

---

[15] Both the district court in granting the preliminary injunction, as well as this Court in refusing to stay that injunction, recognized that the case against the Executive Order "does not present an ordinary statutory interpretation argument." *FEA*, 2025 WL 2738626, *12 (Pan, J., concurring). This Court further recognized, "no plausible reading of the statute would permit the Executive to exclude a plethora of agencies from FSLMRS coverage for reasons that have nothing to do with national security." *Id.* The same considerations apply with the FSA, where the executive seeks to exclude almost all of the Foreign Service employees from the statute that provides them with the rights to organize and bargain collectively.

2. **The District Court Correctly Determined That the President Exceeded his Authority by Either Applying Overly Broad Interpretations of the Terms of § 4103(b) or by Disregarding the Terms Entirely.**

a. **"Primary Function."**

The district court rejected the government's approach of pointing to different categories of work that segments of the State Department and USAID perform and concluding that the "primary function" of each subdivision was national security. The government argues that "[i]t cannot be seriously disputed that the Department of State performs national-security work as a primary function." Defs.' Br. at 50. However, the issue is whether national security is the primary function of *each* of the subdivisions that were excluded. JA285–86.

*i.* First of all, the President lacks authority under the clear text of the FSA to exclude the entirety of the Department of State or the entirety of USAID directly or indirectly from coverage. The FSA only permits the President to "exclude *any subdivision* of the Department from coverage . . . if the President determines that . . . the provisions of this subchapter cannot be applied *to that subdivision* in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b) (emphasis added).

There is no statutory authority to exclude the entirety of the Department of State or USAID from coverage. If Congress intended to permit the President to revoke the collective bargaining rights in the entirety of the State Department or USAID, it would have used the same language as found in the corresponding section of the Federal Service Labor-Management Relations Statute, also known as "Chapter 71," which provides that "[t]he President may issue an order excluding any *agency or subdivision* thereof from coverage under this chapter." 5 U.S.C. § 7103(b) (emphasis supplied). Subsection 4103(b) cannot be interpreted as permitting the exclusion of the ***entirety*** of State or USAID because it defies both the plain text and Congressional findings that collective bargaining by members of the Foreign Service "safeguards the public interest, contributes to the effective conduct of public business and facilitates and encourages the amicable settlement of disputes" and that "the unique conditions of Foreign Service employment requires a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Service." 22 U.S.C. §§ 4101(1), (3). The complete termination of AFSA's

representation of Foreign Service members within State and USAID also cannot be reconciled with Congress's finding that "labor organizations and collective bargaining in the Service are in the public interest and are consistent with the requirement of an effective and efficient Government." 22 U.S.C. § 4101. Congress would never have enacted the Foreign Service Labor-Management Relations Statute (a/k/a Subchapter X of the FSA) had it believed that, as a general rule, collective bargaining by Foreign Service members is inconsistent "with national security requirements and considerations."

As a matter of statutory construction, the authority to exclude particular subdivisions cannot be read to permit the exclusion of everyone covered by the statute because "[a] statutory exemption cannot swallow the rule." *Sinclair Wyoming Ref. Co. LLC v. Env'tl Prot. Agency*, 114 F.4th 693, 711 (D.C. Cir. 2024); *see also Env'tl Prot. Agency v. Calumet Shreveport Refining, LLC*, 145 S. Ct. 1735, 1751 (2025); *City of Los Angeles, CA v. Patel*, 576 U.S. 409, 424–25 (2015); *Cuomo v. Clearing House Assn.*, 557 U.S. 519, 530 (2009); *Flynt v. Ohio*, 451 U.S. 619, 622 (1981); *Pac. Gas & Elec. Co. v FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024). Section 3 of the Executive Order is "in plain disregard of the elementary

rule requiring that exceptions from a general policy which a law embodies should be strictly construed; that is, should be so interpreted as not to destroy the remedial processes intended to be accomplished by the enactment." *Spokane & Inland Empire R.R. Co. v. United States*, 241 U.S. 344, 350 (1916).

*ii.* The government mistakenly argues that the district court "turn[ed] the relevant legal standard on its head" by asking that the government explain how national security is a "primary function" of each excluded State Department and USAID subdivision. However, once the presumption of regularity is rebutted, the burden falls on the government to demonstrate that the President interpreted and applied Section 4103 correctly. Once the presumption of regularity has been overcome, "further explication can be required of the decisionmaker." *Hercules, Inc. v. Env'tl Prot. Agency,* 598 F.2d 91, 123 (D.C. Cir. 1978). If the presumption of regularity is rebutted, "the Government is put to proof." *Romero v. Tran*, 33 Vet. App. 252, 261 (2021). "If it appears irregular, it is irregular, and the burden shifts to the proponent to show the contrary." *United States v. Roses Inc.,* 706 F.2d 1563, 1567 (Fed. Cir. 1983).

***iii.*** The *only* rationale offered by the White House for excluding the Department of State and USAID when the Executive Order was issued was that "President Trump has demonstrated how trade policy is a national security tool." Fact Sheet, *supra*, at 6 n.4. While "national security" may not be defined in the FSA, it cannot be so broad as to encompass everything that Foreign Service employees do in connection with their employment with State or USAID. *Cole*, 351 U.S. at 543–44. The term has to have a more specific definition, such as "those activities which are directly concerned with the Nation's safety, as distinguished from the general welfare." *Id.*

In its brief, the government identifies *just two* subdivisions of the State Department that ostensibly conduct national security work. (Def. Br. at 51). But "[p]ost hoc rationalizations by imaginative government counsel do not suffice." *Ace Motor Freight, Inc. v. I. C. C.,* 557 F.2d 859, 864 (D.C. Cir. 1977). "The courts may not accept appellate counsel's *post hoc* rationalizations" for the government's actions. *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). The government's brief describes the work that USAID *once* performed but no longer performs (extending development assistance, supporting economic

reform, democratic reform, addressing food insecurity combating the spread of disease), but does not even claim that its primary function was national security. Defs.' Br. at 51–52.

## b. "National Security."

As can be seen from the government's description of the work of USAID in particular, the district court was correct that the expansive interpretation of the term "national security" would convert a narrow exclusion to one that defeats the whole statute, which could not have been Congress's intent. JA287–88. "It therefore is plainly unreasonable to conclude that the exclusion in Section 4103(b) can be satisfied merely by pointing to the general national security and foreign policy 'character' of the departments and agencies that Congress included in the Statute," the district court wrote. JA290. "To do so would essentially render Section 4103(b) meaningless since an agency subdivision necessarily would satisfy the provision by nature of their inclusion in the Statute." *Id.*

## c. Consistent with National Security Requirements.

The President's Fact Sheet reveals his fundamental misunderstanding, if not misrepresentation of, both the FSA and the

FSLMR Statute, along with their labor-management provisions. This misunderstanding further demonstrates that "the President was indifferent to the purposes and requirements of the Act, or acted deliberately in contravention of them." *AFGE*, 870 F.2d at 728.

Neither statute allows "Federal unions to obstruct agency management," as the Fact Sheet claims. Nor is it correct to say that because "Agencies cannot make most contractually permissible changes until after finishing 'mid-term' union bargaining," collective bargaining is "dangerous in agencies with national security responsibilities." Nor is it true that either statute precludes the agencies from "execut[ing] their missions without delay."

*First*, both statutes have an expansive management rights clause that protects management prerogatives and precludes bargaining over a host of issues, not the least of which includes the right "to determine the mission, budget, organization, number of employees, and internal security practices of the agency," to "assign work," and, importantly, "to take whatever actions may be necessary to carry out the agency mission during emergencies." 22 U.S.C. § 4105(a); 5 U.S.C. § 7106(a). As a result, although unions may bargain only over the "procedures" that the agency

will use in exercising its management rights and over "appropriate arrangements for employees adversely affected by the exercise" of those management rights, they cannot bargain over the substance of the agency's decision itself.

*Second*, an agency need not complete bargaining before changing conditions of employment when immediate implementation is "consistent with the necessary functioning of the agency, such that a delay in implementation would have impeded the agency's ability to effectively and efficiently carry out its mission." *SPORT and Dep't of Air Force, Edwards AFB*, 68 F.L.R.A. 9, 10–11 (2014), *recon. denied*, 68 F.L.R.A. 107 (2014) (agency properly furloughed employees without completing implementation bargaining).[16]

*Third*, even when the FLRA finds that an agency committed an unfair labor practice by failing to bargain with a union, the FLRA may forgo ordering the agency to restore the *status quo ante* as a remedy for that failure if it would disrupt and impair the efficiency and effectiveness of an agency's operations. *Dep't of the Air Force, 913th Air Wing, Willow*

---

[16]     As noted *supra* at pages 15–16, the FSLRB must follow FLRA precedent unless it determines special circumstances require otherwise. 22 U.S.C. § 4107(b).

*Grove Air Reserve Station*, 57 F.L.R.A. 852, 858 (2002). *See infra* pages 55–56.

*Fourth,* the government, relying on March 27, 2025 OPM Guidance implementing the executive order, argues that "[i]n agencies like the State Department, for example, removing 'procedural impediments to separating poor performers' is a national-security imperative." Def. Br. at 47. But the OPM Guidance addresses only the alleged impediments for removing poor performers at the Veterans Administration and in Federal agencies covered by the performance management provisions of Title 5, which is not applicable to the Foreign Service. Charles Ezell, *Guidance on Executive Order Exclusions from Federal Labor-Management Programs*, 4–5, OPM (Mar. 27, 2025), https://perma.cc/Z2ZJ-Y8U7.

AFSA has not asked the courts to substitute their judgment for that of the President on national security needs—only to correct the President's misunderstanding or misrepresentation of the State Department's and USAID's bargaining obligations under the FSA, which forms the basis for the President's determination that collective

bargaining at State and USAID is inconsistent with national security requirements.

## II. The District Court Did Not Abuse its Discretion in Finding That AFSA Would Suffer Irreparable Injury Absent a Preliminary Injunction.

The district court correctly determined that AFSA's loss of bargaining power at this critical time when the State Department is being reorganized and USAID disbanded cannot be later remedied. JA291–95. The exclusion of employees from a labor-management relations statute inflicts immediate, irreparable harm upon both the employees and their collective bargaining representative. *SEIU Health Care of Mich. v. Snyder*, 875 F.Supp.2d 710, 724–25 (E.D. Mich. 2012) (explaining the extent of the irreparable injury). Federal courts have repeatedly found that employers' refusal to recognize or their withdrawal of union recognition, along with the repudiation of collective bargaining agreements, causes irreparable harm to unions and the employees they represent. *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191 (9th Cir. 2011); *NLRB v. Electro-Voice*, 83 F.3d 1559, 1573 (7th Cir. 1996); *Asseo v. Centro Medico del Turabo*, 900 F.2d 445, 455 (1st Cir. 1990).

**A.** The government argues that the loss of membership support is speculative. Defs.' Br. at 57. But this Court recognizes the long-term harm that unions suffer when an employer refuses to recognize or deal with a union:

> Employee interest in a union can wane quickly as working conditions remain apparently unaffected by the union or collective bargaining. When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees.

*Int'l Union of Elec. Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C.Cir.1970), *cert. denied,* 400 U.S. 950 (1970). Collective bargaining derives its value in real time, enabling employees to address their employment conditions through their collective bargaining representative when it matters the most. If a union is unable to bargain on behalf of its members and represented employees as changes unfold, then the employees' interest in and support for collective bargaining will weaken. *Moore-Duncan ex rel. NLRB v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396–97 (E.D. Pa. 2001) ("*Horizon House*"). These losses create a "mutually reinforcing cycle," whereby the union's lack of power and the employees' declining interest further weaken the union's support. *Id.* The end result of that cycle is irreparable. *See*, *e.g.,*

*Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1191–92 (9th Cir. 2011) (finding order cannot remedy lost support for union).

Moreover, AFSA cannot rely on the FSLRB to impose a retroactive remedy. The FLRA (whose precedent the FSLRB must apply) denies a status quo ante remedy if it would disrupt and impair the efficiency and effectiveness of an agency's operations. *913th Air Wing, supra.*; *Army & Air Force Exch. Serv. Waco Distribution Ctr. Waco, Texas*, 53 F.L.R.A. 749, 759–63 (1997) (remanding to reopen record to determine whether retroactive remedy following failure to bargain over impact of a RIF would be disruptive). Retroactive bargaining orders are discretionary. *Nat'l Treas. Emps. Union v. FLRA*, 910 F.2d 964 (D.C. Cir. 1990) (*en banc*). They are often denied. *Health Serv., Crownpoint Comp. Health Care Fac.*, 53 F.L.R.A. 1161 (1998); *Fed. Deposit Ins. Co.*, 40 F.L.R.A. 75, 784-85 (1991); *Dept. of Treas., Customs Serv.*, 38 F.L.R.A. 989, 992–93 (1990); *Fed. Aviation Admin.*, 23 F.L.R.A. 209, 218 (1986) (failure to bargain over agency reorganization); *Env'tl Prot. Agency*, 21 F.L.R.A. 786, 790 (1986); *Dep't. of Health & Human Servs.*, 16 F.L.R.A. 288 (1984) (denying retroactive bargaining order following failure to bargain over a RIF).

**B.** The government also takes issue with the financial injuries inflicted upon AFSA resulting from the government's cessation of dues allotments. AFSA faces a threat of financial ruin if it has to wait for the conclusion of court proceedings, as well as the exhaustion of subsequent proceedings before the Board once coverage under Subchapter X has been reestablished, to regain years of lost dues income. *Wilmer Cutler Pickering Hale & Dorr, LLP v. Exec. Off. of the President*, 774 F. Supp. 3d 86, 89 (D.D.C. 2025) ("While economic loss does not always warrant a temporary restraining order, this is not a typical situation because plaintiff faces more than economic harm—it faces crippling losses and its very survival is at stake"); *SEIU Health Care Michigan*, 875 F. Supp. 2d at 725 ("By mandating that state officials refuse to recognize Plaintiff as a union representative and refuse to withhold union dues and fees, Plaintiff will be irreparably harmed by being deprived its contractual rights, its ability to advocate and bargain for its members, and the loss of revenue to operate effectively and exercise its First Amendment rights during an important time . . . ").

And it is obviously impossible to retroactively withhold dues from the paychecks from members who have been laid off in the interim

because the union wasn't around to protect their jobs.  There is also little incentive for AFSA's worldwide membership to pay dues directly if it has lost its role as their collective bargaining representative. But it is not so much the loss of income that constitutes the irreparable injury as it is AFSA's loss of its statutory right in 22 U.S.C. § 4118(a) to receive dues income on an ongoing basis that it can put to use *now* to represent and advocate for its members during a period of rapid change and threats to their job security which constitutes irreparable injury. *SEIU Health Care Michigan*, 875 F.Supp.2d at 724–25.

## III.  The District Court Did Not Abuse its Discretion in Determining that the Balance of Equities Favored AFSA.

Whether the government is injured pendente lite depends on whether it or AFSA is likely to succeed on the merits, as the rights they each say will be injured are found in the statute in dispute. The public's interest resides with whomever has the better of the merits argument:

> [T]he Plaintiffs' likelihood of success on the merits lightens the Executive's stated interests. In *Youngstown Sheet & Tube Co. v. Sawyer*, for example, the Supreme Court affirmed the district court's preliminary injunction of an illegal executive order even though a wartime President said his order was "necessary to avert a national catastrophe." 343 U.S. 579, 582 (1952). More recently, the Supreme Court confirmed that "our system does not permit agencies to act unlawfully even in

pursuit of desirable ends." *Ala. Ass'n of Realtors v. Dep't Health & Human Servs.*, 141 S. Ct. 2485, 2490 (2021); *see also NFIB v. Dep't of Lab.*, 142 S. Ct. 661, 666 (2022) (staying an illegal vaccine mandate even though the government said the mandate would save more than 6,500 lives).

*Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 734 (D.C. Cir. 2022) (cleaned up). Having correctly determined that AFSA is likely to succeed on the merits, the district court logically had no choice but to find that the public's interest in collective bargaining embodied in the FSA outweighs the non-existent interest of the President in exempting the State Department and USAID from coverage of Subchapter X under the guise of national security. *Fed. Educ. Ass'n*, 2025 WL 2738626, *12 (Pan, J. concurring) (finding public interest does not support the issuance of Exec. Order No. 14,251 to undermine statutory protections of employees where the order is "likely unlawful").

## CONCLUSION

In sum, the district court properly found all of the traditional injunctive relief factors favored the issuance of a preliminary injunction in this case. The Defendants-Appellants raise many arguments, which can be reduced to little more than elevating the President's invocation of "national security" as something for which there must be unquestioning

acceptance. The district court properly followed established D.C. Circuit precedent to reach a conclusion that upholds the rule of law without crossing the separation of powers. Accordingly, AFSA respectfully requests that the Court affirm the district court's entry of a preliminary injunction, vacate this Court's prior order staying the preliminary injunction pending appeal, and remand the case for further proceedings on the merits.

Respectfully submitted,

By: */s/ Richard J. Hirn*
Richard J. Hirn
D.C. Bar No. 291849
5335 Wisconsin Ave., NW, Suite 440
Washington, D.C. 20015
(202) 274-1812
richard@hirnlaw.com

*/s/ April H. Pullium*
Keith R. Bolek
Bar No. 463129
April H. Pullium
Bar No. 198026
O'Donoghue & O'Donoghue LLP
5301 Wisconsin Avenue, Suite 800
Washington, D.C. 20015
(202) 362-0041
kbolek@odonoghuelaw.com
apullium@odonoghuelaw.com

*/s/ Sharon L. Papp*
Sharon L. Papp

General Counsel
D.C. Bar No. 107992
Raeka Safai
Deputy General Counsel
D.C. Bar No. 977301
American Foreign Service Association
2101 E Street, NW
Washington, DC 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for American Foreign Service Association*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the foregoing Brief of Appellee satisfies the requirements of Fed. R. App. P. 32(a)(5) because it has been prepared in 14-point Century, a proportionally spaced font, and that it complies with the typeface and type-volume limitations of Fed. R. App P. 32(e) because it contains 11,776 words, excluding those words that Fed. R. App. P. 32(f) and D.C. Cir. R. 32(e)(1) exempt.

DATED: October 9, 2025          */s/ Richard J. Hirn*
                               Richard J. Hirn

# APPENDIX A –

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM – TABLE OF CONTENTS

22 U.S.C. § 4101 ..................................................................A1

22 U.S.C. § 4102 ..................................................................A1

22 U.S.C. § 4103 ..................................................................A3

22 U.S.C. § 4104 ..................................................................A3

22 U.S.C. § 4105 ..................................................................A4

22 U.S.C. § 4106 ..................................................................A4

22 U.S.C. § 4107 ..................................................................A5

22 U.S.C. § 4108 ..................................................................A6

22 U.S.C. § 4109 ..................................................................A6

22 U.S.C. § 4110 ..................................................................A6

22 U.S.C. § 4111 ..................................................................A7

22 U.S.C. § 4112 ..................................................................A9

22 U.S.C. § 4113 ..................................................................A9

22 U.S.C. § 4114 .................................................................A10

22 U.S.C. § 4115 .................................................................A11

22 U.S.C. § 4116 .................................................................A13

22 U.S.C. § 4117 .................................................................A14

22 U.S.C. § 4118 .................................................................A16

22 U.S.C. § 4131 .................................................A17

22 U.S.C. § 4135 .................................................A19

22 U.S.C. § 4140 .................................................A21

CHAPTER 10—LABOR-MANAGEMENT RELATIONS

SEC. 1001. 【22 U.S.C. 4101】 LABOR-MANAGEMENT POLICY.—
The Congress finds that—

(1) experience in both private and public employment indicates that the statutory protection of the right of workers to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—

(A) safeguards the public interest,

(B) contributes to the effective conduct of public business, and

(C) facilitates and encourages the amicable settlement of disputes between workers and their employers involving conditions of employment;

(2) the public interest demands the highest standards of performance by members of the Service and the continuous development and implementation of modern and progressive work practices to facilitate improved performance and efficiency; and

(3) the unique conditions of Foreign Service employment require a distinct framework for the development and implementation of modern, constructive, and cooperative relationships between management officials and organizations representing members of the Service.

Therefore, labor organizations and collective bargaining in the Service are in the public interest and are consistent with the requirement of an effective and efficient Government. The provisions of this chapter should be interpreted in a manner consistent with the requirement of an effective and efficient Government.

SEC. 1002. 【22 U.S.C. 4102】 DEFINITIONS.—As used in this chapter, the term—

(1) "Authority" means the Federal Labor Relations Authority, described in section 7104(a) of title 5, United States Code;

(2) "Board" means the Foreign Service Labor Relations Board, established by section 1006(a);

(3) "collective bargaining" means the performance of the mutual obligation of the management representative of the Department and of the exclusive representative of employees to meet at reasonable times and to consult and bargain in a good-faith effort to reach agreement with respect to the conditions of employment affecting employees, and to execute, if requested by either party, a written document incorporating any collective bargaining agreement reached, but this obligation does not compel either party to agree to a proposal or to make a concession;

(4) "collective bargaining agreement" means an agreement entered into as a result of collective bargaining under the provisions of this chapter;

(5) "conditions of employment" means personnel policies, practices, and matters, whether established by regulation or otherwise, affecting working conditions, but does not include policies, practices, and matters—

All statutory provisions cited in this Statutory Addendum are available at:
https://www.govinfo.gov/content/pkg/COMPS-1077/pdf/COMPS-1077.pdf

A1

(A) relating to political activities prohibited abroad or prohibited under subchapter III of chapter 73 of title 5, United States Code;

(B) relating to the designation or classification of any position under section 501;

(C) to the extent such matters are specifically provided for by Federal statute; or

(D) relating to Government-wide or multiagency responsibility of the Secretary affecting the rights, benefits, or obligations of individuals employed in agencies other than those which are authorized to utilize the Foreign Service personnel system;

(6) "confidential employee" means an employee who acts in a confidential capacity with respect to an individual who formulates or effectuates management policies in the field of labor-management relations;

(7) "dues" means dues, fees, and assessments;

(8) "employee" means—

(A) a member of the Service who is a citizen of the United States, wherever serving, other than a management official, a confidential employee, a consular agent, a member of the Service who is a United States citizen (other than a family member) employed under section 311, or any individual who participates in a strike in violation of section 7311 of title 5, United States Code; or

(B) a former member of the Service as described in subparagraph (A) whose employment has ceased because of an unfair labor practice under section 1015 and who has not obtained any other regular and substantially equivalent employment, as determined under regulations prescribed by the Board;

(9) "exclusive representative" means any labor organization which is certified as the exclusive representative of employees under section 1011;

(10) "General Counsel" means the General Counsel of the Authority;

(11) "labor organization" means an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose dealing with the Department concerning grievances (as defined in section 1101) and conditions of employment, but does not include—

(A) an organization which, by its constitution, bylaws, tacit agreement among its members, or otherwise, denies membership because of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or disability;

(B) an organization which advocates the overthrow of the constitutional form of government of the United States;

(C) an organization sponsored by the Department; or

(D) an organization which participates in the conduct of a strike against the Government or any agency thereof or imposes a duty or obligation to conduct, assist, or participate in such a strike;

(12) "management official" means an individual who—

(A) is a chief of mission or principal officer;

(B) is serving in a position to which appointed by the President, by and with the advice and consent of the Senate, or by the President alone;

(C) occupies a position which in the sole judgment of the Secretary is of comparable importance to the offices mentioned in subparagraph (A) or (B);

(D) is serving as a deputy to any individual described by subparagraph (A), (B), or (C);

(E) is assigned to carry out functions of the Inspector General of the Department of State and the Foreign Service under section 209; or

(F) is engaged in the administration of this chapter or in the formulation of the personnel policies and programs of the Department;

(13) "Panel" means the Foreign Service Impasse Disputes Panel, established by section 1010(a); and

(14) "person" means an individual, a labor organization, or an agency to which this chapter applies.

SEC. 1003. ⟦22 U.S.C. 4103⟧ APPLICATION.—(a) This chapter applies only with respect to the Department of State, the Broadcasting Board of Governors, the Agency for International Development, the Department of Agriculture, and the Department of Commerce.

(b) The President may by Executive order exclude any subdivision of the Department from coverage under this chapter if the President determines that—

(1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(2) the provisions of this chapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

(c) The President may by Executive order suspend any provision of this chapter with respect to any post, bureau, office, or activity of the Department, if the President determines in writing that the suspension is necessary in the interest of national security because of an emergency.

SEC. 1004. ⟦22 U.S.C. 4104⟧ EMPLOYEE RIGHTS.—(a) Every employee has the right to form, join, or assist any labor organization, or to refrain from any such activity, freely and without fear of penalty or reprisal. Each employee shall be protected in the exercise of such right.

(b) Except as otherwise provided under this chapter, such right includes the right—

(1) to act for a labor organization in the capacity of a representative and, in that capacity, to present the views of the labor organization to the Secretary and other officials of the Government, including the Congress, or other appropriate authorities; and

(2) to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter.

SEC. 1005. 【22 U.S.C. 4105】 MANAGEMENT RIGHTS.—(a) Subject to subsection (b), nothing in this chapter shall affect the authority of any management official of the Department, in accordance with applicable law—

(1) to determine the mission, budget, organization, and internal security practices of the Department, and the number of individuals in the Service or in the Department;

(2) to hire, assign, direct, lay off, and retain individuals in the Service or in the Department, to suspend, remove, or take other disciplinary action against such individuals, and to determine the number of members of the Service to be promoted and to remove the name of or delay the promotion of any member in accordance with regulations prescribed under section 605(b);

(3) to conduct reductions in force, and to prescribe regulations for the separation of employees pursuant to such reductions in force conducted under section 611;

(4) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which the operations of the Department shall be conducted;

(5) to fill positions from any appropriate source;

(6) to determine the need for uniform personnel policies and procedures between or among the agencies to which this chapter applies; and

(7) to take whatever actions may be necessary to carry out the mission of the Department during emergencies.

(b) Nothing in this section shall preclude the Department and the exclusive representative from negotiating—

(1) at the election of the Department, on the numbers, types, and classes of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;

(2) procedures which management officials of the Department will observe in exercising any function under this section; or

(3) appropriate arrangements for employees adversely affected by the exercise of any function under this section by such management officials.

SEC. 1006. 【22 U.S.C. 4106】 FOREIGN SERVICE LABOR RELATIONS BOARD.—(a) There is established within the Federal Labor Relations Authority the Foreign Service Labor Relations Board. The Board shall be composed of 3 members, 1 of whom shall be the Chairman of the Authority, who shall be the Chairperson of the Board. The remaining 2 members shall be appointed by the Chairperson of the Board from nominees approved in writing by the agencies to which this chapter applies, and the exclusive representative (if any) of employees in each such agency. In the event of inability to obtain agreement on a nominee, the Chairperson shall appoint the remaining 2 members from among individuals the Chairperson considers knowledgeable in labor-management relations and the conduct of foreign affairs.

(b) The Chairperson shall serve on the Board while serving as Chairman of the Authority. Of the 2 original members of the Board other than the Chairperson, one shall be appointed for a 2-year

A4

term and one shall be appointed for a 3-year term. Thereafter, each member of the Board other than the Chairperson shall be appointed for a term of 3 years, except that an individual appointed to fill a vacancy occurring before the end of a term shall be appointed for the unexpired term of the member replaced. The Chairperson may at any time designate an alternate Chairperson from among the members of the Authority.

(c) A vacancy on the Board shall not impair the right of the remaining members to exercise the full powers of the Board.

(d) The members of the Board, other than the Chairperson, may not hold another office or position in the Government except as authorized by law, and shall receive compensation at the daily equivalent of the rate payable for level V of the Executive Schedule under section 5316 of title 5, United States Code, for each day they are performing their duties (including traveltime).

(e) The Chairperson may remove any other Board member, upon written notice, for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at a hearing, except where the right to a hearing is waived in writing.

SEC. 1007. 【22 U.S.C. 4107】 FUNCTIONS OF THE BOARD.—(a) The Board shall—

(1) supervise or conduct elections and determine whether a labor organization has been selected as the exclusive representative by a majority of employees who cast valid ballots and otherwise administer the provisions of this chapter relating to the according of exclusive recognition to a labor organization;

(2) resolve complaints of alleged unfair labor practices;

(3) resolve issues relating to the obligation to bargain in good faith;

(4) resolve disputes concerning the effect, the interpretation, or a claim of breach of a collective bargaining agreement, in accordance with section 1014; and

(5) take any action considered necessary to administer effectively the provisions of this chapter.

(b) Decisions of the Board under this chapter shall be consistent with decisions rendered by the Authority under chapter 71 of title 5, United States Code, other than in cases in which the Board finds that special circumstances require otherwise. Decisions of the Board under this chapter shall not be construed as precedent by the Authority, or any court or other authority, for any decision under chapter 71 of title 5, United States Code.

(c) In order to carry out its functions under this chapter—

(1) the Board shall by regulation adopt procedures to apply in the administration of this chapter; and

(2) the Board may—

(A) adopt other regulations concerning its functions under this chapter;

(B) conduct appropriate inquiries wherever persons subject to this chapter are located;

(C) hold hearings;

(D) administer oaths, take the testimony or deposition of any individual under oath, and issue subpenas;

A5

(E) require the Department or a labor organization to cease and desist from violations of this chapter and require it to take any remedial action the Board considers appropriate to carry out this chapter; and

(F) consistent with the provisions of this chapter, exercise the functions the Authority has under chapter 71 of title 5, United States Code, to the same extent and in the same manner as is the case with respect to persons subject to chapter 71 of such title.

SEC. 1008. 【22 U.S.C. 4108】 FUNCTIONS OF THE GENERAL COUNSEL.—The General Counsel may—

(1) investigate alleged unfair labor practices under this chapter,

(2) file and prosecute complaints under this chapter, and

(3) exercise such other powers of the Board as the Board may prescribe.

SEC. 1009. 【22 U.S.C. 4109】 JUDICIAL REVIEW AND ENFORCEMENT.—(a) Except as provided in section 1014(d), any person aggrieved by a final order of the Board may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of such order in the United States Court of Appeals for the District of Columbia.

(b) The Board may petition the United States Court of Appeals for the District of Columbia for the enforcement of any order of the Board under this chapter and for any appropriate temporary relief or restraining order.

(c) Subsection (c) of section 7123 of title 5, United States Code, shall apply to judicial review and enforcement of actions by the Board in the same manner that it applies to judicial review and enforcement of actions of the Authority under chapter 71 of title 5, United States Code.

(d) The Board may, upon issuance of a complaint as provided in section 1016 charging that any person has engaged in or is engaging in an unfair labor practice, petition the United States District Court for the District of Columbia, for appropriate temporary relief (including a restraining order). Upon the filing of the petition, the court shall cause notice thereof to be served upon the person, and thereupon shall have jurisdiction to grant any temporary relief (including a temporary restraining order) it considers just and proper. A court shall not grant any temporary relief under this section if it would interfere with the ability of the Department to carry out its essential functions or if the Board fails to establish probable cause that an unfair labor practice is being committed.

SEC. 1010. 【22 U.S.C. 4110】 FOREIGN SERVICE IMPASSE DISPUTES PANEL.—(a) There is established within the Federal Labor Relations Authority the Foreign Service Impasse Disputes Panel, which shall assist in resolving negotiating impasses arising in the course of collective bargaining under this chapter. The Chairperson shall select the Panel from among individuals the Chairperson considers knowledgeable in labor-management relations or the conduct of foreign affairs. The Panel shall be composed of 5 members, as follows:

(1) 2 members of the Service (other than a management official, a confidential employee or a labor organization official);

(2) one individual employed by the Department of Labor;

(3) one member of the Federal Service Impasses Panel; and

(4) one public member who does not hold any other office or position in the Government.

The Chairperson of the Board shall set the terms of office for Panel members and determine who shall chair the Panel.

(b) Panel members referred to in subsection (a) (3) and (4) shall receive compensation for each day they are performing their duties (including traveltime) at the daily equivalent of the maximum rate payable for grade GS–18 of the General Schedule under section 5332 of title 5, United States Code, except that the member who is also a member of the Federal Service Impasses Panel shall not be entitled to pay under this subsection for any day for which he or she receives pay under section 7119(b)(4) of title 5, United States Code. Members of the Panel shall be entitled to travel expenses as provided under section 5703 of title 5, United States Code.

(c)(1) The Panel or its designee shall promptly investigate any impasse presented to it by a party. The Panel shall consider the impasse and shall either—

(A) recommend to the parties to the negotiation procedures for the resolution of the impasse; or

(B) assist the parties in resolving the impasse through whatever methods and procedures, including factfinding and recommendations, it may consider appropriate to accomplish the purpose of this section.

(2) If the parties do not arrive at a settlement after assistance by the Panel under paragraph (1), the Panel may—

(A) hold hearings;

(B) administer oaths, take the testimony or deposition of any individual under oath, and issue subpenas as provided in section 7132 of title 5, United States Code; and

(C) take whatever action is necessary and not inconsistent with this chapter to resolve the impasse.

(3) Notice of any final action of the Panel under this section shall be promptly served upon the parties, and the action shall be binding on such parties during the term of the collective bargaining agreement unless the parties agree otherwise.

SEC. 1011. 【22 U.S.C. 4111】 EXCLUSIVE RECOGNITION.—(a) The Department shall accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in a unit who cast valid ballots in the election.

(b) If a petition is filed with the Board—

(1) by any person alleging—

(A) in the case of a unit for which there is no exclusive representative, that 30 percent of the employees in the unit wish to be represented for the purpose of collective bargaining by an exclusive representative, or

(B) in the case of a unit for which there is an exclusive representative, that 30 percent of the employees in the unit alleged that the exclusive representative is no longer

the representative of the majority of the employees in the unit; or

(2) by any person seeking clarification of, or an amendment to, a certification then in effect or a matter relating to representation;

the Board shall investigate the petition, and if it has reasonable cause to believe that a question of representation exists, it shall provide an opportunity for a hearing (for which a transcript shall be kept) after reasonable notice. If the Board finds on the record of the hearing that a question of representation exists, the Board shall supervise or conduct an election on the question by secret ballot and shall certify the results thereof. An election under this subsection shall not be conducted in any unit within which a valid election under this subsection has been held during the preceding 12 calendar months or with respect to which a labor organization has been certified as the exclusive representative during the preceding 24 calendar months.

(c) A labor organization which—

(1) has been designated by at least 10 percent of the employees in the unit; or

(2) is the exclusive representative of the employees involved;

may intervene with respect to a petition filed pursuant to subsection (b) and shall be placed on the ballot of any election under subsection (b) with respect to the petition.

(d)(1) The Board shall determine who is eligible to vote in any election under this section and shall establish regulations governing any such election, which shall include regulations allowing employees eligible to vote the opportunity to choose—

(A) from labor organizations on the ballot, that labor organization which the employees wish to have represent them; or

(B) not to be represented by a labor organization.

(2) In any election in which more than two choices are on the ballot, the regulations of the Board shall provide for preferential voting. If no choice receives a majority of first preferences, the Board shall distribute to the two choices having the most first preferences the preferences as between those two of the other valid ballots cast. The choice receiving a majority of preferences shall be declared the winner. A labor organization which is declared the winner of the election shall be certified by the Board as the exclusive representative.

(e) A labor organization seeking exclusive recognition shall submit to the Board and to the Department a roster of its officers and representatives, a copy of its constitution and bylaws, and a statement of its objectives.

(f) Exclusive recognition shall not be accorded to a labor organization—

(1) if the Board determines that the labor organization is subject to corrupt influences or influence opposed to democratic principles; or

(2) in the case of a petition filed under subsection (b)(1)(A), if there is not credible evidence that at least 30 percent of the employees wish to be represented for the purpose of collective

A8

G:\COMP\FOREIGN\FOREIGN SERVICE ACT OF 1980.XML

bargaining by the labor organization seeking exclusive recognition.

(g) Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules or decisions of the Board.

SEC. 1012. 〚22 U.S.C. 4112〛 EMPLOYEES REPRESENTED.—The employees of the Department shall constitute a single and separate worldwide bargaining unit, from which there shall be excluded—

(1) employees engaged in personnel work in other than a purely clerical capacity; and

(2) employees engaged in criminal or national security investigations or who audit the work of individuals to insure that their functions are discharged honestly and with integrity.

SEC. 1013. 〚22 U.S.C. 4113〛 REPRESENTATION RIGHTS AND DUTIES.—(a) A labor organization which has been accorded exclusive recognition is the exclusive representative of, and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit described in section 1012. An exclusive representative is responsible for representing the interests of all employees in that unit without discrimination and without regard to labor organization membership.

(b)(1) An exclusive representative shall be given the opportunity to be represented at—

(A) any formal discussion between one or more representatives of the Department and one or more employees in the unit (or their representatives), concerning any grievance (as defined in section 1101) or any personnel policy or practice or other general condition of employment; and

(B) any examination of an employee by a Department representative in connection with an investigation if—

(i) the employee reasonably believes that the examination may result in disciplinary action against the employee, and

(ii) the employee requests such representation.

(2) The Department shall annually inform employees of their rights under paragraph (1)(B).

(c) The Department and the exclusive representative, through appropriate representatives, shall meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement. In addition, the Department and the exclusive representative may determine appropriate techniques, consistent with the provisions of section 1010, to assist in any negotiation.

(d) The rights of an exclusive representative under this section shall not preclude an employee from—

(1) being represented by an attorney or other representative of the employee's own choosing, other than the exclusive representative, in any grievance proceeding under chapter 11; or

(2) exercising grievance or appeal rights established by law, rule, or regulation.

(e) The duty of the Department and the exclusive representative to negotiate in good faith shall include the obligation—

(1) to approach the negotiations with a sincere resolve to reach a collective bargaining agreement;

(2) to be represented at the negotiations by duly authorized representatives prepared to discuss and negotiate on any condition of employment;

(3) to meet at reasonable times and convenient places as frequently as may be necessary and to avoid unnecessary delays;

(4) for the Department to furnish to the exclusive representative, or its authorized representative, upon request and to the extent not prohibited by law, data—

(A) which is normally maintained by the Department in the regular course of business;

(B) which is reasonably available and necessary for full and proper discussion, understanding, and negotiation of subjects within the scope of collective bargaining; and

(C) which does not constitute guidance, advice, counsel, or training provided for management officials or confidential employees, relating to collective bargaining;

(5) to negotiate jointly with respect to conditions of employment applicable to employees in more than one of the agencies authorized to utilize the Foreign Service personnel system, as determined by the heads of such agencies; and

(6) if agreement is reached, to execute, upon the request of any party to the negotiation, a written document embodying the agreed terms, and to take the steps necessary to implement the agreement.

(f)(1) An agreement between the Department and the exclusive representative shall be subject to approval by the Secretary.

(2) The Secretary shall approve the agreement within 30 days after the date of the agreement unless the Secretary finds in writing that the agreement is contrary to applicable law, rule, or regulation.

(3) Unless the Secretary disapproves the agreement by making a finding under paragraph (2), the agreement shall take effect after 30 days from its execution and shall be binding on the Department and the exclusive representative subject to all applicable laws, orders, and regulations.

(g) The Department shall consult with the exclusive representative with respect to Government-wide or multiagency matters affecting the rights, benefits, or obligations of individuals employed in agencies not authorized to utilize the Foreign Service personnel system. The exclusive representative shall be informed of any change proposed by the Department with respect to such matters, and shall be permitted reasonable time to present its views and recommendations regarding such change. The Department shall consider the views and recommendations of the exclusive representative before taking final action on any such change, and shall provide the exclusive representative a written statement of the reasons for taking the final action.

SEC. 1014. 【22 U.S.C. 4114】 RESOLUTION OF IMPLEMENTATION DISPUTES.—(a) Any dispute between the Department and the exclusive representative concerning the effect, interpretation, or a claim of breach of a collective bargaining agreement shall be resolved

through procedures negotiated by the Department and the exclusive representative. Any procedures negotiated under this section shall—

    (1) be fair and simple,

    (2) provide for expeditious processing, and

    (3) include provision for appeal to the Foreign Service Grievance Board by either party of any dispute not satisfactorily settled.

(b) Either party to an appeal under subsection (a)(3) may file with the Board an exception to the action of the Foreign Service Grievance Board in resolving the implementation dispute. If, upon review, the Board finds that the action is deficient—

    (1) because it is contrary to any law, rule, or regulation; or

    (2) on other grounds similar to those applied by Federal courts in private sector labor-management relations;

the Board may take such action and make such recommendations concerning the Foreign Service Grievance Board action as it considers necessary, consistent with applicable laws, rules, and regulations.

(c) If no exception to a Foreign Service Grievance Board action is filed under subsection (b) within 30 days after such action is communicated to the parties, such action shall become final and binding and shall be implemented by the parties.

(d) Resolutions of disputes under this section shall not be subject to judicial review.

SEC. 1015. ⟦22 U.S.C. 4115⟧ UNFAIR LABOR PRACTICES.—(a) It shall be an unfair labor practice for the Department—

    (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

    (2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

    (3) to sponsor, control, or otherwise assist any labor organization, other than to furnish upon request customary and routine services and facilities on an impartial basis to labor organizations having equivalent status;

    (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint or petition, or has given any information, affidavit, or testimony under this chapter;

    (5) to refuse to consult or negotiate in good faith with a labor organization, as required under this chapter;

    (6) to fail or refuse to cooperate in impasse procedures and impasse decisions, as required under this chapter;

    (7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of title 5, United States Code) which is in conflict with an applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

    (8) to fail or refuse otherwise to comply with any provision of this chapter.

(b) It shall be an unfair labor practice for a labor organization—

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to cause or attempt to cause the Department to discriminate against any employee in the exercise by the employee of any right under this chapter;

(3) to coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment or reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's functions as an employee;

(4) to discriminate against an employee with regard to the terms and conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or disability;

(5) to refuse to consult or negotiate in good faith with the Department, as required under this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions, as required under this chapter;

(7)(A) to call, or participate in, a strike, work stoppage, or slowdown, or to picket the Department in a labor-management dispute (except that any such picketing in the United States which does not interfere with the Department's operations shall not be an unfair labor practice); or

(B) to condone any unfair labor practice described in subparagraph (A) by failing to take action to prevent or stop such activity;

(8) to deny membership to any employee in the unit represented by the labor organization except—

(A) for failure to tender dues uniformly required as a condition of acquiring and retaining membership, or

(B) in the exercise of disciplinary procedures consistent with the organization's constitution or bylaws and this chapter; or

(9) to fail or refuse otherwise to comply with any provision of this chapter.

(c) The expression of any personal view, argument, or opinion, or the making of any statement, which—

(1) publicizes the fact of a representational election and encourages employees to exercise their right to vote in such an election;

(2) corrects the record with respect to any false or misleading statement made by any person; or

(3) informs employees of the Government's policy relating to labor-management relations and representation,

if the expression contains no threat of reprisal or force or promise of benefit and was not made under coercive conditions shall not—

(A) constitute an unfair labor practice under this chapter, or

(B) constitute grounds for the setting aside of any election conducted under this chapter.

(d) Issues which can properly be raised under an appeals procedure may not be raised as unfair labor practices prohibited under

A12

this section. Except for matters wherein, under section 1109(a)(2), an employee has an option of using the grievance procedure under chapter 11 or an appeals procedure, issues which can be raised under section 1014 or chapter 11 may, in the discretion of the aggrieved party, be raised either under section or chapter or else raised as an unfair labor practice under this section, but may not be raised both under this section and under section 1014 or chapter 11.

SEC. 1016. 【22 U.S.C. 4116】 PREVENTION OF UNFAIR LABOR PRACTICES.—(a) If the Department or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the Department or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.

(b) Any complaint under subsection (a) shall contain a notice—
　　(1) of the charge;
　　(2) that a hearing will be held before the Board (or any member thereof or before an individual employed by the Board and designated for such purpose); and
　　(3) of the time and place fixed for the hearing.

(c) The labor organization or Department involved shall have the right to file an answer to the original and any amended complaint and to appear in person or otherwise and give testimony at the time and place fixed in the complaint for the hearing.

(d)(1) Except as provided in paragraph (2), no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Board.

(2) If the General Counsel determines that the person filing any charge was prevented from filing the charge during the 6-month period referred to in paragraph (1) by reason of—
　　(A) any failure of the Department or labor organization against which the charge is made to perform a duty owed to the person, or
　　(B) any concealment which prevented discovery of the alleged unfair labor practice during the 6-month period,
the General Counsel may issue a complaint based on the charge if the charge was filed during the 6-month period beginning on the day of the discovery by the person of the alleged unfair labor practice.

(e) The General Counsel may prescribe regulations providing for informal methods by which the alleged unfair labor practice may be resolved prior to the issuance of a complaint.

(f) The Board (or any member thereof or any individual employed by the Board and designated for such purpose) shall conduct a hearing on the complaint not earlier than 5 days after the date on which the complaint is served. In the discretion of the individual or individuals conducting the hearing, any person involved may be allowed to intervene in the hearing and to present testimony. Any such hearing shall, to the extent practicable, be conducted in accordance with the provisions of subchapter II of chapter 5 of title

5, United States Code, except that the parties shall not be bound by rules of evidence, whether statutory, common law, or adopted by a court. A transcript shall be kept of the hearing. After such a hearing the Board, in its discretion, may upon notice receive further evidence or hear argument.

(g) If the Board (or any member thereof or any individual employed by the Board and designated for such purpose) determines after any hearing on a complaint under subsection (f) that the preponderance of the evidence received demonstrates that the Department or labor organization named in the complaint has engaged in or is engaged in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the Department or labor organization an order—

(1) to cease and desist from any such unfair labor practice in which the Department or labor organization is engaged;

(2) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Board and requiring that the agreement, as amended, be given retroactive effect;

(3) requiring reinstatement of an employee with backpay in accordance with section 5596 of title 5, United States Code; or

(4) including any combination of the actions described in paragraphs (1) through (3) or such other action as will carry out the purpose of this chapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the Department (as provided in section 5596 of title 5, United States Code) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

(h) If the individual or individuals conducting the hearing determine that the preponderance of the evidence received fails to demonstrate that the Department or labor organization named in the complaint has engaged in or is engaged in an unfair labor practice, the individual or individuals shall state in writing their findings of fact and shall issue an order dismissing the complaint.

SEC. 1017. ⟦22 U.S.C. 4117⟧ STANDARDS OF CONDUCT FOR LABOR ORGANIZATIONS.—(a) The Department shall accord recognition only to a labor organization that is free from corrupt influences and influences opposed to basic democratic principles. Except as provided in subsection (b), an organization is not required to prove that it is free from such influences if it is subject to a governing requirement adopted by the organization or by a national or international labor organization or federation of labor organizations with which it is affiliated, or in which it participates, containing explicit and detailed provisions to which it subscribes calling for—

(1) the maintenance of democratic procedures and practices, including—

(A) provisions for periodic elections to be conducted subject to recognized safeguards, and

(B) provisions defining and securing the right of individual members to participate in the affairs of the organization, to receive fair and equal treatment under the gov-

erning rules of the organization, and to receive fair process in disciplinary proceedings;

(2) the exclusion from office in the organization of persons affiliated with Communist or other totalitarian movements and persons identified with corrupt influences;

(3) the prohibition of business or financial interests on the part of organization officers and agents which conflict with their duty to the organization and its members; and

(4) the maintenance of fiscal integrity in the conduct of the affairs of the organization, including provisions for accounting and financial controls and regular financial reports or summaries to be made available to members.

(b) A labor organization may be required to furnish evidence of its freedom from corrupt influences opposed to basic democratic principles if there is reasonable cause to believe that—

(1) the organization has been suspended or expelled from, or is subject to other sanction by, a parent labor organization, or federation of organizations with which it has been affiliated, because it has demonstrated an unwillingness or inability to comply with governing requirements comparable in purpose to those required by subsection (a); or

(2) the organization is in fact subject to influences that would preclude recognition under this chapter.

(c) A labor organization which has or seeks recognition as a representative of employees under this chapter shall file financial and other reports with the Assistant Secretary of Labor for Labor Management Relations, provide for bonding of officials and others employed by the organization, and comply with trusteeship and election standards.

(d) The Assistant Secretary of Labor shall prescribe such regulations as are necessary to carry out this section. Such regulations shall conform generally to the principles applied to labor organizations in the private sector. Complaints of violations of this section shall be filed with the Assistant Secretary. In any matter arising under this section, the Assistant Secretary may require a labor organization to cease and desist from violations of this section and require it to take such actions as the Assistant Secretary considers appropriate to carry out the policies of this section.

(e)(1) Notwithstanding any other provision of this chapter—

(A) participation in the management of a labor organization for purposes of collective bargaining or acting as a representative of a labor organization for such purposes is prohibited under this chapter—

(i) on the part of any management official or confidential employee;

(ii) on the part of any individual who has served as a management official or confidential employee during the preceding two years; or

(iii) on the part of any other employee if the participation or activity would result in a conflict of interest or apparent conflict of interest or would otherwise be incompatible with law or with the official functions of such employee; and

(B) service as a management official or confidential employee is prohibited on the part of any individual having participated in the management of a labor organization for purposes of collective bargaining or having acted as a representative of a labor organization during the preceding two years.

(2) For the purposes of paragraph (1)(A)(ii) and paragraph (1)(B), the term "management official" does not include—

(A) any chief of mission;

(B) any principal officer or deputy principal officer;

(C) any administrative or personnel officer abroad; or

(D) any individual described in section 1002(12) (B), (C), or (D) who is not involved in the administration of this chapter or in the formulation of the personnel policies and programs of the Department.

(f) If the Board finds that any labor organization has willfully and intentionally violated section 1015(b)(7) by omission or commission with regard to any strike, work stoppage, slowdown, the Board shall—

(1) revoke the exclusive recognition status of the labor organization, which shall then immediately cease to be legally entitled and obligated to represent employees in the unit; or

(2) take any other appropriate disciplinary action.

SEC. 1018. [22 U.S.C. 4118] ADMINISTRATIVE PROVISIONS.—(a) If the Department has received from any individual a written assignment which authorizes the Department to deduct from the salary of that individual amounts for the payment of regular and periodic dues of the exclusive representative, the Department shall honor the assignment. Any such assignment shall be made at no cost to the exclusive representative or the individual. Except as provided in subsection (b), any such assignment may not be revoked for a period of one year from its execution.

(b) An assignment for deduction of dues shall terminate when—

(1) the labor organization ceases to be the exclusive representative;

(2) the individual ceases to receive a salary from the Department as a member of the Service; or

(3) the individual is suspended or expelled from membership in the exclusive representative.

(c) During any period when no labor organization is certified as the exclusive representative of employees in the Department, the Department shall have the duty to negotiate with a labor organization which has filed a petition under section 1011(b)(1)(A) alleging that 10 percent of the employees in the Department have membership in the organization if the Board has determined that the petition is valid. Negotiations under this subsection shall be concerned solely with the deduction of dues of the labor organization from the salary of the individuals who are members of the labor organization and who make a voluntary allotment for that purpose. Any agreement between the Department and a labor organization under this subsection shall terminate upon the certification of an exclusive representative of any employees to whom the agreement applies.

(d) The following provisions shall apply to the use of official time:

(1) Any employee representing an exclusive representative in the negotiation of a collective bargaining agreement under this chapter shall be authorized official time for such purposes, including attendance at impasse proceedings, during the time the employee otherwise would be in a duty status. The number of employees for whom official time is authorized under this paragraph shall not exceed the number of individuals designated as representing the Department for such purposes.

(2) Any activities performed by any employee relating to the internal business of the labor organization, including the solicitation of membership, elections of labor organization officials, and collection of dues, shall be performed during the time the employee is in a nonduty status.

(3) Except as provided in paragraph (1), the Board shall determine whether any employee participating for, or on behalf of, a labor organization in any phase of proceedings before the Board shall be authorized official time for such purpose during the time the employee would otherwise be in a duty status.

(4) Except as provided in paragraphs (1), (2), and (3), any employee representing an exclusive representative, or engaged in any other matter covered by this chapter, shall be granted official time in any amount the Department and the exclusive representative agree to be reasonable, necessary, and in the public interest.

CHAPTER 11—GRIEVANCES

SEC. 1101. 〔22 U.S.C. 4131〕 DEFINITION OF GRIEVANCE.—(a)(1) Except as provided in subsection (b), for purposes of this chapter, the term "grievance" means any act, omission, or condition subject to the control of the Secretary which is alleged to deprive a member of the Service who is a citizen of the United States (other than a United States citizen employed under section 311 who is not a family member) of a right or benefit authorized by law or regulation or which is otherwise a source of concern or dissatisfaction to the member, including—

(A) separation of the member allegedly contrary to laws or regulations, or predicated upon alleged inaccuracy, omission, error, or falsely prejudicial character of information in any part of the official personnel record of the member;

(B) other alleged violation, misinterpretation, or misapplication of applicable laws, regulations, or published policy affecting the terms and conditions of the employment or career status of the member;

(C) allegedly wrongful disciplinary action against the member;

(D) dissatisfaction with respect to the working environment of the member;

(E) alleged inaccuracy, omission, error, or falsely prejudicial character of information in the official personnel record of the member which is or could be prejudicial to the member;

(F) action alleged to be in the nature of reprisal or other interference with freedom of action in connection with participation by the member in procedures under this chapter;

(G) alleged denial of an allowance, premium pay, or other financial benefit to which the member claims entitlement under applicable laws or regulations; and

(H) any discrimination prohibited by—

(i) section 717 of the Civil Rights Act of 1964,

(ii) section 6(d) of the Fair Labor Standards Act of 1938,

(iii) section 501 of the Rehabilitation Act of 1973,

(iv) sections 12 and 15 of the Age Discrimination in Employment Act of 1967, or

(v) any rule, regulation, or policy directive prescribed under any provision of law described in clauses (i) through (iv).

(2) The scope of grievances described in paragraph (1) may be modified by written agreement between the Department and the labor organization accorded recognition as the exclusive representative under chapter 10 (hereinafter in this chapter referred to as the "exclusive representative").

(b) For purposes of this chapter, the term "grievance" does not include—

(1) an individual assignment of a member under chapter 5, other than an assignment alleged to be contrary to law or regulation;

(2) the judgment of a selection board established under section 602, a tenure board established under section 306(b), or any other equivalent body established by laws or regulations which similarly evaluates the performance of members of the Service on a comparative basis;

(3) the expiration of a limited appointment, the termination of a limited appointment under section 612, or the denial of a limited career extension or of a renewal of a limited career extension under section 607(b); or

(4) any complaint or appeal where a specific statutory hearing procedure exists, except as provided in section 1109(a)(2).

Nothing in this subsection shall exclude any act, omission, or condition alleged to violate any law, rule, regulation, or policy directive referred to in subsection (a)(1)(H) from such term.

(c) This chapter applies only with respect to the Department of State, Broadcasting Board of Governors [25], the Agency for International Development, the Department of Agriculture, and the Department of Commerce.

SEC. 1102. 〔22 U.S.C. 4132〕 GRIEVANCES CONCERNING FORMER MEMBERS.—Within the time limitations of section 1104, a former member of the Service or the surviving spouse (or, if none, another member of the family) of a deceased member or former member of the Service may file a grievance under this chapter only with respect to allegations described in section 1101(a)(1)(G).

---

[25] So in law. Should probably insert "the" before "Broadcasting".

Foreign Service Grievance Board, the grievant was unaware of the grounds for the grievance and could not have discovered such grounds through reasonable diligence.

(b) If a grievance is not resolved under Department procedures (which have been negotiated with the exclusive representative, if any) within ninety days after it is filed with the Department, the grievant or the exclusive representative (on behalf of a grievant who is a member of the bargaining unit) shall be entitled to file a grievance with the Foreign Service Grievance Board for its consideration and resolution.

(c)(1) In applying subsection (a) with respect to an alleged violation of a law, rule, regulation, or policy directive referred to in section 1101(a)(1)(H), the reference to "2 years" shall be deemed to read "180 days", subject to paragraph (2).

(2) If the occurrence or occurrences giving rise to the grievance are alleged to have occurred while the grievant was assigned to a post abroad, the 180-day period provided for under paragraph (1) shall not commence until the earlier of—

(A) the date as of which the grievant is no longer assigned to such post; or

(B) the expiration of the 18-month period beginning on the date of the occurrence giving rise to the grievance or the last such occurrence, as the case may be.

SEC. 1105. ⟦22 U.S.C. 4135⟧ FOREIGN SERVICE GRIEVANCE BOARD.—(a) There is established the Foreign Service Grievance Board (hereinafter in this chapter referred to as the "Board"). The Board shall consist of no fewer than 5 members who shall be independent, distinguished citizens of the United States, well known for their integrity, who are not employees of the Department or members of the Service.

(b) The Chairperson and other members of the Board shall be appointed by the Secretary of State, from nominees approved in writing by the agencies to which this chapter applies and the exclusive representative (if any) for each such agency. Each member of the Board shall be appointed for a term of 2 years, subject to renewal with the same written approvals required for initial appointment. In the event of a vacancy on the Board, an appointment for the unexpired term may be made by the Secretary of State in accordance with the procedures specified in this section. In the event of inability to obtain agreement on a nominee, each such agency and exclusive representative shall select 2 nominees and shall, in an order determined by lot, in turn strike a name from a list of such nominees until only one name remains. For purposes of this section, the nominee whose name remains shall be deemed to be approved in writing by each such agency head and exclusive representative.

(c) Members of the Board who are not employees of the Government shall be paid for each day they are performing their duties (including traveltime) at the daily equivalent of the maximum rate payable for grade GS–18 of the General Schedule under section 5332 of title 5, United States Code.

(d) The Secretary of State may, upon written notice, remove a Board member for corruption, neglect of duty, malfeasance, or demonstrated incapacity to perform his or her functions, established at

a hearing (unless the right to a hearing is waived in writing by the Board member).

(e) The Board may obtain facilities, services, and supplies through the general administrative services of the Department of State. All expenses of the Board, including necessary costs of the travel and travel-related expenses of a grievant, shall be paid out of funds appropriated to the Department for obligation and expenditure by the Board. At the request of the Board, employees of the Department and members of the Service may be assigned as staff employees for the Board. Within the limits of appropriated funds, the Board may appoint and fix the compensation of such other employees as the Board considers necessary to carry out its functions. The individuals so appointed or assigned shall be responsible solely to the Board, and the Board shall prepare the performance evaluation reports for such individuals. The records of the Board shall be maintained by the Board and shall be separate from all other records of the Department of State under appropriate safeguards to preserve confidentiality.

(f)(1) Not later than March 1 of each year, the Chairman of the Foreign Service Grievance Board shall prepare a report summarizing the activities of the Board during the previous calendar year. The report shall include—

(A) the number of cases filed;

(B) the types of cases filed;

(C) the number of cases on which a final decision was reached, as well as data on the outcome of cases, whether affirmed, reversed, settled, withdrawn, or dismissed;

(D) the number of oral hearings conducted and the length of each such hearing;

(E) the number of instances in which interim relief was granted by the Board; and

(F) data on the average time for consideration of a grievance, from the time of filing to a decision of the Board.

(2) The report required under paragraph (1) shall be submitted to the Director General of the Foreign Service and the Committee on Foreign Relations of the Senate and the Committee on International Relations of the House of Representatives.

SEC. 1106. 〚22 U.S.C. 4136〛 BOARD PROCEDURES.—The Board may adopt regulations concerning its organization and procedures. Such regulations shall include provision for the following:

(1) The Board shall conduct a hearing at the request of a grievant in any case which involves—

(A) disciplinary action or the retirement of a grievant from the Service under section 607 or 608, or

(B) issues which, in the judgment of the Board, can best be resolved by a hearing or presentation of oral argument.

(2) The grievant, the representatives of the grievant, the exclusive representative (if the grievant is a member of the bargaining unit represented by the exclusive representative), and the representatives of the Department are entitled to be present at the hearing. The Board may, after considering the views of the parties and any other individuals connected with the grievance, decide that a hearing should be open to others.

tion 1214 or 1221 of title 5, United States Code, and the matter has been carried to final decision under such provision on its merits or is still under consideration.

(2) If a grievant is not prohibited from filing a grievance under paragraph (1), the grievant may file with the Board a grievance which is also eligible for consideration, resolution, and relief under chapter 12 of title 5, United States Code, or a regulation or Executive order other than under this chapter. An election of remedies under this subsection shall be final upon the acceptance of jurisdiction by the Board.

(3) This subsection shall not apply to any grievance with respect to which subsection (b) applies.

(b)(1) With respect to a grievance based on an alleged violation of a law, rule, regulation, or policy directive referred to in section 1101(a)(1)(H), a grievant may either—

(A) file a grievance under this chapter, or

(B) initiate in writing a proceeding under another provision of law, regulation, or Executive order that authorizes relief,

but not both.

(2) A grievant shall be considered to have exercised the option under paragraph (1) as soon as the grievant timely either—

(A) files a grievance under this chapter, or

(B) initiates in writing a proceeding under such other provision of law, regulation, or Executive order.

SEC. 1110. 〔22 U.S.C. 4140〕 JUDICIAL REVIEW.—(a) Any aggrieved party may obtain judicial review of a final action of the Secretary or the Board on any grievance in the district courts of the United States in accordance with the standards set forth in chapter 7 of title 5, United States Code, if the request for judicial review is filed not later than 180 days after the final action of the Secretary or the Board (or in the case of an aggrieved party who is posted abroad at the time of the final action of the Secretary or the Board, if the request for judicial review is filed not later than 180 days after the aggrieved party's return to the United States). Section 706 of title 5, United States Code, shall apply without limitation or exception. This subsection shall not apply to any grievance with respect to which subsection (b) applies.

(b)(1) For purposes of this subsection, the term "aggrieved party" means a grievant.

(2) With respect to a grievance based on an alleged violation of a law, rule, regulation, or policy directive referred to in section 1101(a)(1)(H), judicial review of whether the act, omission, or condition that is the basis of the grievance violates such law, rule, regulation, or policy directive may be obtained by an aggrieved party only if such party commences a civil action, not later than 90 days after such party receives notice of the final action of the Secretary or the Board, in an appropriate district court of the United States for de novo review.

# APPENDIX B –

# WHITE HOUSE FACT SHEET



*The* WHITE HOUSE

⬉ **FACT SHEETS**

## Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements

The White House

March 27, 2025

**PROTECTING OUR NATIONAL SECURITY:** Today, President Donald J. Trump signed an Executive Order using authority granted by the Civil Service Reform Act of 1978 (CSRA) to end collective bargaining with Federal unions in the following agencies with national security missions:

- ***National Defense.*** Department of Defense, Department of Veterans Affairs (VA), the National Science Foundation (NSF), and Coast Guard.
  - VA serves as the backstop healthcare provider for wounded troops in wartime.
  - NSF-funded research supports military and cybersecurity breakthroughs.

- ***Border Security.*** Department of Homeland Security (DHS) leadership components, U.S. Citizenship and Immigration Services, U.S. Immigration and Customs Enforcement, the Department of Justice's (DOJ) Executive Office of Immigration Review, and the Office of Refugee Resettlement within the Department of Health and Human Services (HHS).

- ***Foreign Relations.*** Department of State, U.S. Agency for International Development, Department of Commerce's International Trade Administration, and U.S. International Trade Commission.
  - President Trump has demonstrated how trade policy is a national security tool.

- ***Energy Security.*** Department of Energy, Nuclear Regulatory Commission, Environmental Protection Agency, and Department of Interior units that govern domestic energy production.

B1

- The same Congress that passed the CSRA declared that energy insecurity threatens national security.

- ***Pandemic Preparedness, Prevention, and Response.*** Within HHS, the Secretary's Office, Office of General Counsel, Centers for Disease Control and Prevention, Administration for Strategic Preparedness and Response, Food and Drug Administration, and National Institute of Allergy and Infectious Diseases. In the Department of Agriculture, the Office of General Counsel, Food Safety and Inspection Service, and Animal and Plant Health Inspection Service.
  - COVID-19 and the recent bird flu have demonstrated how foreign pandemics affect national security.
  - VA is also a backstop healthcare provider during national emergencies, and served this role during COVID-19.

- ***Cybersecurity.*** The Office of the Chief Information Officer in each cabinet-level department, as well as DHS's Cybersecurity and Infrastructure Security Agency, the Federal Communications Commission (FCC), and the General Services Administration (GSA).
  - The FCC protects the reliability and security of America's telecommunications networks.
  - GSA provides cybersecurity related services to agencies and ensures they do not use compromised telecommunications products.

- ***Economic Defense.*** Department of Treasury.
  - The Federal Labor Relations Authority (FLRA) defines national security to include protecting America's economic and productive strength. The Treasury Department collects the taxes that fund the government and ensures the stable operations of the financial system.

- ***Public Safety.*** Most components of the Department of Justice as well as the Federal Emergency Management Agency.

- ***Law Enforcement Unaffected***. Police and firefighters will continue to collectively bargain.

**ENSURING THAT AGENCIES OPERATE EFFECTIVELY:** The CSRA enables hostile Federal unions to obstruct agency management. This is dangerous in agencies with

B2

national security responsibilities:

- Agencies cannot modify policies in collective bargaining agreements (CBAs) until they expire.
  - The outgoing Biden Administration renegotiated many agencies' CBAs to last through President Trump's second term.

- Agencies cannot make most contractually permissible changes until after finishing "midterm" union bargaining.
  - For example, the FLRA ruled that ICE could not modify cybersecurity policies without giving its union an opportunity to negotiate, and then completing midterm bargaining.

- Unions used these powers to block the implementation of the VA Accountability Act; the Biden Administration had to offer reinstatement and backpay to over 4,000 unionized employees that the VA had removed for poor performance or misconduct.

**SAFEGUARDING AMERICAN INTERESTS:** President Trump is taking action to ensure that agencies vital to national security can execute their missions without delay and protect the American people. The President needs a responsive and accountable civil service to protect our national security.

- Certain Federal unions have declared war on President Trump's agenda.
  - The largest Federal union describes itself as "fighting back" against Trump. It is widely filing grievances to block Trump policies.
  - For example, VA's unions have filed 70 national and local grievances over President Trump's policies since the inauguration—an average of over one a day.

- Protecting America's national security is a core constitutional duty, and President Trump refuses to let union obstruction interfere with his efforts to protect Americans and our national interests.

- President Trump supports constructive partnerships with unions who work with him; he will not tolerate mass obstruction that jeopardizes his ability to manage agencies with vital national security missions.

B3





**GET THE FACTS** →

NEWS

WIRE

ISSUES

CONTACT

VISIT

EOP

ADMINISTRATION

GALLERY

VIDEO LIBRARY

AMERICA 250

FOUNDING FATHERS

THE SIGNERS



Subscribe to The White House newsletter

Your email                                                    SIGN UP

 Text POTUS to 45470 to receive updates

THE WHITE HOUSE

1600 Pennsylvania Ave NW
Washington, DC 20500

WH.GOV

Copyright

Privacy

B5