**[ORAL ARGUMENT SCHEDULED FOR DECEMBER 15, 2025]**

**No. 25-5184**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

——————————

AMERICAN FOREIGN SERVICE ASSOCIATION,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP et al.,

*Defendants-Appellants.*

——————————

On Appeal from the United States District Court
for the District of Columbia

——————————

**REPLY BRIEF FOR APPELLANTS**
——————————

BRETT A. SHUMATE
 *Assistant Attorney General*

MELISSA N. PATTERSON
WEILI J. SHAW
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7212*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-4820*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... ii

GLOSSARY ..................................................................................... vi

INTRODUCTION AND SUMMARY ......................................................... 1

ARGUMENT ...................................................................................... 3

I.     THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS .............. 3

     A.    Plaintiff Identifies No Basis For District-Court
           Jurisdiction .............................................................. 3

     B.    The Foreign Service Act Allows The President To
           Exercise Discretion, Which Cannot Be Challenged
           Through A Non-Statutory Cause Of Action ........................ 10

     C.    Plaintiff Failed To Establish A Likelihood Of Success
           On The Merits Of Its *Ultra Vires* Claim ........................... 17

           1.    Plaintiff failed to rebut the presumption of
                 regularity .......................................................... 17

           2.    Plaintiff failed to demonstrate that the President
                 exceeded his discretion under § 4103(b) .................... 22

II.    PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY
       SUFFER IRREPARABLE HARM .......................................................... 31

III.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN
       DEFENDANTS' FAVOR .................................................................... 33

CONCLUSION .................................................................................. 35

CERTIFICATE OF COMPLIANCE

i

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*AFGE v. Reagan*,
   870 F.2d 723 (D.C. Cir. 1989) ....................................................... 16, 24

*AFGE v. Trump*,
   929 F.3d 748 (D.C. Cir. 2019) ....................................................... 3, 5, 6

*AFGE v. Trump*,
   148 F.4th 648 (9th Cir. 2025) ......................................................... 20

*AFSA v. Baker*,
   895 F.2d 1460 (D.C. Cir. 1990) ...................................................... 3-4, 5

*AFSA v. Trump*, No. 25-5184,
   2025 WL 1742853 (D.C. Cir. June 20, 2025) ................... 11, 26, 33, 34

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n*,
   110 F.4th 242 (D.C. Cir. 2024) ......................................................... 16

*Aid Ass'n for Lutherans v. USPS*,
   321 F.3d 1166 (D.C. Cir. 2003) ......................................................... 16

*American Forest Res. Council v. United States*,
   77 F.4th 787 (D.C. Cir. 2023) ........................................................... 15

*Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*,
   331 F.3d 918 (D.C. Cir. 2003) ........................................................... 31

*Chamber of Com. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996) ...................................................... 14, 15

*Changji Esquel Textile Co. v. Raimondo*,
   40 F.4th 716 (D.C. Cir. 2022) ........................................................... 17

*Cole v. Young*:
   226 F.2d 337 (D.C. Cir. 1955) ........................................................... 27
   351 U.S. 536 (1956) ................................................................... 26, 27

*Committee for Nuclear Resp., Inc. v. Seaborg*,
   463 F.2d 788 (D.C. Cir. 1971) ........................................................... 16

ii

*Dakota Cent. Tel. Co. v. South Dakota ex rel. Payne,*
    250 U.S. 163 (1919) ...................................................................... 11, 14

*Dalton v. Specter,*
    511 U.S. 462 (1994) ......................................................................... 10

*Defense Logistics Agency & AFGE,*
    5 F.L.R.A. 126 (1981) ...................................................................... 33

*Department of Com. v. New York,*
    588 U.S. 752 (2019) ..................................................................... 21-22

*East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.,*
    414 F.3d 700 (7th Cir. 2005) ............................................................ 32

*Elgin v. Department of the Treasury,*
    567 U.S. 1 (2012) .............................................................................. 8

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010) .......................................................... 31

*Global Health Council v. Trump,*
    153 F.4th 1 (D.C. Cir. 2025) ............................................................. 17

*Graham v. Ashcroft,*
    358 F.3d 931 (D.C. Cir. 2004) ........................................................... 7

*Hartman v. Moore,*
    547 U.S. 250 (2006) ......................................................................... 18

*Mountain States Legal Found. v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002) ........................................................ 15

*National Ass'n of Postal Supervisors v. USPS,*
    26 F.4th 960 (D.C. Cir. 2022) ...................................................... 15-16

*North Am. Butterfly Ass'n v. Wolf,*
    977 F.3d 1244 (D.C. Cir. 2020) ........................................................ 22

*NTEU v. Trump,* No. 25-5157,
    2025 WL 1441563 (D.C. Cir. May 16, 2025) ..................................... 35

iii

*Owlfeather-Gorbey v. Avery*,
119 F.4th 78 (D.C. Cir. 2024) ............................................................ 17

*Parsippany Hotel Mgmt. Co. v. NLRB*,
99 F.3d 413 (D.C. Cir. 1996) .................................................. 18-19, 19

*Patent Office Pro. Ass'n & U.S. Patent & Trademark Office*,
71 F.L.R.A. 1223 (2020) ..................................................................... 9

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ............................................................................ 8

*Trump v. Hawaii*,
585 U.S. 667 (2018) .......................................................................... 20

*Trump v. International Refugee Assistance Project*,
582 U.S. 571 (2017) .......................................................................... 34

*U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970*,
71 F.L.R.A. 829 (2020) ..................................................................... 33

*U.S. Dep't of the Treasury U.S. Mint & AFGE Mint Council, C-157*,
35 F.L.R.A. 1095 (1990) ................................................................... 33

*United States v. Fausto*,
484 U.S. 439 (1988) ............................................................................ 6

*Webster v. Doe*,
486 U.S. 592 (1988) .......................................................................... 25

*Wendt Corp. v. NLRB*,
26 F.4th 1002 (D.C. Cir. 2022) ........................................................ 18

**Statutes:**

5 U.S.C. § 7103(b)(1) ................................................................ 1, 22, 25

5 U.S.C. § 7103(b)(1)(B) ...................................................................... 19

22 U.S.C. § 4101 .......................................................................... 23, 30

22 U.S.C. § 4103(b) ......................................................... 12, 13, 19, 30

iv

22 U.S.C. § 4103(b)(2) ................................................................... 12

22 U.S.C. § 4105(a) ...................................................................... 28

22 U.S.C. § 4109(a) ........................................................................ 7

22 U.S.C. § 4111(b) ........................................................................ 7

22 U.S.C. § 4114(d) ........................................................................ 8

**Regulatory Materials:**

Exec. Order No. 14,211,
     90 Fed. Reg. 9,831 (Feb. 18, 2025) .................................... 30

Exec. Order No. 14,251,
     90 Fed. Reg. 14,553 (Apr. 3, 2025) ..................................... 1

**Legislative Material:**

PN560-1, 119th Cong. (2025), https://www.congress.gov/
     nomination/119th-congress/560/1............................................ 6

**Other Authorities:**

Letter from U.S. Gov't Accountability Off. to
     President Biden (Feb. 8, 2023), https://perma.cc/9WW9-NPC7.........5-6

NTEU, *NTEU Endorses Harris for President*
     (Sept. 18, 2024), https://perma.cc/93TR-RS8Y ................................... 21

NTEU, *NTEU on the FY2026 Budget Request
     for CBP* (June 13, 2025), https://perma.cc/4Z3Q-XBZB ...................... 21

The White House, *Fact Sheet: President Donald J. Trump
     Exempts Agencies with National Security Missions from
     Federal Collective Bargaining Requirements* (Mar. 27, 2025),
     https://perma.cc/Y7HR-4W3H ............................................................. 19

3 U.S. Dep't of State, *Foreign Affairs Manual* § 2323.1-1 .....................29

## GLOSSARY

| | |
|---|---|
| AFGE | American Federation of Government Employees |
| AFSA | American Foreign Service Association |
| FLRA | Federal Labor Relations Authority |
| FSLMRS | Federal Service Labor–Management Relations Statute |
| FSLRB | Foreign Service Labor Relations Board |
| NTEU | National Treasury Employees Union |
| USAID | U.S. Agency for International Development |

## INTRODUCTION AND SUMMARY

Plaintiff American Foreign Service Association (AFSA) challenges the President's exercise of discretionary authority vested in him by the Foreign Service Act.  Acting in accordance with that authority, the President issued Executive Order 14,251, excluding certain subdivisions of the Department of State and U.S. Agency for International Development (USAID) from the provisions of subchapter X of the Act after determining that those subdivisions have "as a primary function intelligence, counterintelligence, investigative, or national security work" and that the collective-bargaining provisions of the subchapter "cannot be applied to th[o]se subdivisions in a manner consistent with national security requirements and considerations."  Exec. Order No. 14,251, § 1, 90 Fed. Reg. 14,553, 14,553 (Apr. 3, 2025); *see* 5 U.S.C. § 7103(b)(1).

Plaintiff fails to justify the district court's preliminary injunction of the executive order.  First, the court erred by asserting jurisdiction over plaintiff's claim, which the Foreign Service Act requires plaintiff to raise first with the Foreign Service Labor Relations Board (FSLRB) and then in this Court on direct review of the FSLRB decision.  Plaintiff errs

in contending that it had no available route to bring its claims before the FSLRB, and, in any event, Congress's intent to preclude district-court jurisdiction is clear.

Second, plaintiff cannot bring an *ultra vires* claim to challenge a presidential action where, as here, a statute commits the relevant decision to the President's discretion. Plaintiff identifies several cases in which this Court has reviewed *ultra vires* challenges to presidential action, but in each case the plaintiff alleged that the President contravened a statutory requirement that did not vest discretion in the President. Such authorities fail to provide a basis for plaintiff's claim because the Foreign Service Act contains a clear grant of discretionary authority.

Third, even if plaintiff could assert a claim that the executive order is *ultra vires*, that claim would fail on the merits because plaintiff has not identified clear evidence to rebut the presumption of regularity. Plaintiff alleges that the President acted with improper motivations, but the evidence plaintiff relies upon supports the conclusion that the President acted pursuant to the statutory criteria—that is, he determined that the provisions of subchapter X cannot be applied to the

2

identified agencies consistent with the requirements of national security. Furthermore, plaintiff's demand that the government justify the President's exclusion decision is inconsistent with this Court's precedent that the President need not explain his decision.

Finally, the balance of equities weighs against a preliminary injunction because any harm plaintiff would suffer is reparable by an FSLRB order if plaintiff ultimately prevails in this litigation. And the district court's intrusion upon the President's exercise of national-security authority vested in him by Congress injures the Executive Branch and the public interest.

This Court should vacate the preliminary injunction.

## ARGUMENT

## I.    THE GOVERNMENT IS LIKELY TO PREVAIL ON THE MERITS

### A.    Plaintiff Identifies No Basis For District-Court Jurisdiction

Plaintiff's claims must be brought through the Foreign Service Act's review scheme, which is "exclusive with respect to claims within its scope." *American Fed'n of Gov't Emps.* (*AFGE*) *v. Trump*, 929 F.3d 748, 755 (D.C. Cir. 2019); *see* Opening Br. 22-32; *AFSA v. Baker*, 895

F.2d 1460, 1462 (D.C. Cir. 1990).  Accordingly, the district court lacks jurisdiction over this suit.

As the government explained (Br. 24-25), plaintiff could obtain judicial review of its claim that the executive order is invalid by alleging that the defendant agencies have committed unfair labor practices or by raising its challenge in a separate proceeding before the FSLRB; plaintiff could then appeal any adverse decision to this Court.  Plaintiff notes (Br. 15-16) that the Federal Labor Relations Authority (FLRA) has dismissed cases filed by unions that have lost recognition as a result of a presidential exclusion order, but in none of the cases cited was there any dispute over the validity of the exclusion order.  The FLRA has never held that it lacks authority to consider the validity of a presidential exclusion order, and there is every reason to think that the FLRA (or FSLRB) would need to confront such a challenge to determine its jurisdiction over a case.

Plaintiff also errs in contending (Br. 17-21) that the district court has jurisdiction over this case because plaintiff cannot, as a practical matter, bring its claims before the FSLRB.  Plaintiff notes there is currently no FLRA General Counsel to issue a complaint, and

4

speculates that any General Counsel that may be appointed by the
President might refuse to issue such a complaint.  But this reasoning
proves too much, as it would mean that the Foreign Service Act does not
preclude district-court jurisdiction over any unfair-labor-practice claim.
Indeed, as plaintiff notes, there has been no Senate-confirmed General
Counsel since 2017.  Congress chose to give the General Counsel
unreviewable discretion to decide, after investigating a charge, whether
to file an unfair-labor-practice complaint with the FSLRB.  That
discretion is not particular to the facts presented here, and this Court
has nonetheless held that subchapter X precludes district-court
jurisdiction over claims that could be brought through the statutory
process.  *See AFSA*, 895 F.2d at 1462.  And in the analogous context of
the Federal Service Labor–Management Relations Statute (FSLMRS),
this Court recognized such preclusion even at a time that there was no
duly appointed General Counsel.  *See AFGE*, 929 F.3d at 757, 761
(holding that the district court lacked jurisdiction to consider a
challenge to executive orders where the challenge could be brought in
an FLRA unfair-labor-practice proceeding); Letter from U.S. Gov't

5

Accountability Off. to President Biden 2-3 (Feb. 8, 2023), https://

perma.cc/9WW9-NPC7.[1]

The relevant question is whether Congress intended the district

courts to be open to these types of claims.  *See AFGE*, 929 F.3d at 755

(considering whether the court could "fairly discern that Congress

intended the [FSLMRS's] statutory scheme to be exclusive with respect

to claims within its scope").  The fact that Congress purposely limited

the remedies available under the statutory review scheme—including

making them, in some instances, dependent on the decisions of a duly-

appointed FLRA General Counsel—does not suggest that Congress did

not intend to make the review scheme exclusive.  *Cf. United States v.*

*Fausto*, 484 U.S. 439, 447 (1988) (holding that Congress's exclusion of

certain federal employees from the Civil Service Reform Act's

administrative-review scheme did not leave those employees free to

pursue judicial review but rather left them without any opportunity for

review at all).  After all, "it is the comprehensiveness of the statutory

scheme involved, not the 'adequacy' of specific remedies thereunder,

---

[1] The President nominated a General Counsel in September 2025.
*See* PN560-1, 119th Cong. (2025), https://www.congress.gov/nomination/
119th-congress/560/1.

that counsels judicial abstention." *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (Roberts, J.) (quotation marks omitted). And if Congress concludes the unavailability of a General Counsel is problematic, that is reason for Congress to amend the statute—not for courts to ignore Congress's intent to preclude district-court jurisdiction.

In any event, the government also explained (Br. 25) that plaintiff could challenge the executive order by opposing the dismissal of a separate case before the FSLRB. If the FSLRB disagrees with plaintiff and dismisses such a case for lack of jurisdiction because of the exclusion order, that dismissal would generally be subject to judicial review. *See* 22 U.S.C. § 4109(a). Plaintiff states that there are no such cases currently pending before the Board. But plaintiff could file such a case—for example, seeking clarification of a matter relating to representation. *See id.* § 4111(b). Indeed, plaintiff may be able to obtain FSLRB review of its challenge to the executive order simply by filing a representation petition under § 4111, seeking to clarify its right to represent Foreign Service members at the State Department and

USAID. Such a petition would put the merits of plaintiff's challenge to the executive order directly before the FSLRB.[2]

It is not relevant for present purposes that the FSLRB may ultimately conclude that it lacks jurisdiction over any claims against the defendant agencies because the executive order is valid—or even that the Board may assume the order's validity and decline to adjudicate challenges to it. *See* Answering Br. 22-23. In *Elgin v. Department of the Treasury*, the Supreme Court held that the Civil Service Reform Act precludes district-court jurisdiction over constitutional challenges raised by former federal employees even if the Merit Systems Protection Board lacks jurisdiction to consider such challenges because those challenges can be meaningfully addressed in the court of appeals. 567 U.S. 1, 16-17 (2012); *see also Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 215-216 (1994) (holding that a statute precluded district-court review of the plaintiff's statutory and constitutional claims even if the relevant administrative body had no

---

[2] Plaintiff argues (Br. 19-21) that subchapter X does not provide for judicial review of a grievance filed under a collective-bargaining agreement. *See* 22 U.S.C. § 4114(d). The government has not argued otherwise.

authority to address those challenges).  Here too, this Court could consider a challenge to the executive order on appeal from an FSLRB order dismissing a claim brought against an excluded agency subdivision, even if the FSLRB determined that it was bound to assume the order's validity and reject such a challenge.

In any event, the FLRA has never held that it lacks jurisdiction to consider the validity of a presidential exclusion.  As the government has already pointed out (Br. 30-31), the FLRA cases on which the district court and plaintiff rely did not address this issue because they involved no dispute about the validity of the exclusion order.  If plaintiff asserts that the FSLRB continues to have jurisdiction over cases against the defendants because the executive order is invalid, the FSLRB may consider that argument—thus confronting the merits of plaintiff's claim here.[3]

---

[3] Plaintiff's reliance on *Patent Office Professional Ass'n & U.S. Patent & Trademark Office*, 71 F.L.R.A. 1223 (2020), is similarly unavailing.  The FLRA there said that "executive orders issued pursuant to statutory authority are to be accorded the force and effect of law."  *Id.* at 1224.  The FLRA did not disclaim authority to determine whether an executive order was in fact "issued pursuant to statutory authority"; to the contrary, the FLRA went on to consider whether the executive order was in fact consistent with statute.  *Id.* at 1224-1226.

9

Plaintiff's remaining jurisdictional arguments also fail. Other than a conclusory assertion (Br. 21), plaintiff makes no argument that the matters raised in this suit are wholly collateral to the Foreign Service Act's review provisions or outside the FSLRB's expertise. Instead, plaintiff just assumes that the FSLRB will decline to resolve any challenge to the executive order—an assumption that, again, has neither a basis in precedent nor relevance to the jurisdictional analysis. And plaintiff fails to acknowledge that, as the government pointed out (Br. 25-28), plaintiff's claim raises a statutory-interpretation issue involving the very statute the FSLRB is charged with administering, plaintiff seeks relief within the FSLRB's power to issue, and the FSLRB has expertise on the legal and factual issues presented here.

**B.    The Foreign Service Act Allows The President To Exercise Discretion, Which Cannot Be Challenged Through A Non-Statutory Cause Of Action**

Even if the district court has jurisdiction, plaintiff cannot assert a non-statutory cause of action alleging "that the President has violated a statutory mandate" "when the statute in question commits the decision to the discretion of the President." *Dalton v. Specter*, 511 U.S. 462, 474 (1994); *see* Opening Br. 33-36. As this Court explained in granting a

10

stay pending appeal, the Foreign Service Act "commits the relevant decision" under § 4103(b) "to the President's discretion." *AFSA v. Trump* (*AFSA* Stay Order), No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (per curiam).

**1.** Plaintiff contends (Br. 28) that the bar on judicial review set out in *Dalton* is limited to situations where the statute provides no limits on the President's discretion, but that argument is refuted by *Dakota Central Telephone Co. v. South Dakota ex rel. Payne*, 250 U.S. 163 (1919), which the Supreme Court cited in *Dalton*. In *Dakota Central*, the Court reviewed a claim that the President exceeded the scope of his authority under a statute permitting him to take control of the telegraphs "whenever he shall deem it necessary for the national security or defense." *Id.* at 181-182, 184. The statute thus limited the President's authority to situations where he had made the requisite national-security determination, yet the Supreme Court held that the plaintiffs could not challenge the President's national-security finding or argue that he exceeded his authority by making an improper determination.

11

Here, too, plaintiff cannot state a claim that the executive order exceeds the scope of the President's authority under the Foreign Service Act because the President allegedly erred in determining that subchapter X "cannot be applied" to the designated agency subdivisions "in a manner consistent with national security requirements and considerations." 22 U.S.C. § 4103(b)(2). Indeed, that national-security determination is virtually indistinguishable from the national-security determination at issue in *Dakota Central* that the Supreme Court held was unreviewable.

The first subparagraph of § 4103(b) provides no greater basis for judicial review. Congress permitted the President to exclude an agency subdivision from coverage of subchapter X "if *the President* determines that," *inter alia*, "the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work." 22 U.S.C. § 4103(b) (emphasis added). The statute thus makes clear that both of the determinations necessary for the President to issue an exclusion order—the primary-function determination and the national-security determination—are entrusted to the discretion of the President.

12

Congress could have made the first of these prerequisites a judicially findable fact and only the second a presidential determination.  For example, the statute could have been drafted to read:

> The President may by Executive order exclude any subdivision of the Department from coverage under this subchapter if ~~the President determines that~~ —
>
> (1) the subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and,
>
> (2) <u>the President determines that</u> the provisions of this subchapter cannot be applied to that subdivision in a manner consistent with national security requirements and considerations.

Such language might have permitted a court to review the President's finding about a subdivision's primary function.  But by granting "the President" responsibility to "determine[]" whether the two prerequisites for an exclusion order are present, the statute makes clear that both of those determinations are entrusted solely to the discretion of the President.  22 U.S.C. § 4103(b).

Plaintiff errs in arguing (Br. 29) that *Dakota Central* permits a plaintiff to bring a non-statutory claim challenging the President's exercise of discretionary authority.  Certainly, the Court reviewed the

13

statute to confirm that Congress had indeed given the President the discretionary power exercised, *Dakota Cent.*, 250 U.S. at 184-185, but the Court refused to consider whether the President was justified in exercising the power granted, *id.* at 184. Here, there is no dispute that Congress gave the President the power to exclude agency subdivisions from the provisions of subchapter X; plaintiff alleges only that the President misused that power, and *Dakota Central* confirms that such a claim is unreviewable.

**2.** The cases on which plaintiff relies are inapposite because in those cases the plaintiffs contended that the challenged presidential action violated a statute that delegated no discretion to the President. In *Chamber of Commerce v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), for example, the Court reviewed a claim that the President had acted unlawfully in issuing an executive order barring the federal government from contracting with employers who hired permanent replacements during a strike. Although the Court recognized the President's "broad discretion" under the Procurement Act, it held that it could review the plaintiffs' claim that the executive order "independently violate[d] the [National Labor Relations Act], a statute that delegates no authority to

14

the President to interfere with an employer's right to hire permanent replacements during a lawful strike." *Id.* at 1330-1332.

Likewise, in *American Forest Resource Council v. United States*, 77 F.4th 787 (D.C. Cir. 2023), the Court held that it could review the President's exercise of discretionary authority under the Antiquities Act for an alleged violation of an independent statute that required that certain land be managed for forest production. *Id.* at 796-798. Thus, in *Chamber of Commerce* and *American Forest Resource Council*, it was critical that the plaintiffs claimed the President's exercise of discretionary authority violated a clear, independent, and non-discretionary statutory requirement. Here, in contrast, plaintiff alleges only a violation of § 4103(b), which grants broad discretion to the President.[4]

Many of the other cases that plaintiff cites involved challenges to agency action. *E.g.*, *National Ass'n of Postal Supervisors v. USPS*, 26

---

[4] The Court's decision in *Mountain States Legal Foundation v. Bush*, 306 F.3d 1132 (D.C. Cir. 2002), is not to the contrary. There, the Court stated that it had "no occasion to decide the ultimate question of the availability or scope of review for exceeding statutory authority" because the plaintiff had failed to "allege facts to support the claim that the President acted beyond his authority under the Antiquities Act." *Id.* at 1137.

F.4th 960 (D.C. Cir. 2022) (challenge to Postal Service pay); *Aid Ass'n for Lutherans v. USPS*, 321 F.3d 1166 (D.C. Cir. 2003) (challenge to Postal Service regulations); *Committee for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788 (D.C. Cir. 1971) (per curiam) (challenge to agency's withholding of documents). These cases say nothing about a court's ability to review the exercise of discretion that Congress entrusted specifically to the President.

Plaintiff fares no better in suggesting (Br. 25) that the executive order must be subject to judicial review because this Court performed an extremely deferential review of a similar order in *AFGE v. Reagan*, 870 F.2d 723 (D.C. Cir. 1989). First, that case was decided before the Supreme Court reaffirmed in *Dalton* that the President's exercise of discretion granted to him by statute is not subject to review under a non-statutory cause of action. Second, the Court in *AFGE* simply assumed that judicial review was available and addressed the proper deference to be given to the President's determination. The issue of reviewability *vel non* thus "received at best a 'drive-by' ruling … that did not amount to a precedential holding." *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 110 F.4th 242, 254 (D.C. Cir. 2024).

16

### C.    Plaintiff Failed To Establish A Likelihood Of Success On The Merits Of Its *Ultra Vires* Claim

Even if plaintiff could assert an *ultra vires* claim to challenge the President's exercise of discretion under § 4103(b), it cannot meet the high bar to establish a right to relief on such a claim.  *See, e.g.*, *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (observing that such violations occur "only when the error is so extreme that one may view it as jurisdictional or nearly so" (quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022))).

### 1.    Plaintiff failed to rebut the presumption of regularity

Plaintiff contends (Br. 33) that the executive's order's breadth and a White House fact sheet rebut the presumption of regularity by demonstrating that the President was indifferent to the Foreign Service Act's purposes and requirements.  As the government has explained, however, each of these circumstances is entirely consistent with a properly issued order excluding subdivisions from coverage of subchapter X.  *See Owlfeather-Gorbey v. Avery*, 119 F.4th 78, 86 (D.C. Cir. 2024) (a party seeking to rebut the presumption of regularity must

17

present "clear evidence" that public officers have not "properly discharged their official duties" (quotation marks omitted)).

**a.** Plaintiff first contends (Br. 33-38) that a White House fact sheet demonstrates that the President acted to punish certain unions rather than to protect national security. As an initial matter, the fact sheet does not necessarily reflect the President's thinking in issuing the executive order. Plaintiff has not produced any evidence, or even alleged, that the President reviewed the fact sheet before it was published. Without more, the fact sheet cannot be attributed to the President.[5]

Because plaintiff fails to establish that the fact sheet is attributable to the President, plaintiff's citation (Br. 37) to *Hartman v. Moore*, 547 U.S. 250, 263-264 (2006), is inapposite. In the scenario posited there, the relevant decisionmaker disclosed his own "retaliatory thinking." *Id.* at 264. Likewise, *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010-1011 (D.C. Cir. 2022), and *Parsippany Hotel Management Co. v.*

---

[5] For a similar reason, plaintiff errs in trying (Br. 39-40) to draw an inference from an order issued by the Secretary of Veterans Affairs permitting certain unions to represent employees at the Department of Veterans Affairs. That separate order fails to shed light on the President's motivations in issuing the executive order at issue here.

18

*NLRB*, 99 F.3d 413, 423 (D.C. Cir. 1996), stand only for the proposition that "high-level corporate managers speak on behalf of the company," *id.* Indeed, the motivations of a company can only be divined from the statements of its executives.

In any event, rather than demonstrating animus against plaintiff or other specific unions, the fact sheet suggests consideration of unions' "constructive partnerships" that promote an agency's national-security mission or engagement in "mass obstruction that jeopardizes" the agency's ability to fulfill that mission. The White House, *Fact Sheet: President Donald J. Trump Exempts Agencies with National Security Missions from Federal Collective Bargaining Requirements* (Mar. 27, 2025), https://perma.cc/Y7HR-4W3H (Fact Sheet). Such considerations clearly bear on the statutory criteria. *See* 5 U.S.C. § 7103(b)(1)(B); 22 U.S.C. § 4103(b). The President's agenda includes improving agencies' efficiency to better protect national security, and the fact sheet's concern regarding a "war" on that agenda is relevant to the determination the statutes entrust to the President. Fact Sheet. As the Ninth Circuit concluded, "the Fact Sheet, taken as a whole, …

demonstrates the President's focus on national security." *AFGE v. Trump*, 148 F.4th 648, 655 (9th Cir. 2025) (per curiam).

**b.**  Plaintiff also contends (Br. 43) that the executive order's "breadth" demonstrates improper motives.  But the government explained (Br. 41-42) that neither the Foreign Service Act nor the FSLMRS contains any limitation on the number of agencies or subdivisions the President may exclude from those statutes' provisions. And it is entirely reasonable for a President to determine that in the nearly half-century since those statutes' enactment, national-security considerations and agencies' work have changed such that a larger share of the federal workforce can, and should, be excluded from the statute's coverage.  In any event, allegations that the President has established an "overbroad" policy that does not "serve national security interests" do not permit courts to "substitute [their] own assessment for the Executive's predictive judgments on such matters, all of which 'are delicate, complex, and involve large elements of prophecy.'" *Trump v. Hawaii*, 585 U.S. 667, 707-708 (2018).

Plaintiff likewise errs in arguing (Br. 38-39) that the executive order must not be based on legitimate considerations because it does

20

not exclude from the FSLMRS U.S. Customs and Border Protection and certain agency subdivisions represented by police and firefighter unions. Plaintiff suggests that this line-drawing may be tied to unions' electoral endorsements, but that assertion is unsupported by evidence. The National Treasury Employee Union (NTEU) represents many Customs and Border Protection employees and endorsed Vice President Harris. *See* NTEU, *NTEU on the FY2026 Budget Request for CBP* (June 13, 2025), https://perma.cc/4Z3Q-XBZB; NTEU, *NTEU Endorses Harris for President* (Sept. 18, 2024), https://perma.cc/93TR-RS8Y. It is thus at least as reasonable to conclude that the President's decision was informed by past union activity and practices, and that the President acted to exclude those agencies and subdivisions where union conduct had demonstrated that applying the provisions of the FSLMRS or subchapter X would be inconsistent with national-security requirements. "Where there are equally plausible views of the evidence, one of which involves attributing bad faith to an officer of a coordinate branch of Government, the presumption [of regularity] compels giving the benefit of the doubt to that officer." *Department of Com. v. New*

*York*, 588 U.S. 752, 797-798 (2019) (Thomas, J., concurring in part and dissenting in part).

Amici former officials fare no better in arguing (Br. 5-6) that the executive order must be overbroad because it excludes whole agencies from the FSLMRS, whereas prior Presidents excluded only subdivisions. The FSLMRS specifically authorizes the President to exclude "any agency or subdivision" from that statute's provisions upon making the requisite determination, 5 U.S.C. § 7103(b)(1), thus leaving it to the President to determine what level of agency hierarchy should be excluded.

> **2.  Plaintiff failed to demonstrate that the President exceeded his discretion under § 4103(b)**

Even if plaintiff could rebut the presumption of regularity accorded to the executive order, it cannot demonstrate that the President acted "'obviously beyond the terms of the statute,'" *North Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020).

**a.** The government does not disagree with plaintiff that the President must make the relevant determination under § 4103(b) with respect to each subdivision of the State Department or USAID that he

22

excludes from subchapter X.  But plaintiff errs in suggesting (Br. 46-47)
that there is a limitation on the number of subdivisions that the
President can so exclude.  Congress left it to the President to determine
whether subchapter X's provisions can be applied to a subdivision
consistent with national security, and Congress certainly granted the
President authority broad enough to exclude every subdivision if
necessary for national security.  That conclusion is not incompatible
with Congress's finding that, where not inconsistent with national
security, collective bargaining in the Foreign Service is "in the public
interest."  22 U.S.C. § 4101.  Rather, the government's construction
simply gives full effect to the statute's exceptions as well as its default
rule.

Plaintiff's construction of the statute would create a significant
vulnerability, preventing the President from excluding every
subdivision of an agency from the provisions of subchapter X even when
necessary for national security.  And, contrary to plaintiff's assertion
(Br. 47-48), the government's construction does not allow the exception
to swallow the rule because the provisions of subchapter X will still
apply to subdivisions unless and until the President makes the

23

determination required under § 4103(b), or if a President ever withdraws that determination.  And the executive order does not exclude from subchapter X Foreign Service members at the Departments of Commerce or Agriculture or the U.S. Agency for Global Media.  *See* JA11.

**b.**  Contrary to plaintiff's assertion (Br. 48), the government need not explain and support the exclusion of each subdivision.  In *AFGE v. Reagan*, the plaintiffs argued that "the courts are the instrumentalities for ensuring that the [§ 7103(b)(1)] authority is properly exercised" and that "the courts must see some proof that [the statutory] prerequisites were satisfied."  870 F.2d at 726.  This Court rejected those arguments, explaining that "Section 7103(b)(1) makes clear that the President may exclude an agency from the [FSLMRS's] coverage whenever he 'determines' that the conditions statutorily specified exist," and the statute "does not expressly call upon the President to insert written findings into an exempting order, or indeed to utilize any particular format for such an order."  *Id.* at 727.  Rather, a bare determination by the President is sufficient to invoke that authority.  Thus, the Court

held that the district court had erred "by mandating a presidential demonstration of compliance with" § 7103(b)(1).  *Id.*

Just as the President need not make written findings supporting the determinations stated in his exclusion order, neither may a court require the government to justify the President's determination in subsequent litigation.  Indeed, there would be no way for a court to inquire into the President's determination other than to subject him to cross-examination or discovery—a process that would plainly be improper.  *See* Opening Br. 38-39; *Webster v. Doe*, 486 U.S. 592, 600 (1988).

Plaintiff criticizes (Br. 49) the government for addressing only two subdivisions of the State Department in its opening brief.  Those subdivisions were discussed as examples of the work performed by the State Department.  *AFGE v. Reagan* makes clear that the government need not justify the executive order subdivision-by-subdivision, and review at that level would engage the courts in a line-drawing exercise that Congress intended be undertaken only by the President.  This Court recognized as much in its stay order.  The Court there explained that "[t]he conduct of diplomatic negotiations, the everyday contact

25

between our State Department officers and foreign nationals, the reports Foreign Service officers in the field submit to Washington, and the planning activities they carry out all have a vital impact on maintenance of our national security"; "the Secretary of State is a member of the National Security Council"; and the Department's mission is to protect and promote U.S. security. *AFSA* Stay Order, 2025 WL 1742853, at *3 (quotation marks omitted). The Court then explained that "[a] more 'searching inquiry' than this would be 'inconsistent with the broad statutory text and the deference traditionally accorded the President in this sphere.'" *Id.* "The President's national-security findings are not agency actions subject to arbitrary-or-capricious review," and this Court should "decline to treat them as such." *Id.*

**c.** Relying on *Cole v. Young*, 351 U.S. 536 (1956), plaintiff argues (Br. 49-50) that Congress must have intended the term "national security" in § 4103(b) to have a narrow meaning. As an initial matter, *Cole* rested on an analysis of the text and legislative history of the particular 1950 Act at issue there, *see Cole*, 351 U.S. at 543-551, and thus is of limited value in construing the Foreign Service Act. In any

26

event, plaintiff overstates *Cole*'s interpretation of the 1950 Act.  Before

the case got to the Supreme Court, this Court rejected an argument

that the President had exceeded his powers under the Act by extending

the authority to conduct summary terminations to the Department of

Health, Education, and Welfare.  *Cole v. Young*, 226 F.2d 337, 339-340

(D.C. Cir. 1955).  The Court explained that "[t]he statute puts the

selection of the agencies to be affected in the hands of the President"

and "says nothing about sensitiveness or policy-making."  *Id.* at 339.

The Supreme Court declined to disturb that ruling, reversing on an

independent ground, and "assum[ing], for purposes of [the] decision,

that the Act ha[d] validly been extended to apply to the Department of

Health, Education, and Welfare."  *Cole*, 351 U.S. at 542; *see* Opening Br.

55-56.  *Cole* thus does not support plaintiff's argument that the

President's national-security-related exclusion authority under

§ 4103(b) extends only to a narrow set of agency subdivisions.

**d.**  Plaintiff likewise fails to refute the President's national-

security determination by identifying (Br. 51-53) limitations in the

labor-relations statutes.  The government does not dispute that the

FSLMRS and subchapter X of the Foreign Service Act contain

27

provisions to protect management prerogatives over certain issues or during emergencies. *See, e.g.*, 22 U.S.C. § 4105(a). But the statutes also give unions the right to bargain over the procedures through which the agency will be managed. And those procedures can create obstacles to agency management that may affect an agency's or subdivision's mission, including at times when the government may not be able to identify a particular emergency that would justify working around the ordinary procedures. Indeed, collective-bargaining agreements are by nature designed to reduce the control of the agency or subdivision over its personnel and operations.

Under the Framework Agreement between plaintiff and the State Department, the Department must postpone operational changes that substantively affect working conditions until it has offered plaintiff an opportunity to bargain. *See* JA57-58; *see also* JA172-175 (USAID). And although the Department may implement changes before the resolution of any dispute in the case of an "emergency," JA57, the agreement does not contain such an exception for non-emergent national-security reasons.

28

Furthermore, the collective-bargaining agreements reduce management control in areas that are critical in agencies with national-security roles. The collective-bargaining agreements afford plaintiff input into numerous aspects of Foreign Service employees' job-related procedures, including assignment procedures, tenure and promotion procedures, agency-level grievance and discipline procedures, and time-in-class and time-in-service rules. *See* JA32. For example, plaintiff has historically negotiated the precepts instructing the Foreign Service Selection Boards on promotion criteria. *See* JA93-148; 3 U.S. Dep't of State, *Foreign Affairs Manual* § 2323.1-1. This has limited the Executive Branch's discretion in determining whom to promote, where to assign employees, and whom to give supervisory responsibilities in subdivisions performing national-security work.

The President could reasonably determine that requiring subdivisions of the State Department and USAID to negotiate over such matters is inconsistent with national-security requirements and considerations. Indeed, in a separate executive order issued earlier this year, the President determined that it was necessary to reform the Foreign Service to implement the United States's foreign policy

29

effectively.  Exec. Order No. 14,211, 90 Fed. Reg. 9,831 (Feb. 18, 2025).

Those reforms will be directed to, among other things, recruiting,

performance, evaluation, and retention standards, as well as revisions

to the Foreign Affairs Manual.  *Id.* § 5, 90 Fed. Reg. at 9,831-9,832.

These reform efforts would be slowed if the agencies had to comply with

the negotiation requirements of collective-bargaining agreements.

Although the Foreign Service Act states that "labor organizations

and collective bargaining in the [Foreign] Service are in the public

interest," it also recognizes a competing public interest in the

"requirement of an effective and efficient Government," 22 U.S.C.

§ 4101.  It is for this reason that Congress gave the President discretion

to exempt certain subdivisions when the President determines that it is

in the interest of national security to do so.  *Id.* § 4103(b).  Congress

provided for the possibility of such exclusions, recognizing that

subchapter X's provisions—including those permitting more agency

discretion in cases of emergency—may be incompatible with the needs

of national security.  It is not for plaintiff or a court to decide whether

subchapter X's provisions adversely impact national security as applied

to any particular agency subdivision.  Rather, Congress entrusted that

30

judgment to the President. *Cf., e.g.*, *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) (en banc) ("[C]ourts are not a forum for reconsidering the wisdom of discretionary decisions made by the political branches in the realm of foreign policy or national security."); *Center for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 932 (D.C. Cir. 2003) ("It is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.").

## II.   PLAINTIFF DID NOT ESTABLISH THAT IT WOULD LIKELY SUFFER IRREPARABLE HARM

As the government has explained (Br. 57-61), plaintiff has not established that it would suffer irreparable harm in the absence of an injunction. Plaintiff contends that employee support for the union will diminish if it is unable to bargain on employees' behalf. But if plaintiff ultimately prevails in this litigation, its status as the exclusive bargaining representative will be confirmed and it can ask the FSLRB to reverse any non-negotiated changes to working conditions. It is speculative to think that Foreign Service members' confidence in plaintiff would not be restored at that point or that employees who may

31

have left the union in the interim would not rejoin.  Plaintiff is "free to explain the difficulties of litigation to its members if they ask why more is not being done sooner."  *East St. Louis Laborers' Loc. 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 704 (7th Cir. 2005).  "And if some members' confidence is shaken, the chance that vindication of the union at [final judgment] would not restore that confidence is too speculative to justify a preliminary injunction."  *Id.*

Plaintiff does not deny that the FSLRB could impose a retroactive remedy.  It worries (Br. 56) that the FSLRB may not impose a retroactive remedy if doing so "would disrupt and impair the efficiency and effectiveness of an agency's operations."  But plaintiff is free to argue for a retroactive remedy in any subsequent FSLRB proceeding, and any concern that plaintiff may not ultimately be entitled to that remedy is entirely speculative.

Plaintiff fares no better in arguing (Br. 57-58) that it faces irreparable financial injury.  As the government explained (Br. 59-61), plaintiff remains free to collect dues directly from its members.  And any interim injury that plaintiff may incur can be fully remedied by the FSLRB, which can order an agency to reimburse a union for any dues

32

not withheld.  *See* Opening Br. 60 (citing cases).  Plaintiff makes no showing beyond its unsupported assertion that any temporary reduction in revenue threatens its very existence.

Plaintiff contends (Br. 57) that the government will be unable to "retroactively withhold dues from the paychecks [of] members who have been laid off in the interim."  While that is true, plaintiff appears to misunderstand the nature of the remedy that the FSLRB can impose.  Where an agency has improperly failed to withhold dues, the FLRA has ordered *the agency* to provide reimbursement to the union; it has not required the agency to retroactively withhold dues from the affected employees.  *See, e.g.*, *U.S. Dep't of Def. Ohio Nat'l Guard & AFGE Loc. 3970*, 71 F.L.R.A. 829, 830 (2020); *U.S. Dep't of the Treasury U.S. Mint & AFGE Mint Council, C-157*, 35 F.L.R.A. 1095, 1100-1102 (1990); *Defense Logistics Agency & AFGE*, 5 F.L.R.A. 126, 131-133 (1981).

## III.  THE BALANCE OF EQUITIES AND PUBLIC INTEREST WEIGH IN DEFENDANTS' FAVOR

Finally, this Court correctly concluded that any injury to plaintiff is outweighed by the injury a preliminary injunction imposes on the government and public interest.  *AFSA* Stay Order, 2025 WL 1742853, at *3.  Notwithstanding the policy judgments that may underlie other

portions of the Foreign Service Act, § 4103(b) reflects a clear congressional intent to permit the President to guarantee the effective operation of agencies as necessary to national security, without the constraints of collective bargaining.

Plaintiff contends that the public interest necessarily favors whichever side has the better argument on the merits, but such reasoning would write the public-interest factor out of the standard for granting a preliminary injunction. *Cf. Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam) ("The purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." (citation omitted)). As this Court has explained, "[t]he district court's preliminary injunction inflicts irreparable harm on the President by interfering with the national-security determinations entrusted to him by Congress." *AFSA* Stay Order, 2025 WL 1742853, at *3. The injunction "ties the government's hands" in determining whether and how to implement the executive order, and "[t]hat transfer of control, from the Executive to the Judiciary," is particularly "problematic … in the national security context, an area in which the

34

President generally enjoys unique responsibility." *NTEU v. Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (per curiam) (quotation marks omitted).

## CONCLUSION

The district court's preliminary injunction should be vacated.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

MELISSA N. PATTERSON
WEILI J. SHAW

 */s/ Joshua M. Koppel*
JOSHUA M. KOPPEL
BENJAMIN T. TAKEMOTO
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7212*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-4820*
  *joshua.m.koppel@usdoj.gov*

October 2025

35

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,484 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Joshua M. Koppel*
Joshua M. Koppel